UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
———————————————————————————

KEVIN DAMION CRICHLOW,

                                          Plaintiff,

                    v.

                                                                    9:17-cv-00194
                                                                    (TJM/TWD)

BRIAN FISCHER, et al.,

                                          Defendants.

———————————————————————————

APPEARANCES:                                          OF COUNSEL:

KEVIN DAMION CRICHLOW
Plaintiff, *pro se*
08-A-3511
Five Points Correctional Facility
Caller Box 119
Romulus, NY 14541

HON. ERIC T. SCHNEIDERMAN                    NICOLE E. HAIMSON, ESQ.
Attorney General of the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

*Pro se* Plaintiff Kevin Damon Crichlow, an inmate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), commenced this action by

filing a complaint pursuant to 42 U.S.C. § 1983 in the Southern District of New York on October

16, 2012. (Dkt. No. 2.) Plaintiff filed an amended complaint, the operative pleading, on June

17, 2013, seeking relief against more than 100 defendants. (Dkt. No. 12.) Plaintiff alleges

violations of the First, Eighth, and Fourteenth Amendments, Title II of the Americans with

Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"), and the Rehabilitation Act of 1973, 29

U.S.C. § 794(a), while confined at Downstate Correctional Facility ("Downstate"), Eastern New

York Correctional Facility ("Eastern"), Auburn Correctional Facility ("Auburn") and Wende

Correctional Facility ("Wende").  On April 28, 2015, the action was transferred to the Western

District of New York.  (Dkt. No. 168.)  Thereafter, on February 21, 2017, Plaintiff's claims

arising from his incarceration at Auburn and Eastern were transferred to this District.  (Dkt. No.

225.)  The Honorable Thomas J. McAvoy, Senior United States District Judge, has referred the

matter to this Court for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and L.R.

72.3(c).

　　　Presently before the Court is Defendants' motion for summary judgment in lieu of an

answer pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 177.)  Plaintiff

has opposed the motion.  (Dkt. No. 209.)  Also before the Court is Plaintiff's motion for

substitution of a party pursuant to Rule 25(a) of the Federal Rules of Civil Procedure.  (Dkt. No.

231.)  For the reasons explained below, it is recommended that the District Court grant summary

judgment to all Defendants, including those who have not been named and/or served, and that

Plaintiff's Rule 25(a) motion be denied as moot.

## I.    PROCEDURAL HISTORY

　　　Plaintiff's original complaint, comprising of 163 pages, was filed in the Southern District

on October 16, 2012, against more than 100 defendants arising from his incarceration at four

DOCCS facilities from 2008 through 2012.  (Dkt. No. 2.)  On March 19, 2013, Plaintiff was

ordered to file an amended complaint that complied with Rules 8 and 10 of the Federal Rules of

Civil Procedure.  (Dkt. No. 6.)  On June 17, 2013, Plaintiff filed an amended complaint seeking

relief against 136 defendants, namely DOCCS employees and medical providers, arising from

his confinement at Downstate, Auburn, Eastern, and Wende. (Dkt. No. 12.) On February 13,

2015, the Southern District Court *sua sponte* dismissed numerous defendants and ordered

Plaintiff to show cause why the case should not be transferred to the Western District of New

York. (Dkt. No. 164.) On April 28, 2015, the action was transferred to the Western District.

(Dkt. No. 168.)

On November 20, 2015, Defendants filed a motion for summary judgment in lieu of an

answer, arguing all claims were time-barred, unexhausted, vague, or due process claims that did

not implicate a liberty interest. (Dkt. No. 177-5.) Plaintiff initially responded with an opposition

totaling more than 900 pages with exhibits, and Defendants filed a reply. (Dkt Nos. 188 and

189.) Thereafter, Plaintiff was granted permission to file an amended opposition to Defendants'

motion. (Dkt. Nos. 192 and 198.) Plaintiff filed his amended opposition, totaling more than 200

pages with exhibits. (Dkt. No. 209.) Defendants filed a reply to Plaintiff's amended opposition.

(Dkt. No. 210.) Without obtaining permission from the Court, Plaintiff filed a sur-reply, along

with numerous exhibits that it appears Plaintiff inadvertently failed to file with his amended

opposition. (Dkt. No. 211.)

On February 10, 2017, Western District Judge Elizabeth A. Wolford severed the action

into three separate actions based upon the location where each claim allegedly arose, transferred

those claims arising in the Southern and Northern Districts, and retained the claims arising in the

Western District. (Dkt. No. 223.[1]) On February 21, 2017, Plaintiff's claims arising during his

---

[1]  At the time of the severance and transfer, Judge Wolford noted that there were a number of
pending motions, including Defendants' fully brief motion for summary judgment. (Dkt. No.
No. 223 at 7-8.) Judge Wolford left the transferee courts in the Northern and Southern District to
decide whether to grant the pending motions vis-à-vis those Defendants and claims transferred to
each of them. *Id*.

confinement at Auburn and Eastern were transferred to this District.  (Dkt. No. 225.)  On April

26, 2017, Senior Judge McAvoy severed and transferred all claims arising at Wende that were

mistakenly transferred to this District back to the Western District, Case Number 6:15-CV-6252.

(Dkt. No. 228.)

Remaining Defendants in this action are Corrections Officer ("C.O.") Daniel Bauer, C.O.

Christopher Clarke, Dr. Mikhail Gusman, RN Denise Falzon, Nurse II Ellenjane Aversano, Dr.

Ann L. Andola, Lieutenant ("Lt.") Karl Simmons, Senior Counselor Thomas Briggs, C.O.

Donielle Allison, C.O. Kevin Rosa, Counselor Ariel Escobar, C.O. Jill Friedman, C.O. Kelly

Jamil, Captain Anthony Russo, Acting Superintendent Rosemarie Wendland, C.O. Jeffrey

Brewer, C.O. Merrill Conner, Sergeant ("Sgt.") Daniel Parkhurst, C.O. Scott Navitsky, Lt.

Edward Madison, D.M.D. Marlon K. Moore, C.O. Nathan Vevone, Sgt. Berndt J. Leifeld, Nurse

LaPenna, and Dr. Jeffrey Arliss.  (Dkt. No. 227.)

## II.    BACKGROUND

### A.    Plaintiff's Allegations

At all times relevant to this action, Plaintiff was incarcerated at Auburn and Eastern.

(Dkt. Nos. 12, 223, and 225.[2])  Generally, Plaintiff alleges violations of his constitutional and

statutory rights under the First, Eighth, and Fourteenth Amendments, the ADA, and

Rehabilitation Act while confined at Auburn and Eastern from November 16, 2010, through

February 16, 2012.  (*See generally* Dkt. No. 12.)  For a complete statement of Plaintiff's claims

related to Auburn and Eastern, reference is made to Plaintiff's amended complaint.

---

[2]  Plaintiff's amended complaint spans 137 pages.  (Dkt. No. 12.)  Plaintiff's claims relating to
Auburn and Eastern are set forth in Dkt. No. 12-1 at ¶¶ 71-147 and Dkt. No. 21-2 at ¶¶ 148-202.

1.      Auburn

On November 16, 2010, Plaintiff was transferred from Wende to Eastern.  (Dkt. No. 12-1 at ¶ 71.)  Plaintiff's transfer route stopped at Auburn for 72 hours.  *Id*.  While confined at Auburn, Plaintiff alleges he was verbally threatened and denied medical care.  *Id*.  Specifically, on November 19, 2010, at 8:00 a.m., while in the first floor transfer area Plaintiff was threatened by C.O. Clarke to "give up" his medical wrist brace "or get beat up."  *Id*.  C.O. Clark took Plaintiff's wrist brace, causing "more damages" to Plaintiff's wrist.  *Id*.  Plaintiff was without a wrist brace for approximately six weeks.  *Id*.

2.      Eastern

a.      *Medical Indifference Claims*

Plaintiff alleges inadequate or nonexistent medical care, and claims he was treated "unprofessionally" because of his race, ethnicity, weakened immune system, and hearing disability.  *Id*. at ¶¶ 75-76.  Specifically, in December 2010, Plaintiff alleges he was denied dental care, pain medication, and batteries for his hearing aid.  *Id*. at ¶¶ 76-77.  On December 13, 2010, Plaintiff was denied pain medication and emergency dental treatment.  *Id*. at ¶ 77.  Although x-rays revealed Plaintiff has two cavities in February 2011, and he was in extreme pain, Plaintiff was denied emergency extraction and was forced to wait several months for dental extractions.  *Id*. at ¶ 101, 105.  Plaintiff was also denied a "soft food diet or Ensure" even though he had difficulty eating.  *Id*. at ¶ 103.

On April 18, 2011, Dr. Arliss operated on Plaintiff's wrist at Foxhall Ambulatory Surgery Center, which took much longer than planned.  *Id*. at ¶ 124.  Thereafter, on August 3, 2011, "a pin came out of the bottom" of Plaintiff's right wrist.  *Id*. at ¶ 152.  Although Plaintiff was taken to the facility's hospital, Plaintiff claims he should have been transported immediately to Dr.

5

Arliss.  *Id*.  Plaintiff alleges he was in extreme pain for over thirty-one hours and received inadequate and negligent medical care at the facility's hospital before he was transported to an outside facility to have Dr. Arliss remove the broken pin.  *Id*.

On October 21, 2011, Plaintiff was denied medical treatment after a use of force incident. *Id*. at ¶ 194.

                    b.        *Conditions of Confinement Claims*

Plaintiff also brings conditions of confinement claims while confined to keeplock on the S.D.U. Block and in the Segregated Housing Unit ("SHU").  Plaintiff claims he was denied showers and recreation, laundry services and clean linen, special religious meals, personal hygiene products, fresh drinking and bathing water, commissary, and legal supplies.  Plaintiff alleges senior officials were all aware and tolerated these unconstitutional practices by subordinate employees.  *Id*. at ¶ 91.

Specifically, Plaintiff claims from January 12, 2011, through January 31, 2011, and from February 3, 2011, through February 5, 2011, while on keeplock, he was denied medical care, batteries for his hearing aids, recreation, showers, medical sick calls, and religious meals in retaliation for filing grievances against C.O. Jamil, C.O. Friedman, and C.O. Brewer.  *Id*. at ¶¶ 81-84, 90-91, 140.  On January 14, 2012, C.O. Friedman denied Plaintiff toilet paper and soap. *Id*. at ¶ 84.  On January 24, 2011, and January 25, 2011, C.O. Allison denied Plaintiff outside exercise and fresh air because it was "to [sic] cold."  *Id*. at ¶ 87.  C.O. Friedman and C.O. Jamil routinely denied Plaintiff recreation if he attended a "medical call out" in retaliation for filing grievances against them.  *Id*. at ¶¶ 113, 114.

On March 6, 2011, Plaintiff claims he was discriminated against due to his disability and was subject to inhumane conditions of keeplock confinement for fifty-eight days.  *Id*. at ¶ 106.

While keeplocked, Plaintiff claims he was denied laundry and clean linens "at least once a week" in violation of DOCCS Directives. *Id*. Plaintiff also was denied a "commissary buy sheet." *Id*. Plaintiff claims he was denied soap, shampoo, deodorant, stationary supplies, adequate nutrition, clothing, shelter, sanitation, medical care, and personal safety. *Id*. at ¶ 107.

On March 3, 2011, C.O. Friedman told Plaintiff "if you go to a call out that would be considered your keeplock rec." *Id*. at ¶ 113. On March 7, 2011, C.O. Friedman refused to let Plaintiff wash his laundry or change his sheets on his "meds run." *Id*. at ¶ 108. On March 25, 2011, after attending a medical call out, C.O. Friedman denied Plaintiff recreation and told Plaintiff that his "medical call out" was his "keeplock rec." *Id*. at ¶ 114. Plaintiff claims he was denied recreation in retaliation for filing grievances. *Id*. Plaintiff also claims he was "always" denied outdoor exercise and fresh air. *Id*. at ¶ 113.

On April 14, 2011, Plaintiff claims Defendant C.O. Brewer threatened to extend his keeplock because he requested to speak to the block sergeant about his housing conditions. *Id*. at 123. Plaintiff claims he was denied packages on May 16, 2011. *Id*. at ¶¶ 133-34. On July 27, 2011, Plaintiff claims he was deprived of fresh drinking water. *Id*. at ¶ 141.

From July 28, 2011, through November 13, 2011, Plaintiff was subjected to excessive noise from other inmates yelling and "banging" in their cells. *Id*. at ¶ 147. Throughout September 2011, Plaintiff alleges he was exposed to "infectious diseases" and forced to live in unsanitary and unhygienic conditions with rusty brown water. *Id*. at 175. Due to a maintenance error, Plaintiff's cell flooded on October 6, 2011. *Id*. at ¶ 184.

Regarding his food, Plaintiff alleges C.O. Jamil and C.O. Friedman "tampered" with his religious meals and deprived Plaintiff of adequate nutrition by failing to provide Plaintiff with the carton of milk included with his meals. *Id*. at ¶ 114. Further, while confined to keeplock,

C.O. Friedman and C.O. Jamil would often delay his first meal by over two hours. *Id*. at ¶ 85. On May 24, 2011, C.O. Friedman and C.O. Jamil deprived Plaintiff of his "Jewish kosher breakfast." *Id*. at ¶ 131. That same day, Plaintiff was deprived commissary and was not provided with toothpaste, deodorant, soap, shampoo, and legal postage. *Id*. at ¶ 132. Throughout September and October of 2011, Plaintiff also claims he was given the "wrong food" on numerous occasions and therefore was deprived of his religious meals. *Id*. at ¶¶ 177, 178, 180. Plaintiff was denied Jewish food and commissary on October 4, 2011 and October 5, 2011. *Id*. at ¶ 183.

c.    *Excessive Force Claims*

Plaintiff alleges he was subjected to excessive force on October 21, 2011. *Id*. at ¶¶ 188-91. At approximately 3:30 p.m., on the way to the evening "meds run," C.O. Navitsky asked Plaintiff for his identification care and medical card. *Id*. at ¶¶ 187-88. Plaintiff explained that he did not have a medical card because he had only been released from the SHU a few hours prior. *Id*. at ¶ 188. C.O. Navitsky instructed Plaintiff to "sit the fuck down." *Id*. Plaintiff waited for approximately fifteen minutes and then requested to return to his housing unit. *Id*. C.O. Navitsky stated in a very loud voice, "what are you fucking dumb or are you deaf too[?]" *Id*. Plaintiff sat back down. *Id*. Ten minutes later, Plaintiff told C.O. Navitsky he was going to miss evening chow. *Id*. C.O. Navitsky stated, "I'm going to fucking kill you." *Id*. at ¶ 189. C.O. Navitsky left the area and returned with a "black hammer mallet." *Id*. at ¶¶ 189-90. Thereafter, C.O. Navitsky struck Plaintiff with a "black hammer mallet" and C.O. Wilson punched Plaintiff on the right side of his head. *Id*. at ¶ 190; Dkt. No. 12 at ¶ 5. Plaintiff states he was hit on the right side of his head, body, hand, and hip. (Dkt. No. 12-1 at ¶ 190.) After the assault, C.O. Navitsky and C.O. Wilson started screaming, ran into the control room, and pressed a button. *Id*.

A response team arrived and Plaintiff was escorted to his cell, and approximately two hours later, to the SHU. *Id*. at ¶ 191. The next day, Plaintiff was issued an inmate misbehavior report, charging Plaintiff with violet conduct, harassment, refusing a direct order, threat, being out of place, and noncompliance. *Id*.

> ### d.    Due Process Claims

Plaintiff also raises Fourteenth Amendment due process claims. *Id*. at ¶¶ 77-80, 86, 89, 100, 117, 119, 120, 161-66, 193. Plaintiff claims his due process rights were violated when he was denied witnesses during disciplinary hearings and sentenced to keeplock and subjected inhumane conditions of confinement. *Id*. at ¶¶ 77-80. On January 12, 2011, Plaintiff alleges he was denied witnesses that would have proven his innocence. *Id*. at ¶ 86. On February 11, 2011, during a Tier II disciplinary hearing, Lt. Simmons sentenced Plaintiff to 60 days of keeplock for refusing his programs even though the maximum penalty was 30 days under DOCCS directive. *Id*. at ¶ 89.

On February 24, 2011, Plaintiff was sentenced to "30 more days" without due process after being found guilty of "obstruction." *Id*. On April 1, 2011, Lt. Simmons denied Plaintiff an inmate witness, and sentenced Plaintiff to an additional 30 days of keeplock for contraband. *Id*. at ¶ 117. During the April 1, 2011, disciplinary hearing, Plaintiff told Lt. Simmons he was being denied packages and was "not getting" showers, commissary, and recreation. *Id*. On April 2, 2011, Lt. Simmons found Plaintiff guilty of refusing a direct order, and added 30 days of keeplock. *Id*. at ¶ 120. Lt. Simmons told Plaintiff that DOCCS was getting "rich" from all of the $5.00 surcharges related to Plaintiff's misbehavior reports. *Id*.

On August 6, 2011, while housed in the medical clinic following his wrist surgery, Plaintiff was summoned to a disciplinary hearing even though he had not been issued an inmate

misbehavior report twenty-four hours in advance. *Id*. at ¶ 161.  At the hearing, Lt. Madison

provided Plaintiff with a copy of a false July 27, 2011, inmate misbehavior report. *Id*. at ¶¶ 161-

62.  Lt. Madison threatened Plaintiff with physical harm for objecting to the late notice. *Id*. at ¶¶

163-64.  During the hearing, Plaintiff was denied a witnesses and was found guilty of DOCCS

violation 102.10 (threats). *Id*. at ¶ 164.  Plaintiff was sentenced to 120 days in the SHU with a

corresponding loss of privileges. *Id*. at ¶ 165.

On November 12, 2011, at the disciplinary hearing related to the October 22, 2011, use of

force incident, Plaintiff was found guilty of "being out of place." *Id*. at ¶ 193.  Plaintiff alleges

the involved parties conspired to cover up the use of force incident, thereby depriving Plaintiff of

his due process rights. *Id*.

### e.    *Access to Courts*

Plaintiff also claims he was denied the opportunity to access the courts.  On March 29,

2011, C.O. Vevone searched Plaintiff's cell for over three hours, while making sexual and

derogatory comments to Plaintiff. *Id*. at ¶ 110.  During this search, C.O. Vevone found a

blueprint of Eastern, which was an exhibit to Plaintiff's *coram nobis* petition. *Id*. at ¶¶ 110-11.

Plaintiff was charged with "contraband" and denied his exhibit. *Id*.

On or about November 10, 2011, while confined in the SHU, Plaintiff gave unknown

officers legal mail to be sent to the Southern District, in Action No. 11 Civ. 833. *Id*. at ¶ 197.

Instead of mailing Plaintiff's legal documents to the Southern District, DOCCS destroyed his

amended pleading. *Id*. at ¶ 198.

### f.    *Reasonable Accommodation Claims*

Plaintiff argues Defendants failed to provide reasonable accommodations for his hearing

disability.  Plaintiff alleges on December 13, 2010, Nurse Aversano denied Plaintiff batteries for

10

his hearing aids, thereby forcing Plaintiff to "get batteries from other inmates." *Id*. at ¶ 77. From April 18, 2011, through April 25, 2011, C.O. Jamil, C.O. Brewer, and C.O. Friedman refused to escort Plaintiff to the package room, thereby denying Plaintiff two packages containing reading material for his "reasonable accommodation" to learn sign language. *Id*. at ¶ 127. On August 8, 2011, Plaintiff was deprived of a typewriter, even though he was issued a permit. *Id*. at ¶ 135. Plaintiff also alleges he was denied his "shake awake" alarm and batteries for his hearing aid while he was recovering from his second wrist surgery. *Id*. at ¶ 159.

g.      *Retaliation and Conspiracy Claims*

Plaintiff alleges all of the above conduct was in retaliation for filing grievances and lawsuits. *Id*. at ¶ 166. Plaintiff also alleges Defendants conspired to cover up evidence of the above conduct. *Id*. at ¶ 112. Lastly, Plaintiff alleges he was transferred from Eastern to Wende on February 16, 2012, in retaliation for filing grievances. *Id*. at ¶ 166.

**B.      Parties' Briefing on Defendants' Motion for Summary Judgment**

In their pre-answer motion for summary judgment, Defendants maintain that Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 177-5 at 4-6.[3]) In that regard, Defendants argue Plaintiff only exhausted a single grievance relevant to this action. *Id*. In that grievance, Plaintiff complained of the conditions of his keeplock confinement at Eastern, stating he was being denied laundry, soap, shampoo, deodorant, and writing papers. *Id*. at 6-7. Defendants contend such claims do not give rise to an Eighth Amendment conditions of confinement claim. *Id*. Defendants also contend Plaintiff's generalized allegations in that grievance, to the effect that he faced discrimination based on a disability, and was denied

---

[3] Page references to documents identified by docket number are to the page assigned by the Court's electronic filing system.

adequate nutrition, clothing, shelter, medical care, and security while keeplocked, failed to provide Defendants with enough information to rectify the problem at the administrative level, and therefore, is also unexhausted. *Id*. at 7.

In his opposition to Defendants' motion, Plaintiff claims, among other things, that he exhausted his administrative remedies by filing over 300 grievances and by complaining to supervisory prison officials and Commissioner Fischer. (Dkt. Nos. 209-3 at 7 and 211 at 1.) Plaintiff further argues his grievances and appeals were lost, destroyed, or ignored by prison officials and DOCCS. *Id*. As to his conditions of confinement claim, Plaintiff explains he had been keeplocked for fifty-eight days and was deprived of his "basic human needs," such as showers and recreation. (Dkt. No. 209-2 at 21.)

## III.    LEGAL STANDARD

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, "a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). "The standard for granting summary judgment is the same whether the motion is made in lieu of an answer or after discovery has occurred." *Crichlow v. Fischer*, No. 6:15-cv-06252 EAW, 2017 WL 920753, at *3 (W.D.N.Y. Mar. 7, 2017[4]) (citing *Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 206 (2d Cir. 2003)).

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of

---

[4] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

"To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id*. (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14

13

F.3d 787, 790 (2d Cir. 1994).  However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## IV.    DISCUSSION

### A.    Exhaustion of Administrative Remedies

#### 1.    Legal Standard

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  This rule applies to an inmate's constitutional claims, as well as claims under the ADA and Rehabilitation Act.  *Carlson v. Parry*, No. 06-CV-6621P, 2012 WL 1067866, at *12 (W.D.N.Y. Mar. 29, 2012) (ADA and Rehabilitation Act claims "must be exhausted administratively prior to raising them in federal court"); *Carrasquillo v. City of N.Y.*, 324 F. Supp. 2d 428, 442 (S.D.N.Y. 2004) (ADA and Rehabilitation Act claims "fall within the rubric of 'any other federal law.'").

In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined.  *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96

(2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly").

In New York state prisons, DOCCS has a well-established three-step Inmate Grievance Program ("IGP").  N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5 (2013). Generally, the DOCCS IGP involves the following procedure for the filing of grievances.  First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence.  *Id*. § 701.5(a).  A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue.  *Id*. § 701.5(b)(1).  If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id*. § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing.  *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision.  *Id*. § 701.5(c)(1).  If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal.  *Id*. § 701.5(c)(3)(ii).  Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step.  *Id*. § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision.  *Id*. § 701.5(d)(1)(i).  CORC is to render a written decision within thirty calendar days of receipt of the appeal.  *Id*. § 701.5(d)(3)(ii).

Grievances claiming employee harassment "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent.[5]  *Id*. § 701.8.  The superintendent is required to initiate an in-house investigation by higher ranking supervisory personnel; request an investigation by the inspector general's office; or request an investigation by the New York State Police Bureau of Investigation if the superintendent determines that criminal activity may be involved.  *Id*. § 701.8(d).  A grievance referred to the superintendent and determined to be an allegation of harassment, may not be withdrawn and must be addressed by the superintendent. *Id*. § 701.8(d).  The superintendent is required to render a decision on the grievance within twenty-five calendar days, and extensions may be granted only with the consent of the grievant. *Id.* § 701.8(f).  If the superintendent fails to respond within the required twenty-five days, the grievant may appeal the grievance to CORC by "filing a notice of decision to appeal (form #2133) with the inmate grievance clerk."  *Id.* § 701.8(g).

If a prisoner has failed to properly follow each of the applicable steps, including receipt of a decision from CORC prior to commencing litigation, he has failed to exhaust his administrative remedies and is barred from commencing a federal lawsuit.  *Woodford*, 548 U.S. at 93.

Because failure to exhaust is an affirmative defense, the defendant bears the burden of showing by a preponderance of the evidence that the plaintiff has failed to exhaust administrative remedies.  *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *4 (N.D.N.Y. Mar. 31, 2010); *Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254,

---

[5]  Section 701.8 has been found applicable to claims of excessive force.  *See, e.g.*, *Torres v. Carry*, 691 F. Supp. 2d 366 (S.D.N.Y. 2009).

at *6 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving

its elements by a preponderance of the evidence).

Whether a plaintiff has exhausted his administrative remedies is a question of law.

*Snider v. Melindez*, 199 F.3d 108, 113-14 (2d Cir. 1999).  Thus, an inmate's failure to exhaust

administrative remedies is properly considered on a motion for summary judgment in lieu of an

answer.  *Crichlow v. Fischer*, No. 6:15-CV-06252 EAW, 2017 WL 920753, at*5 (W.D.N.Y.

Mar. 7, 2017) (citing *Mckinney v. Prack*, 170 F. Supp. 3d 510, 514 (W.D.N.Y. 2016) (granting a

motion for summary judgment made in lieu of an answer where inmate failed to exhaust

administrative remedies)); *see also Crichlow v. Crowley*, No. 13-CV-6624 CJS, 2015 WL

1808626, at *6-7 (W.D.N.Y. Apr. 21, 2015) (same); *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236

(W.D.N.Y. 2010) (same).

### 2.    Analysis

Defendants contend summary judgment should be granted because Plaintiff failed to

comply with the administrative exhaustion requirement of the PLRA.  (Dkt. No. 177-5 at 4-7.)

In support of their motion, Defendants have submitted the declaration of Jeffery Hale, Assistant

Director of DOCCS IGP.  (Dkt. No. 177-3.)  In that capacity, Hale is a custodian of the records

maintained by CORC.  *Id*. at ¶ 1.  The CORC computer database contains records of all appeals

received from the facility IGP offices and which were heard and decided by CORC since 1990.

*Id*. at 2.  These grievances are referred to as "exhausted."  *Id*.

Hale declares that he has reviewed the records for all grievances appealed to CORC by

Plaintiff from his incarceration in 2008, through commencement of this action in October 2012.

*Id*. at ¶¶ 3-4.  In total, Plaintiff exhausted twenty-seven grievances to CORC, only one of which

is relevant to this action.  *See id*. at 5-7.

17

On March 14, 2011, Plaintiff filed a six-page grievance dated March 6, 2011, assigned

Grievance No. ECF-24381-11:

> I'VE BEEN ON KEEPLOCK FOR 58 DAYS I'M BEING
> DISCRIMINATED AGAINST CAUSE OF MY HARD
> HEARING HL20 HEARING LOSS DEPRIVED OF THE
> OPPORTUNTIY FOR LAUNDRY SERVICES ALSO TO
> PROVIDE CLEAN CHANGE OF CLOTHING OR SHEETS AT
> LEAST ONCE A WEEK IN ACCORDANCE WITH ITS OWN
> DOCS ALSO COMMISARY BUYSHEET FOR KEEP LOCK
> INMATES NO SOAP SHAMPOO OR DEODORANT OR
> LEGAL PAD OR PENS TO DO LAW WORK ALSO STAMPS,
> AND HAD INSUFFICIENT HEALTH & HYGIENE SUPPLIES,
> I CRICHLOW WAS DEPRIVED OF THESE BASIC HUMAN
> NECESSITIES.  AND ITS EFFECTS INCLUDING
> INADQEUATE NUTRITION, CLOTHING, SHELTER,
> SANITATION, MEDICAL CARE, AND PERSONAL SAFETY,
> AND CAUSE GENUINE DEPRATION AND HARDSHIP OVER
> AN EXTENDED PERIORD OF TIME.  FOR I, CRICHLOW,
> SUCH HARSH CONDITIONS & RESTRICTIONS ARE
> INCOMPATIBLE WITH CONTEMPROARY STANDARDS OF
> DECENCY, CAUSE WANTON AND UNNECESSARY
> INFLICTION OF PAIN, AND ARE NOT REASONABLY
> RELATED TO ANY LEGITIMATE PENOLOGICAL
> OBJECTIVES.  AS A RESULT OF THE FORGOING, I,
> CRICHLOW OF B-3-32-25 S.D.U., WAS SUBJECTED TO
> CRUEL AND UNUSUAL PUNISHMENT IN VIOALTION OF
> THE EIGHTH AMENDMENT AND FORTHEENTH
> AMDNENDMNT.  ALSO IN VIOLATION OF THE F.R.A. 1973
> & A.D.A. OF 1990.
>
> ALSO TODAY OFFICER FREEMAN REFUSED TO LET ME
> WASH CLOTHING 3,7,2011 OR CHANGE MY SHEET THIS
> BEEN GOING ON FOR OVER 2 WEEKS BY OFFICERS
> WORKING 7 TO 3 TOUR IN S.D.U., THE EFFECT OF ALL
> ABOVE THESE DEPRIVATIONS WAS ONLY
> COMPOUNDED, BY THE UNSANITARY LIVING
> CONDITIONS ALSO VERY UNHEALTHY TO ME WITH MY
> FRAGILE HEALTH CONDITION.
>
> I KNOW NEXT 7 TO 3 FEMALE OFFICERS ARE GOING TO
> SAY I TRY TO BRUTAL ATTACKS THEM OR PUT A GUN
> IN MY CELL OR SET ME UP.  ALSO MIGHT SAY I'LL
> THREATING HER SO I BE PUT IN S.H.U. ALSO ON 3,8,2011 I

18

> TALK TO DEPUTY ABOUT NOT GETTING NONE OF THE
> ABOVE TIME 10:00 AM ALSO ABOUT OFFICER FREEMAN.

(Dkt. No. 177-4 at 12-17 (original unaltered text).)

On April 8, 2011, the Superintendent found "no merit" to Plaintiff's grievance:

> Grievant alleges harassment by security staff regarding his
> clothing, laundry, medical, and toiletries.  The involved staff have
> taken the appropriate steps to explain how keeplocked inmates
> receive services including recreation, medical, laundry, etc.  The
> grievant has failed to follow staff direction.  As a result, the
> grievant has misbehavior reports pending resolution.  Grievant
> must follow staff direction.  Staff direction should not be viewed as
> harassment.  Grievance has no merit."

*Id.* at 18.

In his appeal statement to CORC, Plaintiff alleged: "OFFICER FREEMAN & OFFICER

JAHMEL ARE NOT LET ME OUT FOR SHOWER OR RECRECATION AND WHEN I GO

TO MEDS RUN THEY SAYING THAT MY REC AND SHOWER."  *Id.* (original unaltered

text).

On June 15, 2011, CORC upheld the Superintendent's decision for the reasons stated.  *Id.*

at 9.  In addition:

> CORC notes that that the facility administration has conducted a
> proper investigation, and that sufficient evidence has not been
> presented to substantiate that the grievant was denied appropriate
> hygiene items, medical treatment, meals, or laundry services.
> CORC notes that keeplock inmates are permitted to purchase soap,
> shampoo, deodorant and stamps from the commissary.  Further,
> CO F . . .  indicates that she observed the grievant several times
> attempting to wash his clothing in the slop sink on the way to
> medication.  CORC notes that in accordance with facility P&P 639
> Section VI.B.1. laundry services for B/3 are conducted on
> Wednesday mornings.  CORC advises him to follow facility P&P
> regarding laundry procedures in order to avoid future similar
> difficulties.  . . .  With respect to the grievant's appeal, CORC
> asserts that all relevant information must be presented at the time
> of filing in order for a proper investigation to be conducted at the

19

facility level.

*Id.*

As such, Defendants seek summary judgment on all claims that were not raised in

Grievance No. ECF-24381-11.  (Dkt. No. 177-5 at 4-6.)

In his opposition, Plaintiff claims he has filed over 300 grievances, and seems to suggest

that this is sufficient to exhaust his administrative remedies.  (Dkt. No. 209-3 at 8.)  Plaintiff

misunderstands the exhaustion requirement.  The filing of a grievance is but the first step in

exhausting administrative remedies.  To exhaust DOCCS administrative remedies, a prisoner

must appeal to CORC.  *See Woodford*, 548 U.S. at 93.  "Plaintiff's filing of 300 grievances, even

if true, is insufficient to exhaust his remedies under the PLRA."  *See Crichlow v. Fischer*, 2017

WL 920753, at 5.

Plaintiff has also suggested alternative means to exhaust administrative remedies, all of

which have been previously rejected by the Western District.  *Crichlow v. Crowley*, 2015 WL

1808626, at *5-6 (granting summary judgment and dismissing Plaintiff's First, Eighth, and

Fourteenth Amendment claims, and ADA and Rehabilitation Act claims without prejudice for

failure to exhaust administrative remedies).  For example, Plaintiff argues that his claims should

be deemed exhausted when the Inspector General "takes over" and investigates a claim.  (Dkt.

No. 209-3 at 9.)  Plaintiff also claims he exhausted his administrative remedies by "filing out-

side grievances" and complaining to Commissioner Fischer, wardens, and senior staff.  *Id.* at 7.

Lastly, Plaintiff contends inmates do not have to exhaust "favorable" determinations to CORC.

*Id.* at 44.  The Court also finds Plaintiff's contentions to be meritless.

Indeed, "the law is clear that prisoners 'cannot satisfy the PLRA's exhaustion

requirement solely by . . . making informal complaints to prison staff.'"  *Khudan v. Lee*, No. 12-

cv-8147 (RJS), 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016) (quoting *Macias v. Zenk*, 495

F.3d 37, 44 (2d Cir. 2007)); *see also Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017

WL 2791063, at *4 (N.D.N.Y. May 9, 2017) ("such correspondence does not satisfy exhaustion

and falls outside of the grievance procedures.").  Furthermore, contrary to Plaintiff's contention,

an investigation conducted by the Inspector General regarding an inmate's claim does not

exhaust nor excuse the inmate from exhausting his grievance to CORC.  *See Dabney v. Pegano*,

604 F. App'x 1, 4 (2d Cir. 2015) ("The [Inspector General's] of [the inmate's] claims does not

constitute such a special circumstance [excusing exhaustion].").

    Based upon the foregoing, the Court finds Defendants have adequately supported the

affirmative defense of non-exhaustion as to all claims not addressed in Grievance No. ECF-

24381-11.  However, as recognized by the Supreme Court in *Ross v. Blake*, a finding of failure to

exhaust does not end a court's exhaustion review because "the PLRA contains its own, textual

exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1588 (2016).[6]

    Under the PLRA, "the exhaustion requirement hinges on the 'availab[ility]' of

administrative remedies: An inmate, that is, must exhaust available remedies, but need not

exhaust unavailable ones." *Id*.  Thus, courts are tasked with determining whether or not a

_____

[6] Not long after the parties filed their briefs, the Supreme Court rejected the "special
circumstances" exception to mandatory exhaustion applied by many circuits and held that
"[c]ourts may not engraft an unwritten 'special circumstance' onto the PLRA's exhaustion
requirement." *Ross*, 136 S. Ct. 1850, 1862 ("mandatory exhaustion statutes like the PLRA
establish mandatory exhaustion regimes, foreclosing judicial discretion"); *see also Williams v.
Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (*Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004)
and *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004) have been abrogated by *Ross* to the extent
those decisions established the "special circumstances" exception from the exhaustion of
administrative remedies requirement in the PLRA).  As the Second Circuit explained in
*Williams*, "*Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely
within the context of whether administrative remedies were actually available to the aggrieved
inmate." *Williams*, 829 F.3d at 123.

prisoner's administrative remedies are, in fact, "available." The Supreme Court found the ordinary meaning of the word "available" to be "'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 737-38 (2001)). "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (citation omitted).

To guide courts in this analysis, the Supreme Court identified "three kinds of circumstances" in which an administrative remedy, "although officially on the books," is not "available."[7] *Id.* at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. *Id.* "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.'" *Id.* Finally, an administrative remedy is not available "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

In response to Defendants' assertion that Plaintiff failed to exhaust his administrative remedies for all claims not addressed in Grievance No. ECF-24381-11, Plaintiff claims that DOCCS lost or destroyed his grievances. (Dkt. No. 209-3 at 19 (claiming that DOCCS

---

[7] In a footnote in *Williams*, the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive, given the Court's focus on three kinds of circumstances that were 'relevant' to the facts of the case." 829 F.3d 118, 123 n.2. Because the same three circumstances were relevant to the PLRA exhaustion issue in *Williams*, the Second Circuit did not "opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use." *Id.*

22

destroyed meritorious grievances); *see also* Dkt. No. 211 at 1.)  Western District Judge Wolford rejected this argument in Case No. 6:15-CV-06252, finding that "Plaintiff's wholly conclusory and unsupported allegation that grievances are tampered with at Wende do not create a material issue of fact in this case."  *Crichlow v. Fischer*, 2017 WL 920753, at *6 (quoting *Mims v. Yehl*, Nos. 13-CV-6405-FPG, 14-CV-6304-FPG, 14-CV-6305-FPG, 2014 WL 4715883, at *4 (W.D.N.Y. Sept. 22, 2014)).  This Court also finds that Plaintiff's general claim of grievance tampering at Eastern fails to create a material issue of fact in this action.

Indeed, "[c]ourts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations."  *Rodriguez v. Cross*, 2017 WL 2791063, at *7 (citing *Khudan*, 2016 WL 4735364, at *6 (citations omitted) (holding under *Ross*, mere "stand alone" accusations that prison officials routinely interfered with his attempts to file grievances are "insufficient" to withstand summary judgment)); *see also Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (granting summary judgment where the plaintiff claimed prison officers misplaced his grievances but offered no evidence to support his contention) (citing *Nunez v. Goord*, 172 F. Supp. 2d 417, 428 (S.D.N.Y. 2001) (inmate's unsupported claims that his grievances were lost or destroyed by officers thereby rendering his attempts to grieve futile, fails to excuse inmate from fully grieving remedies)); *Rosado v. Fessetto*, No. 9:09-cv-67 (DNH)(ATB), 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010) ("Courts have consistently held . . . that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *adopted by* 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010).

In his sur-reply, Plaintiff claims in conclusory fashion that Captain Russo and Acting Superintendent Wendland "conspired" with other staff at Eastern to "destroy" Grievance Nos.

23

ECF-242710-10, ECF-24275-10, ECF-24281-10, and ECF-24287-10, so as to "cover-up their

own misconduct." (Dkt. No. 211 at 19.) Plaintiff speculates that because only one grievance

was appealed to CORC while he was confined at Eastern (ECF-24381-11), all of his grievances

must have been destroyed by DOCCS. However, as set forth above, "[c]onclusory allegations,

conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer*, 156

F.3d at 400.

Plaintiff has also challenged the veracity of Hale's declaration. (Dkt. No. 209-3 at 8, 16-

17.) Specifically, Plaintiff contends Hale's declaration is "inadequate" because several

grievances are "missing" from CORC's records and thus omitted from Hale's declaration and

attached exhibits, including Grievance Nos. ECF-24713-11, ECF-24515-11, ECF-24607-11,

ECF-24622-11 and ECF-24782-11. (Dkt. No. 209-3 at 8.) However, as set forth in Hale's

declaration, "[t]he CORC computer database contains records of all appeals received from the

facility Inmate Grievance Program Officers *and* which were heard and decided by CORC since

1990. (Dkt. No. 177-3 at ¶ 2 (emphasis added).) The five grievances Plaintiff claims were

omitted from Hale's declaration do not bear the Grievance Clerk's Signature. (*See* Dkt. No. 211-

1 at 18, 27, 28, 29, 30.)

Lastly, to the extent Plaintiff relies on *Hemphill* and *Giano* to argue "special

circumstances" justify and excuse his failure to comply with the exhaustion requirement (*see*

Dkt. No. 211 at 4), "that avenue has been foreclosed." *Riles v. Buchanan*, 656 F. App'x 577, 581

(2d Cir. 2016).

Based upon the forgoing, the Court finds Plaintiff exhausted a single grievance before

commencing this action. Therefore, the Court recommends granting Defendants' motion for

summary judgment on all claims not addressed in ECF-24381-11 for failure to exhaust administrative remedies.

###    B.    Grievance No. ECF-24381-11

Defendants also seek summary judgment on Plaintiff's claims addressed in ECF-2431-11, which pertain to the conditions of Plaintiff's keeplock confinement.  (Dkt. No. 177-55 at 6-7.)  As an initial matter, Defendants contend that Plaintiff's exhausted claims of being denied laundry, soap, shampoo, deodorant, and writing paper while in keeplock do not give rise to an Eighth Amendment claim.  *Id.*  Defendants further argue that Plaintiff's generalized allegations, to the effect that he faced discrimination based on a disability, and was denied adequate nutrition, clothing, shelter, medical care, and security, fails to provide Defendants with enough information to rectify the problem at the administrative level as to have exhausted those claims associated with Plaintiff's keeplock confinement.  *Id.*  In response to Defendants' motion, Plaintiff claims he was "deprived of basic human necessities."  (Dkt. No. 210-2 at 21.)

###    1.    Conditions of Confinement

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials.  *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  To establish an Eighth Amendment conditions of confinement claim, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety.  *See Farmer*, 511 U.S. at 834.

The required culpable state of mind of the prison official is one of deliberate indifference. *Farmer*, 511 U.S. at 834; *Trammell v. Keane*, 338 F.3d 155, 162 (2d Cir. 2003). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. The prison official must know that the inmate faces "a substantial risk of serious harm and [must disregard] that risk by failing to take reasonable measures to abate it." *Bolton v. Goord*, 992 F. Supp. 604, 626 (S.D.N.Y. 1998) (quoting *Farmer*, 511 U.S. at 847).

The Supreme Court has held that the Eighth Amendment requires that inmates not be deprived of their "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (internal citation and quotation omitted). However, "[b]ecause society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a conditions of confinement claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999). "The conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (citation and internal quotation marks omitted).

### 2.    Analysis

Plaintiff alleges while keeplocked for fifty-eight days, he was subjected to conditions in violation of the Eighth Amendment. (Dkt. No. 12-1 at ¶ 106-07.[8]) Specifically, Plaintiff claims

---

[8] Defendants also argue that facility records show that on March 6, 2011, Plaintiff was a mere "three weeks into serving a 30-day keeplock sentence, which had begun on February 11, 2011." (Dkt. No. 177-5 at 6; *see* Dkt. No. 177-4 at 8.) In his opposition, Plaintiff explains that he had been keeplocked since January 11, 2011. (Dkt. No. 209-3 at 9-10.) In this instance, each position is supported by the record evidence. (*See* Dkt. No. 177-4 at 7.) Plaintiff's inmate disciplinary record indicates Plaintiff was keeplocked from January 11, 2011, through May 11, 2011, for various infractions. (Dkt. No. 177-4 at 8.) On March 6, 2011, Plaintiff was in the

he was denied laundry, soap, shampoo, deodorant, and stationary supplies such as writing paper, and pens.  *Id.*  Such claims do not give rise to an Eighth Amendment claim.  *See, e.g.*, *Chavis v. Kienert*, No. 9:03-CV-0039 (FJS/RFT), 2005 WL 2452150, at *21 (N.D.N.Y. Sept. 30, 2005) (denial of toiletries for a two month period did not rise to the level of deliberate indifference to the prisoner's health or safety); *Thomas v. Smith*, 559 F. Supp. 223, 224 (W.D.N.Y. 1983) (denial of basic hygiene items such as deodorant, soap, shampoo while confined in disciplinary segregation dismissed as frivolous); *see also Trammell v. Keane*, 338 F.3d at 165 (holding that "[d]eprivation of other toiletries for approximately two weeks—while perhaps uncomfortable— does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference.'" (quoting *Farmer*, 511 U.S. at 837)); *Fernandez v. Armstrong*, No. 3:02-CV-2252, 2005 WL 733664, at *5 (D. Conn. Mar. 30, 2005) (denial of hygiene items including a toothbrush, toothpaste, soap, and shampoo for a period of sixteen days does not allege a violation of Eighth Amendment rights (citations omitted)). *McCorkle v. Walker*, 871 F. Supp. 555, 557 (N.D.N.Y. 1995) (no Eighth Amendment violation where plaintiff was not given a change of underwear for fifteen days); *Chavis v. Fairman*, No. 94-1503, 1995 WL 156599, at *5 (7th Cir. Apr. 6, 1995) (no Eighth Amendment violation where inmate was forced to wear same uniform for three weeks).

Furthermore, to the extent Plaintiff relies on alleged violations of DOCCS regulations regarding laundry services and commissary buy sheets, "[a] violation of a state law or regulation,

---

midst of serving a 30-day keeplock sentence, which he served from February 11, 2011 to March 13, 2011.  *Id.*

in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 482 (N.D.N.Y. 2009) (collecting cases).

In his opposition, Plaintiff claims he "was not getting commissary" at all.  (Dkt. No. 209-3 at 11.)  However, as Defendants correctly note, the record evidence demonstrates loss of commissary was part of Plaintiff's disciplinary sentences.  (*See* Dkt. No. 177-4.)

Regarding Plaintiff's general allegation of being deprived of adequate nutrition, clothing, shelter, sanitation, medical care, and personal safety while keeplocked, Defendants challenge whether Grievance No. ECF-24381-11 is sufficient on its face to exhaust Plaintiff's administrative remedies.  (Dkt. No. 177-5 at 6-7.)

Second Circuit case law is clear that the grievance standard is similar to notice pleading in that a grievance "must contain allegations sufficient to alert the defendants to the nature of the claim and to allow them to defend against it." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004).  Although it is appropriate to afford *pro se* inmates a liberal grievance pleading standard, the grievance may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally.[9]  *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006).  Thus, "a prisoner must allege facts sufficient to alert corrections officials 'to the nature of the claim,' and 'provide enough information about the conduct' at issue 'to allow prison officials to take appropriate responsive measures.'" *Singh v. Lynch*, 460 F. App'x 45, 47 (2d Cir. 2012) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)).

---

[9]  New York regulations provide that "[i]n addition to the grievant's name, department identification number, housing unit, program assignment, etc., the grievance should contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint, *i.e.*, specific persons/areas contacted and responses received."  7 N.Y.C.R.R. § 701.5(a)(2).

28

Furthermore, the plaintiff's claim and grievance must be predicated on the same injury. *Rentas v. Nason*, No. 09-cv-5528, 2010 WL 3734086, at *1 (S.D.N.Y. Sept. 22, 2010); *see Turner v. Goord*, 376 F. Supp. 2d 321, 324 (W.D.N.Y. 2005) ("[T]he mere fact that [the] plaintiff filed some grievance, and fully appealed all the decisions on that grievance, does not automatically mean that he can now sue anyone who was in any way connected with the events giving rise to that grievance.").

In this instance, Defendants contend Plaintiff's generalized allegations in Grievance No. ECF-24381-11, to the effect that Plaintiff faced discrimination based on a disability, and was denied adequate nutrition, clothing, shelter, medical care and security, fails to provide Defendants with enough information to rectify the problem at the administrative level as to have exhausted the claims associated with Plaintiff's keeplock confinement. (Dkt. No. 177-5 at 6-7.) Although the Court tends to agree with Defendants, the decisions issued by the Superintendent and CORC suggest Plaintiff's grievance provided enough information to investigate and conduct a proper investigation regarding "hygiene items, medical treatment, meals, or laundry services" while keeplocked. (Dkt. No. 177-3 at 9, 18.)

Regardless, upon a thorough review of Plaintiff's amended complaint and opposition papers, the Court finds Plaintiff's alleged deprivations of adequate nutrition, clothing, shelter, medical care, do not meet, neither singularly nor collectively, the objective standard of the Eighth Amendment. Simply put, "the Constitutional does not require comfortable prison conditions." *Walker*, 717 F.3d at 125.

As to his alleged denial of medical care, Plaintiff's allegations are belied by his claims. (*See* Dkt. No. 12-1 at ¶¶ 106-07.) Throughout his keeplock confinement, Plaintiff states he attended sick calls, received emergency dental services and pain medication, and had wrist

surgery and follow-up care appointments.  Specifically, the day after he was confined to keeplock, Plaintiff went to a medical call on January 12, 2011.  *Id*. at ¶ 80.  Thereafter, Plaintiff "went to emergency dental" on February 27, 2011, and claims to have been to "emergency dental" over "10 times" and "also emergency sick call over 8 times."  *Id*. at ¶ 101.  On March 1, 2011, Plaintiff again went to "emergency dental" and received antibiotics.  *Id*. at ¶ 105.  Plaintiff attended medical call out on March 7, 2011, March 24, 2011, March 25, 2011, April 9, 2011, and April 14, 2011.  *Id*. at ¶¶ 108, 121, 128.  Furthermore, on April 18, 2011, Plaintiff was transported to Foxhall Ambulatory Surgery Center for wrist surgery performed by Dr. Arliss.  *Id*. at ¶ 124.  Plaintiff received medical services on April 29, 2011, and follow-up care with Dr. Arliss on May 2, 2011.  *Id*. at ¶ 129-30.  Plaintiff received medication on May 24, 2011.  *Id*. at ¶ 131.

Regarding inadequate nutrition, the "limited denial of food . . . while on keeplock confinement does not rise to the level of cruel and inhuman punishment."  *Barclay v. New York*, 477 F. Supp. 2d 546, 554 (N.D.N.Y. 2007) (being denied food for two or three days for a messhall violation did not constitutional a constitutional violation).  At most, Plaintiff alleges meals were withheld on an isolated basis.  "[S]uch conduct, though not necessarily to be condoned, does not typically rise to a level of constitutional significance."  *Cruz v. Church*, No. 05-CV-1067, 2008 WL 4891165, at *12 (N.D.N.Y. Nov. 10, 2008).  While Plaintiff complains on January 11, 2011, January 12, 2011, and January 14, 2011, that he was provided with "general population" food instead of his "special Jewish diet," Plaintiff has not alleged a total deprivation of food for an extended period of time.  Further as discussed above, Plaintiff's claims regarding religious meals were not exhausted.  *Id*. at ¶ 84.

30

Plaintiff also maintains he was regularly denied recreation and showers while keeplocked.[10]  Specifically, Plaintiff claims he was denied outdoor exercise and fresh air on January 24, 2011, and January 25, 2011, because C.O. Allison said it was "to [sic] cold" even though general population was permitted in the "yard."  *Id.* at ¶ 87.  On February 3, 4, and 5, 2011, Plaintiff claims he was denied recreation and shower.  *Id.* at ¶ 91.  Plaintiff claims he was denied recreation and showers on February 8, 9, 11, and 13, 2011.  *Id.* at ¶ 92.  Plaintiff claims he was denied recreation on March 7, 2011, March 24, 2011, March 25, 2011, April 9, 2011, and April 14, 2011, because he attended medical call out.  *Id.* at ¶¶ 108, 121, 128.

Even if these claims were exhausted, a conditions of confinement claim concerning the denial of showers rises to the level of an Eighth Amendment violation only "when such a denial deprives the prisoner of basic human needs."  *Dillon v. City of New York*, No. 12 Civ. 7112(LAP), 2013 WL 3776167, at *2 (S.D.N.Y. July 18, 2013) (citing *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003)).  As such, "courts are reluctant to consider the temporary deprivation of showers a constitutional violation."  *Id.*; *see, e.g.*, *Myers v. City of N.Y.*, No. 11 Civ. 8525(PAE), 2012 WL 3776707, at *8 (S.D.N.Y. Aug. 29, 2012) (temporary deprivations of personal hygiene do not deny plaintiff basic human needs and thus are not constitutional violations).  Specifically, the denial of showers for as long as two weeks is not sufficiently serious to state a constitutional claim.  *See McCoy*, 255 F. Supp. 2d at 260 (a two-week suspension of shower privileges does not rise to the level of an Eighth Amendment violation);

---

[10]  The Court finds that inasmuch as Plaintiff claimed he was deprived of recreation and showers for the first time in his appeal statement to CORC, such claims are also unexhausted.  (Dkt. No. 177-3 at 12-18.)

*Cruz v. Jackson*, No. 94 Civ. 2600(RWS), 1997 WL 45348, at *6 (S.D.N.Y. Feb. 5, 1997) (same).

As to his alleged denial of outdoor exercise and recreation, such claims also fall short of the Eighth Amendment standard. *See, e.g., Barnes v. Craft*, No. 04-CV-1269, 2008 WL 3884369, at *9 (N.D.N.Y. Aug. 18, 2008) (denial of outdoor exercise "for six days [was] simply not sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation."); *Gibson v. City of N.Y.*, 96 Civ. 3409, 1998 WL 146688, at *3 (S.D.N.Y. Mar. 25, 1998) (finding the "deprivation of the opportunity to participate in recreation for eight days in a sixty day period, even when coupled with the deprivation of an opportunity to exercise on two consecutive days," not sufficiently serious); *Davidson v. Coughlin*, 968 F. Supp. 121, 131 (S.D.N.Y. 1997) (deprivation of outdoor exercise for fourteen days did not violate Eighth Amendment). Indeed, "an occasional day without exercise when weather conditions preclude outdoor activities . . . is not cruel and unusual punishment." *Anderson v. Coughlin*, 757 F.2d 32, 36 (2d Cir. 1985).

Even considering the totality of Plaintiff's alleged conditions while keeplocked, such claims still fall far short of the Eighth Amendment objective standards. *See, e.g.*, *McNatt v. Unit Manager Parker*, No. 99-CV-1397, 2000 WL 307000, at *4 (D. Conn. Jan. 18, 2000) (holding that the totality of conditions in restrictive housing unit, including stained, smelly mattresses, unclean cell, no bedding for six days, no cleaning supplies for six days, no toilet paper for one day, no toiletries or clothing for six days, no shower shoes, dirty showers, cold water that did not function properly; and smaller food portions, while not pleasant, did not rise to level of Eighth Amendment violation)).

In light of the above, the Court finds Plaintiff has failed to raise a triable issue of fact as to the objective element of his Eighth Amendment claim. Even if Plaintiff had satisfied the

objective element, Plaintiff offers no evidence and only his conclusory allegations of retaliatory animus and harassment to support the subjective element claim that Defendants acted with deliberate indifference to his health or safety. Indeed, Plaintiff cannot rely on conclusory allegations and speculation to defeat a motion for summary judgment. *Kerzer*, 156 F.3d at 400.

Based on the foregoing, the Court recommends granting summary judgment to Defendants on Plaintiff's Eighth Amendment conditions of confinement claim.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment in lieu of an answer (Dkt. No. 177) be **GRANTED**; and is further

**RECOMMENDED** that Plaintiff's motion for substitution of a party (Dkt. No. 231) be **DENIED** as moot; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[11] Such objections shall be filed with the Clerk of the Court. <u>**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**</u> *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

---

[11]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).


Dated:  September 5, 2017
        Syracuse, New York

Therèse Wiley Dancks
United States Magistrate Judge

2017 WL 920753
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Kevin Damion CRICHLOW, Plaintiff,

v.

Brian FISCHER et al., Defendants.

6:15-CV-06252 EAW
|
Signed March 7, 2017

**Attorneys and Law Firms**

Kevin Damion Crichlow, Romulus, NY, pro se.

Hillel David Deutsch, NYS Attorney General's Office Department of Law, Rochester, NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

## INTRODUCTION

*1 Plaintiff Kevin Damion Crichlow ("Plaintiff") filed this action pursuant to 42 U.S.C. § 1983 in the Southern District of New York on October 16, 2012. (Dkt. 2). Plaintiff filed an amended complaint seeking relief against 136 Defendants on June 17, 2013. (Dkt. 12). The action was transferred to this Court on April 28, 2015. (Dkt. 168). The action was then severed by this Court on February 10, 2017. (Dkt. 223). Following severance, 35 Defendants (together "Defendants") remain. (*See id.* at 5-6).

Presently before the Court are: Defendants' motion for summary judgment (Dkt. 177); Plaintiff's motion for discovery (Dkt. 182); Plaintiff's motion to appoint counsel (Dkt. 182); Plaintiff's motion for a stay (Dkt. 182); Plaintiff's motion for a medical exam (Dkt. 187); Plaintiff's motion for reconsideration (Dkt. 192); Plaintiff's motion to amend (Dkt. 192); Plaintiff's motion for a hearing (Dkt. 192); Defendants' motion for sanctions (Dkt. 195); and Plaintiff's motion for sanctions (Dkt. 198).

For the reasons stated below, Defendants' motion for summary judgment is granted in part and denied in part; Plaintiff's motion for discovery is denied without prejudice; Plaintiff's motion to appoint counsel is denied without prejudice; Plaintiff's motion for a stay is denied without prejudice; Plaintiff's motion for a medical exam is denied; Plaintiff's motion for reconsideration is denied; Plaintiff's motion to amend is denied as moot; Plaintiff's motion for a hearing is denied; Defendants' motion for sanctions is denied without prejudice; and Plaintiff's motion for sanctions is denied.

## I. Plaintiff's Allegations

Plaintiff's amended complaint spans 142 pages. (*See* Dkt. 12). Following severance of the action into three separate parts, this Court retained Plaintiff's claims in which he asserts violations of his constitutional rights by Defendants relating to Plaintiff's incarceration at the Wende Correctional Facility ("Wende") and treatment at Wyoming Community Hospital. (*See* Dkt. 223).

Plaintiff alleges actions occurring at Wende beginning on or about September 27, 2008—the date Plaintiff was transferred to Wende—through his transfer to Eastern Correctional Facility on November 16, 2010. (*See* Dkt. 12 at 14-36; Dkt. 12-1 at 1-12).

Plaintiff alleges inadequate or nonexistent medical care throughout his incarceration at Wende, in violation of the Eighth Amendment. Plaintiff argues that he was not provided mental health treatment as required (Dkt. 12 at 19), and that he was "unreasonably exposed to infectious disease" (*id.* at 25, 36; Dkt. 188 at 35-36, 38-39). Plaintiff alleges deficient dental care from "2008 into 2013 at 3 [New York Department of Corrections and Community Supervision] prisons." (Dkt. 12 at 36). He contends he was not provided care for "alot of pain hip, jaw, hand, tooth's also need replacement of four's lost teeths & restoration of function and 'oral surgery & periodontics.'" (*Id.* at 31; *see, e.g.,* Dkt. 12-1 at 1). Plaintiff further alleges that he was denied dental care at Wende on June 30, 2008, to fix a "broken jaw." (Dkt. 12 at 36). As to his medical care, Plaintiff states that Defendant George Boucher, M.D., was grossly negligent in misdiagnosing an injury to Plaintiff's hand, which led to Plaintiff's receiving the "wrong surgery" on January 13, 2010. (Dkt. 12-1 at 2). Plaintiff complains that he was denied treatment for "injuries hip, back, shoulder, head" for "about 68 months." (*Id.* at 3). Plaintiff also asserts that he was

subjected to a risk of disease due to asbestos in Wende. (Dkt. 12 at 21-24, 31; Dkt. 188 at 35).

**\*2** Plaintiff also charges he was deprived of adequate nutrition and hygiene while incarcerated at Wende. Plaintiff claims that from April to September 2009, Defendants C.O. Bartels and C.O. Kevin Barlow "routinely deprived [Plaintiff] ... meaningful opportunities for yard, food, shower, exercise, adequately nutrition." (Dkt. 12 at 25). He makes similar claims against Defendants C.O. Richard Brooks ("Brooks") (*id.* at 32), and C.O. Alicia Humig ("Humig") (*id.* at 26). Plaintiff complains that he was "taken off" of a mandatory religious diet for months because he was not allowed to go to the mess hall. (*Id.* at 32). Plaintiff also alleges that because he is H.I.V. positive, a nutritious diet is critical to his health, and he was deprived of such a diet. (Dkt. 12-1 at 1, 3). Plaintiff asserts that on November 11, 2009, Humig and Defendant Sergeant Paul Olszewski ("Olszewski") refused to let him out of his cell, and placed him in keeplock for about six weeks. (Dkt. 12 at 32). Plaintiff further alleges that he was refused basic laundry services from 2008 through November 1, 2009. (*Id.* at 27).

Plaintiff complains that Defendant T.M.C. Christopher Zaluski ("Zaluski") and others failed to provide reasonable accommodations for Plaintiff's hearing disability. (Dkt. 12 at 14-16; Dkt. 12-1 at 1). Plaintiff alleges that he was in New York Department of Corrections and Community Supervision ("DOCCS") custody for six months before receiving hearing aids. (Dkt. 12 at 30; Dkt. 12-1 at 1). He also claims that he was denied equal access to opportunities and recreation in Wende because of his hearing disability, and that the failure to accommodate his hearing disability was retaliation for his standing up for himself and other disabled inmates. (Dkt. 12 at 33-35; Dkt. 12-1 at 11-12).

Plaintiff claims he was harassed and verbally abused while at Wende. He alleges numerous instances of sexual harassment by Defendant C.O. Attea, and states that he reported such harassment to others, including the superintendent of Wende. (*Id.* at 17-18, 19, 31). Plaintiff claims that on June 18, 2010, Brooks verbally abused and threatened Plaintiff. (Dkt. 12-1 at 8-9). Plaintiff asserts C.O. Corey Petties verbally abused and threatened Plaintiff on July 12, 2010. (*Id.* at 9-10). Plaintiff alleges that DOCCS has a "common practice to encourage and further its employee's, and officers discrimination and harassment

and assault and [deprivation] of proper nutrition." (Dkt. 12 at 20).

Plaintiff also raises Fourteenth Amendment due process claims. Plaintiff complains of unspecified disciplinary proceedings that led a total of 180 days of disciplinary confinement between 2008 and 2010. (*Id.* at 29). Plaintiff claims his due process rights were violated because of the handling of "over 150" grievances filed through November 16, 2010, by Defendants Director Karen Bellamy ("Bellamy") and Sergeant William Scott ("Scott"). (*Id.* at 27-30). Plaintiff asserts that he was retaliated against for filing grievances and that no investigations were conducted into his claims. (*Id.* at 28). Plaintiff states that he filed over 300 grievances. (Dkt. 209-3 at 8; *see, e.g.,* Dkt. 211 at 1).

He also alleges that on July 4, 2010, C.O. Hojsan destroyed Plaintiff's legal documents in the Wende law library, thereby depriving Plaintiff of an opportunity to be heard by the courts. (Dkt. 12-1 at 10-11). Hojsan also allegedly denied Plaintiff access to the law library. (*Id.* at 11).

Plaintiff complains that a fire broke out in his cell block on April 12, 2010, and that the correctional officers in the area, including Olszewski, failed to respond to calls for help. (*Id.* at 6-7). Plaintiff claims that he was denied "fresh-air" and was thereafter denied medical care. (*Id.* at 7).

Plaintiff further contends that on some unspecified date Zaluski instructed others not to let Plaintiff out of his cell, in retaliation for Plaintiff's filing of grievances against Zaluski. (Dkt. 12 at 30).

Plaintiff complains that Defendant Brian Fischer ("Fischer")—the commissioner of DOCCS during Plaintiff's incarceration at Wende—knew of constitutional violations against Plaintiff and failed to take action. (Dkt. 12-1 at 4-5). Plaintiff states that he personally sent "several letters" detailing inadequate health care and assault. (*Id.* at 4). Plaintiff also contends that Defendants "disregarded conditions posing an excessive risk to [his] health and safety ...," and that prison staff was inadequately trained. (*Id.*).

## II. Defendant's Motion for Summary Judgment

### A. Standard of Review

2017 WL 920753

**\*3** Federal Rule of Civil Procedure 56 provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *See Scott v. Harris,* 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)). The standard for granting summary judgment is the same whether the motion is made in lieu of an answer or after discovery has occurred. *See Anderson v. Rochester-Genesee Reg'l Transp. Auth.,* 337 F.3d 201, 206 (2d Cir. 2003).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec.,* 475 U.S. at 586-87). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).

"[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). But, summary judgment is generally not appropriate until after some discovery has occurred. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (stating that summary judgment is appropriate on the proper showing "after adequate time for discovery"); *see, e.g., Hellstrom v. U.S. Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir. 2000) ("[S]ummary judgment should only be granted if *after discovery,* the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." (emphasis original) (internal quotation marks and citations omitted)). "Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom,* 201 F.3d at 97; *see also Trebor Sportswear Co. v. The Ltd. Stores, Inc.,* 865 F.2d 506, 511 (2d Cir. 1989) ("The nonmoving party should not

be 'railroaded' into his offer of proof in opposition to summary judgment." (citing *Celotex,* 477 U.S. at 326)).

## B. Statute of Limitations

Defendants argue that some of Plaintiff's claims are time-barred by the statute of limitations. (Dkt. 177-5 at 3). "In [§] 1983 actions, the applicable limitations period is found in the 'general or residual state statute of limitations for personal injury actions....' " *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure,* 488 U.S. 235, 249-50 (1989)). A § 1983 action filed in New York is subject to a three-year statute of limitations. *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir. 2013).

Here, Plaintiff filed this action October 16, 2012. (Dkt. 1). Therefore, any claim arising before October 16, 2009, is barred by the statute of limitations. Plaintiff points to the "continuing violation doctrine" to save his otherwise time-barred claims. (Dkt. 209-3 at 21-22).

> [The continuing violation doctrine] applies to claims composed of a series of separate acts that collectively constitute one unlawful practice. The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of a serial violation, but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment. Accordingly, where the continuing violation doctrine applies, the limitations period begins to run when the defendant has engaged in enough activity to make out an actionable claim. A claim will be timely, however, only if the plaintiff alleges some non-time-barred acts contributing to the alleged violation.

**\*4** *Gonzalez v. Hasty,* 802 F.3d 212, 220 (2d Cir. 2015). Although the continuing violation doctrine generally applies to claims "composed of a series of separate acts that collectively constitute one unlawful practice," *id.* at 220, a plaintiff "must allege both the existence of an ongoing policy of discrimination and some non-time-

barred acts taken in furtherance of that policy." *Fahs Constr. Grp., Inc. v. Gray,* 725 F.3d 289, 292 (2d Cir. 2013) (quoting *Harris v. City of N. Y.,* 186 F.3d 243, 250 (2d Cir. 1999)); *see, e.g., Shomo v. City of N. Y,* 579 F.3d 176, 182 (2d Cir. 2009).

Here, Plaintiff alleges four patterns of conduct which occurred both before and after October 16, 2009: (1) denial of adequate medical and dental treatment; (2) denial of adequate nutrition and hygiene; (3) discrimination and failure to accommodate based on Plaintiff's disability; and (4) denial of due process rights.

The continuing violation doctrine applies to Eighth Amendment claims for deliberate indifference to medical needs. *See Shomo,* 579 F.3d at 182 ("[T]he continuing violation doctrine can apply when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs."). Plaintiff raises a number claims that he was denied adequate medical and dental treatment, which, taken together, could comprise an Eighth Amendment claim for deliberate indifference to serious medical needs. Plaintiff also complains of ongoing deprivations of adequate food and access to showers and laundry. Prison officials' Eighth Amendment obligations require that they "ensure that inmates receive adequate food, shelter, and medical care...." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994).

Defendants argue that Plaintiff failed to allege the existence of a policy of deliberate indifference. (Dkt. 196-2 at 10). The Court disagrees. Plaintiff's amended complaint includes allegations that senior prison officials, including Fischer, knew of ongoing violations related to Plaintiff's inadequate heath care but failed to take action. Plaintiff claims he sent letters to Fischer to point out the inadequacies of his health care at Wende. Plaintiff also attaches a reply letter from Bellamy in which Bellamy states that she is responding to Plaintiff's letters on behalf of "governor Cuomo and Commissioner Fischer." (Dkt. 209-4 at 2). Plaintiff also asserts that the practices complained of "are widespread, longstanding, and deeply embedded in the culture of all [DOCCS] agenc[ies], constitut[ing] unwritten [DOCCS] policies & customs." (Dkt. 12-1 at 5).

Similarly, the amended complaint can be read as alleging a continuing violation as to Defendants' indifference

to Plaintiff's nutrition and hygiene needs. Plaintiff alleges that he was routinely deprived of meaningful opportunities to shower and exercise, and was not provided adequate nutrition. (Dkt. 12 at 25; *see, e.g., id.* at 26). Plaintiff states that while he was in keeplock, corrections officers were told not to feed him. (*Id.* at 26). He also claims that he was only allowed to shower six times in a nine-month period, and that "his clothing and linen's [sic] were never laundered." (*Id.* at 27).

Plaintiff's allegations are sufficient to establish a plausible claim of "an ongoing policy of deliberate indifference and acts taken in accordance with that policy." *See Taylor v. Goord,* Civil Action. No. 9:09-CV-1036 (FJS/DEP), 2010 WL 3825661, at *7 (N.D.N.Y. Sept. 2, 2010), *report and recommendation adopted by* No. 9:09-CV-1036 (FJS/DEP), 2010 WL 3825656 (N.D.N.Y. Sept. 24, 2010). *Cf. Bussey v. Fischer,* Civil Action No. 9:10-CV-1021 (NAM/DEP), 2011 WL 4862478, at *5 (N.D.N.Y. Aug. 1, 2011) (finding a plaintiff failed to allege an ongoing policy of deliberate indifference sufficient to show a continuing violation where the alleged unwritten policy was inconsistent with written policies and requirements), *report and recommendation adopted by* No. 9:10-CV-1021 (NAM/DEP), 2011 WL 4499324 (N.D.N.Y. Sept. 27, 2011). Thus, particularly at this stage of the proceedings, Plaintiff's pre-October 16, 2009, claims as to inadequate medical and dental treatment, as well as inadequate food and hygiene, survive Defendants' statute of limitations defense.

**\*5** Similarly, Plaintiff alleges ongoing discrimination because of his hearing disability in violation of the Eighth and Fourteenth Amendments, as well as the "Rehabilitation Act" and the Americans with Disabilities Act.[1] (Dkt. 12-1 at 1). Plaintiff alleges a pattern of discriminatory conduct, arguing that DOCCS and individual Defendants at Wende failed to accommodate his hearing disability. The last complained-of act of discrimination at Wende occurred on August 18, 2010, well within the three-year statute of limitations. Plaintiff alleges that prison staff at Wende continuously failed to provide him reasonable accommodations, such as providing working hearing aids. Plaintiff also states that other disabled prisoners were not provided reasonable accommodations. Such *pro se* allegations are sufficient, at this stage, to state the existence of an ongoing policy of disability discrimination against Plaintiff.

1    Defendants have not made any statute-of-limitations arguments regarding Plaintiff's claims under the Rehabilitation Act or the Americans with Disabilities Act. (*See* Dkt. 177-5 at 3). Thus, the Court only addresses Defendants' statute-of-limitation argument as it relates to Plaintiff's constitutional claims of discrimination under § 1983.

Plaintiff also claims due process violations related to the processing of his grievances and disciplinary hearings. In this context, the continuing violation doctrine does not apply to Plaintiff's Fourteenth Amendment due process claims because "[e]ach decision made without due process is a discrete violation, and the statute of limitations begins to run from the date that Plaintiff was denied the full and fair hearing he was entitled to." *Bunting v. Fischer,* 14-CV-0578-RJA-MJR, 2016 WL 4939389, at *3 (W.D.N.Y. Aug. 4, 2016) (citing *Gonzalez,* 802 F.3d at 223), *report and recommendation adopted by* 14-CV-578A, 2016 WL 4804099 (W.D.N.Y. Sept. 14, 2016). Thus, all of Plaintiff's claimed due process violations which occurred before October, 16, 2009, are subject to the statute of limitations and must be dismissed.

In sum, at this stage in the proceedings, Plaintiff's claims of deliberate indifference to medical care, inadequate food and hygiene, and the failure to provide reasonable accommodations for his hearing disability all survive Defendants' statute of limitations challenge. Plaintiff's due process claims which are based on the processing of his grievances and which arose before October 16, 2009, are time barred and must be dismissed.

### C. Failure to Exhaust Administrative Remedies

Next, Defendants argue that many of Plaintiff's claims must be dismissed for failure to exhaust administrative remedies. (Dkt. 177-5 at 4-6). An inmate's failure to exhaust administrative remedies is properly considered on a motion for summary judgment made in lieu of an answer. *See Crenshaw v. Syed,* 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010) (granting a summary judgment motion made in lieu of answer where inmate failed to exhaust administrative remedies). Pursuant to 42 U.S.C. § 1997e, "[n]o action shall be brought with respect to prison conditions under [§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

To satisfy that requirement, prisoners in New York must ordinarily follow a three-step [DOCCS] grievance process. The first step in that process is the filing of a grievance with the Inmate Grievance Resolution Committee. Next, the inmate may appeal an adverse decision to the prison superintendent. Finally, the inmate may appeal the superintendent's decision to the Central Office Review Committee ("CORC"). In general, it is only upon completion of all three levels of review that a prisoner may seek relief in federal court under § 1983.

*Crenshaw,* 686 F. Supp. 2d at 236 (citations omitted). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador v. Andrews,* 655 F.3d 89, 96 (2d Cir. 2011). "[D]efendants bear the burden of proof and prisoner plaintiffs need not plead exhaustion with particularity." *McCoy v. Goord,* 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003). Pursuant to the Second Circuit's decision in *Hemphill v. New York,* 380 F.3d 680 (2d Cir. 2004), a failure to exhaust administrative remedies may be excused where: "(1) the administrative remedies were not in fact available; [or] (2) prison officials have forfeited, or are estopped from raising, the affirmative defense of non-exhaustion; or (3) 'special circumstances justify the prisoner's failure to comply with administrative procedural requirements.' " *Dabney v. Pegano,* 604 Fed.Appx. 1, 3 (2d Cir. 2015) (quoting *Hemphill,* 380 F.3d at 686). However, the third prong of *Hemphill,* relating to "special circumstances" was abrogated by the Supreme Court's decision in *Ross v. Blake,* 136 S. Ct. 1850 (2016). *Williams v. Corr. Officer Priatno,* 829 F.3d 118, 123 (2d Cir. 2016). The inquiry which used to be under the third prong of *Hemphill,* is now considered "entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." *Id.*

**\*6** Here, Plaintiff claims he filed over 300 grievances, and seems to suggest that this is sufficient to exhaust his administrative remedies. (*See* Dkt. 209-3 at 8; *see, e.g.,* Dkt. 211 at 1). Plaintiff misunderstands the exhaustion requirement. The filing of a grievance is but the first step in exhausting administrative remedies. To exhaust

2017 WL 920753

DOCCS administrative remedies, a prisoner must appeal to CORC. Plaintiff's filing of 300 grievances, even if true, is insufficient to exhaust his remedies under § 1997e.

In response to Defendants' assertion that Plaintiff failed to exhaust his administrative remedies for most of his claims, Plaintiff claims that DOCCS lost or destroyed his grievances. (Dkt. 209-3 at 19 (claiming that DOCCS destroyed meritorious grievances); Dkt. 211 at 1 (same)). "Plaintiff's wholly conclusory and unsupported allegations that grievances are tampered with at [Wende] do not create a material issue of fact in this case." *See Mims v. Yehl,* Nos. 13-CV-6405-FPG, 14-CV-6304-FPG, 14-CV-6305-FPG, 2014 WL 4715883, at *4 (W.D.N.Y. Sept. 22, 2014).

However, Defendants' submissions show that Plaintiff has satisfied the exhaustion requirement for some potential claims. Defendants' sworn declaration from Jeffery Hale —the Assistant Director of the DOCCS Inmate Grievance Program—states that Plaintiff exhausted 25 grievances between the beginning of his incarceration in 2008 and the filing of this action in October 2012. (Dkt. 177-3 at 2). Of those 25 exhausted grievances, 23 relate to Plaintiff's incarceration at Wende. (*See id.* at 5-6). Defendants provide only a printout listing the titles and grievance numbers of the 23 exhausted grievances that arose at Wende (*see id.*); they did not submit any paperwork relating to the grievances themselves or the final resolution of any exhausted grievance. (*See* Dkt. 177).

Plaintiff clearly exhausted some potential claims which could be raised in federal court pursuant to § 1997e. However, the Court cannot determine whether the claims Plaintiff raises in this action are those which have been exhausted because neither party submitted sufficient information which would allow the Court to make such a determination. It is possible that none of Plaintiff's exhausted grievances relate to the named Defendants in this action; it is equally possible that all 23 exhausted grievances relate to actions taken by the named Defendants. Since Defendants seek summary judgment on this basis, it is their burden to establish the lack of any issue of material fact on the exhaustion argument. They have failed to meet this burden. Thus, Defendants' motion based upon Plaintiff's alleged failure to exhaust is denied.

**D. Plaintiff's Due Process Claims**

Regardless of whether grievances were exhausted or whether the claims were timely asserted, Plaintiff's due process claims relating to disciplinary confinement and grievance processing fail as a matter of law and summary judgment is appropriate.

**1. SHU Confinement**

Plaintiff alleges due process claims related to disciplinary proceedings which led to disciplinary confinement. (Dkt. 12 at 29). "[A] prisoner asserting a § 1983 claim for denial of due process at a disciplinary hearing must first identify a liberty interest protected by the Due Process Clause of which he was deprived, and then show that he was deprived of that interest without due process of law." *Aguirre v. Kendra,* 123 F. Supp. 3d 419, 422 (W.D.N.Y. 2015). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir. 2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). Where a prisoner alleges that he was confined to the Special Housing Unit ("SHU") as the result of a disciplinary hearing, the court considers how long the confinement lasted, along with "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population," in determining whether a liberty interest is implicated. *Vasquez v. Coughlin,* 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998). "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir. 1999) (internal citation omitted).

**\*7** There is no "bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir. 2004). However, the Second Circuit has held that confinement for fewer than 101 days under "normal" SHU conditions does not amount to an atypical and significant hardship and thus does not implicate a liberty interest under the Due Process Clause. *Ortiz,* 380 F.3d at 654-55; *see also Tafari v. McCarthy,* 714 F. Supp. 2d 317, 375 (N.D.N.Y. 2010) (stating that SHU confinements of up to 90 days "fall within the 'short range' of disciplinary confinement and thus implicate a liberty interest only if

'the conditions were more severe than the normal SHU conditions.' " (quoting *Palmer,* 364 F.3d at 65)).

Here, Defendants argue that none of Plaintiff's disciplinary confinements violated Plaintiff's due process rights. (Dkt. 177-5 at 6-7). Defendants submitted Plaintiff's prison disciplinary record. (*See* Dkt. 177-4). The records show Plaintiff was subjected to only one non-time-barred SHU confinement at Wende. (*See id.* at 8). That SHU confinement was for 30 days. (*Id.*). Plaintiff does not argue that the conditions of his confinement were in any way abnormal or atypical. Because Plaintiff's disciplinary confinement fell within the "short" range and did not involve any abnormalities, it did not implicate any liberty interest sufficient to raise a due process violation. Plaintiff's due process claims as to disciplinary confinement at Wende fail as a matter of law.

### 2. Grievance Processing

Plaintiff also raises due process complaints about the handling of his grievances. (*See* Dkt. 12 at 27-30; Dkt. 209-2 at 21). It is well-established that inmates do not have a protected liberty interest in the processing of their prison grievances. *See Torres v. Mazzuca,* 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003). "[Although] there is a First Amendment right of meaningful access to the courts and a right to petition the government for redress, inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983." *Cancel v. Goord,* No. 00 CIV 2042 LMM, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) (internal citations omitted).

Plaintiff has no liberty interest in the prison grievance program. Even if Defendants violated their own procedures in processing Plaintiff's grievances, Plaintiff cannot find relief under § 1983. A prisoner may raise due process claims related to disciplinary hearings. *Montalvo v. Lamy,* 139 F. Supp. 3d 597, 608 (W.D.N.Y. 2015); *Richard v. Fischer,* 38 F. Supp. 3d 340, 358-59 (W.D.N.Y. 2014). However, Plaintiff's allegations here relate only to allegedly faulty grievance processing; Plaintiff makes no allegations of due process violations related to disciplinary hearings. Therefore, these claims fail as a matter of law.

Plaintiff's only claim against Defendants Bellamy and Scott are the due process claims related to the grievance

process. Because Plaintiff's claims fail, Defendants Bellamy and Scott must be dismissed from the action.

### E. Retaliation

Finally, Plaintiff alleges that he was retaliated against because he filed grievances. (Dkt. 12 at 28).

> A prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of grievances. Retaliating against inmates for filing grievances by filing false disciplinary reports violates the First Amendment. In fact, our Circuit has held that the filing of a false disciplinary report is a serious enough action that temporal proximity between an inmate grievance and the filing of a report is enough to state a retaliation claim. Accordingly, a plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action.

**\*8** *Richard v. Fischer,* 38 F. Supp. 3d 340, 358 (W.D.N.Y. 2014) (internal quotation marks and citations omitted). Here, Plaintiff asserts that because of his filing of numerous grievances, unspecified Defendants retaliated by filing false misbehavior reports. (*See* Dkt. 12 at 28). Defendants have not raised any argument related to Plaintiff's retaliation claim. (*See* Dkt. 177-5). Therefore, the Court will not dismiss the retaliation claim.

### F. Summary

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Plaintiff's alleged due process claims, but is denied as to Plaintiff's Eighth Amendment claims related to the alleged denial of adequate medical treatment and adequate food and nutrition, and it is also denied with respect to Plaintiff's claims alleging retaliation and the failure to provide reasonable accommodations for Plaintiff's disability.

## III. Plaintiff's Motion for Discovery

Plaintiff moves this Court to open discovery. (Dkt. 182). Plaintiff states that he is "asking for interrogatory answers and other evidence [to] show that the material facts are in dispute." (*Id.* at 2). Plaintiff also states that discovery will allow him to show that he filed "over 300 grievances." (*Id.*).

The Court construes Plaintiff's motion as one under Fed. R. Civ. P. 56(d). In opposing a summary judgment motion, if a nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

> A party seeking to delay resolution of a summary judgment motion on grounds that he has been deprived of certain discovery materials "must show that the material sought is germane to the defense, and that it is neither cumulative nor speculative, and a bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient."

*Alphonse Hotel Corp. v. Tran,* 828 F.3d 146, 151 (2d Cir. 2016) (quoting *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir. 1994)).

Here, Plaintiff has not submitted any sworn affidavit or declaration requesting particular information, nor has he described how the material requested is germane to his defense related to the due process claims (the only claims on which the Court has granted summary judgment). As discussed above, the due process claims are barred as a matter of law, and Plaintiff has not made a showing that discovery would alter that conclusion. Therefore, the motion for discovery is denied without prejudice to Plaintiff seeking discovery with respect to the claims that remain.

## IV. Plaintiff's Motion to Appoint Counsel

As part of Plaintiff's motion for discovery, he also moves this Court to appoint counsel "to assist [Plaintiff] in preparing his case...." (Dkt. 182 at 5). Under 28 U.S.C. § 1915(e), the Court may appoint counsel to assist indigent litigants, *see, e.g., Sears, Roebuck & Co. v. Charles Sears Real Estate, Inc.,* 865 F.2d 22, 23-24 (2d Cir. 1988), and

the assignment of *pro bono* counsel in civil cases is within the trial court's discretion. *In re Martin-Trigona,* 737 F.2d 1254, 1260 (2d Cir. 1984). The court must evaluate "the merits of [the] plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel." *Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir. 1989). Particular attention must be paid to the merits of the plaintiff's claim. *Id.* ("Even where the claim is not frivolous, counsel is often unwarranted where the indigent's chances of success are extremely slim." (quoting *Hodge v. Police Officers,* 802 F.2d 58, 60 (2d Cir. 1986))). Additionally, for prison inmates, the court must also give weight to the plaintiff's lack of practical access to attorneys. *Id.* at 173-74.

**\*9** Plaintiff was in prison when he filed the complaint, and remains in custody. (*See* Dkt. 1; Dkt. 4). Plaintiff has already been granted *in forma pauperis* status in this case. (Dkt. 5). In his *in forma pauperis* motion, Plaintiff stated that he was incarcerated, had not worked in the past 12 months, and did not have any cash or other assets. (Dkt. 4 at 1-2). A prison official certified that Plaintiff's average account balance for the previous six months was $1.07. (*Id.* at 3). Plaintiff has conclusively shown that he is indigent, and has met the threshold test for appointing counsel.

However, the *Cooper* factors all weigh against appointing counsel at this time. Plaintiff's motion papers provide no information suggesting that he attempted to obtain counsel to assist in his case. (*See* Dkt. 182 at 5). As the Second Circuit has noted, "[t]he vast majority of litigation on behalf of personal claimants is financed initially by lawyers who accept the representation for a contingent fee in the expectation of being rewarded by a share of the winnings." *Cooper,* 877 F.2d at 173. In the absence of an affirmative statement by Plaintiff otherwise, the Court assumes that he has not sought an attorney to represent him. This weighs against the appointment of counsel.

The Court also finds that the Plaintiff has failed to show anything more than a remote possibility of success on the merits. Plaintiff's ultimate success on the merits faces significant hurdles, including Defendants' defense that Plaintiff failed to exhaust his administrative remedies. This too weighs heavily against the appointment of counsel.

Balancing the factors set forth in *Cooper*, the Court finds that appointing counsel is inappropriate at this time, and Plaintiff's motion is denied without prejudice.

**V. Plaintiff's Motion for a Stay**

Plaintiff moves this Court to stay the action while he undergoes surgery in his wrist, arm, and back. (Dkt. 182 at 6). Plaintiff does not disclose the date of the surgery, or any further information which would allow the Court to evaluate the necessity of such a stay. (*See id.*). Plaintiff has not sufficiently shown a need for a stay in the litigation. Therefore, the motion is denied without prejudice.

**VI. Plaintiff's Motion for a Medical Exam**

Plaintiff asks this Court, pursuant to Fed. R. Civ. P. 35, to order a medical examination so that he can access medical care for currently occurring medical issues. (Dkt. 187). Rule 35 permits a court to order "a party whose ... condition ... is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner. The court has the same authority to order a party to produce for examination a person who is in its custody...." Fed. R. Civ. P. 35. "In order to obtain a medical examination under Rule 35, the moving party must establish 'good cause....' " *Kelly v. Times/review Newspapers Corp.,* CV 14-2995 (JMA) (SIL), 2016 WL 2901744, at *1 (E.D.N.Y. May 18, 2016). " 'Rule 35 does not, however, authorize a party to file a motion for his own physical examination.' Neither may a plaintiff invoke Rule 35 in order to receive medical care." *Rodriguez v. Conway,* No. 10-CV-6243L, 2011 WL 4829725, at *3 (W.D.N.Y. Sept. 6, 2011) (citations omitted), *affirmed in relevant part by* No. 10-CV-6243L, 2011 WL 4829869 (W.D.N.Y. Oct. 12, 2011).

Here, Plaintiff's current medical condition is not "in controversy." Plaintiff has already submitted records regarding his medical and dental maladies for the time period at issue in this action. (*See* Dkt. 209-5 at 1-27). Defendants have in no way challenged the substance of Plaintiff's claimed medical needs during his incarceration at Wende from 2008 to 2010. Further, Plaintiff cannot use Rule 35 to receive medical care. Therefore, Plaintiff's motion is denied.

**VII. Plaintiff's Motion for Reconsideration**

**\*10** Plaintiff titles his motion at Dkt. 192 as a "motion for reconsideration," however, he does not point to any order or decision of the Court for which he seeks reconsideration. Although the Court has the inherent power to reconsider and modify interlocutory orders prior to the entry of judgment, *see* Fed. R. Civ. P. 54(b) ("[A]ny order or other ... that adjudicates fewer than all the claims ... does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); *Williams v. Cty. of Nassau,* 779 F. Supp. 2d 276, 280 & n.2 (E.D.N.Y. 2011) ("A district court retains absolute authority to reconsider or otherwise affect its interlocutory orders any time prior to appeal."), *aff'd,* 581 Fed.Appx. 56 (2d Cir. 2014), Plaintiff has not provided sufficient information to allow the Court to decide his motion. Therefore, Plaintiff's motion is denied.

**VIII. Plaintiff's Motion to Amend**

Plaintiff also filed a motion which, in essence, asks the Court to allow Plaintiff to amend his response to Defendants' motion for summary judgment. (Dkt. 192). The Court granted such relief already (Dkt. 208), and Plaintiff already filed amended response papers (Dkt. 209; Dkt. 211). Therefore, Plaintiff's motion is denied as moot because he has already received the requested relief.

**IX. Plaintiff's Motion for a Hearing**

Plaintiff further asks the Court to hold a hearing "to cover several issue[s] that Plaintiff [does not] fully[ ] understand." (Dkt. 192 at 3). Plaintiff also seeks scheduling conferences or orders pursuant to Fed. R. Civ. P. 16(b) and 26(f). The Court finds that neither a hearing nor a scheduling order is necessary at this time. If Plaintiff has legal questions, he may retain an attorney or do further legal research to answer those questions. It is not the Court's role to answer such questions. Thus, Plaintiff's motion is denied. Once an answer is filed, the case will proceed to discovery.

**X. Defendant's Motion for Sanctions**

Defendants move this Court to impose sanctions on Plaintiff pursuant to Fed. R. Civ. P. 11. (Dkt. 195). Defendants argue that, as part of his response to the motion for summary judgment, Plaintiff filed a grievance exhausted by another inmate, claiming the grievance as one Plaintiff had himself exhausted. (Dkt. 195-2 at 1-2

(citing Dkt. 188-8 at 2)). Plaintiff allegedly did so in an attempt to show that the Jeffery Hale declaration was knowingly false and that Defendants had destroyed Plaintiff's grievances. (*Id.* (citing Dkt. 188 at 12)).

A party or counsel for a party is required by the Federal Rules of Civil Procedure to certify that, to the best of their knowledge, the factual contentions made have evidentiary support. Fed. R. Civ. P. 11(b)(3). Rule 11 allows the court to "impose an appropriate sanction on any attorney, law firm, or party that violated [Rule 11(b)] or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "Sanctions may be—but need not be—imposed when court filings are used for an 'improper purpose,' or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous." *Ipcon Collections LLC v. Costco Wholesale Corp.,* 698 F.3d 58, 63 (2d Cir. 2012) (citation omitted). "Further, even when a district court finds a violation of Rule 11, 'the decision whether to impose a sanction is committed to the district court's discretion.'" *Id.* (quoting *Perez v. Posse Comitatus,* 373 F.3d 321, 325 (2d Cir. 2004)).

Defendants argue that "the only appropriate sanction in this matter is dismissal." (Dkt. 195-2 at 3). The Court disagrees. The grievance at issue relates to a complaint which arose during 2012 and 2013. (Dkt. 188-8 at 2). Even if Plaintiff was the grievant, the grievance itself would be irrelevant to this Court's inquiry into Plaintiff's incarceration conditions from 2008 until 2010. Indeed, the grievance at issue was not taken into account during the Court's review of the motion for summary judgment because it is irrelevant to the time frame at issue. Further, although the filing of false documents in bad faith to a court can, in egregious cases, result in dismissal, *see Ceglia v. Zuckerberg,* No. 10-CV-00569A(F), 2013 WL 1208558 (W.D.N.Y. 2013), *report and recommendation adopted by* 2014 WL 1224574 (W.D.N.Y. 2014), *aff'd,* 600 Fed.Appx. 34 (2d Cir. 2015), such an extreme sanction is not warranted at this time. However, **Plaintiff is hereby warned that any future violation of Rule 11 may result in dismissal of the action or other appropriate sanctions.**

**\*11** Defendants' motion is denied without prejudice.

## XI. Plaintiff's Motion for Sanctions
Finally, Plaintiff asks this Court to impose sanctions on Defendants for making materially misleading and false statements to the Court in its response in opposition (Dkt.

174) to Plaintiff's letter motion (Dkt. 172). (Dkt. 198). The Court denied Plaintiff's motion as unrelated to the claims at issue in this action. (Dkt. 176).

Read generously, Plaintiff argues that Defendants' counsel failed to acknowledge in his response that one of the individuals named in the letter motion was also a named Defendant in this action. (*See* Dkt. 198 at 1-2). Such a misstatement is immaterial and does not warrant sanctions. As Plaintiff failed to assert any material violation of Rule 11, sanctions are inappropriate, and Plaintiff's motion is denied.

## CONCLUSION

For the foregoing reasons, the Court

GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment (Dkt. 177);

INSTRUCTS the Clerk of Court to terminate Defendants Bellamy and Scott from this action;

DIRECTS Defendants to answer the complaint within 30 days of the filing of this Decision and Order;

DENIES Plaintiff's motion for discovery (Dkt. 182) without prejudice;

DENIES Plaintiff's motion to appoint counsel (Dkt. 182) without prejudice;

DENIES Plaintiff's motion for a stay (Dkt. 182) without prejudice;

DENIES Plaintiff's motion for a medical exam (Dkt. 187);

DENIES Plaintiff's motion for reconsideration (Dkt. 192);

DENIES Plaintiff's motion to amend (Dkt. 192) as moot;

DENIES Plaintiff's motion for a hearing (Dkt. 192);

DENIES Defendants' motion for sanctions (Dkt. 195) without prejudice; and

DENIES Plaintiff's motion for sanctions (Dkt. 198).

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 920753

---

**End of Document**                                © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Miles v. Walawender, W.D.N.Y., May 7, 2013

2012 WL 1067866
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Mark Alan CARLSON, Plaintiff,

v.

Jamieson PARRY, New York State
Department of Correctional Services,
Superintendent Cully, Lieutenant Yonkers,
Brian Clifford, and Steve Smith, Defendants.

No. 06–CV–6621P.
|
March 29, 2012.

**Attorneys and Law Firms**

David A. Johns, Pultneyville, NY, for Plaintiff.

*DECISION & ORDER*

MARIAN W. PAYSON, United States Magistrate Judge.

*PRELIMINARY STATEMENT*

 *1 In December 2006, plaintiff Mark Alan Carlson ("Carlson") filed this action against the New York State Department of Correctional Services ("DOCS") and certain of its officers at Livingston Correctional Facility, alleging that defendants violated his rights under the First, Eighth, and Fourteenth Amendments, as well as his rights under the Americans with Disabilities Act and the Rehabilitation Act. (Docket # 1). Carlson retained counsel in March 2008. (Docket # 15). Carlson has amended his complaint four times, the last time on March 18, 2009. (Docket4, 9, 23, 33).

Currently pending before the Court is defendants' motion for summary judgment. (Docket # 43). For the reasons discussed below, defendants' motion for summary judgment is granted as to all of Carlson's claims except his Eighth Amendment claims against defendant Parry.

*FACTUAL BACKGROUND*

The following facts are undisputed except where otherwise noted.

**I. *Carlson's Programming Assignments***

In 1996, Carlson's right leg was partially amputated below the knee; since then he has used a prosthetic leg. (Docket # 43–2 at ¶ 2). In March 2005, Carlson was incarcerated pursuant to a felony conviction of driving while intoxicated and eventually was sent to DOCS's Gowanda Correctional Facility. (*Id.* at ¶ 12; Docket # 33 at 16).

According to Carlson, on May 28, 2005, the foot of his prosthetic leg broke off, and thereafter he was unable to wear the prosthesis or walk. (Docket # 56 at ¶¶ 18–19). Three days later, on May 31, 2005, he fell down some stairs and tore his rotator cuff. (*Id.* at ¶¶ 29–30; Docket # 43–2 at ¶ 44). On June 27, 2005, Carlson received a new prosthesis, but it did not fit properly and needed adjustment. (Docket # 56 at ¶ 33). On August 10, 2005, Carlson filed a Notice of Intent to File a Claim against New York State regarding the May 31st incident, and he subsequently filed suit in the New York State Court of Claims. (Docket # 44, Ex. F).

On July 14, 2005, Carlson was transferred to Livingston Correctional Facility, a facility designated for inmates with medical and mobility issues, and was evaluated by the Livingston medical unit upon arrival. (Docket # 43–2 at ¶¶ 45–47). Carlson testified that he told the Livingston medical staff that he was still adjusting to his new prosthesis and that he was suffering from six or seven different blister-like "hot spots" and abrasions that made walking uncomfortable. (Docket # 44, Ex. A at 81–83). The medical unit issued a "Program Clearance" indicating that Carlson could not climb stairs, jump, bend or reach "normally" or play contact sports, but was eligible to work in the mess hall. (Docket # 43–2 at ¶ 66).

Carlson subsequently met with defendant Senior Corrections Counselor Jamieson Parry ("Parry") to determine his program assignment. [1] (*Id.* at ¶ 61). Parry advised Carlson that he was required to attend alcohol counseling, known as Alcohol and Substance Abuse Treatment ("ASAT") because he had been incarcerated for an alcohol-related offense. (*Id.*). The parties dispute

whether Parry also told Carlson that he was required to attend Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings. (Docket33 at 4; 43–2 at ¶ 71). According to Parry, he encouraged Carlson to attend those meetings, but did not order it because he did not have the authority to do so. (Docket # 45 at ¶ 27).

[1]    According to defendants, DOCS requires inmates to participate in "programs," which consist of therapeutic, education or vocational activities. (Docket # 43–2 at ¶ 49). "The purpose of programs is to facilitat[e] inmates' appropriate conduct within the facility ..., keep inmates involved in productive tasks, and prepare inmates for their eventual reintegration with society upon their release." (Id. at ¶ 50).

**\*2** Parry assigned Carlson to work in the mess hall in accordance with the program clearance from the medical unit. (Docket # 43–2 at ¶ 63). Carlson objected to the assignment and explained to Parry that his disability would hinder his ability to work in the mess hall. (Id. at ¶ 64). According to Carlson, he told Parry that his prosthesis was broken, he could not stand for long periods of time and could not walk any significant distance. (Docket # 56 at ¶¶ 42–43). In addition, Carlson told Parry that he had injured his shoulder and could not lift any significant weight. (Id.). Carlson showed Parry his residual limb by removing the prosthesis. (Docket # 44, Ex. A at 90).

Carlson contends that Parry responded as follows:

> I must be getting soft as I get older because I'm willing to give you 30 days to get your medical bullshit 'straightened away.' But ... I want you to know that I expect to see your name on every attendance sheet for AA and NA meetings for the next 30 days, because if I don't see your name, believe me when I tell you, I will stick so many programs so far up your ass that you won't be able to sit down and visit with your mama when she comes to visit you!

(Id. at ¶ 44). Parry denies making any such statement. (Docket # 43–2 at ¶ 69). It is undisputed, however, that Carlson was not assigned to any program other than ASAT for the next thirty days. (Id. at ¶ 75).

Carlson contends that from July 24, 2005 until mid-August 2005, he attended AA and NA meetings four nights a week. (Id. at ¶¶ 45, 50). According to Carlson, he walked 1400 yards, or 4/5 of a mile, round-trip in order to attend the meetings. (Id. at ¶ 49). By mid-August, the walking had so aggravated the injuries to his residual limb that he could no longer walk to the meetings. (Id. at ¶¶ 49–50). Specifically, Carlson testified that during August 2005 his tibia broke through the skin of his residual limb and the area became filled with pus. (Docket # 44, Ex. A at 84–85).

According to Carlson, on or about September 1, 2005, he saw Parry, who asked him if he had been attending the AA and NA meetings. (Docket # 56 at ¶¶ 51–52). Carlson told Parry that he "was trying to heal some wounds on the end of [his] stump and as soon as they were healed [he] would continue with the meetings." (Id. at ¶ 52). According to Carlson, Parry responded sarcastically that he would be getting a "nice cushy" job assignment in the mail the next day. (Id. at ¶ 53). The next day, Carlson was assigned to work on the "Utility Gang," a vocational program in which inmates perform outdoor work in "various assignments, including mowing lawns, as well as outdoor cleanup and snow removal." (Docket56 at ¶ 56; 43–2 at ¶¶ 80–83).

Carlson initially alleged that his assignment on the Utility Gang required him to "push[ ] a lawnmower all afternoon," which caused "further trauma and injury" to his leg and that "the tibia in his leg broke through the skin ... and became infected." (Docket # 33 at ¶¶ 39, 43). He later testified at his deposition, however, that he only worked on the Utility Gang for three days and never mowed any lawns. (Docket # 44, Ex. A at 101). Instead, on the first day Carlson "swept up a little bit"; on the second he "played cards"; and, on the third day he received a medical release from the Utility Gang. (Id. at 101–102; Docket # 43–2 at ¶¶ 87–90). Carlson further testified that he suffered no injury from his assignment to the Utility Gang. [2] (Docket # 44, Ex. A at 103).

[2]    This Court rejects Carlson's allegation of injury made in his affidavit opposing this motion because "[i]t is well-settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *E.E. O.C. v. Johnson & Higgins, Inc.,* 1998 WL 778369, \*7 (S.D.N.Y.1998) (quoting *Mack*

*v. United States,* 814 F.2d 120, 124 (2d Cir.1987)).
*See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d
Cir.1996) ("a party does not show a triable issue of
fact merely by submitting an affidavit that disputes
his own prior sworn testimony").

## II. *Conviction at Disciplinary Hearing*

**\*3** Pursuant to DOCS policy, inmates are prohibited
from helping other inmates with their legal work or
possessing other inmates' legal documents. (Docket #
43–2 at ¶¶ 157, 159). In early June 2007, Carlson's
cube was searched by DOCS officers based on an
anonymous tip that he was assisting other inmates
with their legal work without permission. (*Id.* at ¶¶
169, 174, 176). Legal documents belonging to other
inmates, specifically inmates Sanford Bell and George
Rogner, were seized during the search. (*Id.* at ¶ 191). In
addition, correspondence from Carlson's lawyer referring
to inmates McKenna and Crump was also confiscated.
(Docket43–2 at ¶¶ 192–93; 49, Ex. A at 2, 21–22).
Following the search, Carlson was issued a misbehavior
report for possessing other inmates' crime and sentencing
information and providing legal assistance without
approval. (Docket # 43–2 at ¶ 196).

On June 14, 2007, defendant Vocational Supervisor Steve
Smith ("Smith") conducted a Tier III disciplinary hearing,
found Carlson guilty of two of three charges and sentenced
him to serve sixty-three days in the Special Housing Unit
("SITU"). (*Id.* at ¶ 203; Docket # 56 at ¶ 98). Carlson
appealed that conviction and, on January 25, 2008, it was
reversed. (Docket # 43–2 at ¶ 222). By that time, Carlson
had completed his SITU sentence. (Docket # 56 at ¶ 118).

At the hearing, Smith notified Carlson of the charges
against him, as well as his right to defend himself and
to present witnesses and documentary evidence. (Docket
# 43–2 at ¶ 205). Carlson testified at the hearing that
he had sought written permission from the Deputy
Superintendent for Programming ("DSP") to assist both
Bell and Rogner with their legal work, but that he had only
received permission to help Bell. (*Id.* at ¶¶ 163–64, 166–67).
Carlson further testified that during a casual conversation
with an officer named "Lieutenant Bob" ("Lt.Bob") and
Rogner, he had obtained verbal permission to assist
Rogner. (Docket # 56 at ¶ 76). Carlson also admitted
to possessing the letters from his attorney referring to
inmates McKenna and Crump. (Docket # 43–2 at ¶ 210).

At the hearing, Carlson requested that Smith call four
witnesses, including Rogner and Lt. Bob. (*Id.* at ¶¶ 213,
216). Two of the witnesses testified, but Smith did not
call either Rogner or Lt. Bob. Smith explained that he
decided not to call Rogner, who had been transferred from
Livingston, because his testimony would be irrelevant
in view of Carlson's admission that he had not received
written permission from the DSP to assist him, as DOCS's
policy required. (*Id.* at ¶ 216; Docket # 57). With respect
to his decision not to call Lt. Bob, Smith explained at the
hearing that he did not "feel that [Lt. Bob's] testimony
[wa]s going to have any bearing on [Carlson's] guilt or
innocence." (Docket43–2 at ¶¶ 213–14; 49, Ex. A at 29,
30). Smith has further affirmed that, in denying Carlson's
request, he had assumed that "what inmate Carlson
had told me about his conversation with Lt. Bob was
true." (Docket # 49 at ¶ 24).

**\*4** At the conclusion of the hearing, Smith found Carlson
guilty of providing legal assistance without approval and
possessing crime and sentence information pertaining to
other inmates. [3] Smith's written disposition noted that
Carlson had not obtained approval from the DSP to
perform legal work for three of the four inmates whose
work had been found in Carlson's cube. (Docket # 49, ¶
28, Ex. B).

[3]     Smith found Carlson not guilty of possession of an
        altered item. (Docket # 49 at ¶ 28, Ex. B).

## III. *Conditions in the Special Housing Unit*

Carlson spent his first week in SHU at Orleans
Correctional Facility and served the rest at Lakeview
Correctional Facility. (Docket # 44, Ex. A at 122). He
was allowed use of his wheelchair at Orleans, but not at
Lakeview. (*Id.* at 124). Otherwise, the conditions of his
confinement at both facilities were the same. (*Id.* at 122).
Specifically, he was locked in his cell for twenty-three
hours a day, was permitted to shower only two days a
week and had no access to the library, gym, commissary
or AA meetings. (Docket # 56 at ¶¶ 103, 111). In addition,
Carlson alleges that he was not permitted to clean his
residual limb and gel liners on a daily basis as required.
(*Id.* at ¶¶ 114–115).

## IV. *Requests for Accommodation under the ADA*

On May 16, 2005, pursuant to the Americans with
Disabilities Act ("ADA"), Carlson requested a transfer

from Gowanda to a "flat facility" with no stairs. (Docket # 44–2 at ¶¶ 35, 38). On May 19, 2005, his transfer request was granted. (*Id.* at ¶ 42). As discussed above, he was transferred to Livingston on July 14, 2005.

On April 7, 2006, Carlson made a second request for an accommodation under the ADA.[4] (Docket # 44–2 at ¶ 112). Specifically, Carlson requested that he be transferred "to a facility more able to meet [his] needs." (*Id.* at ¶ 115). His request was made on a DOCS Form No. 2614 entitled "Request for Reasonable Accommodation" and was accompanied by a four-page letter to the Superintendent in which he expressed dissatisfaction with his medical treatment, stated that he did not wish to be assigned a mobility assistant, requested new shower chairs and suggested structural changes to be made at Livingston. (*Id.* at ¶¶ 118–23; Docket # 50, Exs. A, B). On May 8, 2006, after it was discussed with DOCS's ADA Coordinator, Carlson's request for a transfer was denied by the Deputy Superintendent for Administrative Services, J. McAnany. (*Id.* at ¶ 141; Docket # 46, Ex. A). In his denial, McAnany noted that a new shower chair had been purchased, a mobility assistant was available and Livingston was designated as a "handicap facility." (Docket # 46 at Ex. A). Carlson wrote a letter to McAnany stating that he disagreed with the denial. (*Id.*). He did not appeal the determination through the grievance program. (Docket # 43–2 at ¶ 146).

[4]    Both parties agree that Carlson's request is erroneously dated "6/7/06," but actually was submitted on "4/7/06." (Docket # 44–2 at ¶ 114).

Defendants have submitted the affidavit of Robert F. Raymond, a former DOCS ADA Coordinator. (Docket # 50 at ¶ 2). According to Raymond, in order for an inmate to seek review of a denial of a requested ADA accommodation, he must file an appeal through the grievance program. (*Id.* at ¶ 17). The DOCS form for requesting ADA accommodations, which Carlson used to make both of his requests, advises the inmate of his right to appeal the denial through the grievance program. (Docket # 50, Ex. B).

### DISCUSSION

**\*5** Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In making this determination, the court must assess whether there are any disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 166–67 (2d Cir.1991). A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248; *Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d 92, 97 (2d Cir.2000). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see also Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d at 97.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, after which the non-moving party must come forward with sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The party seeking to avoid summary judgment "must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 ..., that there are specific factual issues that can only be resolved at trial." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *see also Driscoll v. Townsend,* 60 F.Supp.2d 78, 80 (W.D.N.Y.1999).

As the Second Circuit has explained:

> [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution .... [I]t must be kept in mind that only by reference to the substantive law can it be determined

Case 9:17-cv-00194-TJM-TWD    Document 233    Filed 09/05/17    Page 50 of 211
Carlson v. Parry, Not Reported in F.Supp.2d (2012)
2012 WL 1067866

whether a disputed fact is material to
the resolution of the dispute.

*Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d
1219, 1224 (2d Cir.1994).

### I. *Claims As To Which Carlson Concedes Dismissal*
At oral argument on this motion, Carlson's counsel
conceded that summary judgment is proper on several of
the claims. I address those first.

I turn first to Carlson's claims that Livingston's
Superintendent Malcolm Cully violated his rights under
the First, Eighth and Fourteenth Amendments as alleged
in Count Two of his complaint. At oral argument on this
motion, counsel conceded that Carlson's complaint fails
to allege that Cully was personally involved in any of the
alleged violations and that the claims against him should
be dismissed. *See Wright v. Smith,* 21 F.3d 496, 501 (2d
Cir.1994) (personal involvement of defendants in alleged
constitutional deprivations is a prerequisite to an award
of damages under Section 1983). Accordingly, defendants'
motion for summary judgment on the claims against Cully
is granted.

**\*6** In addition, counsel also conceded that summary
judgment must be granted on Carlson's Section 1983
claims against DOCS because DOCS is immune from
suit under the Eleventh Amendment. *Davis v. New York,*
316 F.3d 93, 101–02 (2d Cir.2002). Both parties agree,
however, that Carlson's claims against DOCS under the
ADA and the Rehabilitation Act remain. *See Tennessee
v. Lane,* 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820
(2004).

Finally, Carlson's complaint asserts various constitutional
violations based on the search of his cube. At oral
argument, however, counsel conceded that these claims
do not fall within the scope of Section 1983 and should
be dismissed. Accordingly, this Court grants summary
judgment on Carlson's claims against defendants Smith,
Clifford and Yonkers regarding the search of his cube.

As a result, the following claims remain: (1) that Parry
violated the Eighth Amendment by (a) requiring Carlson
to attend AA and NA meetings which entailed a
substantial amount of walking and (b) assigning him to
work on the Utility Gang; (2) that Parry made these
assignments in retaliation for Carlson's filing of a Notice

of Claim against New York State; (3) that Smith denied
him due process at the Tier III disciplinary hearing;
and finally, (4) that DOCS failed to accommodate his
disability under the ADA and Rehabilitation Act. I
address each claim in turn below.

### II. *Eighth Amendment Claims Against Parry*
Carlson's complaint asserts claims that Parry acted with
deliberate indifference to his safety as an amputee when
Parry (1) directed Carlson to attend AA and NA meetings,
which required him to walk nearly one mile round-
trip in order to attend, and (2) assigned Carlson to the
Utility Gang, a program that required inmates to perform
outdoor physical labor, such as mowing lawns. [5] Parry
argues that he is entitled to summary judgment on these
Eighth Amendment claims.

[5]    Carlson has admitted that he did not file a grievance
complaining about Parry's actions, claiming that he
did not do so because he was "fearful of further more
severe, retaliation." (Docket # 33 at ¶ 52). Although
the exhaustion requirement is generally mandatory,
an inmate's failure to exhaust may be excused
in some circumstances if an inmate demonstrates
that threats or intimidation either "rendered all
administrative remedies unavailable ... [or that] some
procedures that would ordinarily be available were
effectively unavailable." *Hemphill v. New York,* 380
F.3d 680, 687 (2d Cir.2004). Whether remedies
were unavailable is an objective inquiry, asking
whether "a similarly situated individual of ordinary
firmness have deemed them available." *Id.* at 688
(internal quotation omitted). "[M]ere allegation[s] of
a generalized fear of retaliation [are] insufficient"
to excuse a failure to file a grievance. *Brown v.
Napoli,* 687 F.Supp.2d 295, 297 (W.D.N.Y.2009)
(collecting cases). In addition, the failure to allege
that the inmate was specifically threatened regarding
the grievance procedures may lead to the conclusion
that a similarly-situated individual may have not
considered the administrative remedies unavailable.
*Snyder v. Whittier,* 428 F. App'x 89, 91 (2d Cir.2011).
Defendants do not seek summary judgment on
this ground, however, although they have asserted
failure to exhaust administrative remedies as an
affirmative defense in their answer. (Docket # 34
at ¶ 19). Accordingly, I do not address whether
Carlson's allegation of fear is sufficient to excuse his
failure to grieve Parry's actions.

2012 WL 1067866

Under the Eighth Amendment, inmates are protected from punishments that "involve the unnecessary and wanton infliction of pain," *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995), which include actions that "transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency,' " *Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (quoting *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The Eighth Amendment further requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Prison officials are thus liable under Section 1983 "for harm incurred by an inmate if the officials acted with 'deliberate indifference' to the safety of the inmate." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (quoting *Morales v. New York State Dep't of Corr.,* 842 F.2d 27, 30 (2d Cir.1988)). Determining whether a prison official's actions rise to the level of deliberate indifference requires consideration of a two-part test:

> **\*7** First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

*Hawkins v. Nassau Cnty. Corr. Facility,* 781 F.Supp.2d 107, 112 (E.D.N.Y.2011) (quoting *Hayes v. New York City Dep't of Corr.,* 84 F.3d at 620)); *see also Phelps v. Kapnolas,* 308 F.3d 180, 185–86 (2d Cir.2002).

As to the first prong, a claim for deliberate indifference may lie where a prison official compels an inmate to perform physical labor that is beyond his strength, endangers his life or health or causes undue pain. *See, e.g., Ambrose v. Young,* 474 F.3d 1070, 1078 (8th Cir.2007) (objective component satisfied where corrections officer ordered prisoners to extinguish non-threatening fire within reach of downed power line); *Morgan v. Morgensen,* 465 F.3d 1041, 1045 (9th Cir.2006) (prison must take "reasonable measures to guarantee [inmate's] safety" in work assignments); *Jackson v. Cain,* 864 F.2d 1235, 1247 (5th Cir.1989) (summary judgment for defendants improperly granted on Eighth Amendment claim by prisoner that defendants' requirement that he perform heavy labor aggravated his medical condition); *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (finding colorable Eighth Amendment claim where inmate fell from ladder after warning corrections officer that ladder was unsafe).

An Eighth Amendment claim may also be asserted where prison officials deliberately disregard the unique needs of a disabled inmate. *See, e.g., Frost v. Agnos,* 152 F.3d 1124, 1129 (9th Cir.1998) (denying summary judgment where disabled prisoner on crutches alleged that slippery shower floors created substantial risk to his safety; *Allen v. Morris,* 2010 WL 1382112, \*5 (E.D.Ark.) (denying summary judgment where amputee-inmate alleged that jail showers posed risk to his safety and he was injured as a result of slipping and falling in the shower), *report and recommendation adopted by* 2010 WL 1382116 (E.D.Ark.2010); *Muhammad v. Dep't of Corr.,* 645 F.Supp.2d 299, 317 (D.N.J.2008) (denying summary judgment on Eighth Amendment claim brought by amputee-inmate who was assigned to an upper bunk and whose cell was located far from handicapped-accessible shower); *Lamzot v. Phillips,* 2006 WL 686578, \*5 (S.D.N.Y.2006) (disabled inmate met objective prong of test where he alleged that he was denied access to a handicapped-accessible bathroom).

Based on the above-cited authority, I easily conclude that Carlson's allegations raise a triable issue of fact whether the conditions of his confinement—specifically, the requirements that he walk nearly one mile daily to attend AA and NA meetings and work on the Utility Gang—posed a substantial risk to Carlson's safety.[6]

6    Carlson does not argue that his rights were violated when he was removed from the Utility Gang; therefore, this is not a case where an inmate attempts

to assert a right to a particular job assignment. *See, e.g., Frazier v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996) ("prisoner has no protected liberty interest in a particular job assignment"). Rather, the issue is whether Parry violated Carlson's Eighth Amendment rights by giving Carlson a work assignment that was beyond his physical capabilities.

**\*8** A closer question is whether an issue of fact exists as to the subjective prong of the test, which requires the court to consider whether the prison official had "knowledge that an inmate faces a substantial risk of serious harm *and* ... disregard[ed] that risk by failing to take reasonable measures to abate the harm." *Hayes,* 84 F.3d at 620 (emphasis added). The official must be aware of facts giving rise to an inference that a substantial risk of serious harm exists, and he must also draw that inference. *Id.* The subjective component requires more than a showing of mere negligence. *Farmer v. Brennan,* 511 U.S. at 835.

Construing the facts in favor of Carlson as I must on this motion, they show the following. When Carlson arrived at Livingston, he was suffering from six or seven fluid-filled hot spots on his residual limb. Soon after his arrival, Carlson met with Parry and advised him that he could not work in the mess hall because his prosthesis was broken, could not stand for long periods of time and could not walk any significant distance. Carlson even removed his residual limb from his prosthesis and showed it to Parry. Finally, Carlson told Parry that he had injured his shoulder and could not lift any significant weight. Parry responded by directing Carlson to attend daily AA or NA meetings, which were held in a building approximately 700 yards from Carlson's dormitory. According to Carlson, when he saw Parry a month later, Parry asked whether he had been attending AA and NA meetings. Carlson told him that he was in too much pain to walk the long distance to the meetings and had stopped attending. Parry responded that he would be receiving a "nice cushy" job assignment, and the next day Parry assigned him to the Utility Gang.

Drawing all reasonable inferences in favor of Carlson, I find that an issue of fact exists whether Parry knew, and unreasonably disregarded the risk, that an assignment involving walking nearly a mile daily and performing manual labor would pose a substantial risk to Carlson's safety and health as an amputee. Considering Carlson's conversation with Parry when he arrived at Livingston about his physical limitations and medical

condition, questions of fact plainly exist as to the extent of Parry's knowledge of both and the risks posed by walking long distances and performing manual labor. [7] *See, e.g., Jackson v. Cain,* 864 F.2d at 1247 (denying summary judgment where inmate alleged that he had notified medical personnel that his condition required special treatment and his work assignment was causing him injury); *Walker v. Dep't of Corr. Serv.,* 2012 WL 527210, \*2 (S.D.N.Y.2012) (claim for deliberate indifference may be supported by allegation that plaintiff "informed [defendant] as to his alleged medical problem, and that [defendant] understood the condition to necessitate allowances or accommodations that [defendant] purposely withheld from plaintiff"); *Allen v. Morris,* 2010 WL 1382112 at \*5 (denying summary judgment where amputee-inmate alleged that he told jail officials that he needed a shower chair but his request was denied); *Lamzot v. Phillips,* 2006 WL 686578 at \*6 (denying summary judgment where inmate alleged that he twice advised defendant officer that using a non-handicapped bathroom was dangerous, but officer ordered him to use it anyway). Accordingly, I deny summary judgment on Carlson's Eighth Amendment claims against Parry.

7      Although Carlson performed minimal manual labor while assigned to the Utility Gang, the absence of physical injury does not warrant summary judgment, but may limit Carlson's available damages. *See Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002) (under Section 1997e(e) of the PLRA, an inmate cannot "recover for damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury"; for this reason, where no physical injury is alleged, an inmate's damages are limited to nominal or punitive damages); *Hill v. Washburn,* 2011 WL 846558, \*8 (W.D.N.Y.2011) (Section 1997e(e) does not limit the availability of nominal damages). A review of Carlson's complaint reveals that he has asserted a claim for punitive damages against Parry. (Docket # 33 at ¶ 56).

### III. *Retaliation Claim Against Parry*

**\*9** I turn next to Carlson's claim that Parry assigned him to the Utility Gang in retaliation for filing a Notice of Intent to sue the State. Specifically, Carlson claims "upon information and belief" that Parry knew of his Notice of Intent and that Parry's conduct was "at least partly in retaliation for [p]laintiff's exercise of constitutionally

guaranteed rights." (Docket # 33 at ¶¶ 53–54). In addition, a fair reading of Carlson's complaint reveals a claim that Parry assigned him to the Utility Gang in retaliation for Carlson's decision to stop attending AA and NA meetings. (*Id.* at ¶¶ 27, 37–39).

Courts examine prisoner retaliation claims "with skepticism and particular care" because they are easily fabricated. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003); *Smith v. Napoli,* 2007 WL 4180708, *3 (W.D.N.Y.2007).* To establish a First Amendment retaliation claim, a plaintiff must demonstrate that (1) the conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected activity and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004).* Within the prison context, a common form of constitutionally protected speech is the filing of a lawsuit or inmate grievance. *See, e.g., Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (neither party disputes that prosecution of a lawsuit and the filing of grievances are constitutionally protected activities); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ( "[t]he right to petition government for redress of grievances—in both judicial and administrative forums—is among the most precious of the liberties safeguarded by the Bill of Rights") (internal quotation omitted); *Colon v. Coughlin,* 58 F.3d at 872.

First, no question exists that Carlson's filing of a Notice of Intent qualifies as activity protected under the First Amendment. His decision to stop attending AA and NA meetings, however, is not protected activity. Second, considering his condition as an amputee, Carlson's assignment to an outdoor work crew may be considered an adverse action. *See Davis v. Goord,* 320 F.3d at 353 ("[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation"). This leaves the third question of the causal connection between Carlson's filing of the Notice of Intent and his assignment to the Utility Gang. On this issue, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 354 (internal quotation omitted).

Although conclusory allegations of a retaliatory motive are insufficient to survive a motion for summary judgment, *Webster v. Fischer,* 694 F.Supp.2d 163, 183

(N.D.N.Y.), *aff'd,* 398 F. App'x 683 (2d Cir.2010), the temporal proximity between the protected conduct and the adverse action may reasonably support an inference of a retaliatory motive, *id; Davis,* 320 F.3d at 354. The Second Circuit has declined to draw "a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," preferring instead that a district court exercise its judgment "about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (internal quotation omitted). In the exercise of that judgment, courts frequently have concluded that evidence of a close temporal proximity, without more, is insufficient to raise a triable issue of fact. *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 371 (S.D.N.Y.2011) (temporal proximity in combination with plaintiff's good prison record insufficient to defeat summary judgment); *Webster v. Fischer,* 694 F.Supp.2d at 183–84 (proximity of two months between complaints and misbehavior reports insufficient where plaintiff did not have favorable disciplinary record); *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) (fact that misbehavior report was filed three days after filing grievance did not raise triable issue of fact on retaliation claim).

**\*10** In this case, Carlson filed his Notice of Intent on August 15, 2005. Approximately two weeks later, on September 2, 2005, Carlson learned that he had been assigned to the Utility Gang. Carlson has failed, however, to offer any direct or other circumstantial evidence that Parry knew of, let alone was motivated by, Carlson's filing of the Notice of Intent. *Cf. Colon,* 58 F.3d at 873 (plaintiff alleged that defendant had admitted a retaliatory scheme). Indeed, the Notice of Intent did not name Parry, but named the State of New York, and related to an incident that had occurred in a different facility from the one in which Parry worked. (Docket # 44, Ex. F). On this record, I find that Carlson has failed to adduce any facts or credible inferences that Parry even knew about Carlson's filing when he assigned Carlson to the Utility Gang. *Compare Colon,* 58 F.3d at 873 ("if ... circumstantial evidence [of temporal proximity] represented the sum total of [prisoner-plaintiff's] proof, we might be inclined to affirm the grant of summary judgment based on the weakness of [his] case") *and Brown v. Graham,* 2010 WL 6428251, *18–19 (N.D.N.Y.2010) (denying

summary judgment where sole evidence consisted of temporal proximity and no evidence that defendant was aware of plaintiff's grievance), *report and recommendation adopted by* 2011 WL 1213482 (N.D.N.Y.2011), *aff'd,* 2012 WL 933993 (2d Cir.2012) *with* Solman v. Manzi, 2010 WL 3829149, *1 (D.Conn.2010) (granting motion to reconsider dismissal of retaliation claim where inmate alleged that officer filed misbehavior report two weeks after he filed grievance about the same officer); and *Zaire v. Doe,* 2006 WL 1994848, *5 (N.D.N.Y.2006) (denying summary judgment where officer was aware of plaintiff's favorable verdict in lawsuit and officer filed false misbehavior reports two weeks after verdict).

Accordingly, I grant Parry's motion for summary judgment on Carlson's retaliation claim. [8]

[8]    To the extent that Carlson's complaint may be read to include claims of retaliation for requesting ADA accommodations, those claims are defeated by Carlson's admission during his deposition that he was not retaliated against for those reasons. (Docket # 44, Ex. A at 76).

#### IV. *Due Process Claims Against Smith*

To survive a motion for summary judgment on a claim of denial of due process in connection with a disciplinary hearing, the inmate must establish that his punishment was sufficiently severe to implicate a liberty interest. *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (plaintiff "had 'no right to due process [at his hearing] *unless* a liberty interest' was infringed as a result") (quoting *Scott v. Albury,* 156 F.3d 283, 287 (2d Cir.1998)) (emphasis in original); *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000). A prisoner's liberty interest is implicated by a disciplinary sentence to SHU confinement only where the confinement "imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Palmer v. Richards,* 364 F.3d at 64 (quoting *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). Of course, where an inmate is afforded all the process he was due, the issue of whether a liberty interest is implicated is immaterial. *See id.* at 64, n. 1. For the reasons discussed below, I find that Carlson was afforded all the process he was due at his disciplinary hearing; accordingly, I do not address whether his sixty-three day sentence in SITU implicated a liberty interest. [9]

[9]    In this case, the liberty interest issue would involve consideration of Carlson's claims that he was denied use of a wheelchair and was not permitted to clean his limb and gel liners on a daily basis as he required. *See* Palmer, 364 F.3d at 65 ("SITU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SITU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SITU conditions were, in fact, atypical").

*11   In order to satisfy due process requirements, a prison disciplinary proceeding must afford the prisoner: notice of the charges; the opportunity to call witnesses and present documentary evidence; and, a written statement from the fact finder as to the evidence relied upon and the reasons for the disciplinary action taken. *Wolff v. McDonnell,* 418 U.S. 539, 563–66, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Here, Carlson contends that Smith deprived him of the right to counsel, to confront witnesses, to call witnesses and to review the evidence against him. (Docket # 33 at ¶ 96). Because the Constitution does not require the right to counsel in a prison disciplinary hearing, I grant summary judgment to defendants on that claim. [10] *See* Silva v. Casey, 992 F.2d 20, 22 (2d Cir.1993) (inmate entitled to "some assistance" in marshaling his defense under certain circumstances, but not entitled to obtain counsel); *Loving v. Selsky,* 2009 WL 87452, *1–2 (W.D.N.Y.2009) (inmate's right to assistance during disciplinary hearing "fall [s] far short of the right to counsel that the Sixth Amendment guarantees to criminal defendants").

[10]    At the hearing, Smith advised Carlson that he was not entitled to a hearing assistant because he was not in SITU or keeplock confinement. (Docket # 43–2 at ¶ 206).

#### A. *Denial of Witnesses*

Carlson alleges that Smith's failure to call Rogner and Lt. Bob as witnesses at the disciplinary hearing violated his right to due process under the Fourteenth Amendment.

"[T]he prisoner's right to call witnesses and present evidence in disciplinary hearings [may] be denied if granting the request would be 'unduly hazardous to institutional safety or correctional goals.' " *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986) (quoting *Ponte v. Real,* 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985)). A hearing officer may also refuse to call witnesses if their

testimony would be insufficiently exculpatory, immaterial or cumulative. *E.g., Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992) (prisoner's request for witness may be denied on grounds of relevance); *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (inmate's right to call witnesses and present evidence at disciplinary hearing may be denied if requested evidence would be irrelevant or unnecessary). A hearing officer may not, however, deny such a request without a finding that the witness's testimony would be unnecessary or would jeopardize institutional goals. *Walker v. Bates,* 23 F.3d 652, 659 (2d Cir.1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995).

Here, Smith has affirmed that, in denying Carlson's requests to call the two witnesses, he credited Carlson's testimony about his conversation with Lt. Bob and Rogner. Carlson was nonetheless found guilty of assisting other inmates because Carlson had not obtained permission from the DSP, as DOCS policy required. Because Smith credited Carlson's version of his conversation with Lt. Bob and Rogner, their testimony would have been cumulative and immaterial to the question of whether Carlson had obtained permission from the DSP. Thus, Smith did not violate due process by denying Carlson's request that Lt. Bob and Rogner be called as witnesses.

### B. *Opportunity to See Documentary Evidence*

**\*12** Carlson's complaint also alleges he was not permitted to see the evidence presented against him —specifically, the material that was inventoried as "objectionable content" on his misbehavior report. (Docket33 at ¶¶ 84, 96; 56 at ¶ 89).

Due process considerations entitle an inmate to view evidence critical to his guilt or innocence of disciplinary charges. *See, e.g., Young v. Lynch,* 846 F.2d 960, 963 (4th Cir.1988) (due process may require production of evidence "when it is the dispositive item of proof, it is critical to the inmate's defense, it is in the custody of prison officials, and it could be produced without impairing institutional concerns"). In this case, however, Carlson admitted to possessing the material giving rise to the disciplinary charges. (Docket43–2 at ¶¶ 209–10; 57 at ¶¶ 209–10). Carlson's sole defense was Lt. Bob's alleged verbal permission. Under these circumstances, no due process violation occurred.

### C. *Sufficiency of the Evidence*

Finally, I reject Carlson's challenge that his disciplinary conviction violates due process. (*See* Docket # 33 at ¶¶ 118–120). Under the due process clause, the results of a hearing must be supported by reliable evidence in the record. *See Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (disciplinary decision must be supported by "some evidence in the record"); *Luna v. Pico,* 356 F.3d 481, 489 (2d Cir.2004) (interpreting *Hill* to require "reliable evidence"). Here, the hearing record included evidence that Carlson admitted possessing legal materials relating to four inmates, three of whom he had not obtained permission from the DSP to assist. The hearing officer's determination of guilt was supported by "reliable evidence" in the record and thus does not violate due process.

## V. *ADA and the Rehabilitation Act Claims Against DOCS*

Finally, I address Carlson's claims under the ADA and the Rehabilitation Act in Counts Three and Four of his complaint, alleging that he was denied reasonable accommodations, such as ramps and accessible facilities. [11] (*See* Docket # 33). Defendants contend that summary judgment is warranted because Carlson failed to exhaust his administrative remedies before filing suit.

[11]     Although there are "subtle differences" between the ADA and the Rehabilitation Act, claims brought under those statutes are to be treated "identically" unless one of the distinctions is relevant to the case. *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003) (considering together claims regarding reasonable accommodations under the ADA and Rehabilitation Act) (citing *Weixel v. Bd. of Educ. of City of New York,* 287 F.3d 138, 146 n. 6 (2d Cir.2002)), *cert. denied,* 541 U.S. 936 (2004).

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v.*

Case 9:17-cv-00194-TJM-TWD    Document 233    Filed 09/05/17    Page 56 of 211
Carlson v. Parry, Not Reported in F.Supp.2d (2012)
2012 WL 1067866

*Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

"The ADA falls within the rubric of 'any other federal law.' " *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 442 (S.D.N.Y.2004). Thus, under the PLRA, ADA and Rehabilitation Act claims must be exhausted administratively prior to raising them in federal court. *Pacheco v. Zurlo,* 2011 WL 1103102, *2 (N.D.N.Y.), report and recommendation adopted by, 2011 WL 1102769 (N.D.N.Y.2011); *Alster v. Goord,* 745 F.Supp.2d 317, 322 (S.D.N.Y.2010); *Arce v. O'Connell,* 427 F.Supp.2d 435, 440 (S.D.N.Y.2006).

**\*13** To properly exhaust a claim, a prisoner must comply with the prison's grievance procedure. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). An inmate must exhaust all available remedies, even where the inmate seeks relief that is unavailable in grievance proceedings, including money damages. *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). It is undisputed that DOCS has an established grievance procedure through which prisoners may complain about prison conditions, including the denial of requested disability accommodations. (Docket # 50 at ¶ 17, Ex. A). See *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002); *Pacheco v. Zurlo,* 2011 WL 1103102 at *3–5 (inmate who did not complete DOCS's three-tier grievance process before filing complaint under the ADA failed to exhaust administrative remedies).

Here, Carlson filed two requests for reasonable accommodations while he was incarcerated. The first was granted, [12] and the second was denied. Carlson did not appeal the denial of his second request through the grievance process. There is no evidence in the record that he was prevented from doing so. Although, as discussed above, Carlson alleged that he was afraid to grieve Parry's actions, he has made no such allegation regarding filing grievances related to his ADA and Rehabilitation Act claims.

[12]    Carlson argues that even though his first accommodation request was granted, the delay in transfer from Gowanda to Livingston amounted to a *de facto* denial of that request. A delay in implementing an accommodation does not violate the

ADA, however, unless the delay was unreasonable or plaintiff has provided evidence of discriminatory intent. *Lyman v. City of New York,* 2003 WL 22171518, *6 (S.D.N.Y.2003); *Powers v. Polygram Holding, Inc.,* 40 F.Supp.2d 195, 202 (S.D.N.Y.1999). Here, Carlson has admitted defendants' assertion that Carlson "was required to be housed in a facility in the same geographic region as Gowanda (known as the "Wende hub") [and] it took some time to coordinate the transfer." (Docket # 57 at ¶ 43). The record simply contains no evidence of any purposeful delay or discriminatory intent.

To the extent that Carlson's complaint attempts to base an ADA or Rehabilitation Act claim on issues other than those raised in his two accommodation requests —such as, the requirement that he climb and descend stairs, walk long distances and "do vigorous physical labor" on an ill-fitting prosthesis (Docket # 60 at 16–17) —the record demonstrates that he failed to pursue those issues administratively. Thus, having failed to exhaust his administrative remedies, Carlson is barred from seeking judicial relief. See *Jones v. Bock,* 549 U.S. at 211 ("[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court") (internal citations omitted).

Accordingly, because no issue of fact exists that Carlson failed to exhaust his administrative remedies, summary judgment is granted to defendants on Carlson's claims under the ADA and Rehabilitation Act.

### CONCLUSION

For the reasons stated above, defendants' motion for summary judgment **(Docket # 43)** is **GRANTED in PART** and **DENIED in PART.** Specifically, summary judgment is granted on all claims except Carlson's Eighth Amendment claims against Parry. A *telephone conference* shall be held on **May 2, 2012,** at **11:30 a.m.,** to set a trial date.

### IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1067866

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Arnett v. Shojaie, C.D.Cal., November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
|
March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony

was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial adjudication." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R.

2010 WL 1235591

§§ 701.5, 701.6(g), 701.7. [1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence. [2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

[1]    See also *White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

[2]    The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied. [3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process. [4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number. [5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative. [6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

[3]    *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

[4]    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step.); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez*

Case 9:17-cv-00194-TJM-TWD    Document 233    Filed 09/05/17    Page 59 of 211
Murray v. Palmer, Not Reported in F.Supp.2d (2010)

2010 WL 1235591

*v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5    Compare *Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies,

plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6    *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3**  "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). [7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, [8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim. [9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim, [10] (b) the inmate was specifically informed that the claim in question was grievable, [11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC, [12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion, [13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC. [14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim, [15] and/or (b) the inmate did not appeal his disciplinary hearing conviction. [16]

[7]     The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled

any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

8      *Giano,* 380 F.3d at 678 (["W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9      *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10     *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007)

(McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11     *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12     *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13     *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14     *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

15     *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied

his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

16      See, e.g., Colon v. Furlani, 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; Cassano v. Powers, 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

*4  Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. See, e.g., Sease v. Phillips, 06-CV-3663, 2008 WL 2901966, *4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies are available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances."[17]

17      See Hemphill, 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner

plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); Verley v. Wright, 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); Winston v. Woodward, 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under Hemphill of demonstrating 'special circumstances' "; see also Ramirez v. Martinez, 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); Washington v. Proffit, 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than the Court.[18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury.[19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law.[20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.)[21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." Snider v. Melindez, 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue

for a judge. See *Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied,* --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury.[22]

18      *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

19      *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

20      *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating

to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law." [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21      *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law.

The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

22    *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied, ---U.S. ----,* 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

 **\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at *8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 380F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during

the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [25]

[23]    The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

[24]    In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restraints against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance Number

GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

[25]    For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

**B. Estoppel**

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

[26]    *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008)

Case 9:17-cv-00194-TJM-TWD   Document 233   Filed 09/05/17   Page 66 of 211
Murray v. Palmer, Not Reported in F.Supp.2d (2010)
2010 WL 1235591

(Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from raising the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone

employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

## C. Special Circumstances

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at *8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was

not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/ or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations, [27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order. [28]

[27]  *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

[28]  The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a

letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

*7  For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is *DISMISSED* **in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1235591

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 6935254
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09−CV−0742 (GLS/DEP).
|
Oct. 4, 2012.

**Attorneys and Law Firms**

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Charles E. Roberts, Esq., Assistant U.S. Attorney, of counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Everton Bailey, a federal prison inmate, has commenced this *Bivens*[1] action against defendant Michelle Fortier, a corrections officer stationed at the prison facility in which Bailey was confined at the relevant times, alleging deprivation of his civil rights. Bailey's claims are based upon Fortier's alleged failure to protect him from an assault by a cellmate, despite having registered prior complaints expressing fear for his safety.

[1]   *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

Currently at the forefront of the action is the threshold question of whether Bailey, who admits that he did not file a grievance following the procedures in place at Bureau of Prisons ("BOP") facilities, should be excused from the requirement of exhausting administrative remedies before commencing suit due to the alleged refusal of prison officials to provide him with the forms necessary to file a grievance. Because I find, based upon an evidentiary hearing conducted, that Bailey was not prevented by the actions of prison officials from filing a grievance regarding his claim against Fortier, and that he has offered no special circumstances providing a basis to excuse his failure to exhaust administrative remedies, I recommend that his complaint be dismissed on this procedural basis, without addressing its merits.

I. *BACKGROUND*

Bailey is a federal prison inmate currently being held in the custody of the BOP as a result of a 2007 criminal conviction entered in the United States District Court for the Eastern District of Pennsylvania. *See generally* Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt. No. 10−4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt. No. 44) at p. 84.[2] While he is presently housed in another BOP facility, at times relevant to this litigation Bailey was designated by the BOP to the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York. *Id.*

[2]   The June 20, 2012 Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. ____".

On the morning of February 23, 2009, while housed in a six-person cell in the Mohawk Housing Unit at FCI Ray Brook, Bailey was confronted and physically assaulted by one of his cellmates after being accused of stealing that inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8−9; *see also* VanWeelden Decl. (Dkt. No. 10−4) Exh. D. Bailey reported the incident to Fortier, and requested that he be moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That request was denied, and Bailey was directed by Fortier to return to his cell in light of an impending inmate count. *Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by the same inmate, who on this occasion threw hot oil from a ceramic mug onto his face.[3] Complaint (Dkt. No. 1) ¶ 13; VanWeelden Decl. (Dkt. No. 10−4) Exh. D; Tr. 100, 145. Bailey suffered second degree burns to his face resulting in his being hospitalized at an outside medical facility for a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13−14; Tr. 32, 84−85. Upon his return to FCI Ray Brook, Bailey was placed in a special housing unit ("SHU") cell, where he remained until he was transferred to another BOP facility. Tr. 59−60, 85.

3      According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

**\*2** The BOP has established an Administrative Remedy Program ("ARP"), comprised of a four-step administrative process through which inmates can seek formal internal review of any complaint regarding any aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10 *et seq.; see also Macias v. Zenk,* 495 F.3d 37, 42 (2d Cir.2007). In accordance with the established ARP protocol, an inmate must first attempt informal resolution of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d Cir.2004). This informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint.[4] Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); *see also Johnson,* 380 F.3d at 693. That twenty-day period, however, can be extended in appropriate circumstances.[5] Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at 693. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

4      Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

5      Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. *See* Tr.

43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. *See* Tr. 34, 43.

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for commencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. *See* Tr. 72, 131, 146–47, 153, 155, 168; *see also* Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor.[6] Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. *See, e.g.,* Tr. 126, 129–30, 140–41, 165.

6      Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was required to visit inmates in the

SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No." [7] *Id.*

[7]    During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

## II. *PROCEDURAL HISTORY*
Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Officer M. Fortier as the sole named defendant, and alleges that she violated his constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his

failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord, 652 F.3d 305 (2d Cir.2011),* in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, 2012, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties. [8] , [9]

[8]    The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco, 814 F.2d 859, 862 (2d Cir.1987).* At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

[9]    Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January 2012 to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

## III. *DISCUSSION*

2012 WL 6935254

A. *Governing Legal Principles*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 WL 276206, at *4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must determine whether the plaintiff has established the existence of special circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements. [10] , [11] *Id.*

[10]    In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantively exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford* would have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 WL 4326747, at *6 (S.D.N.Y. Dec.4, 2007). It therefore appears that the teachings

of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

11     In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

### B. *Burden of Proof*

Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003)); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for example—that typically require the party asserting them to bear the ultimate burden of proof. *See e.g., Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R.R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

**\*6** Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at * 4 and n. 17 (N.D.N.Y. Mar.31, 2010)

(Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

### C. *Application of Governing Legal Principles*

#### 1. *Availability of Administrative Remedy*

In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison

officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

### 2. *Presentation of Defense/Estoppel*

**\*7** The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff clearly failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)."). Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, 2012 WL 4026840, at \*3 (N.D.N.Y. Sept.12, 2012) (Suddaby, J.) (citing *Murray,* 2010 WL 1235591, at \*5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 WL 4345299, at \*4 (citing *Bennett v. James,* 737 F.Supp.2d 219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through

her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and cooperate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,* 2012 WL 4026840, at \* 3. Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

### 3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at \*10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at \*10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 WL 1235591, at \*6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

**\*8** During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative

remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

## IV. *SUMMARY AND RECOMMENDATION*

The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from

the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6935254

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00194-TJM-TWD   Document 233   Filed 09/05/17   Page 75 of 211

2015 WL 1808626
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Kevin D. CRICHLOW, Plaintiff

v.

Deputy K. CROWLEY, et al., Defendants.

No. 13–CV–6624 CJS.
|
Signed April 20, 2015.
|
Filed April 21, 2015.

**Attorneys and Law Firms**

Kevin Damion Crichlow, Alden, NY, pro se.

Hillel David Deutsch, NYS Attorney General's Office, Rochester, NY, for Defendants.

DECISION AND ORDER

CHARLES J. SIRAGUSA, District Judge.

INTRODUCTION

*1  This is an action pursuant to 42 U.S.C. § 1983, the Americans With Disabilities Act and the Rehabilitation Act, in which Kevin Crichlow ("Plaintiff"), an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), proceeding *pro se,* alleges that staff at Wende Correctional Facility ("Wende") violated his federal constitutional and statutory rights in various ways. Now before the Court is Defendants' motion for summary judgment (Docket No. [# 9] ). The application is granted.

BACKGROUND

On November 20, 2013, Plaintiff commenced this action. The Complaint (Docket No. [# 1] ) is a rambling, non-chronological, frequently-repetitive, sixty-six page document, asserting a litany of claims going back several years.[1] However, after carefully reviewing Plaintiff's

Complaint and other submissions multiple times, it appears clear that he is asserting the following claims:

[1]  The Complaint is apparently similar to a different complaint that Plaintiff filed in the Southern District, about which the Judge observed: "It is difficult to determine what Plaintiff's claims or allegations are, as the Amended Complaint reads like a stream of consciousness the length of a short novel, covering approximately four years' worth of events of all sorts and citing long strings of statutes and cases[.]" *Crichlow v. Fischer,* No. 12–cv–7774 (NSR), 2015 WL 678725 at *1 (S.D.N.Y. Feb. 17, 2015).

*Assaults by Staff and Failure to Protect from Inmate Assaults*

Plaintiff claims that on August 7, 2013, he was assaulted by an inmate named Coleman ("Coleman"), and that a few minutes later, Corrections Sergeant Parkin ("Parkin"), or perhaps "Parker," Corrections Officer Scherer ("Scherer") and Corrections Officer Alvarado ("Alvarado") also assaulted him, while expressing their approval of Coleman's attack. In that regard, Plaintiff alleges that Wende staff employed Coleman as an "enforcer" to retaliate against inmates. Plaintiff further contends that after the assault, Nurse Sedar ("Sedar") failed to properly treat or document his injuries. Subsequently, on or about September 23, 2013, Coleman attacked Plaintiff again, and Corrections Officer Rome ("Rome"), ran away from the fight, rather than intervening.

*Inadequate Medical Care*

Plaintiff claims to suffer from an infectious disease, and maintains that he is being denied a required supplemental diet. Plaintiff also contends that he was denied pain medication and appropriate treatment for a hernia, an injury to his right hand/wrist/arm, and an injury to his jaw.

*Retaliation*

Plaintiff contends that he has repeatedly experienced retaliation for writing inmate grievances, and that such retaliation includes the aforementioned assaults, the issuance of false misbehavior reports, the confiscation of his property and the refusal to treat his medical conditions.

Crichlow v. Crowley, Not Reported in F.Supp.3d (2015)

2015 WL 1808626

*Conditions of Confinement*

Plaintiff contends that he should not have been placed at Wende. *See,* Complaint [# 1] at p. 2 ("[I] was wrongfully tranfer[red] from Eastern [Correction Facility] to a high-risk facility for violent offenders, Wende."). Plaintiff also maintains that there is an unusually high incidence of violence at Wende that is part of a "Fight Club" promoted by Wende staff. Plaintiff further contends that living conditions at Wende are unconstitutional due to overcrowding, lack of recreation, lack of reading lights, [2] lack of personal care items such as toothpaste and soap, lack of legal supplies, lack of laundry service, exposure to asbestos [3] and insect infestation.

[2]    Plaintiff claims that on numerous instances in 2012 and 2013, Corrections Sergeant Johnson ("Johnson") denied him the opportunity to exercise.

[3]    Plaintiff previously sue DOCCS over an alleged exposure to asbestos at Rikers Island. *See, Bush, et al. v. Horn,* No. 07 Civ. 3231(RJS)(FM), 2010 WL 1712024 (S.D.N.Y. Mar. 2, 2010).

*Accommodations for a Disability*

**\*2**  Plaintiff contends that he has a hearing disability, and that he is being denied items including a special alarm clock, telephone amplifier and headphones.

*Equal Protection*

Plaintiff claims to be asserting a "class of one" equal protection claim, based on retaliation against him for filing grievances. *See,* Docket No. [# 16] at p. 13 (Indicating that Defendant treated him differently, without a rational basis: "Defendants retaliated against Plaintiff for pursuing various administrative and legal claims against Defendants."). However, the purported equal protection claims seems to be duplicative of his First Amendment retaliation claim.

On June 11, 2014, Defendants filed the subject pre-answer Motion for Summary Judgment [# 9], including the required *Irby* notice. Defendants maintain that Plaintiff failed to exhaust his administrative remedies as to "nearly all" of his claims prior to commencing this action, in violation of 42 U.S.C. § 1997e(a). In that regard, Defendants maintain that prior to commencing this action, Plaintiff exhausted only one pertinent administrative grievance, which concerned an incident in

which Defendant Nurse Cook ("Cook") allegedly handed Plaintiff a can of nutritional supplement while she was not wearing surgical gloves, and after she had coughed into her hand. Defendant allegedly told Cook that she needed to wear gloves, but Cook responded by calling Plaintiff the "N word" and issuing him a "false" misbehavior report. However, while Defendants admit that Plaintiff exhausted that claim administratively, they deny that Cook's alleged conduct amounts to an actionable claim. Defendants state that Plaintiff also exhausted a grievance concerning alleged assault by staff, [4] but not until after he filed this action. Defendants further maintain that any claims against them in their official capacities are barred.

[4]    Grievance WDE–38314–13 indicates that Plaintiff was assaulted by staff on August 7, 2013. As part of the investigation of the grievance, Plaintiff indicated that he was assaulted by Corrections Officer Alvarado, Corrections Officer Barrett, Corrections Officer Schultz, and Corrections Sergeant Parkin. Docket No. [# 9–5] at p. 57. Plaintiff further indicated that Nurse Sedar failed to properly document his injuries. Plaintiff commenced this action on November 20, 2013, and the grievance was not exhausted until February 26, 2014.

In response to Defendants' motion, Plaintiff submitted two documents [# 15] [# 16] which are largely unresponsive to the motion, in that they focus on the merits of the underlying claims, rather than on whether he exhausted his administrative remedies. Plaintiff also spends pages discussing other issues not raised by Defendants in their motion, such as standing, and 42 U.S.C. § 1997e(e)'s limitation on damages. [5]

[5]    *See,* Docket No. [# 15], "Response" Memorandum of Law at pp. 14–15, 16–17.

Interspersed among his discussion of the merits, however, Plaintiff includes a few sentences pertaining to the exhaustion of remedies. [6] For example, Plaintiff maintains that one of his grievances was "granted," and is therefore deemed exhausted. *See,* Docket No. [# 15], attached memo of law at p. 10 ("[T]he Second Circuit Court of Appeal has held that an inmate need not appeal a favorable grievance decision in order to exhaust administrative remedies.") (*citing Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004)). Specifically, Plaintiff contends that after he filed a grievance concerning alleged assaults and failure to intervene by staff (Grievance Non. WDE

38314–13), the DOCCS Inspector General ("IG") "took over" the investigation. *See,* Docket No. [# 16] at p. 5. Plaintiff contends that such grievance should be considered to have been resolved in his favor and/or exhausted, since the IG investigated his claim.

6   *See, e.g.,* Docket No. [# 15], "Response" Memorandum of Law at pp. 9–10, wherein Plaintiff focuses on exhaustion for a few sentences, but then drifts back into a discussion of the merits of his claims. In all, Plaintiff's response[# 15][# 16] to Defendants' motion consists of one-hundred thirty-two pages, of which there are perhaps 3–4 pages dealing with administrative remedies.

**\*3** Plaintiff also contends that he exhausted a grievance concerning his conditions of confinement claim, and specifically, the lack of supplies to clean his cell, which was granted. See, Docket No. [# 16], Ex. C (Grievance No. WDE 39555–14). However, that grievance was not filed until after this action was commenced. Plaintiff also seems to indicate that he exhausted his claims by appealing from adverse determinations at disciplinary hearings.

Additionally, Plaintiff contends that the staff at Wende interfered with his ability to exhaust his administrative claims by retaliating against him for filing grievances. See, Docket No. [# 16] at p. 11 ("I, Plaintiff [have been] threat[ened] by staff and assault[ed] by staff and inmate[s] enforcing for staff at Wende C.F. for filing a lot of grievances."); see also Docket No. [# 15] at p. 3 (referring to "mishandling of various inmate grievances"); *id.* at 5 ("They send back paper from grievances say I drop my complaint. Then I would have [to] write the whole thing up again. This is one of the reasons why I had to write so much"); *id.* at 6 (indicating that he was assaulted "by a inmate that work[s] in Grievances as a[e]nfo[r]cer for Wende."); *id.,* attached Rule 56 stmt. at p. 4 ("Plaintiff claims that Defendant Haygood and other senior staff[ ] [members] interfered with Plaintiff's filing of inmate grievances by losing or ignoring numerous, but unspecified grievances Plaintiff filed.").

The Court notes, however, that Plaintiff's reference to staff "losing" or destroying his grievances appears to refer to incidents in which his personal legal papers were lost long after he filed his grievances. For example, Plaintiff contends that on September 13, 2011, a civil complaint, with attachments including "over 200 grievances," that he was attempting to send to the Southern District of

New York in connection with a lawsuit went missing, and was not received by the Court. See, Docket No. [# 15], "Declaration Under Penalty of Perjury of Kevin Crichlow" at ¶ 3. Similarly, Plaintiff contends that on one occasion, Defendant Corrections Officer Haygood was supposed to make a photocopy of a civil complaint for him, but she went on vacation and either lost or destroyed the documents. 7 The loss of such documents, though, is not pertinent to the issue of exhaustion of administrative remedies, and Defendants' counsel has provided Plaintiff with copies of all of his lost grievances.

7   *See,* Docket No. [# 15], Rule 56 Stmt., at p. 4; see also, Complaint [# 1] at ¶ ¶ 4, 52 and attached affidavit of inmate Tim Jones (Indicating that on August 24, 2013, C.O. Arlethia Haygood took Plaintiff's § 1983 complaint to make copies for him, went on vacation, failed to return the documents, apologized to Plaintiff for losing his documents, but later denied losing the documents and attempted to cover up the loss.); accord, Docket No. [# 16] at p. 6. Plaintiff also vaguely alleges that "prison staff" "lost or ignored" other grievances. See, Docket No. 16] at p. 4.

With regard to Defendants' application for summary judgment on the merits of the claim against Cook, Plaintiff responds only as follows: 1) he states that Cook "has a history of racial slurs, false misbehavior reports[,] harassment and denial of medical care"; 8 2) he states that Cook "denied equal protection of the law"; 9 3) he states that Cook "discriminat[ed] against me at medication on 10.26.12 ... she call[ed] me a "nigger" [be]cause I asked[ed] her to put on gloves [be]cause she as coughing and covering her mouth with her hand"; 10 and 4) he states that "Nurse Cook made up misbehavior report to cover up her misconduct." 11

8   Docket No. [# 16] at p. 3.

9   *Id.* at p. 12.

10   Docket No. [# 15] at p. 4.

11   Docket No. [# 15], attached Rule 56 stmnt. at p. 3.

**\*4** The Court granted Defendants an opportunity to file a reply, see, Order [# 14], but they declined to do so.

DISCUSSION

## Rule 56

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993). Moreover, since Plaintiff is proceeding *pro se,* the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

The Court is mindful that this case is still in its early stages, and that "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Young v. Benjamin Development Inc.,* 395 Fed.Appx. 721, 722–723, 2010 WL 3860498 at *1 (2d Cir.Oct.5, 2010) (citation omitted). Here, however, Defendants have already provided Plaintiff with discovery concerning the issue that is before the Court, which is exhaustion of administrative remedies. In that regard, on August 18, 2014, Defendants' counsel served Plaintiff with approximately 200 pages of documents, consisting of all inmate grievances that Plaintiff filed at Wende between November 2010 and November 2013.

## Official Capacity Claims

Under the Eleventh Amendment, State officials can be sued in their official capacities for injunctive relief, but not for money damages. *See Fulton v. Goord,* 591 F.3d 37, 45 (2d Cir.2009) (noting that "*Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), holds that in a suit against state officials in their official capacities, monetary relief (unlike prospective injunctive relief) is generally barred by the Eleventh Amendment," though such immunity may be waived or abrogated in a particular case). The instant Complaint demands money damages as well as injunctive and declaratory relief. To the extent Plaintiff is seeking money damages against Defendants in their official capacities, such claims are dismissed.

## Exhaustion of Administrative Remedies

Defendants contend that Plaintiff failed to exhaust his administrative remedies before commencing this action, and that his claims must therefore be dismissed. The relevant legal principles are clear:

> The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e(a). The PLRA exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures.

\* \* \*

**\*5** The exhaustion inquiry thus requires that we look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures.

\* \* \*

The IGP has a regular three-tiered process for adjudicating inmate complaints: (1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ("IGRC"), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the Central Officer Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7. *Espinal v. Goord,* 558 F.3d 119, 123–125 (2d Cir.2009) (citations and internal quotation marks omitted). As the exhaustion statute indicates, it applies to § 1983 claims and claims "under any other Federal law," including the ADA and § 504. *See, e.g., Arce v. O'Connell,* 427 F.Supp.2d 435, 440 (S.D.N.Y.2006) ("It is undisputed that claims under the ADA must be exhausted via the grievance procedure established under the PLRA.");

*see also, Alster v. Goord,* 745 F.Supp.2d 317, 332 (S.D.N.Y.2010) (agreeing that inmates' ADA claims must be exhausted).

However, an inmate's duty to exhaust administrative remedies under § 1997e(a) may be excused in certain cases:

> Though exhaustion is generally mandatory, we have explained that a failure to exhaust administrative remedies may be excused where: (1) the administrative remedies were not in fact available; (2) prison officials have forfeited, or are estopped from raising, the affirmative defense of non-exhaustion; or (3) "special circumstances ... justify the prisoner's failure to comply with administrative procedural requirements." *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (internal quotation marks omitted).

*Dabney v. Pegano,* —— Fed.Appx. ——, 2015 WL 664562 at *1 (2d Cir. Feb.17, 2015).

In the instant case, Plaintiff does not claim that administrative remedies were unavailable to him. To the contrary, he repeatedly states that he filed "over 300 grievances." Docket No. [# 16] at p. 1; see also, Docket No. [# 15] at p. 2 ("Since 2008–2014 Plaintiff filed over 300 grievance[s]."). This means that during the seven-year period between 2008 to 2014 which Plaintiff discusses in his papers, he filed one inmate grievance every 8.5 days, or essentially one grievance every week. Plaintiff has not come forward with evidence that he fully exhausted those grievances, however.

Instead, Plaintiff offers various reasons why the Court should excuse his failure to follow the usual steps for exhausting inmate grievances. For example, he suggests that one of his grievances became exhausted when the Inspector General investigated his claim. However, contrary to Plaintiff's contention, the fact that the Inspector General investigates an inmate's claim does not excuse the inmate from exhausting his grievance using New York's usual 3–tiered grievance system. *See, Dabney v. Pegano,* 2015 WL 664562 at *3 ("The IG's investigation of Plaintiff's claims does not constitute such a special circumstance [excusing exhaustion].").

**\*6** Nor has Plaintiff shown that he exhausted his administrative remedies by appealing from adverse rulings at disciplinary hearings. In that regard, Plaintiff, who has spent many years in DOCCS custody, has neither claimed nor shown that he reasonably believed that appealing from his disciplinary convictions was a proper substitute for using the inmate grievance program. *See, Dabney v. Pegano,* 2015 WL 664562 at *3 ("Appealing from a disciplinary hearing, however, only justifies non-compliance with the grievance procedures when a prisoner "reasonably interpret[s] [DOCCS] regulations to mean that his only administrative recourse was to appeal his disciplinary conviction." *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004). Plaintiff is no stranger to the IGP and does not claim that he believed the disciplinary appeal substituted for IGP compliance.").

Consequently, Plaintiff has not raised a triable issue of fact as to whether the Inmate Grievance Program was unavailable to him, or as to whether there were special circumstances justifying his failure to follow the usual procedures for exhausting grievances.

Additionally, Plaintiff has failed to comply with § 1997e(a) by exhausting a grievance *after* he filed this action. *See, Burgos v. Craig,* 307 Fed.Appx. 469, 470, 2008 WL 5210890 at *1 (2d Cir. Dec.15, 2008) ("[C]ompleting the exhaustion requirements only after filing suit is insufficient.") (citation omitted).

Plaintiff, though, also appears to argue that Defendants should be estopped from raising the affirmative defense of failure to exhaust. In that regard, construing Plaintiff's papers very liberally, he maintains that he generally faced retaliation whenever he filed a grievance. Assuming that Plaintiff is attempting to assert estoppel, the legal principles are clear:

> A prisoner may invoke the doctrine of estoppel when "defendants took affirmative action to prevent him from availing himself of grievance procedures." *Ruggiero [v. County of Orange],* 467 F.3d [170,] 178 [ (2d Cir.2006) ]. Prior cases have held that verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers constitute such affirmative action. *See, e.g., Hemphill [v. New York,]* 380 F.3d [680,] 688 [ (2d Cir.2004) ]; *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004).

*Amador v. Andrews,* 655 F.3d 89, 103 (2d Cir.2011).

However, such estoppel only applies to a particular defendant if that defendant did something to prevent a plaintiff from exhausting administrative remedies. *See, Hemphill v. New York,* 380 F.3d at 689 ("[D]epending on

the facts pertaining to each defendant, it is possible that some individual defendants may be estopped, while others may not be."); *see also, Mena v. City of New York,* No. 12 Civ. 0028(CM), 2014 WL 2968513 at \*7 (S.D.N.Y. Jun.27, 2014) ("The Second Circuit has indicated that the theory of equitable estoppel only estops a particular defendant from asserting the affirmative defense of non-exhaustion if the defendant's own actions inhibited the inmate from exhausting.").

 **\*7** On the other hand, an inmate-plaintiff's general fear of retaliation cannot estop defendants from raising the failure-to-exhaust affirmative defense. *Ceparano v. County of Suffolk,* No. 10–CV–2030 (SJF)(AKT), 2013 WL 6576817 at \*4, 6 (E.D .N.Y. Dec. 13, 2013) (Inmate not excused from exhausting remedies where he did not indicate that any defendant prevented him from exhausting his remedies, but stated only that he "knew that filing a Grievance would result in further harm to his health and further destruction of his property.") (collecting cases); *see also, Singh v. Lynch,* 460 Fed.Appx. 45, 48, 2012 WL 386416 at \*2 (2d Cir. Feb.8, 2012) ("Singh's subjective fear of retaliation was insufficient to support estoppel. Estoppel of a non-exhaustion defense requires some evidence of threats or other conduct by Lynch that could reasonably be understood as intended to inhibit Singh from pursuing administrative remedies for the alleged assault.").

In the instant case, Plaintiff does not claim that the aforementioned perceived culture of retaliation at Wende actually prevented him from filing any particular grievance relating to a particular claim in this action. Nor does Plaintiff contend that any particular defendant in this action prevented him from exhausting his administrative remedies. Rather, he merely refers to unnamed "staff" retaliating against him for filing grievances.[12] As for identifying any particular defendant, at most Plaintiff contends that Defendant Haygood "lost" some of his documents, including grievance exhibits, after she took them to make photocopies for Plaintiff. However, as already discussed, Haygood allegedly lost Plaintiff's copies of already-filed grievances; she did not prevent Plaintiff from filing grievances.

[12]     *See, e.g.,* Docket No. [# 16] at p. 11 ("I, Plaintiff been threatin by staff's and assaults by staff's and inmate inforceing for staffs at Wende C.F. for filing a lot of grievances against Wende C.F.")

Based upon all of the foregoing, the Court finds that Plaintiff has failed to raise a triable issue of fact as to whether he exhausted his administrative remedies as to any claim except his claim against Nurse Cook, which Defendants admit was exhausted prior to the commencement of this action.

*Claim Against Nurse Cook*

Plaintiff contends that after he told Nurse Cook to put on gloves, she called him "the N word" and issued him a false misbehavior report. Even assuming *arguendo* that Cook referred to Plaintiff with a racial slur, or that she issued Plaintiff a false misbehavior report, such actions by themselves are not constitutional violations. *See, Williams v. Dubray,* 557 Fed.Appx. 84, 86–87 (2d Cir. Feb.26, 2014) (Indicating that "verbal harassment, without more, is not actionable under § 1983," and that "it is well settled that a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.") (citations omitted). Of course, the issuance of a false misbehavior report in retaliation for protected activity is actionable, but Plaintiff has not pleaded a retaliation claim against Cook. In that regard, although Plaintiff contends that Cook filed a false misbehavior report against him after he spoke to her, he does not specifically allege that she did so in order to retaliate against him. And, in any event, Plaintiff did not engage in "protected activity" when he told Cook that she needed to put on surgical gloves.[13] *See, Lashley v. Wakefield,* 367 F.Supp.2d 461 (W.D.N.Y.2005) (Inmate did not engage in protected activity when he told correctional facility employee "how to do his job."). Lastly, to the extent that Plaintiff contends Cook violated his Eighth Amendment rights by denying him a nutritional supplement on one occasion following their argument, such deprivation does not rise to the level of constitutional violation. Accordingly, Cook is entitled to summary judgment.

[13]     Plaintiff alleges that Cook became "upset and red in the face" after he told her that she had to put on gloves: "I told Nurse Cook that under S.N.Y. Law & S.N.Y. DOCS & Department of Health, she had to wear gloves." Complaint [# 1] at ¶ 39.

CONCLUSION

2015 WL 1808626

**\*8** Defendants' motion for summary judgment [# 9] is granted. The official capacity claims are dismissed, as is the claim against Cook, with prejudice. The Clerk of the Court is directed to terminate Cook as a defendant. The remaining claims are dismissed without prejudice, for failure to exhaust administrative remedies as required by 42 U.S.C. § 1997e(a). The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure. The Clerk of the Court is directed to terminate this action.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1808626

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2791063
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edy RODRIGUEZ, Plaintiff,

v.

J. CROSS, Sergeant, Clinton
Correctional Facility; et al., Defendants.

No. 15-CV-1079 (GTS/CFH)
|
Signed 05/09/2017

**Attorneys and Law Firms**

Edy Rodriguez, East Elmhurst, NY, pro se.

Ryan E. Manley, Harris, Conway & Donovan, Christopher J. Hummel, New York State Attorney General, Albany, NY, for Defendants.

## REPORT-RECOMMENDATION AND ORDER [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

**Christian F. Hummel**, U.S. Magistrate Judge

 **\*1**  Plaintiff pro se Edy Rodriguez ("Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that Sergeant ("Sgt.") J. Cross, Sgt. R. Furnia, Correction Officer ("C.O.") G. Falcon, and C.O. J. Roberts (collectively "Defendants") violated his constitutional rights under the First and Eighth Amendments. Dkt. No. 1 ("Compl."). [2]

[2]    On March 27, 2017, this Court granted plaintiff an extension until May 1, 2017 to file a motion to amend his complaint. Dkt. No. 38. The deadline has expired and plaintiff has not filed a motion to amend his complaint.

Presently pending is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(a) for plaintiff's failure to exhaust administrative remedies before commencing this action. Dkt. No. 26. Plaintiff filed a response in opposition to defendants' motion. Dkt. No. 34. Defendants filed a reply. Dkt. No. 39.

## I. Background

The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection II(A) infra. At the relevant times giving rise to plaintiff's claims, plaintiff was an inmate incarcerated at Clinton Correctional Facility ("Clinton").

On July 10, 2014, plaintiff wrote a letter to Sgt. Cross "complaining about being harassed" by staff at Clinton. Compl. at 4. Plaintiff further alleges that he was taken out of his cell on July 14, 2014, brought to the second floor of the facility's hospital, and subjected to a "beating" by defendants. Compl. at 4-5. Sgt. Cross grabbed him by the hair; Sgt. Furnia punched him; and C.O. Falcon and C.O. Roberts punched him in the face, back, and neck. Id. at 4. Plaintiff alleges "each one of the blows" he suffered was from the named defendants, as well as other officers he cannot identify by name. Id. at 5-6. After the alleged incident, plaintiff was seen by a nurse with "about ten" officers present in the room, where he admits "having no choice," but to tell the nurse that officers had just beat him up. See Affirmation of Christopher J. Hummel ("Hummel Aff."), Dkt. No. 26-1, Exhibit ("Exh.") A [3] at 59-60. [4]

[3]    Exhibit A to the Affirmation of Christopher J. Hummel is a transcript of plaintiff's deposition, held on September 19, 2016 at Great Meadow Correctional Facility. See Dkt. No. 26-1.

[4]    When citing documents within the record, the Court uses the page numbers generated by CM/ECF.

While at Clinton, plaintiff filed five grievances. See Declaration of Christine Gregory ("Gregory Decl."), Dkt. No. 26-3 Exh. A at 6. Only one grievance was appealed. Declaration of Jeffrey Hale ("Hale Decl."), Dkt. No. 26-2 ¶¶ 12-13. The subject matter of the single appealed grievance does not concern the matter before the Court. Id. ¶ 12. The only grievance filed that is pertinent to the pending motion was filed on July 29, 2014. See Gregory Decl. Exh. B at 8. This grievance alleges that plaintiff suffered "an assault by (C.O.)" and, following the

assault, did not receive appropriate medical care. Id. The investigation into the July 29, 2014 grievance concluded that plaintiff saw his medical provider, and medicine was given to him without any further action. Id. at 10. The investigation did not mention anything about an assault. Id.

**\*2** Plaintiff alleges that he filed a grievance regarding the incidents described in his complaint, but an unidentified Sergeant destroyed the grievance. Compl. at 2. He also alleges that he was beaten by correction staff for filing the grievance. Id. Plaintiff also states that he filed a handwritten grievance (not on a grievance form) on July 19, 2014, regarding the July 14, 2014 incident. See Hummel Aff. Exh. A at 93. Plaintiff alleges that he sent a copy of this grievance to his mother and instructed her to send it directly to Clinton "[f]rom outside." Id. at 94. Defendants have no record of this grievance being filed. See Gregory Decl. Exh. A at 6. Plaintiff never inquired further about the July 19, 2014 grievance, but maintains that he has handwritten copies of the grievance since he did not have access to carbon paper when he originally drafted this grievance. See Hummel Aff. Exh. A at 94-95, 96-97. The July 19, 2014 grievance was drafted while plaintiff was in keeplock. Id. at 93.

Plaintiff further alleges, in his response to defendants' motion for summary judgment, that defendants have total control over facility mail and any failure to exhaust administrative remedies occurred because defendants strategically removed grievances from the mailbox to cover up their use of excessive force against plaintiff. See Dkt. No. 34 at 4. Plaintiff further alleges a general belief that there is a pattern of prison officials threatening and retaliating against inmates for filing grievances, thus making administrative remedies unavailable. Id. at 6. Lastly, plaintiff alleges that there is an "unwritten posture" at Clinton where inmates are not given grievance forms unless they provide a clear description of their complaint, or the complaint does not involve staff misconduct. Id. at 8.

## II. Discussion [5]

[5]    All unpublished opinions cited to by the Court in this Report-Recommendation and Order are, unless otherwise noted, attached to this Report-Recommendation and Order.

Plaintiff alleges that defendants retaliated against him in violation of the First Amendment, used excessive force against him in violation of the Eighth Amendment, and violated his Due Process rights under the First and Fourteenth Amendments. See Compl. at 7. Defendants argue that plaintiff's complaint should be dismissed in its entirety as plaintiff failed to exhaust his administrative remedies with respect to the causes of action outlined in the Complaint. See Defendants' Memorandum of Law, Dkt. No. 26-5 at 3.

### A. Legal Standard For Motions Pursuant to Fed. R. Civ. P. 56(a)

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "In determining whether summary judgment is appropriate, [the Court] will resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Carey, 923 F.2d at 19. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. Partnership, 22 F.3d, 1219, 1224 (2d Cir. 1994).

**\*3** Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law" ....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

### B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Mauldin v. Kiff, No. 11-CV-107-A, 2014 WL 2708434, at \*4 (W.D.N.Y. June 16, 2014) (quoting Porter, 534 U.S. at 532). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Porter, 534 U.S. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, 136 S. Ct. 1850, 1862 (2016). As such, the special circumstances exception previously promulgated by the Second Circuit in Hemphill is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

**\*4** Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception promulgated by Hemphill, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Here, there is no genuine dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5. First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. Id. at § 701.5(a)(1). An IGP representative has sixteen calendar days to

2017 WL 2791063

informally resolve the issue. Id. at § 701.5(b)(1). If no informal resolution occurs, the Inmate Grievance Review Committee ("IGRC") must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

### 1. Application

First, the Court will address whether there is any genuine dispute that plaintiff failed to exhaust his administrative remedies. Courts in the Second Circuit have consistently held that any informal resolutions or relief outside of the administrative procedures do not satisfy exhaustion requirements. See, e.g., Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007) (holding that regardless of whether prison officials know of plaintiff's complaints in a "substantive sense," procedural exhaustion of remedies must still occur); Ruggiero v. Cty. of Orange, 467 F.3d 170, 177-78 (2d Cir. 2006); Perez v. City of N.Y., No. 14 CIV. 07502(LGS), 2015 WL 3652511, at *4 (S.D.N.Y. June 11, 2015) ("Plaintiff's allegation that he advised others of his grievance does not excuse his failure to exhaust the administrative process.").

Here, subsequent to the alleged events giving rise to the matter before the Court, plaintiff states he and family members contacted the Inspector General's Office to complain about prison conditions and concerns of plaintiff's safety. See Hummel Aff. Exh. A at 89, 90. Such correspondence does not satisfy exhaustion and falls outside of the grievance procedures. See Geer v. Chapman, No. 9:15-CV-952(GLS/ATB), 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016), report and recommendation adopted, No. 9:15-CV-952 (GLS/

ATB), 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies."); Salmon v. Bellinger, No. 9:14-CV-0827(LEK/DJS), 2016 WL 4411338, at *4 (N.D.N.Y. July 5, 2016), report and recommendation adopted by, No. 9:14-CV-0827(LEK/DJS), 2016 WL 4275733 (N.D.N.Y. Aug. 12, 2016) (holding that letters sent to the Inspector General do not satisfy exhaustion procedures).

**\*5** After the alleged incident of excessive force, plaintiff was seen by a nurse in a room with "about ten" officers present, where he admits "having no choice" but to tell the nurse that the officers had beat him up. Hummel Aff. Exh. A at 59-60. Plaintiff alleges filing grievances on July 19, 2014 and July 29, 2014 that mention the assault. See id. at 93; Gregory Decl. Exh. B at 6, 8-10. Defendants state that there is no record of appeal on any grievances pertaining to the alleged assault. Gregory Decl. ¶ 15. While plaintiff's complaints were aired verbally and in writing, plaintiff failed to utilize the procedures required to exhaust administrative remedies. Timmons v. Schriro, No. 14-CV-6606(RJS), 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("[T]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA."). Thus, there is no genuine dispute that plaintiff failed to exhaust administrative remedies.

As a result, the Court must determine whether administrative remedies are in fact available to plaintiff. See Ross, 136 S. Ct. at 1858 ("An inmate ... must exhaust available remedies, but need not exhaust unavailable ones"); Mena v. City of New York, No. 13-cv-2430(RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) (citing Ross, 136 S. Ct. at 1862) ("[T]he lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are 'available' to him."). Plaintiff sets forth three factual arguments as to why administrative remedies were not available to him. First, plaintiff alleges that the grievance procedures were unavailable to him because he was denied access to paper and writing instruments. See Compl. at 3. Next, plaintiff alleges that he was physically beaten when he attempted to take steps to utilize the grievance process. Id. Lastly, plaintiff suggests that he never received a response to his grievance, his mail was tampered with, and his letters were not delivered. See Hummel Aff. Exh. A at 91-92, 94.

2017 WL 2791063

### a. Lack of Paper and Pen to Complete Grievance Procedures

The third prong of Ross is triggered by plaintiff's argument that he was denied access to pen and paper, as it shows an alleged attempt to stop him from taking part in the grievance process. When a plaintiff-inmate asserts that a defendant-facility withheld pens, courts have granted summary judgment against a plaintiff when "the record does not show that "[p]laintiff indicated to prison officials that he needed a pen so he could file a grievance or that prison officials refused to provide him a pen for this purpose." Mena v. City of N.Y., No. 12 CIV. 6838(GBD), 2013 WL 3580057, at *2 (S.D.N.Y. July 10, 2013). When an inmate argues that a correction officer denies him access to pen or paper, even assuming the allegations are true, courts examine whether the inmate was drafting other documents during the same time period, or whether they were able to access materials from other sources. See Williams v. Ramos, No. 13 CV 826(VLB), 2015 WL 864888, at *3 (S.D.N.Y. Feb. 9, 2015) ("It is unclear how plaintiff was able to submit [other] grievances if defendants took his pens and paper and threatened him ... Moreover, when defendants allegedly stole his pens and papers, plaintiff testified he was able to file grievances on his commissary sheet."); Lahoz v. Orange Cty. Jail, No. 08 CIV. 4364(RWS), 2010 WL 1789907, at *3 (S.D.N.Y. Apr. 29, 2010) (stating that an inmate was not deprived of writing materials when he drafted a handwritten letter during the same time period as the grievance process).

Here, the Court notes contradictory statements within the complaint pertaining to plaintiff's access to writing instruments or paper. When prompted as to why facts relating to the complaint were not presented in the grievance program, plaintiff asserts that he was denied a paper or pen. Compl. at 3. However, plaintiff also states that he wrote a grievance, the grievance was destroyed by a Sergeant, and he was beaten in retaliation for writing the grievance. See id. at 2. The only time plaintiff asserts that he was denied a paper and pen was when he was taken to the Special Housing Unit ("SHU")[6] on July 14, 2014 after the alleged incident. See id. at 3; Hummel Aff. Exh. A at 68. In fact, records indicate that plaintiff filed grievances on July 19, July 29, August 4, and November 19 of that same year.[7] Gregory Decl. Exh. A at 6. Plaintiff does not allege any difficulties obtaining a pen and paper after the July 2014 SHU stay, but rather, admits having "a piece of paper that an inmate had and a pen" on at least one occasion. See id. at 94.

[6]    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS . tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

[7]    Both the August and November grievances are unrelated to the cause of action before the Court. Gregory Decl. Exh. A at 6.

*6    Lastly, in his response to defendants' motion for summary judgment, plaintiff alleges that there is an "unwritten posture" at Clinton where inmates are not given grievance forms unless they provide a clear description of their complaint, or if their complaint does not involve staff misconduct. Dkt. No. 34 at 8. Such general allegations without any factual support are insufficient to show that procedures were unavailable, coupled with the fact that, grievances can and have been submitted by plaintiff on plain paper. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1) ("If this form is not readily available, a complaint may be submitted on plain paper."); see Veloz v. N.Y., 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004), aff'd, 178 Fed.Appx. 39 (2d Cir. 2006) (granting summary judgment where plaintiff does not allege that any specific officer thwarted his efforts to timely file a grievance); Hummel Aff. Exh. A at 94.

Even if the Court assumes that plaintiff was denied access to pen and paper while in the SHU, the grievances filed in July 2014 were filed within the twenty-one calendar days required, and his subsequent failure to exhaust administrative remedies regarding those grievances is unaffected by any denial of pen and paper that occurred in the past. Thus, the Court rejects plaintiff's argument as there is no genuine dispute of fact that administrative remedies were unavailable due a lack of writing instruments or paper.

### b. Allegation that Grievance Was Not Received and Mail Tampering

Courts have long held that where an inmate does not receive a response to a written grievance, the inmate must appeal to the next level of review. See Khudan v. Lee, No. 12-cv-8147(RJS), 2015 WL 5544316, at *5 (S.D.N.Y. Sept. 17, 2015) (dismissing a plaintiff's complaint where plaintiff failed to appeal to the next level of review after not receiving a response to his filed grievance); see also Veloz v. New York, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004), aff'd, 178 Fed.Appx. 39 (2d Cir. 2006) ("[P]laintiff's allegation that these particular grievances were misplaced or destroyed by correctional officers ultimately does not relieve him of the requirement to appeal these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming.").

However, recent decisions by courts in the Second Circuit have addressed the availability of administrative remedies when an inmate's grievance is unfiled and unanswered. These cases have focused on the second prong of the Ross test, where a grievance process becomes unusable for an inmate. Ross, 136 S. Ct. at 1859. In Williams v. Priatno, the Second Circuit held that when an inmate's grievance is not filed, "the regulations plainly do not describe a mechanism for appealing a grievance." See 829 F.3d at 126. Thus, "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." Id. The Williams ruling relied upon a scenario where an inmate is housed in a SHU and personally gives a grievance to a correction officer, as required by grievance procedures. Id. at 120-21. Additionally, adding to the "opaque" nature of the procedures, the plaintiff in Williams followed up when he did not receive a response after a week, but was subsequently transferred one week later without any resolution or knowledge of his grievance being filed. Williams, 829 F.3d at 120-21. Ultimately, the Williams Court held that "in giving his grievance to the correction officer, [the plaintiff] exhausted all administrative remedies that were available to him." Id. at 126.

Here, in his September 19, 2016 deposition, plaintiff sets forth facts suggesting prison staff filtered his mail and "when they [saw] grievances" they were thrown to the side, not delivered, "and were never [ ] seen." See Hummel Aff. Exh. A at 91-92. The grievance that plaintiff allegedly filed on July 19, 2014 was sent to the Clinton grievance office by his mother. Id. at 94. Plaintiff never received a response on the grievance or followed up on the status

of the grievance. Id. Without concrete facts, plaintiff states that his grievance was not resolved because "no civilian ... picks up your grievances. It's officers." Id. at 91. Plaintiff's allegations of mail tampering are conclusory and weakened by the fact that other correspondence, including complaints, were sent and received during the general time period material to the issues before the Court. Johnson v. Fraizer, No. 16-CV-6096(CJS), 2016 WL 7012961, at *4 (W.D.N.Y. Dec. 1, 2016) ("Plaintiff makes only a conclusory statement that his mailing was not allowed to leave the facility[,] ... his contention ... is belied by his admission that he was able to send other complaints about the matter to various New York State officials at around the same time."); see Hummel Aff. Exh. A at 89, 94 (providing an example where plaintiff successfully sent legal mail to his mother).

**\*7** In plaintiff's response in opposition to defendants' motion for summary judgment, he raises general complaints about defendants having total control over facility mail and defendants strategically removing grievances from the mailbox to cover up their excessive use of force against plaintiff and other inmates. See Dkt. No. 34 at 2. Plaintiff's bare assertions do not excuse exhaustion requirements. Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations. Khudan, 2016 WL 4735364, at *6 (citations omitted) (holding that under Ross, mere stand alone contentions of mail tampering without support and particularity cannot deem administrative remedies unavailable); Veloz, 339 F. Supp. 2d at 516 (holding that summary judgment is proper where the plaintiff contends that officers misplaced his grievances, but offers no evidence to support his claim). In Khudan, the court did not consider or rely upon conclusory allegations when plaintiff attested he "was informed by other [unnamed] inmates that grievances routinely go 'missing.' " Khudan, 2016 WL 4735364, at *6. This is similar to plaintiff's conclusory theory of injustice and displeasure with mail procedures, and other "recurrent pattern[s]" in New York correctional facilities. Dkt. No. 34 at 2, 4; see Khudan, 2016 WL 4735364, at *6 ("Plaintiff's accusations, which 'stand alone' and are 'unsupported,' are insufficient to withstand summary judgment.") (quoting Bolton v. City of N.Y., No. 13-CV-5749(RJS), 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015)).

Courts have denied a defendant's motion for summary judgment when faced with an unanswered and unfiled grievance drafted in SHU. See, e.g., Juarbe v. Carnegie, No. 9:15-CV-01485(MAD/DEP), 2016 WL 6901277, at *1, 4 (N.D.N.Y. Nov. 23, 2016). This is distinguishable from plaintiff's alleged July 19, 2014 grievance drafted in keeplock. [8] Such a difference in inmate housing supports the notion that, "the Second Circuit's decision hinged on the 'extraordinary circumstances' specific to the case before it." Mena v. City of N.Y., No. 13-CV-2430(RJS), 2016 WL 3948100, at *5 (S.D.N.Y. July 19, 2016) (quoting Williams, 829 F.3d at 119); see N.Y. COMP. CODES R. & REGS. tit. 7, § 701.7 (explaining that there are different grievance filing procedures for an inmate housed in the SHU). Inmates not housed in the SHU are in a different position to SHU inmates when determining if grievance procedures are "essentially unknowable" or unavailable. Id. at *5 (quoting Ross v. Blake, 136 S. Ct. at 1859).

[8]    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3s 189, 192 (2d Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

Plaintiff never followed up on the July 19, 2014 grievance. Hummel Aff. Exh. A at 94-95. However, on July 29, 2014, he filed a grievance in the facility that included medical complaints, but also a reference to the alleged assault on July 14, 2014. See Gregory Decl. Exh. B at 8. The Clinton grievance department received and responded to this grievance. Id. This grievance was not appealed. Id. ¶ 15. Even assuming, as the Court must on this motion, that plaintiff's allegations of mail tampering are true, he did not exhaust his administrative remedies when he failed to appeal the July 29, 2014 grievance to the next level of review. The fact that this grievance was subsequently filed and not appealed within close proximity to the July 19, 2014 grievance, coupled with three unrelated grievances filed within the next year, demonstrates that plaintiff's situation does not rise to the level where the grievance process is "opaque," unavailable, or unascertainable. See Hill v. Tisch, No. 02CV3901(DRH/AYS), 2016 WL 6991171, at *7 (E.D.N.Y. Nov. 29, 2016) (finding that the plaintiff failed to demonstrate that the grievance "procedures were essentially unknowable"); Gregory Decl. A at 6.

### c. Allegation that Plaintiff Suffered Retaliation and Physical Beatings

Plaintiff's pleadings also suggest an inquiry under the third prong of Ross, whether "machination, misrepresentation, or intimidation" occurred. See Ross, 136 S. Ct. at 1860. Specifically, plaintiff alleges that he did not comply with the grievance procedures because he was subjected to physical beatings, retaliation, and intimidation after complaining about conditions at Clinton. See Compl. at 3, 4, 7. For these reasons, he believed the grievance procedures were unavailable. See id. at 2-3.

 *8  Specific threats of retaliation or intimidation by prison employees can render administrative remedies unavailable. Ross, 136 S. Ct. at 1860 & n.3. However, a generalized fear of retaliation is insufficient to overcome a failure to exhaust administrative remedies. Salmon, 2016 WL 4411338, at *5. Estoppel is found where "verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers" occur showing that defendants acted affirmatively to prevent an inmate from availing him or herself of the grievance procedures. Id. at *5 (quoting Amador v. Andrews, 655 F.3d 89, 103 (2d Cir. 2011)). In Riles, the Second Circuit affirmed a district court's ruling that prison officials' alleged threats did not interfere with exhaustion efforts when plaintiff stated he was threatened "if he pushed the issue," but then subsequently filed a grievance in spite of the alleged threats. See Riles v. Buchanan, 656 Fed.Appx. 577, 581 (2d Cir. 2016) (summary order).

Relying on Ross, courts have carved out factual limitations to the third prong of unavailability concerning fear of retaliation. See, e.g., Aviles v. Tucker, No. 14-CV-08636(NSR), 2016 WL 4619120, at *3-4 (S.D.N.Y. Sept. 1, 2016) (citing Ross, 136 S. Ct. at 1860). In Aviles, the court noted a longstanding rule that general beliefs of retaliation or fears do not excuse the exhaustion requirement. Aviles, 2016 WL 4619120, at *4 (citations omitted). Circumstances that have met the threshold of unavailability by means of intimidation have included widespread beatings with assertions of fear for one's life, in conjunction with the plaintiff withholding all complaints until he was transferred to a different facility. See, e.g., id. (quoting Thomas v. Cassleberry, No. 03-cv-6394L, 2007 WL 1231485, at *2 (W.D.N.Y. Apr. 24, 2007)). Allegations of threats are conclusory where a plaintiff's

allegation "does not indicate who threatened him, when he was threatened, or how he was threatened." See Johnson v. Fraizer, No. 16-CV-6096(CJS), 2016 WL 7012961, at *5 (W.D.N.Y. Dec. 1, 2016). In contrast, this Court has denied a summary judgment motion when a plaintiff alleged he was threatened by a specific correction that the officer would "break [plaintiff's] bones," and another specific correction officer threatened to beat plaintiff "a [sic] inch from life" if he filed a grievance. Galberth v. Durkin, No. 914CV115(BKS/ATB), 2016 WL 3910270, at *3 (N.D.N.Y. July 14, 2016).

Here, plaintiff offers conclusory allegations in his complaint that "[he] was beaten" while attempting to access Clinton's grievance program. Compl. at 2, 3. Plaintiff offers no information of when or how he was threatened or beaten after the July 14, 2014 incident. Some instances of threats alleged by plaintiff refer to a time period before he filed a grievance and he does not state how any specific threat or subsequent act of violence impacted his ability to exhaust administrative remedies related to the events that occurred on July 14, 2014. See Aviles, 2016 WL 4619120, at *4 (finding grievance procedures available where plaintiff offers conclusory allegations of fear and does not substantiate what specific fears or past acts preclude him from advancing in grievance procedures); Harrison v. Stallone, No. 9:06-CV-902(LEK/GJD), 2007 WL 2789471, at *5 (N.D.N.Y. Sept. 24, 2007) ("It has been held that a 'general fear' of retaliation is not sufficient to excuse the exhaustion requirement.... If an inmate could simply state that he feared retaliation, there would no point in having a grievance procedure.") (citations omitted); see, e.g., Hummel Aff. Ex. A at 58. Much of plaintiff's fear is generalized. For instance, he notes that corrections officers become agitated when they see legal mail and "that's when harassment comes." Hummel Aff. Ex. A at 92. By his own admission, plaintiff denies any actual physical force being used against him that prohibited him from taking part in the grievance program. Hummel Aff. Ex. A at 99; see Salmon, 2016 WL 4411338, at *5 (stating there must be affirmative actions or specific instances of physical assault or threats of retaliation for plaintiff to show unavailability of the grievance process).

**\*9** The Court notes that plaintiff directly contradicted allegations in his complaint by statements made in his deposition. While the complaint alleges conclusory instances of being "beaten by staff," plaintiff admits that other than being cut on his face by an inmate in the yard on October 5, 2015, there has not been any other physical force used against him by inmates or correction officers since July 14, 2014. Hummel Aff. Ex. A at 99; Compl. at 3. This statement contradicts plaintiff's allegations of being beaten by staff. See Williams v. Doe, No. 12-CV-1147(HKS), 2016 WL 4804057, at *5 (W.D.N.Y. Sept. 14, 2016) (granting a motion for summary judgment after noting that any triable issue of fact on exhaustion of administrative remedies can be eliminated when plaintiff's prior representations to the court are "flatly contradict[ed]").

Further, this Court finds that plaintiff's failure to follow the grievance procedures cannot be excused by fears or intimidation, when he simultaneously made his complaints known through other means. After the alleged incident, plaintiff was seen by a nurse in a room with "about ten" officers, where he admits "having no choice," but to tell the nurse that they had beaten him. Hummel Aff. Exh. A at 57-58. Plaintiff also aired his complaints and concerns in writing outside of the grievance procedures, clearly identifying his complaints in full substance, including the identification of those who committed acts against him. See, e.g., Hummel Aff. Exh. A at 93; Gregory Decl. Exh. A at 8. Similarly in Johnson v. Fraizer, the Court rejected plaintiff's argument that administrative remedies were unavailable where the plaintiff alleged he was threatened by correction officers but continued to make and send formal complaints to prison officials and other New York State officials. Johnson v. Fraizer, No. 16-CV-6096 (CJS), 2016 WL 7012961, at *5 (W.D.N.Y. Dec. 1, 2016). By plaintiff's own admission, it is clear that he sought to file the initial grievance and tell others about his complaints, which disprove any claim of intimidation or fear of retaliation. Quick v. Omittee, No. 14-CV-1503(TJM/CFH), 2016 WL 5219732, at *4 (N.D.N.Y. Aug. 11, 2016), report and recommendation adopted, No. 914CV1503 (TJM/CFH), 2016 WL 5107125 (N.D.N.Y. Sept. 20, 2016) (holding that fear of physical retaliation or assaults does not deem grievance procedures unavailable when plaintiff continuously sought to file complaints with officials). Like in Quick, where the plaintiff filed formal internal grievances and the grievance procedures were deemed available, here the plaintiff alleges drafting two internal grievances outlining the alleged July 14, 2014 incident. See id. at * 4; Hummel Aff. Exh. A at 93; Gregory Decl. Exh.

2017 WL 2791063

B at 8. Thus, plaintiff has not shown that administrative remedies were unavailable due to intimidation and threats.

In conclusion, the Court finds that defendants have met their burden in showing that there is no genuine issue of material fact as to plaintiff's failure to exhaust administrative remedies. Accordingly, the Court recommends that defendants' motion be granted.

### III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 26) on plaintiff Edy Rodriguez's complaint (Dkt. No. 1) be **GRANTED**; and it is further

**RECOMMENDED** that plaintiff Edy Rodriguez's complaint (Dkt. No. 1) be **DISMISSED** in its entirety, without prejudice; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties in this action, pursuant to local rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F. 2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F. 2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

**All Citations**

Slip Copy, 2017 WL 2791063

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4715883
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Duane MIMS, Plaintiff,
v.
C. YEHL, Captain, and Lucille
Schindler, C.O., Defendants.
Duane Mims, Plaintiff,
v.
C. Yehl, Corrections Captain, and
Lucille Schindler, C.O., Defendants.
Duane Mims, Plaintiff,
v.
Brian Fischer, Commissioner, Defendant.

Nos. 13–CV–6405–FPG, 14–CV–
6304–FPG, 14–CV–6305–FPG.
|
Signed Sept. 22, 2014.

**Attorneys and Law Firms**

Duane Mims, Dannemora, NY, pro se.

Ashley Elizabeth Heisler, Bernard F. Sheehan, New York
State Attorney General's Office, Department of Law,
Rochester, NY, Defendants.

DECISION AND ORDER

FRANK P. GERACI, JR., District Judge.

**\*1** *Pro se* Plaintiff Duane Mims has brought three related
suits under 42 U.S.C. § 1983, alleging that Defendants,
who were or are employees of the New York State
Department of Corrections and Community Supervision
("DOCCS"), violated his constitutional rights. The
Complaints all stem from an incident that occurred on
or about August 10, 2012, where Plaintiff alleges that
two of the named Defendants utilized excessive force
against him, and afterwards, Plaintiff was sentenced
to 36 months of disciplinary confinement, which he
contends is unconstitutionally long. Because Plaintiff
failed to exhaust his administrative remedies before
commencing these actions, Defendants' Motions for

Summary Judgment are granted, and these cases are
dismissed with prejudice.

BACKGROUND

On May 2, 2013, Plaintiff commenced two separate
actions in the Northern District of New York: *Mims v.
Yehl,* N.D.N.Y. Case No. 13–CV–508 ("*Mims I* "), and
*Mims v. Fischer,* N.D.N.Y. Case No. 13–CV–509 ("*Mims
II* ").

In *Mims I,* Plaintiff alleged that on August 10, 2012,
while he was an inmate at Gowanda Correctional Facility,
he was assaulted by the two Defendants in that case,
identified as Captain C. Yehl and Corrections Officer
Lucille Schindler. Plaintiff was charged with misbehavior,
and was afforded a disciplinary hearing where Defendant
Yehl was the hearing officer. Defendant Yehl found
Plaintiff guilty, and sentenced him to 36 months in the
Special Housing Unit ("SHU"), along with the loss of
certain privileges. Plaintiff further alleged that Defendant
Yehl violated his due process rights, and that his sentence
of 36 months in the SHU was unconstitutionally long.

In *Mims II,* Plaintiff alleged that African–American and
Latino inmates were being targeted by the Commissioner
of DOCCS for long term isolation, and that 3,000
such individuals are serving over one year in solitary
confinement. The only named Defendant in that
case was Brian Fischer, who at the time was the
Commissioner of DOCCS. Plaintiff further alleges that
any disciplinary sentence of over one year constitutes cruel
and unusual punishment. Although not specifically stated,
the implication is that Plaintiff was challenging his own
36 month disciplinary sentence, as well as the disciplinary
sentences imposed upon some 3,000 individuals. Plaintiff
requested relief in the form of having any disciplinary
sentence of 24 months and over reduced to 12 months, and
also requested "$3,000.00 for each inmate."

On August 5, 2013, Plaintiff commenced *Mims v. Yehl,*
W.D.N.Y. Case No. 13–CV–6405 ("*Mims III* ") in
the Western District of New York, and that action
was assigned to this Court. *Mims III* names the same
Defendants as *Mims I,* and both *Mims I* and *Mims III*
allege the same underlying facts regarding the August 10,
2012 incident and the subsequent disciplinary hearing. In
commencing *Mims III,* Plaintiff utilized this district's form

complaint, and despite having commenced *Mims I* and *Mims II* in the Northern District just three months prior, he falsely indicated on his Complaint in *Mims III* that he had not "filed any other lawsuits in any state and federal court relating to [his] imprisonment." The next section of the form complaint directs the Plaintiff to provide details regarding any previously filed lawsuits, and the Plaintiff wrote "N/A" in each of the spaces where he should have identified the details of his other lawsuits.

**\*2** On October 9, 2013, United States District Judge for the Northern District of New York Mae D'Agostino found common issues of fact in *Mims I* and *Mims II,* ordered the consolidation of those cases, and ordered that all filings in the now-consolidated cases be docketed under *Mims I.* Judge D'Agostino further dismissed any claims in *Mims II* that purported to be brought as a class action on behalf of other inmates, and allowed Plaintiff's claims in *Mims II* to proceed only as they pertained to his own situation.

On January 10, 2014, Defendants filed a Motion for Summary Judgment in *Mims I* and *Mims II,* arguing that the Plaintiff failed to exhaust his administrative remedies prior to commencing those lawsuits. Alternatively, Defendants moved to transfer venue in *Mims I* and *Mims II* from the Northern District of New York to the Western District of New York, as the underlying facts took place within the Western District. On January 27, 2014, Defendants filed a similar Motion for Summary Judgment in *Mims III,* which also argued that the Plaintiff failed to exhaust his administrative remedies prior to commencing that lawsuit. The Defendants further requested that the Court defer ruling on the motion in *Mims III* until the Northern District of New York ruled on the pending Motion for Summary Judgment and/or Motion to Transfer Venue in *Mims I* and *Mims II.*

By Decision and Order dated May 19, 2014, United States Magistrate Judge for the Northern District of New York Andrew Baxter granted the Defendants' Motion to Transfer Venue, and ordered *Mims I* and *Mims II* transferred to the Western District of New York. Magistrate Judge Baxter further ordered that the Summary Judgment Motion would remain pending, and would be transferred to the Western District of New York for disposition. Upon receipt of that order, the Clerk of the Court for the Western District of New York docketed *Mims I* as W.D.N.Y. Case No. 14–CV–6304,

and docketed *Mims II* as W.D.N.Y. Case No. 14–CV–6305.

As a result, this Court currently has three cases before it brought by Plaintiff: the consolidated *Mims I* and *Mims II* cases, although they each have their own docket number, and *Mims III.* Pending before the Court is the Defendants' Motion for Summary Judgment in each of these three actions, which all seek dismissal of these cases on the basis that the Plaintiff failed to exhaust his administrative remedies before commencing suit. *See Mims I,* Dkt. # 49, *Mims III,* Dkt. # 23. Plaintiff has responded to the motions, and the Court deems oral argument to be unnecessary. For the following reasons, Defendants' Motions for Summary Judgment are granted, and these cases are dismissed with prejudice.

*DISCUSSION*

The standard for ruling on a summary judgment motion is well known. A party is entitled to summary judgment "if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)* (internal quotation marks omitted).

**\*3** When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the non-moving party. *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). In order to establish a material issue of fact, the non-movant need only provide "sufficient evidence supporting the claimed factual dispute" such that a "jury or judge [is required] to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments). If, after considering the evidence in the light most favorable to the non-moving party, the Court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *Scott,* 550 U.S. at 380 (citing *Matsushita,* 475 U.S. at 586–587).

Because the Plaintiff is proceeding *pro se,* his pleadings are held to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (internal quotation marks omitted). Accordingly, I will interpret Plaintiff's submissions "to raise the strongest arguments that they suggest." *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir.2009).

The Defendants argue that Plaintiff failed to exhaust his administrative remedies prior to commencing these lawsuits, and as a result, his Complaints cannot proceed. I agree.

Under the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The administrative exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). If an inmate fails to exhaust their administrative remedies, they are barred from commencing a federal lawsuit. *Martin v. Niagara County Jail,* No. 05–CV– 00868(JTC), 2012 WL 3230435, at *6 (W.D.N.Y. Aug.6, 2012). In other words, to commence a lawsuit "prisoners must complete the administrative review process in accordance with the applicable procedural rules-rules that are defined not by the PLRA, but by the prison grievance process itself." *Johnson v. Killian,* 680 F.3d 234, 238 (2d Cir.2012). Exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly." *Amador v. Andrews,* 655 F.3d 89, 96 (2d Cir.2011) (quoting *Woodford v. Ngo,* 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). To be "[p]roper," exhaustion must comply with all of the agency's "deadlines and other critical procedural rules." *Woodford,* 548 U.S. at 90–91.

**\*4** To satisfy the PLRA's exhaustion requirement, an inmate in New York is generally required to follow the prescribed DOCCS grievance procedure, which is set forth at 7 N.Y.C.R.R. § 701.5. In short, a prison inmate's administrative remedies consist of a three-step grievance and appeal procedure: (1) investigation and review of the grievance by the Inmate Grievance Resolution Committee ("IGRC"), which is comprised of inmates and DOCCS employees; (2) if appealed, review of the IGRC's determination by (or, if the committee is unable to reach a determination, referral to) the superintendent of the facility; and (3) if the superintendent's decision is appealed, review and final administrative determination by the Central Office Review Committee ("CORC"). *See Id.* All three steps of this procedure must ordinarily be exhausted before an inmate may commence suit in federal court. *See Morrison v. Parmele,* 892 F.Supp.2d 485, 488 (W.D.N.Y.2012) (citing *Porter,* 534 U.S. at 524).

In his Complaint and Amended Complaint filed in *Mims III,* Plaintiff states that he filed a grievance, but claims he "never received a response." *Mims III,* Dkt.1,5. In his Response to the Defendants' Summary Judgment Motion, Plaintiff provides two different explanations. First, he states that he "filed five grievances on 12 June 2012, 03 April 2012, 19 May 2012, 29 July 2012 and 01 August 2012" and that he never received a disposition from these grievances. *Mims I,* Dkt. # 51. Second, he alleges that "grievances and complaints against staff at Gowanda Correctional Facility has (sic) the tendency of disappearing, or are tampered with." *Id., see also Mims III,* Dkt. # 32.

Reading his submissions as a whole, Plaintiff does not appear to allege that he filed a grievance regarding the August 10, 2012 incident that is the subject of his Complaint. Indeed, the five grievances he claims to have filed all predate August 10, 2012, the date of the incident alleged in these cases. Rather, he alleges that he had *past* problems with the grievance procedure, and that he did not receive responses to prior grievances that he filed in unrelated matters. Even assuming *arguendo* the truth of those allegations, they are irrelevant as there is no evidence in the record to even suggest-much less demonstrate-that Plaintiff even attempted to comply with the grievance procedure as it relates to this action.

To the extent that Plaintiff *is* attempting to claim that he filed a grievance regarding the August 10, 2012 incident, there is nothing in the record to support such a claim. Plaintiff could have produced a copy of the alleged grievance regarding the August 10, 2012 incident, but instead, he provided nothing. Plaintiff's allegations, to the extent he claims to have submitted a grievance regarding the August 10, 2012 incident, therefore "stand alone and unsupported," *Veloz v. New York,* 339 F.Supp.2d 505, 516 (S.D.N.Y.2004), and such an unsupported statement is insufficient at the summary judgment stage. Further, Plaintiff's wholly conclusory and unsupported allegations that grievances are tampered with at Gowanda Correctional Facility do not create a material issue of fact in this case. *Rosado v. Fessetto,* No. 09–CV–0067 (DNH/ ATB), 2010 WL 3808813, at *7 (N.D.N.Y. Aug.4, 2010) ("Courts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *adopted by* 2010 WL 3809991 (N.D.N.Y. Sept.21, 2010).

**\*5** On the other hand, Defendants have submitted proof in admissible form by way of affidavits from Joseph Chisholm, Brandi Collyer and Kadie O'Connell, who are the Inmate Grievance Program Supervisors at Attica Correctional Facility, Upstate Correctional Facility, and Gowanda Correctional Facility, respectively [1] . These three affidavits establish that the only grievance from Plaintiff on file with any of these facilities was filed in 2012, and related to bunk beds-a matter wholly unrelated to the allegations in this case. Plaintiff has not provided any facts or documents to challenge these statements *as they relate to this case*-meaning relating to the August 10, 2012 incident-and as a result, there is no dispute that Plaintiff did not file a grievance regarding the August 10, 2012 incident. Plaintiff's failure to file a grievance is fatal to his cases, and Defendants are entitled to summary judgment on this basis alone. *Curry v. Mazzuca,* No. 05 Civ. 1542(NRB), 2006 WL 250487, at *6 (S.D.N.Y.Feb.2, 2006) (dismissing plaintiff's claim as "there [was] no evidence whatsoever that such a grievance was actually filed with a grievance clerk or ignored by prison officials .")

[1]    The three separate affidavits from three separate facilities are due to the fact that Plaintiff was transferred from Gowanda Correctional Facility to Attica Correctional Facility on August 10, 2012, the date of the alleged incident, and then to Upstate

Correctional Facility on August 31, 2012, where he remained until at least October 2012, at which time the time period for Plaintiff to file a grievance relating to the August 10, 2012 incident had expired. *See* 7 N.Y.C.R.R. § 701.5.

Although Plaintiff failed to comply with DOCCS' grievance procedure, in interpreting Plaintiff's papers liberally, he argues that he should be excused from the exhaustion requirement. Plaintiff claims that "on August 12, 2012, two days after the attack, [Plaintiff] wrote a letter to Defendant Brian Fischer who was the Commissioner and to the Inspector General" regarding his allegations. *Mims I,* Dkt. # 53. Plaintiff did not attach a copy of this correspondence, but even if I assume that such a letter were indeed sent to the Inspector General or to the Commissioner, the outcome would not change.

Plaintiff's argument that his letters or communications with DOCCS officials should serve as a substitute for filing a grievance fails because "decisions in this circuit have repeatedly held that complaint letters to the DOCCS commissioner or the facility superintendent do not satisfy the PLRA's exhaustion requirements." *Muhammad v. Pico,* No. 02 Civ. 1052(AJP), 2003 WL 21792158, at *8 (S.D.N.Y. Aug.5, 2003) (collecting cases). The same is true for letters sent to the Inspector General's office. *See, e.g., Stephenson v. Dunford,* 320 F.Supp.2d 44, 46, 52 (W.D.N.Y.2004) (finding no exhaustion where inmate complains directly to Inspector General), *vacated on other grounds,* 139 F. App'x 311 (2d Cir.2005); *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 303–04 (W.D.N.Y.2004). As one Court observed, "[t]he Second Circuit has made clear that even if prison officials have notice of a prisoner's claims as a result of such informal communications, the purposes of the PLRA's exhaustion requirement can only be realized through strict compliance with the applicable administrative procedures." *Mamon v. New York City Dep't of Corr.,* No. 10 Civ. 3454(NRB), 2012 WL 260287, at *4 (S.D.N.Y. Jan.27, 2012) (citing *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007)).

**\*6** Going one step further, even if I had been presented with evidence to demonstrate that Plaintiff had filed a grievance with the facility regarding the August 10, 2012 incident, the Defendants would still be entitled to summary judgment in these actions.

Defendants have submitted an affidavit from Jeffrey Hale, the Assistant Director of DOCCS Inmate Grievance

Mims v. Yehl, Not Reported in F.Supp.3d (2014)
Case 9:17-cv-00194-TJM-TWD    Document 233    Filed 09/05/17    Page 95 of 211
2014 WL 4715883

Program. *Minis III,* Dkt. # 23; *Mims I,* Dkt. # 49. In his affidavit, Hale states that he is the custodian or records for the CORC, and in that capacity, has access to records of all grievance appeals received at CORC since 1990. Hale's affidavit further states that although Plaintiff had filed an appeal of a grievance with the CORC in the past (in 2010, relating to an allegation that his bed was warped and regarding concerns with his housing location), no appeal exists relating to the alleged August 10, 2012 incident. This evidence, which is uncontroverted by Plaintiff, establishes that no such appeal ever existed at the CORC. Assuming that Plaintiff did file a grievance regarding the August 10, 2012 incident, Plaintiff was still required to file an appeal with the CORC even if he never received a decision on the grievance he claims to have filed. *Williams v. Hupkowicz,* No. 04–CV–0051, 2007 WL 1774876, at *4 (W.D.N.Y. June 18, 2007) ("Even assuming that an inmate received no timely official response as contemplated by the regulations to a grievance at any stage in the inmate grievance process, the inmate could nevertheless appeal such grievance to the next level, and the failure to do so constitutes a failure to exhaust his administrative remedies as required under the PLRA."); *see also Hecht v. Best,* No. 12 CIV. 4154(CM), 2012 WL 5974079 (S.D.N.Y. Nov.28, 2012).

While I am aware that non-exhaustion can be excused under certain circumstances, *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004), there is simply no basis to excuse Plaintiff's failure to exhaust his administrative remedies in this case. Plaintiff had the ability to file a grievance regarding his allegations, but chose not to do so. There is no allegation-much less any evidence-

that Plaintiff was in any way prevented from accessing the grievance process as it relates to this incident, and despite his arguments to the contrary, there are no special circumstances that justify the Plaintiff's failure to comply with the DOCCS grievance procedures. As a result, Plaintiff's failure to exhaust his administrative remedies is fatal to these actions, and the Defendants are entitled to summary judgment.

## CONCLUSION

Defendants' Motions for Summary Judgment (*Mims I,* Dkt. # 49; *Mims III,* Dkt. # 23) are GRANTED and these actions are dismissed with prejudice. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Any request to proceed *in forma pauperis* on appeal should be directed by motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure. The Clerk of the Court is directed to terminate *Mims I, Mims II,* and *Mims III.*

**\*7** IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.3d, 2014 WL 4715883

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3808813

2010 WL 3808813
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jonathan ROSADO, Plaintiff,
v.
P. FESSETTO, [1] Defendant.

[1]   This defendant's name is actually Paul Fessette, and
the court will refer to him by his proper name.

No. 9:09–CV–67 (DNH/ATB).
|
Aug. 4, 2010.

**Attorneys and Law Firms**

Jonathan Rosado, pro se.

Dean J. Higgins, Asst. Attorney General for Defendants.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred to me for Report
and Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rules N.D.N.Y. 72.3(c). [2]

[2]   The case was originally referred to the Honorable
Gustave J. Di Bianco and was assigned to me upon
Judge Di Bianco's retirement on January 4, 2010.
(Dkt. No. 41).

In this civil rights complaint, plaintiff alleges that
defendant Fessette failed to protect plaintiff from assault
by another inmate. (Compl.) (Dkt. No. 1). [3] Plaintiff seeks
substantial monetary relief. (Compl.¶¶ 14–15).

[3]   Plaintiff has attached his five-page, handwritten
statement of facts, causes of action, and request
for relief to a standard section 1983 complaint
form. (Dkt. No. 1). Plaintiff's attachment contains
numbered paragraphs, and the court will cite to this
document using the paragraph numbers.

Presently before the court is defendant's motion for
summary judgment pursuant to Fed.R.Civ.P. 56, arguing
both that plaintiff has failed to exhaust his administrative
remedies and that his claim fails on the merits. (Dkt.
No. 26). Plaintiff has responded in opposition to the
motion. (Dkt. No. 33). For the following reasons, this
court agrees with defendant and will recommend dismissal
of the complaint.

**I. *Facts***

  **A. Plaintiff's Allegations**
By way of background, plaintiff states that on August
28, 2006, while he was incarcerated at Great Meadow
Correctional Facility ("Great Meadow"), he was "cut
behind his right ear" by an unknown inmate. (Compl.¶ 1).
Plaintiff alleges that the inmate who cut him then pushed
plaintiff down the stairs and disappeared so that plaintiff
could not identify him. *Id.* As a result, plaintiff was placed
in Involuntary Protective Custody ("IPC"). *Id.* Plaintiff
states that at the IPC hearing, he told the hearing officer
that it was not a "smart idea" to put plaintiff back into
General Population because he had "problems with the
bloods." (Compl.¶ 2).

Plaintiff was transferred to Clinton Correctional Facility
("Clinton") on September 29, 2006. Plaintiff claims that
on October 1, 2006, he approached defendant Sergeant
Fessette to inform him that plaintiff believed he was
not safe at Clinton because of his conflict with a gang,
known as the "Bloods." (Compl.¶ 3). Plaintiff claims
that defendant Fessette responded by asking plaintiff for
information about the Bloods, but when plaintiff could
not come up with any information, defendant Fessette
told plaintiff that he could not do anything for him.
(Compl.¶ 4). Plaintiff states that he tried to explain to
defendant Fessette that plaintiff had been cut at Great
Meadow by "members" of the Bloods, and that he wanted
to be placed in Protective Custody ("PC") because he did
not wish to be cut again. (Compl.¶ 5).

Plaintiff claims that defendant Fessette told plaintiff that
if he could not give him any information, he was "on
his own." (Compl.¶ 6). Plaintiff alleges that although he
pleaded with defendant Fessette, the defendant merely
walked away, stating that when plaintiff decided he
could come forward with the information that defendant
Fessette was "looking for," then he would put plaintiff in
PC. *Id.*

Plaintiff claims that after having this discussion with defendant Fessette, plaintiff walked out into the recreation yard to telephone his family so that someone in his family could call the facility in an attempt to get plaintiff into PC. (Compl.¶ 7). When plaintiff reached the yard, all the telephones were being used, and an officer told plaintiff that he could not stand by the telephones to wait. *Id.* Plaintiff claims that while he was "standing around" waiting for a telephone to be available, he was "cut by a light skin [sic] Blood member." *Id.* Plaintiff claims that while he and the other inmate were "fighting," someone "yelled police are coming," and the inmates "split up to avoid getting a fighting ticket." *Id.* Plaintiff states that he was examined due to all the blood on his face,[4] but that "the other guy got away." *Id.*

[4]   Plaintiff sustained a nine-inch laceration on the right side of his face. (Compl.¶ 10).

**\*2** Plaintiff claims that he later refused Voluntary Protective Custody ("VPC") because he knew that he would be placed in IPC anyway because of his injury. (Compl.¶ 8). Plaintiff believed that by refusing VPC, he would obtain protection in IPC, without being "labeled a 'snitch.' " *Id.* Plaintiff states that if he were to be labeled a "snitch," he would be in danger throughout the twenty-five years of his sentence. (Compl.¶ 9). Plaintiff states as his "Cause of Action," that defendant Fessette was deliberately indifferent to plaintiff's safety when he failed to institute an IPC proceeding after being notified by plaintiff that his life was in danger. (Compl.¶ 13).

**B. Defendant's Evidence**

Defendant has submitted further information relative to the incident at Great Meadow and to the October 1st incident at Clinton that is the subject of plaintiff's allegations against defendant Fessette. Jeffrey A. Tedford is currently First Deputy Superintendent ("FDS") at Great Meadow, but was the Deputy Superintendent for Security ("DSS") at Clinton in October of 2006. (Tedford Aff. ¶ 2) (Dkt. No. 26–2). FDS[5] Tedford states that on August 28, 2006, plaintiff was cut by an unidentified inmate at Great Meadow. (Tedford Aff. ¶ 5). Following the incident, plaintiff refused to, or could not, identify his assailant and refused VPC. *Id.* Plaintiff signed a waiver stating that he did not need PC, and that he would inform corrections authorities if and when he did need protection. *Id.*

[5]   The court will refer to FDS Tedford by his current title.

However, because of the injury and because of the uncertain circumstances surrounding the incident, the staff at Great Meadow recommended that plaintiff be placed in IPC. Plaintiff was afforded an IPC hearing on September 1, 2006, and the hearing officer upheld the IPC recommendation. *Id.* The Superintendent at Great Meadow approved the placement. *Id.* FDS Tedford explains the difference between VPC and IPC. (Tedford Aff. ¶ 6). Inmates may request VPC and must justify their request by either having been the victim of an assault or if they can identify a known enemy at the facility. *Id.* IPC is provided for inmates who do not request protection, but in the opinion of the corrections staff, are in need of protection for the same reasons that an inmate may himself request protection. *Id.* (*See also* Def.'s Ex. B, Dkt. No. 26–8).[6]

[6]   Exhibit B is DOCS Directive No. 4948, together with various revisions of that Directive. (Dkt. No. 26–8.Ex. B). The document contains the definitions of VPC and IPC, together with the transfer policy, cited by defendant Fessette, that requires inmates placed in protective custody to be evaluated for transfer to a facility in which they can be placed in General Population. (Ex. B at 2–3).

FDS Tedford states that in accordance with Department of Correctional Services ("DOCS") Directive No. 4948 and DOCS policy, plaintiff's status was reviewed for an "unscheduled transfer," to a facility where he could again be placed in General Population. (Tedford Aff. ¶ 7). After the review, it was determined that Clinton was an appropriate facility for plaintiff. *Id.* Plaintiff was transferred from Great Meadow to Clinton on September 29, 2006.[7] (Tedford Aff. ¶¶ 4, 7; *see also* Def.'s Ex. A, Chronological History Display). FDS Tedford states that when plaintiff arrived at Clinton, his disciplinary history was reviewed, and his IPC status was identified. (Tedford Aff. ¶ 8). The staff at Clinton, under FDS Tedford's supervision, determined that plaintiff could be moved back into General Population. (Tedford Aff. ¶ 9).

[7]   Plaintiff's transfer history indicates that plaintiff left Great Meadow and was admitted at Clinton on the same day. (Def.'s Ex. A, Dkt. No. 26–7).

2010 WL 3808813

**\*3** When he arrived at Clinton, plaintiff had no known enemies at the facility. (Tedford Aff. ¶ 10). FDS Tedford states that the staff at Clinton had no information whatsoever that inmate Ceruti, the inmate who attacked plaintiff at Clinton, posed any threat to plaintiff prior to their altercation on October 1, 2006, only two days after plaintiff arrived at the facility. (Tedford Aff. ¶ 12). If such information had been known to the staff, efforts would have been made to assess the situation and take action, if necessary, to separate the inmates and maintain the security of the facility. *Id.*

Defendant Fessette has also submitted an affidavit. (Fessette Aff., Dkt. No. 26–4). Defendant Fessette is a Corrections Sergeant at Clinton and was employed at Clinton on October 1, 2006. (Fessette Aff. ¶ 1). Defendant Fessette states that on October 1st, he was assigned as a housing sergeant, serving as the area supervisor for the B, C, D, and E Blocks as well as the special housing unit ("SHU") on the 2:00 p.m. to 10:00 p.m. shift. (Fessette Aff. ¶ 5). Defendant Fessette's duties would have included watching inmate movement through the blocks to which he was assigned and that this duty would have brought him into contact with a number of inmates. (Fessette Aff. ¶ 9). However, defendant Fessette does not specifically remember speaking with plaintiff. *Id.*

Defendant Fessette states that he was unaware of any threat to plaintiff prior to the October 1st altercation with inmate Ceruti. (Fessette Aff. ¶ 10). Prior to the incident, defendant Fessette did not even know inmate Ceruti. *Id.* Defendant Fessette asserts that he was unaware of any threat of harm to plaintiff on October 1st. However, even if plaintiff had expressed his concerns in the manner that he alleges in his complaint, the general fear of the Bloods would not have demonstrated a specific threat of physical harm sufficient to recommend PC. (Fessette Aff. ¶ 11).

There is no dispute that an altercation took place between plaintiff and inmate Ceruti, and that plaintiff sustained a significant cut to the right side of his fact. (Fessette Aff. ¶ 12). After the altercation, defendant Fessette participated in the investigation of the fight and prepared a report of the incident. (Fessette Aff. ¶ 14). Defendant Fessette states that he spoke to plaintiff, and that during the interview, plaintiff stated that he was cut from behind and that the fight was the result of a " 'beef out on the street.' " (Fessette Aff. ¶ 15). Following the fight, plaintiff refused VPC and signed a waiver to that effect. (Fessette

Aff. ¶ 16). Based upon the nature of the incident and the injury sustained by plaintiff, defendant Fessette then made a recommendation that plaintiff be admitted to IPC. (Fessette Aff. ¶ 17).

As a result of defendant Fessette's recommendation, plaintiff was afforded an IPC hearing on October 4, 2006. (Def.'s R.7. 1(a)(3) Statement, ¶ 20, Dkt. No. 26–5). A transcript of the hearing has been filed as Defendant's Ex. G. (Dkt. No. 26–13). During the hearing, plaintiff stated that he disagreed with the IPC recommendation because "[I] don't need IPC. It was a fight and I got cut we [sic] in prison. Things like that happen." (Def.'s Ex. G at 3). [8] Plaintiff denied that the person with whom he was fighting was the same person that cut him. *Id.* Plaintiff testified that it "was just a fight," and that he did not know the other inmate's motivation for the altercation. *Id.* at 4. Based on the recommendation and plaintiff's statements at the very short hearing, the hearing officer found that the recommendation for IPC was substantiated. *Id.* The hearing officer also found that, because plaintiff claimed that the person who cut his face was not the inmate with whom he was fighting, and that there was no known motive, it would be difficult for the facility to "arrange for [his] care and custody in the normal course of events." *Id.* It was, therefore, determined that plaintiff needed to be separated from the general population for his own safety. *Id.*

[8]     Defense counsel has numbered the pages of the Exhibit at the bottom right, and the court will use those numbers to refer to the pages of the Exhibit. The transcript itself has numbers at the bottom-center of the page that do not match the page numbers of the exhibit.

## II. *Summary Judgment*

**\*4** Defendant moves for summary judgment, arguing both that plaintiff has failed to exhaust his administrative remedies regarding the failure to protect, and that his claim fails on the merits. This court agrees with both arguments and finds that summary judgment should be granted in favor of defendant.

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes

over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In considering a motion for summary judgment, the court does not resolve contested issues of fact, but must rather determine the existence of any disputed issues of material fact. *Salahuddin v. Coughlin,* 999 F.2d 526, 535 (2d Cir.1998) (citations omitted). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. To evaluate a fact's materiality, the substantive law determines which facts are critical and which are irrelevant. *Salahuddin v. Coughlin,* 999 F.2d at 535 (citing *Anderson v. Liberty Lobby,* 477 U.S. at 248). While the court must extend "extra consideration" to pro se parties, this does not relieve the pro se of his duty to meet the requirements necessary to defeat the motion. *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003). A pro se party's bald assertion, "completely unsupported by the evidence," is not sufficient to overcome a properly supported motion. *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Carey v.. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### III. *Exhaustion of Administrative Remedies*

**\*5** The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a

federal action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Scott v. Del Signore,* 2005 U.S. Dist. LEXIS 6070, \*12–15 (W.D.N.Y. Feb. 18, 2005) (citing *inter alia Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004)). As an affirmative defense, it is the defendant's burden to establish that plaintiff failed to meet the exhaustion requirements. *Id.* at \*12–13 (citing *Giano,* 380 F.3d at 675).

In *Jones v. Bock,* 549 U.S. 199, 218 (2007), the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Id.* (citing *Woodford v. Ngo,* 548 U.S. 81, 88 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must *complete* the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. COMP. CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

The Second Circuit developed a "three part inquiry" to determine whether an inmate fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative

2010 WL 3808813

remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.* As discussed below, this court finds that plaintiff has not shown that the exhaustion requirement should be excused, and thus, plaintiff's case should be dismissed regardless of whether exceptions to the exhaustion requirement continue to exist after *Woodford.*

**\*6** In support of his argument that plaintiff has failed to exhaust his administrative remedies with respect to any claim that defendant Fessette failed to protect plaintiff from the October 1st assault, defendant submits the affidavit of Tara Brousseau, the Inmate Grievance Program ("IGP") Supervisor at Clinton. (Brousseau Aff., Dkt. No. 26–3). IGP Supervisor Brousseau states that she has conducted a review of Clinton's Grievance Office Clerk's Log for the months of October, November, and December of 2006. (Brousseau Aff. ¶ 5). This Log contains "all grievances and appeals filed at Clinton ...." *Id.* IGP Supervisor Brousseau found "no record that inmate Rosado filed any grievance" relating to defendant Fessette's failure to protect plaintiff on October 1, 2006, and there was "no record" that plaintiff appealed any grievance determination to the Superintendent or to the CORC for any incident at Clinton. *Id.*

In his response to defendant's motion for summary judgment, plaintiff claims that he filed a grievance on October 3, 2006 with the IGRC, but never received a response. (Dkt. No. 33 at 5). Plaintiff claims that he then wrote a letter to the IGRC on October 22, 2006 and two letters to the Superintendent, one on October 23, 2006, and another dated October 28, 2006, complaining that he had not received a response to his grievance. *Id.* Plaintiff claims that he exhausted his administrative remedies when he failed to get a response from the prison officials. *Id.* Plaintiff claims that "Facility officers messed with Plaintiffs [sic] outgoing mail due to the seriousness of the injury and claim caused by Defendant failing to protect Plaintiff and issuing Protective Custody in [sic] which Plaintiff requested." *Id.*

Plaintiff attempts to support his claim by stating that a Southport [9] Correctional Facility IGRC representative, Ms. Vanhagen told plaintiff that "a lot of inmate grievances do not reach her through the mail for some

reason," and that she "receives a lot of complaints about the mailroom [sic] interfering and tampering with inmate grievances that go through the mailroom [sic] which occurs in every facility in New York State." *Id.* Thus, plaintiff is attempting to establish that he is entitled to raise the estoppel exception to the exhaustion requirement by stating that someone must have "messed" with his grievance and his mail.

[9]     Plaintiff is currently incarcerated at Southport.

Plaintiff does not attach any copies of the grievance or letters that he allegedly attempted to send. Instead, plaintiff attaches two inmate declarations to his response. (Dkt. No. 33 at 11–12, 13–14). The first statement is from inmate Corey Sloan, who states that he was the plaintiff in another failure-to-protect case against officers at Clinton. (Dkt. No. 33 at 11–12, ¶ 3). Inmate Sloan states that he is making the declaration because he also had his grievances and mail tampered with at Clinton. *Id.* ¶ 2. Inmate Sloan states that the case that he brought against the officers settled before trial. [10] *Id.* The second declaration is from inmate Adrian Lopez, who states that he was incarcerated at Clinton between July 8, 2008 and November 3, 2008. (Dkt. No. 33 at 13–14, ¶ 3). Inmate Lopez claims that during the time he was incarcerated at Clinton, he attempted to file grievances that were "never answered for some apparent reason." *Id.* He states that he has witnessed other inmates having the same problem. *Id.* ¶ 4.

[10]     *See Sloan v. Artus,* 9:07–CV–951 (N.D.N.Y.) (DNH/ RFT). A review of the docket sheet in Inmate Sloan's case shows that he did receive a settlement of $ 3,000.00 as the result of assisted mediation, supervised by Recalled Magistrate Judge Victor Bianchini. (Dkt. No. 62 in 9:07–CV–951). A review of inmate Sloan's amended complaint shows that in his amended complaint, he alleged that he filed a grievance, but was never given a decision. (Dkt. No. 19 ¶ 4(B)(i) & (ii)).

**\*7** Courts have consistently held, however, that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement. *See e.g. Veloz v. New York,* 339 F.Supp.2d 505, 515–16 (S.D.N.Y.2004) (plaintiff's allegations that his grievances were misplaced or destroyed by corrections officers ultimately does not relieve him of the requirement to appeal those claims to the next level once it became clear that no response was forthcoming) (citing *Martinez v.*

Case 9:17-cv-00194-TJM-TWD    Document 233    Filed 09/05/17    Page 101 of 211
Rosado v. Fessetto, Not Reported in F.Supp.2d (2010)
2010 WL 3808813

*Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) (same). *See also Murray v. Palmer,* 9:03–CV–1010, 2010 WL 1235591, *2 & nn. 4, 6 (N.D.N.Y. March 31, 2010) (citations omitted). The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. 7 N.Y.C.R.R. § 701.6(g)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan. 11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level, including the CORC, in order to properly complete the grievance process.

In this case, therefore, plaintiff's claim that the Clinton officials must have "messed with" his grievance and his letters to the Superintendent is insufficient to excuse the exhaustion requirement. Plaintiff states that he filed a grievance on October 3, 2006. When he did not receive a response, he states he wrote a letter to the IGRC and two letters to the Superintendent, but when he did not hear from the Superintendent, plaintiff does not allege that he attempted to appeal to the CORC. Although plaintiff states that he served "Defendant" with copies of the letters and grievances, apparently plaintiff did not retain copies for himself because he has submitted no documents indicating that he attempted to file anything. The fact that other inmates may have had problems with their grievances does not establish that plaintiff's problems were the same.

Plaintiff has shown no special circumstances to justify his failure to properly appeal to the CORC, even assuming that his attempts to exhaust at the first two levels were impeded by unknown corrections officials. Thus, plaintiff has failed to exhaust his administrative remedies against defendant Fessette, and plaintiff's complaint may be dismissed for failure to exhaust. However, even if the court were to excuse plaintiff's failure to exhaust, his claim also fails on the merits as discussed below.

### IV. *Failure to Protect*
In order to establish an Eighth Amendment claim for failure to protect, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, *and* prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan,* 511 U.S. 825, 836 (1994). The plaintiff must show that prison officials *actually knew of and disregarded*

an excessive risk of harm to the inmate's health and safety. *Id.* at 837. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the defendant must also draw that inference. *Id.*

**\*8** An isolated omission by corrections officers generally does not support a claim for deliberate indifference absent circumstances involving evil intent, recklessness, or deliberate indifference. *Coronado v. Goord,* 99 Civ. 1674, 2000 U.S. Dist. LEXIS 13876, *10–11 (citing *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985)). Plaintiff may allege a constitutional claim by alleging that the substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and that the officials being sued were exposed to information concerning the risk and thus, must have known about it. *Id.* (citing *Farmer,* 511 U.S. at 842–43).

In this case, plaintiff claims that defendant Fessette should be liable for failing to protect plaintiff from assault because plaintiff was in IPC at Great Meadow, where plaintiff had agreed to the IPC placement. [11] Thus, defendant Fessette should have taken plaintiff seriously when plaintiff told him that he was in danger. The DOCS Directive 4948 specifically states that inmates who are in IPC will be evaluated for transfer to facilities in which they can be programmed in General Population. (Def.'s Ex. B, DOCS Directive No. 4948(III)(A)). FDS Tedford states that after his placement in IPC at Great Meadow, plaintiff was evaluated, and it was determined that Clinton was an appropriate facility where plaintiff could be placed in General Population. (Tedford Aff. ¶ 7).

[11]    Actually, the exhibits establish that plaintiff initially declined VPC, requiring the prison officials to hold an IPC hearing. By the time plaintiff was afforded his IPC hearing, he had changed his mind and elected to remain in protective custody. *Compare* (Tedford Aff. ¶ 5) *with* (Def.'s Ex. C, Dkt. No 26–9 at 4, 8, 9, 10).

Upon plaintiff's arrival at Clinton, his IPC status was noted, but because he had no known enemies at Clinton, the staff, under FDS Tedford's supervision moved plaintiff into General Population. *Id* . ¶ 9. Defendant Fessette had no way of knowing otherwise. Plaintiff had only been at Clinton for two days when he allegedly approached defendant Fessette to inform him of the danger to plaintiff. Plaintiff claims that defendant Fessette

2010 WL 3808813

asked plaintiff for more information about the potential danger. Although defendant Fessette does not remember such a conversation with plaintiff, even if defendant Fessette asked plaintiff to explain why he believed he was in danger, this does not indicate that defendant Fessette either failed to take plaintiff seriously or was deliberately indifferent to a substantial risk to plaintiff. Plaintiff claims that he was assaulted shortly after his conversation with defendant Fessette, while plaintiff was in the yard waiting to use the telephone.

Based on the undisputed facts, no rational trier of fact could find that defendant Fessette actually knew of and disregarded a risk to plaintiff. According to plaintiff's own description of the facts, so little time passed between the alleged conversation with Fessette and the assault that defendant Fessette would not have had time to confirm what plaintiff was telling him or to take other administrative steps necessary to move plaintiff into protective custody. Thus, even if plaintiff had exhausted his administrative remedies, this court would recommend dismissal on the merits.

*9  **WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant's motion for summary judgment (Dkt. No. 26) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3808813

---

**End of Document**                         © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3809991

2010 WL 3809991
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Jonathan ROSADO, Plaintiff,

v.

P. FESSETTO, Correctional Sergeant,
Clinton Correctional Facility, Defendants.

No. 9:09–CV–67.
|
Sept. 21, 2010.

**Attorneys and Law Firms**

Jonathan Rosado, Pine City, NY.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York, Dean J. Higgins, Esq., Asst. Attorney
General, Albany, NY, for Defendant.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Jonathan Rosado, commenced this civil
rights action in January 2009, pursuant to 42 U.S.C.
§ 1983. By Report–Recommendation dated August 4,
2010, the Honorable Andrew T. Baxter, United States
Magistrate Judge, recommended that defendant's motion
for summary judgment (Docket No. 26) be granted, and
the complaint dismissed in its entirety. No objections to
the Report–Recommendation have been filed.

Based upon a careful review of the file, and the
recommendations of Magistrate Judge Baxter, the
Report–Recommendation is accepted and adopted in all
respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendant's motion for summary judgment (Docket
No. 26) is GRANTED;

2. The complaint is DISMISSED in its entirety; and

3. The Clerk is directed to enter judgment accordingly and
close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3809991

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00194-TJM-TWD    Document 233    Filed 09/05/17    Page 104 of 211

2005 WL 2452150
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

George M. CHAVIS, Plaintiff,

v.

G. KIENERT, Deputy of Programs; C.O. Dumas, Shu (Disciplinary); C.O. Donovan, Shu (Disciplinary); R. Girdich, Prison Superintendent; A. Boucaud, Deputy of Administration; D. Selsky, Shu Disciplinary Director; R. Donaldson, Civilian Grievance Supervisor; Ms. Daggett, Shu Corrections Counselor; L. Friot, Senior Corrections Counselor; A. Tousignant, Prison Nurse Administrator; Ms. Buffman, Medical Staff "PA"; Dr. L.N. Wright, Chief Medical Officer; C.O. J. Rock, Hearings; J. Donelli, Deputy (First) Superintendent; Lucien J. LeClaire, Deputy Commissioner; J. Cromp, Grievance Officer; C.O. M. White, Shu; C.O. G. Canning, Hearings; Mr. Johnson, Prison Doctor; C .O. M. Yuddow, Shu; and Richard D. Roy, Inspector General's Officer, Defendants. [1]

[1]    In his complaint, Plaintiff incorrectly refers to Defendant "Johnston" as "Johnson." The Court will refer to this Defendant as "Johnston." Furthermore, although Plaintiff refers to this Defendant as a Doctor, according to Defendant Johnston's Declaration, which Defendants submitted in support of their motion for summary judgment, Defendant Johnston is a Physician's Assistant. See Dkt. No. 72, P. Johnston Decl., at ¶ 1. Plaintiff also incorrectly refers to Defendant "Yaddow" as "Yuddow;" the Court will refer to this Defendant as Yaddow.

No. 9:03-CV-0039(FJSRFT).
|
Sept. 30, 2005.

**Attorneys and Law Firms**

George M. Chavis, Southport Correctional Facility, Pine City, New York, Plaintiff pro se.

The Attorney General of the State of New York, The Capitol, Albany, New York, for Defendants, Kate H. Nepveu, AAG, of counsel.

MEMORANDUM-DECISION AND ORDER

SCULLIN, Chief J.

I. INTRODUCTION

**\*1** On January 9, 2003, Plaintiff George M. Chavis filed his complaint in this civil rights action, pursuant to 42 U.S.C. § 1983, against twenty-one Defendants, alleging that, during the time that he was incarcerated at Upstate Correctional Facility, Defendants violated his rights under the First, Eighth, and Fourteenth Amendments. See Dkt. No. 1. Specifically, Plaintiff alleges that Defendants, collectively and individually, (1) denied him access to the courts when they confiscated his legal mail, denied him access to the law library, and refused to file grievances that he submitted; (2) retaliated against him in various ways, whether by issuing false misbehavior reports or by extending his confinement in a Special Housing Unit ("SHU"); (3) violated his due process rights at various disciplinary hearings; (4) were deliberately indifferent to his serious medical needs; and (5) housed him in inhumane living conditions. See id.

Currently before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Dkt. Nos. 72, 78, & 79. Plaintiff opposes this motion. See Dkt. No. 75. [2] For the reasons set forth herein, the Court grants Defendants' motion and dismisses Plaintiff's complaint in its entirety.

[2]    At the outset, the Court notes that Plaintiff's opposition papers substantially fail to comply with this District's Local Rules in that Plaintiff (1) failed to include a Statement of Material Facts, (2) included legal arguments in his Affidavit, and (3) submitted a legal memorandum, which, at sixty pages, far exceeds the twenty-five page limit. See L.R. 7.1(a). Although the Court could have rejected Plaintiff's papers as non-compliant, in light of his pro se status, the Court accepts his filings. However, the Court will construe Plaintiff's voluminous response to Defendants' motion, entitled "Affidavit in Testimony," see Dkt. No. 75, as a

Memorandum of Law in Opposition because this District's Local Rules preclude an affidavit from including legal arguments. *See* L.R. 7.1(a)(2). There is no prejudice to Plaintiff as a result of the Court's recharacterization of his papers because his verified complaint may serve as an affidavit for summary judgment purposes. *See* Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995) (citing cases and treatises supporting the proposition that a verified complaint may serve as an affidavit for Rule 56 purposes provided the complaint "contains facts known to be true in the affiant's own knowledge and if it has a certain level of factual specificity").

## II. BACKGROUND [3]

[3]    The Court derives the facts from Defendants' Statement of Material Facts, which they submitted in accordance with L.R. 7.1 and which Plaintiff has not specifically countered or opposed and which the record amply supports. *See* L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

Plaintiff's claims arise from incidents that occurred during the time that he was incarcerated in Upstate Correctional Facility's SHU between July 1 and December 31, 2002. *See generally* Dkt. No. 1. On July 1, 2002, Plaintiff was transferred to Upstate Correctional Facility and was housed in SHU to serve a keeplock sentence imposed at a March 7, 2000 Tier II Disciplinary Hearing held at Coxsackie Correctional Facility. *See* Dkt. No. 72, Kate Nepveu, Esq., Decl., dated December 31, 2004, Exhibit "B," Inmate Disciplinary History, at renumbered p. 3.[4] Plaintiff was to serve the keeplock sentence from June 27 to July 27, 2002.[5] *See id.; see also* Dkt. No. 72, Defendants' 7.1 Statement at ¶ 1.

[4]    In submitting Exhibits in support of Defendants' motion for summary judgment, Defendants' counsel renumbered the pages of all of the Exhibits. For ease of reference, the Court will refer to the relevant Exhibits using their renumbered designations.

[5]    Plaintiff's disciplinary history since his admission to the custody of New York's Department of Correctional Services ("DOCS") is rather lengthy. Some examples of Plaintiff's vast disciplinary history include the following:

(1) from 1993 to 1996, while housed at Clinton Correctional Facility, Plaintiff was found guilty of various prison rule violations at eight separate disciplinary hearings (two Tier III and six Tier II);
(2) from 1997 to 1998, while housed at Attica Correctional Facility, Plaintiff was found guilty at five separate disciplinary hearings (one Tier III and four Tier II);
(3) from 1998 to 2000, while housed at Wende, Orleans, and Southport Correctional Facilities, Plaintiff was found guilty at five separate disciplinary hearings (two Tier III and three Tier II);
(4) in 2000, while housed at Coxsackie Correctional Facility, Plaintiff was found guilty at six separate disciplinary hearings (four Tier III and two Tier II);
(5) from 2000 to 2002, while housed at Southport Correctional Facility, Plaintiff was found guilty at nine separate disciplinary hearings (two Tier III and seven Tier II); and
(6) from July through December 2002, while housed at Upstate Correctional Facility, and the focus of some of Plaintiff's claims herein, Plaintiff was found guilty at six separate disciplinary hearings (three Tier III and three Tier II).
*See* Nepveu Decl., Exhibit "B."

The Upstate Medical Staff received information from Southport Correctional Facility indicating that Plaintiff suffered from Hepatitis B, asthma, and chronic seasonal allergies as well as allergies to penicillin and seafood.[6] *See* Nepveu Decl., Exhibit "K," Chavis Medical Record, at p. 49. The only medications noted were multi-vitamins. *See id.* Upon admission to Upstate Correctional Facility, Plaintiff completed a medical questionnaire regarding his allergy to seafood. *See id.* at pp. 52-53. Based upon his responses to the medical questionnaire, A. Branch,[7] DOCS Registered Dietitian, responded that the facility only served fish, not shellfish, and that the facility would provide Plaintiff with a substitute for fish. *See id.* at pp. 51-52. On October 22, 2002, the facility formally executed a Therapeutic Diet Request Form and Attendance Agreement. *See id.* at p. 50.

[6]    The report further noted that, although Plaintiff had never been referred to a mental health unit, he had a psychiatric history, including a history of violence. *See* Nepveu Decl., Exhibit "K," at p. 49.

[7]    Branch is not a Defendant in this action.

On July 3, 2002, while serving the above referenced keeplock sentence, Plaintiff wrote a letter, addressed as

"legal mail," to Stephen F. Gawlik, Assistant Attorney General ("AAG"). *See* Defendants' 7.1 Statement at ¶ 3; Nepveu Decl., Exhibit "C," July 26, 2002 Hearing Packet, at p. 6. The letter included language such as

> **\*2** neither one of your vindictive KKK clients will get away with it. I'll seek everyone out and put them each under the fucken [sic] dirt w/their devils (illegible). I will get retribution on everyone [sic] of you because I know that all of you are in this together, but you'll pay for it.

*See id.* at p. 8.

Due to the threatening nature of the letter, AAG Gawlik forwarded it to facility officials for investigation. *See* Nepveu Decl., Exhibit "C," at p. 6. On July 12, 2002, after interviewing Plaintiff, who admitted writing the letter, Defendant G. Canning wrote a misbehavior report charging Plaintiff with violating prison rules 102.10 (threats in writing), 107.11 (inmates shall not harass any person), and 180.11 (correspondence procedures). *See id.* at p. 16.[8] Defendant J. Rock, Lieutenant, presided as the hearing officer at a Tier III Superintendent's Hearing regarding this misbehavior report on July 26, 2002. *See* Nepveu Decl., Exhibit "C," at p. 2. Defendant Rock found Plaintiff guilty of violating prison rules regarding harassment and threats and instituted a punishment of twelve months' confinement in SHU with corresponding loss of privileges and further recommended nine months loss of good time.[9] *Id.* In his written statement of disposition, Defendant Rock explained that, in light of Plaintiff's lengthy disciplinary history, of which thirteen disciplinary dispositions had been issued since January 2000 for threats and harassment, and in light of the fact that Plaintiff had exhibited no modification to his behavior, a more severe sentence was warranted. *See id.* at p. 3; *see also supra* note 5. Defendant Rock further noted that Plaintiff had refused assistance from Defendant Daggett, his selected hearing assistant, and had refused to attend the hearing. *See id.; see generally* Nepveu Decl., Exhibit "D," July 26, 2002 Hearing Transcript. The disciplinary disposition, which Defendant Selsky affirmed on appeal, was set to commence on March 4, 2003, and end on March 4, 2004.[10] *See* Nepveu Decl., Exhibit "C," at pp. 1-2.

[8]    Defendants' 7.1 Statement incorrectly states that Defendant Canning's misbehavior report is dated August 26, 2002. *Compare* Defendants' 7.1 Statement at ¶ 8 *with* Nepveu Decl., Exhibit "C," at p. 16.

[9]    Defendant Rock found Plaintiff not guilty of violating facility correspondence rules because his letter was addressed to the Attorney General's Office and some of its content was legal in nature. *See* Nepveu Decl., Exhibit "C," at p. 2.

[10]    According to Plaintiff's Inmate Disciplinary History, the service dates for this disposition commenced on July 26, 2002, and ended on July 26, 2003. *See* Nepveu Decl., Exhibit "B," at p. 1. The parties have not submitted any reason for the discrepancy in service dates.

On August 21, 2002, Plaintiff wrote a letter to Defendant A. Tousignant, Prison Nurse Administrator, in which he referred to Defendant Nurse Buffman an "ill-minded lesbian dyke of a deeply rooted perverted mentality" and a "KKK staff member ... [who] hand masturbates SHU-inmates through the access door." *See* Nepveu Decl., Exhibit "E," Sept. 5, 2002 Hearing Packet, at pp. 6-8; Defendants' 7.1 Statement at ¶ 7. In response, on August 26, 2002, Defendant Tousignant wrote a misbehavior report charging Plaintiff with violating prison rule 107.11 (harassing employees). *See* Nepveu Decl., Exhibit "E," at p. 5. On September 5, 2002, Defendant Canning presided over a Tier II Disciplinary Hearing regarding this misbehavior report. *See id.* at p. 1. At the close of the hearing, Defendant Canning found Plaintiff guilty and sentenced him to thirty days keeplock and loss of privileges. *See id.* Plaintiff did not appeal this disposition. *See* Nepveu Decl ., Exhibit "," at p. 1.

**\*3** Between September 6, 2002, and November 12, 2002, Plaintiff received misbehavior reports charging him with violating prison rules 102.10 (threats), 106.10 (direct order), and 109.12 (movement violation). *See id.* Two separate Tier III Superintendent's Hearings were held, after which Plaintiff was found guilty and sentenced to sixty days' confinement in SHU with loss of privileges and nine months' confinement in SHU with loss of privileges, respectively. *See id.* The latter punishment included nine months recommended loss of good time.[11] *Id.;* Defendants' 7.1 Statement at ¶ 10. Plaintiff did not appeal either of these dispositions. *See* Nepveu Decl., Exhibit "B," at p. 1; Defendants' 7.1 Statement at ¶ 11.

[11]    The service dates for these dispositions were from July 26, 2003, through June 24, 2004. *See* Nepveu Decl. at Exhibit "B."

On September 8, 2002, Plaintiff submitted a grievance to the Inmate Grievance Resolution Committee ("IGRC"), which was filed on September 20, 2002, and designated UST 13378-02. *See* Nepveu Decl ., Exhibit "I," Inmate Grievance Packet-UST 13378-02, at p. 13. In his grievance, Plaintiff complained that on September 5 and 6, 2002, during the morning mail pick-up in SHU, four SHU officers "willfully denied [him] replacement facility envelopes" in exchange for personal envelopes and "further denied [him] other stationary [sic] supplies, *i.e.,* paper and pens," thereby preventing him from filing an appeal of his September 5, 2002 Tier II Hearing. *See id.* at pp. 13-14. On September 25, 2002, the IGRC advised Plaintiff that he needed to specify which officers denied him supplies, to which Plaintiff responded, "the blond haired klan officer." *See id.* at p. 14. Since Plaintiff identified one of the officers as the regular officer on duty, an investigation ensued, pursuant to which it was revealed that Correction Officer ("CO") Manning was the regular officer but was not on duty on those days and that, furthermore, the officers who were on duty did not fit the physical description that Plaintiff had supplied. *See id.* at pp. 1-10. Moreover, according to facility records, Defendants Dumas and Donovan were not working on Plaintiff's gallery on September 5 and 6, 2002. Defendants' 7.1 Statement at ¶ 18; Nepveu Decl., Exhibit "I," at p. 9.

On December 23, 2002, Defendant J. Cromp issued a misbehavior report against Plaintiff due to the harassing nature of a grievance he had submitted regarding Nurse Buffman. *See* Nepveu Decl., Exhibit "G," Jan. 6, 2003 Hearing Packet/December 23, 2002 Misbehavior Report. Plaintiff's grievance, dated December 15, 2002, [12] described Defendant Buffman as a "despicable piece of trash" and an "ill-minded and vindictively racist character." *See id.* at p. 11. Although the grievance was accepted for filing and designated UST 14452-2, Plaintiff was charged with violating prison rule 107.11 (harassing employees). *See* Nepveu Decl., Exhibit "G," at p. 9; Exhibit "J," Consolidated Inmate Grievances, at pp. 4 & 14. Subsequently, on December 24, 2002, during sick call, Plaintiff called Defendant Buffman a "bitch," told her to "drop dead," and said, "I'll kill you." *See* Nepveu Decl., Exhibit "H," January 6, 2003 Hearing Packet/December 24, 2002 Misbehavior Report. Defendant Buffman issued

Plaintiff a misbehavior report charging him with violating prison rules 102.10 (threats), 107.10 (interference), and 107.11 (harassing employees). *See id.* at p. 10. On January 6, 2003, Lieutenant D. Quinn [13] presided as the hearing officer over two Tier II Disciplinary Hearings regarding the December 23 and 24 Misbehavior Reports. *See* Nepveu Decl., Exhibits "G" & "H." Plaintiff was found guilty of all charges and received two consecutive thirty-day sentences of keeplock confinement and corresponding loss of privileges. [14] *See* Nepveu Decl., Exhibit "G," at p. 6, Exhibit "H," at p. 7; Defendants' 7.1 Statement at ¶ 17. Both dispositions were affirmed on appeal. *See* Nepveu Decl., Exhibit "B," at p. 1; Exhibit "G," at p. 1; Exhibit "H," at p. 1.

[12]    Plaintiff actually submitted two seemingly identical grievances against Defendant Buffman, one dated December 15, 2002, and the other dated December 16, 2002; it appears that both grievances were accepted and consolidated with another grievance regarding access to medical care. *See* Nepveu Decl., Exhibit "J," Consolidated Inmate Grievances, at pp. 4 & 14.

[13]    Lieutenant Quinn is not a Defendant in this action.

[14]    The sentences were set to commence on March 1, 2005. *See* Nepveu Decl. at Exhibit "B."

**\*4** With regard to the grievance that Plaintiff submitted regarding Defendant Buffman, Plaintiff claimed that on December 16, 2002, Defendant Buffman passed over his cell during sick call and did not provide him with his medication refills. *See* Nepveu Decl., Exhibit "J," at p. 4. This grievance was consolidated with another grievance in which Plaintiff complained that he was being denied the right to see a doctor and denied medication refills. *See id.* at pp. 3, 12, & 14. In its recommendation, the IGRC advised Plaintiff to refrain from using derogatory remarks because such remarks were counterproductive to the institution's ability to investigate. *See id.* at p. 5. The IGRC further noted that on December 24, 2002, Defendant Buffman asked Plaintiff what refills he needed, to which he responded, "I'll kill you, drop dead bitch." *See id.* Both the Superintendent and CORC affirmed the IGRC's determination on appeal. *See id.* at pp. 7, 11. CORC admonished Plaintiff for using offensive and inflammatory language and also noted that Plaintiff had been non-compliant with sick call procedures on December 10, 13, and 20, 2002, as he either remained in bed or was sleeping. *See id.* at p. 11.

During the relevant time period, July 1 through December 31, 2002, the medical staff at Upstate Correctional Facility saw Plaintiff a total of eighty-five times, an average of fourteen visits per month. *See* Nepveu Decl., Exhibit "K," at pp. 18-48. Furthermore, prior to receiving his Therapeutic Diet Request Form on October 22, 2002, Plaintiff never lodged any complaints with any medical staff regarding fish substitutions or any other dietary related problems. [15] *See id.*

[15]    On September 30, 2002, there is a notation in the medical record of "No Fish-No Seafood," although it is unclear whether Plaintiff lodged an actual complaint because no further directions follow the notation. *See* Nepveu Decl., Exhibit "K," at p. 32.

On the following dates in 2002, Plaintiff was non-compliant with sick call procedures: July 29 (asleep during scheduled/requested sick call), August 6 (uncooperative and belligerent), August 14 (asleep during scheduled/requested sick call), August 15 (uncooperative and belligerent), August 19 (asleep during scheduled/requested sick call), August 21 (complained of jock itch but refused exam of area), September 25 (asleep during scheduled/requested sick call), October 4 (asleep during scheduled/requested sick call), October 5 (asleep during scheduled/requested sick call), October 6 (asleep during scheduled/requested sick call), October 9 (refused to come to cell door), October 10 (asleep during scheduled/requested sick call), October 11 (asleep during scheduled/requested sick call), December 4 (refused to come to cell door), December 5 (refused to come to cell door), December 7. (asleep during scheduled/requested sick call), December 9 (asleep during scheduled/requested sick call), December 13 (asleep during scheduled/requested sick call), December 15 (uncooperative during exam), December 18 (asleep during scheduled/requested sick call), December 20 (asleep during scheduled/requested sick call), December 22 (asleep during scheduled/requested sick call), December 23 (asleep during scheduled/requested sick call), December 24 (belligerent and disrespectful-Misbehavior Report issued), and December 28 (asleep during scheduled/requested sick call). *See* Nepveu Decl., Exhibit "K," at pp. 18-41.

## III. DISCUSSION

A. Summary Judgment Standard

**\*5** Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," ' that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c))). "When a party has moved for summary judgment on the basis of asserted facts supported as required by Fed.R.Civ.P. 56(e) and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992) (citation omitted).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts that the movant submitted. Fed.R.Civ.P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case." (citation omitted)); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994) (citation omitted). To that end, "sworn statements are more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion," *Scott,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995), and the credibility of such statements is better left to a trier of fact, *see id.* (citing *Vital v. Interfaith Med. Ctr.,* 168 F.2d 615, 621-22 (2d Cir.1999)).

When considering a motion for summary judgment, the court must 'resolve [ ] all ambiguities and draw [ ] all factual inferences in favor of the nonmoving party." ' *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998) (quoting *Adams,* 143 F.3d at 65). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether

2005 WL 2452150

there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read his supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (citation omitted); *accord Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (quotation and other citation omitted). Nonetheless, mere conclusory allegations, which the record does not support, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991) (citations omitted).

**B. Dismissal pursuant to** 28 U.S.C. § 1915(g)

**\*6** Defendants ask this Court to dismiss Plaintiff's claims pursuant to 28 U.S.C. § 1915(g) "on the grounds that [such claims are] frivolous, malicious, or fail[ ] to state a claim upon which relief may be granted...." 28 U.S.C. § 1915(g).

Under § 1915, individuals may seek leave of the court to pursue their claims without prepayment of fees and costs and proceed with the litigation as a poor person or *in forma pauperis* ("IFP"). *See* 28 U.S.C. § 1915(a)(1). The IFP statute similarly enables prisoners to apply for this privilege, and indeed, many, if not most, incarcerated individuals bringing suits take advantage of that opportunity. *See* 28 U.S.C. § 1915(a)(2). However, under this statute, a court shall dismiss a case if it determines that such action is "(i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

Recognizing the potential for prisoner abuse and seeking to relieve the courts of congestion caused by patently frivolous prisoner suits, Congress enacted the Prisoner Litigation Reform Act of 1996, Pub.L. 104-134, 110 Stat. 1321-66 to 1321-77 ("PLRA"), which imposes several restrictions upon a prisoner's ability to seek redress in the courts at will. One such mechanism is the so-called "three strikes rule," which bars inmates from proceeding IFP after three or more previous actions, in which the court granted the prisoner IFP status, have been dismissed as frivolous, malicious, or for failing to state a claim, unless the prisoner is under imminent danger of serious physical

injury. *See* 28 U.S.C. § 1915(g). Specifically, this section provides, in pertinent part, that

> [i]n no event shall a prisoner bring a civil action ... under this section if the prisoner has, on 3 or more prior occasions, while incarcerated ... brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

In recognizing that the PLRA amendments foster legitimate governmental interests, the Second Circuit has stated that

[p]rior to the enactment of the *in forma pauperis* amendments, inmates suffered no economic disincentive to filing lawsuits. Indeed, the very nature of incarceration-prisoners have substantial free time on their hands, their basic living expenses are paid by the state and they are provided free of charge the essential resources needed to file actions and appeals, such as paper, pens, envelopes and legal materials-has fostered a " 'nothing to lose and everything to gain" ' environment which allows inmates indiscriminately to file suit at taxpayers' expense.

*Nicholas v. Tucker* 114 F.3d 17, 20 (2d Cir.1997) (citing *Anderson v. Coughlin,* 700 F.2d 37, 42 (2d Cir.1983) (quotation omitted)).

**\*7** The Supreme Court has explained that there are two instances where a dismissal of an action as frivolous is warranted. *See Neitzke v. Williams,* 490 U.S. 319, 327 (1989) (citations omitted); *see also Welch v. Galie,* 207 F.3d 130, 131 (2d Cir.2000) (citations omitted). First, when the "factual contentions are clearly baseless," for example, where the allegations are the product of delusion or fantasy, dismissal is warranted. *Neitzke,* 490 U.S. at 327-28. The second instance is where the claim is "based on an indisputably meritless legal theory...." *Id.* at 327. "A claim is based on an 'indisputably meritless legal theory' when either the claim lacks an arguable basis in law, *Benitez v. Wolff,* 907 F.2d 1293, 1295 (2d Cir.1990) (*per*

*curium* ), or a dispositive defense clearly exists on the face of the complaint. *See Pino v. Ryan,* 49 F.3d 51, 53 (2d Cir.1995)." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998).

With these standards in mind, the Court must determine which claims, if any, are subject to dismissal pursuant to 28 U.S.C. § 1915(g).

C. New Claims
As Defendants note in their Reply Memorandum of Law, Plaintiff raises new claims in his opposition to their motion. *See, e.g.,* Dkt. No. 75, Plaintiff's Aff. in Opposition, at pp. 30-32; Dkt. No. 78, Defendants' Reply Memorandum of Law, at 3.

The Court notes that opposition papers are not the proper vehicles for adding new causes of action or for adding new defendants. *See In re Private Capital Partners, Inc.,* 139 B.R. 120, 124-25 (Bankr.S.D.N.Y.1992) (citing cases for the proposition that a plaintiff's attempt to amend his complaint by instituting new causes of action in his opposition papers to the defendants' dispositive motion is in direct contravention of and amounted to an attempt to circumvent the Federal Rules of Civil Procedure, namely Rule 15(a)). If Plaintiff had wanted to supplement or amend his complaint in this case, he should have followed the proper procedural mechanisms set forth in the Federal Rules of Civil Procedure and this District's Local Rules. Specifically, he should have made any such request by filing a motion seeking that relief.

Furthermore, "it is well established that arguments in legal memoranda may not in themselves serve to create a triable issue of material fact when unsupported by accompanying affidavits, pleadings, depositions, or stipulations." *Greaves v. State of New York,* 958 F.Supp. 142, 144 (S.D.N.Y.1997) (citing 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2723 at 64 (1996)) (other citation omitted). Therefore, the Court will not construe Plaintiff's current submission as a motion to amend or supplement his complaint; thus, any new claims that he has raised in his opposition papers are not properly before the Court, and the Court will not consider them.

D. Fourteenth Amendment-Due Process

**\*8** Plaintiff asserts that the following Defendants violated his Fourteenth Amendment rights to due process: [16]

[16]    Since Plaintiff failed to number all of the paragraphs in his complaint, the Court will make reference to the attached page number. Furthermore, in accordance with the standard of review, the Court has liberally construed Plaintiff's claims to raise the strongest arguments they present. Given the nature and volume of asserted claims, the Court notes that this liberal construction inevitably results in multiple overlapping of claims.

(1) *G. Kiernert,* Deputy of Programs, on July 1, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached pp. 1-2);

(2) *A. Boucaud,* Deputy of Administration, on July 1, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition and fabricated/extended SHU confinement (Complaint at attached pp. 2-3);

(3) *R. Girdich,* Prison Superintendent, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached p. 3);

(4) *J. Donelli,* First Deputy Superintendent, on July 1, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached p. 4);

(5) *Ms. Daggett,* Corrections Counselor, on July 1, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition and, on July 25, 2002, as a selected Tier III Assistant, failed to complete her duty to assist Chavis at his Hearing (Complaint at attached p. 7);

(6) *J. Rock,* CO Hearings, violated Chavis's due process rights at a Tier III Superintendent's Hearing held on July 26, 2002 (Complaint at attached p. 8);

(7) *G. Canning,* CO Hearings, on July 13, 2002, authored a false misbehavior report (Complaint at attached pp. 8-9);

(8) *L. Friot,* Senior Corrections Counselor, on July 1, 2002, subjected Chavis to illegal SHU confinement

with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached p. 9);

(9) *A. Tousignant,* Prison Nurse Administrator, filed a retaliatory misbehavior report on August 26, 2002 (Complaint at attached p. 10);

(10) *Ms. Buffman,* Physician's Assistant (PA), filed a retaliatory misbehavior report on December 25, 2002 (Complaint at attached p. 11);

(11) *J. Cromp,* Grievance Officer, filed a retaliatory misbehavior report on December 24, 2002 (Complaint at attached p. 13);

(12) *R. Donaldson,* Civilian Grievance Supervisor, on July 10, 2002, failed to file Chavis's grievance (Complaint at attached p. 14);

(13) *D. Selsky,* DOCS SHU Disciplinary Director, from July 1, 2002, to the date of the Complaint, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached p. 15);

(14) *Lucien J. LeClaire,* DOCS Deputy Commissioner, on July 1, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached p. 16); and

(15) *Richard D. Roy,* Inspector General's Officer, on November 26, 2002, subjected Chavis to illegal SHU confinement with full deprivation of privileges without an adequate disciplinary disposition (Complaint at attached pp. 16-17).

### 1. Illegal SHU Confinement

**\*9** The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484 (1995) (citations omitted). "[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 37 F.Supp.2d 162, 167 (N.D.N.Y.1999), *vacated and remanded on other grounds by* 238 F.3d 223 (2d Cir.2001) (citing *Bedoya v. Coughlin,* 91 F.3d 349,

351-52 (2d Cir.1996)). In *Sandin,* the Supreme Court ruled that the Constitution did not require that restrictive confinement within a prison be preceded by procedural due process protections unless the confinement subjected the prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d at 225 (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999)). Thus, a prisoner asserting that a defendant denied him due process in connection with segregated confinement or a loss of privileges must make a threshold showing that the deprivation of which he complains imposed such an "atypical and significant hardship." *Sandin,* 515 U.S. at 484.

Although the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, the Court of Appeals has suggested that confinement for a period of less than 101 days would not constitute an atypical and significant hardship, *see Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citation omitted); *see also Hanrahan v. Doling,* 331 F.3d 93, 97-98 (2d Cir.2003); in comparison, segregative sentences of 125-288 days are "relatively long" and therefore necessitate " 'specific articulation of ... factual findings' before the district court could properly term the confinement atypical or insignificant...." *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (internal citations omitted).

Plaintiff alleges that, on July 1, 2002, upon his admission to Upstate Correctional Facility, Defendants improperly confined him in SHU with full deprivation of privileges without a proper "disposition warranting" such confinement and deprivation. Plaintiff seeks to hold Defendants Kienert, Boucaud, Girdich, Donelli, Daggett, Friot, Selsky, Roy, and LeClaire responsible for violating his due process rights by either subjecting him to, or allowing him to be subjected to, illegal SHU confinement. Plaintiff also claims that, on an unspecified date in August 2002, Defendant Boucaud "fabricated a more severe SHU-Disciplinary keeplock readout sheet" thereby extending Plaintiff's illegal SHU confinement through 2004. *See* Complaint at attached p. 3.

Case 9:17-cv-00194-TJM-TWD    Document 233    Filed 09/05/17    Page 112 of 211
Chavis v. Kienert, Not Reported in F.Supp.2d (2005)
2005 WL 2452150

**\*10** According to Plaintiff's Inmate Disciplinary History, on March 7, 2000, while at Coxsackie Correctional Facility, he received a Tier II Disciplinary Hearing resulting in a disciplinary sentence of thirty-days keeplock confinement with loss of package, commissary, and phone privileges. *See* Nepveu Decl., Exhibit "B," at p. 3. The listed service date for this sentence was set for June 27, 2002, through July 27, 2002. First, the sentence imposed was thirty-days and, absent any allegations to the contrary, such a brief disciplinary sentence would not implicate a liberty interest. Notably, Plaintiff has not alleged any circumstances in connection with that sentence that would rise to the level of atypical and significant. Thus, the Court concludes that, in light of all the circumstances, Plaintiff was subjected to normal SHU conditions for thirty-days, which would not implicate a liberty interest.

Also, the Court notes that, upon admission to Upstate Correctional Facility, Plaintiff was confined in SHU to serve out his Coxsackie Correctional Facility keeplock sentence and that New York Regulations specifically authorize such confinement. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6(a)(2) (stating that an inmate in Upstate Correctional Facility "may be housed in a special housing unit ... for confinement pursuant to a disposition of a disciplinary (Tier II) ... hearing"). Plaintiff contends that stripping him of his privileges while he was confined in SHU was unwarranted; however, the Coxsackie Correctional Facility Disciplinary Disposition specifically denied him privileges for the thirty-day sentence. *See* Nepveu Decl., Exhibit "B," at p. 3. The Court also notes that, in this action, Plaintiff has not challenged the propriety of that Disciplinary Disposition and has not named any party associated with that Hearing as a Defendant in this action, although that issue is the subject of another action that Plaintiff has commenced in this District. *See Chavis v. Zodlow,* 128 Fed. Appx. 800 (2d Cir.2005) (unpublished decision affirming in part and vacating and remanding in part); Nepveu Decl., Exhibit "O," *Chavis v. Zodlow,* 9:02-CV-637 (N.D.N.Y. Dec. 5, 2003) (Decision and Order, Hood, J., sitting by designation).

In liberally construing Plaintiff's claim based upon his arguments and the exhibits that he has submitted, the Court concludes that Plaintiff is challenging the fact that he lost certain privileges during his confinement in Upstate Correctional Facility's SHU, at least insofar

as he claims he already served that portion of his Coxsackie Correctional Facility Disciplinary Sentence from March 7, 2000, through April 6, 2000. *See* Dkt. No. 75 at pp. 4-9A. The records that the parties have submitted to the Court for its review support Plaintiff's contention that he had already served his thirty-day loss of privileges sentence. *See* Nepveu Decl., Exhibit "B," at p. 3; Dkt. No. 75, at Exhibit "BB," March 7, 2000 Tier II Hearing Disposition. Although it is unclear from the record what the privileges were that Plaintiff was denied during his thirty-days in SHU, the Court is mindful that, in accordance with New York's Regulations, inmates assigned to keeplock status in SHU pursuant to § 301.6 are subject to the property, visiting, package, commissary, telephone, and correspondence limitations set forth in §§ 302.2(a)-(j). *See* N.Y.Codes R. & Regs. tit. 7, §§ 301.6(c)-(h) & 302.2(a)-(j). Plaintiff has not raised any claim that any deprivations that he suffered were contrary to the above regulations and, in any event, because Plaintiff's allegations amount to normal SHU conditions, the Court finds that no liberty interest is implicated.

**\*11** With regard to Plaintiff's allegation that Defendant Boucaud fabricated a more severe SHU-Disciplinary keeplock readout sheet, Defendant Boucaud avers, in a sworn Declaration, that he did not alter Plaintiff's records; and Plaintiff has not presented any proof demonstrating otherwise. In his complaint, Plaintiff states that Defendant Boucaud falsified the document sometime in August; however, in his opposition papers, which are replete with his incoherent ramblings, Plaintiff argues that Defendants improperly denied him privileges. *Compare* Complaint at attached p. 3 *with* Dkt. No. 75 at pp. 4-9A. This discrepancy is inexplicable; there is no date in August that this Court can discern on which Defendant Boucaud would have had cause to alter Plaintiff's confinement in SHU because, by that time, Plaintiff was serving the twelve-month SHU sentence that Defendant Rock imposed at the July 26, 2002 Tier III Superintendent's Hearing. *See* Nepveu Decl., Exhibit "B," at p. 1; *see infra* Part III.D.3.

Lastly, Plaintiff alleges that Defendant Roy violated his due process rights when he ignored a letter that Plaintiff wrote to him regarding, among other things, his "illegal" SHU confinement. It is well-settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action, *see McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977) (citations

omitted), and furthermore, the doctrine of respondeat superior is inapplicable to § 1983 claims, *Polk County v. Dodson,* 454 U.S. 312, 325 (1981) (citing *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978)). The fact that Plaintiff may have written a letter to Defendant Roy does not automatically render him responsible for any constitutional violations. *See Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, *6 (S.D.N.Y. July 13, 1998)* (citations omitted) (ignoring letter is insufficient for personal involvement); *Young v. Kihl,* 720 F.Supp. 22, 23 (W.D.N.Y.1989) (holding that "the wrong must have been ... capable of mitigation at the time the supervisory official was apprised thereof" (citation omitted)); *Woods v. Goord,* No. 97 CIV. 5143, 1998 WL 740782 (S.D.N.Y. Oct. 23, 1998) (holding that receiving letters or complaints does not automatically make a supervisor liable for the denial of medical care). Thus, Plaintiff cannot hold Defendant Roy liable for the alleged violation of his constitutional rights simply because he either responded or, conversely, failed to respond, to a complaint. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997). In any event, because the Court has concluded that no violations of Plaintiff's constitutional rights occurred, there is no need for the Court to consider the extent, if any, of Defendant Roy's involvement. The Court further finds that Plaintiff's general allegations against these nine Defendants arising from his July 1, 2002 confinement in SHU, regardless of the actual role or power that these Defendants possessed, are patently frivolous and even borderline malicious. Accordingly, the Court dismisses Plaintiff's due process claims against Defendants Kienert, Boucaud, Girdich, Donelli, Daggett, Friot, Selsky, Roy, and LeClaire based upon Plaintiff's confinement to SHU on July 1, 2002, pursuant to 28 U.S.C. § 1915(g).

### 2. Retaliatory Misbehavior Reports

**\*12** Plaintiff alleges that Defendants Tousignant, Cromp, and Buffman filed retaliatory misbehavior reports against him on August 26, December 24, and December 25, 2002, respectively. It is not clear whether Plaintiff challenges the veracity of these reports. However, to the extent that he is claiming that these reports were false, it is well-settled that prisoners have no constitutional right to be free from being falsely accused. *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) (holding that prison inmates do not have a "constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected

liberty interest"). Rather, the Constitution guarantees that such inmates will not be "deprived of a protected liberty interest without due process of law." *Id.* Thus, as long as prison officials provide the inmate with procedural due process requirements, *i.e.,* a hearing and an opportunity to be heard, " 'the filing of unfounded charges d[oes] not give rise to a *per se* constitutional violation actionable under section 1983." ' *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988) (quotation omitted); *see also Wolff v. McDonnell,* 418 U.S. 539, 564-66 (1974).

However, before the Court addresses such issues, it must determine whether a liberty interest is implicated. The misbehavior reports at issue resulted in three sentences of thirty-days keeplock and corresponding losses of privileges. *See* Nepveu Decl., Exhibit "B," at p. 1. Even if this Court were to construe the three sentences in the aggregate, the ninety days total that Plaintiff was confined in SHU would not, standing alone, implicate a liberty interest. Moreover, because at the time that Plaintiff filed his complaint he had not yet served these sentences, the Court is unable to determine whether the actual conditions of confinement in SHU were atypical or significant. Accordingly, because no liberty interest is implicated, Plaintiff cannot assert due process violations against Defendants Tousignant, Buffman, and Cromp and, therefore, the Court grants Defendants' motion for summary judgment with regard to these claims.

Notably, however, there are substantive due process rights, rather than procedural, which cannot be obstructed " 'even if undertaken with a full panoply of procedural protections," ' such as the right of access to courts or to be free from retaliation for exercising a constitutional right. *Franco,* 854 F.2d at 589 (citation omitted); *see id.* at 590 ("Although our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, ... that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights." (internal citations omitted)). Thus, if a prisoner alleges that the defendants filed false disciplinary reports against him in retaliation for exercising a valid constitutional right, his claim may survive a dispositive motion if he properly alleges that the defendants violated his substantive due process rights. *See id.* ("If [the plaintiff] can prove his allegation that he was subjected to false disciplinary charges and subsequent punishment for his [exercise of a

constitutional right], he is entitled to relief under section 1983.").

**\*13** Plaintiff does assert that the three misbehavior reports that Defendants Tousignant, Buffman, and Cromp filed against him were retaliatory in nature. Thus, the Court will address these claims, together with Plaintiff's claim against Defendant Donaldson for willful failure to file Plaintiff's grievances, below in the context of the standards applicable to substantive due process claims. *See infra* Parts III.E-F.

*3. Disciplinary Hearings*
Finally, Plaintiff claims that Defendants Rock, Daggett, and Canning violated his due process rights in connection with the July 26, 2002 Tier III Superintendent's Hearing. As explained below, since Defendant Rock, as Hearing Officer, recommended a loss of good time credits and that disposition was affirmed on appeal, Plaintiff's due process claims are barred.

In *Heck v. Humphrey,* 512 U.S. 477 (1994), the Supreme Court held that a § 1983 action seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction or sentence unless "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." *Id.* at 486-87. The Supreme Court later extended its *Heck* ruling to situations in which inmates challenge disciplinary proceedings that resulted in a loss of good time credits wherein the validity of a disciplinary or administrative sanction would affect the length of the plaintiff's confinement. *See Edwards v. Balisok,* 520 U.S. 641 (1997). This rule does not impose an exhaustion requirement upon a § 1983 plaintiff, but rather, "den[ies] the existence of a cause of action." *Heck,* 512 U.S. at 489.

In the present case, any resolution of Plaintiff's due process claims would ultimately call into question the validity of his disciplinary conviction. Such claims are, therefore, not cognizable under § 1983 absent a showing that this sentence has been overturned or invalidated. Plaintiff has not made such a showing and, therefore, the Court grants Defendants' motion for summary judgment and dismisses without prejudice Plaintiff's due

process claims against Defendants Rock, Daggett, and Canning. [17]

[17]  The Court dismisses Plaintiff's claims without prejudice because such claims would accrue in the event that his sentence is overturned. *Amaker v. Weiner,* 179 F.3d 48, 52 (2d Cir.1999) (holding that "disposition of [a] case on *Heck* grounds ... warrants only dismissal *without* prejudice, because the suit may be reinstituted" in the event the plaintiff's conviction is overturned (citations omitted)).

E. First and Fourteenth Amendment-Access to Courts
Plaintiff claims that the following Defendants violated his First and Fourteenth Amendment right to petition the courts for redress:
(1) *G. Kienert,* on September 5, 6, and 30, 2002, as well as October 25, 2002, ordered SHU officers to confiscate Chavis's legal mail and deny access to the law library (Complaint at attached pp. 1-2);

(2) *R. Girdich,* on September 1, 6, and 30, 2002, as well as October 25, 2002, ordered SHU officers to confiscate outgoing legal mail (Complaint at attached p. 3);

(3) *B. Dumas,* CO SHU, on September 5, 6, and 30, 2002, as well as October 25, 2002, confiscated Chavis's legal mail and denied replacement envelopes, and, on September 8, 2002, as well as unspecified dates in November and December 2002, failed to send outgoing legal mail (Complaint at attached p. 5);

**\*14** (4) *M. White,* CO SHU, on unspecified dates in August, September, and October, 2002, ignored Chavis's request slips and denied access to the law library (Complaint at attached p. 5);

(5) *A. Donovan,* CO SHU, on September 5 and 6, 2002, confiscated Chavis's outgoing legal mail, wherein Chavis was unable to "redo" and mail his administrative appeal and further aided Defendants Kienert, Girdich, and Dumas, presumably, in denying access to the courts. (Complaint at attached p. 6);

(6) *G. Canning,* on July 12, 2002, denied Chavis access to his legal materials despite being directed otherwise (Complaint at attached p. 9);

2005 WL 2452150

(7) *R. Donaldson,* on July 10, 2002, and continuing to the date of the Complaint, failed to redress Chavis's grievances of legal mail confiscation against Defendants Donovan, Dumas, Girdich, and Kienert (Complaint at attached p. 14); and

(8) *Richard D. Roy,* on November 26, 2002, ignored the illegal confiscation and censoring of Chavis's legal mail by Defendants Kienert, Girdich, Dumas, Donovan, and Donaldson (Complaint at attached pp. 16-17).

Interference with legal mail implicates an inmate's First and Fourteenth Amendment rights to access to the courts and free speech. *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). The Second Circuit has stated that in order to state a claim for denial of access to the courts via interference with legal mail, the plaintiff must show that the defendant caused actual injury, *i.e.,* the defendant " 'took or was responsible for actions that "hindered [a plaintiff's] efforts to pursue a legal claim." " ' *Id.* (quotation omitted); *see also Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, *4 (S.D.N.Y. Mar. 29, 2001) (holding that "in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim" (citation omitted)).

Additionally, a prisoner's First Amendment right is implicated when the defendants hinder the "free flow of incoming and outgoing mail...." *Davis,* 320 F.3d at 351 (citations omitted). "Restrictions on prisoners' mail are justified only if they 'further[ ] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Id.* (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). When balancing these competing interests, "courts have consistently afforded greater protection to legal mail than to nonlegal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (citations omitted). Moreover, when asserting a First Amendment violation resulting from interference with mail, the prisoner must show that the prison officials "regularly and unjustifiably interfered with the incoming legal mail rather than merely showing an isolated incident." *Cancel v. Goord,*

00 CIV 2042, 2001 WL 303713, *6 (emphasis added) (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)); *see also Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975) (isolated incident of tampering is insufficient to state a constitutional violation). The Court notes, however, that the Second Circuit has held that as few as two incidents of mail tampering may be sufficiently actionable "(1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis,* 320 F.3d at 351 (citation omitted). Thus, in cases where the incidents are few and a violation is not patent, the plaintiff should specifically allege invidious intent or actual harm. *See id .* (citing cases). Furthermore, mere "delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y 1995) (citations omitted); *see also Konigsberg v. Lefevre,* 267 F.Supp.2d 255, 261 (N.D.N.Y.2003) (citations omitted).

**\*15** Plaintiff fails to state a claim for denial of access to the courts. First, Plaintiff does not claim that Defendants' alleged confiscation of his outgoing mail, denial of replacement envelopes, denial of access to the law library, and/or denial of access to his legal papers caused him any actual harm. Moreover, the only concrete harm he alleges is the confiscation of his appeal from the September 5, 2002 Hearing disposition. In this regard, Plaintiff claims that, on September 5 and 6, 2002, ostensibly on Defendants Kienert's and Girdich's orders, Defendants Dumas and Donovan confiscated Plaintiff's outgoing mail and refused to supply Plaintiff with replacement envelopes. Plaintiff further alleges that, on unspecified dates in August, September, and October, Defendant White ignored his request slips and denied him access to the law library. However, according to the Declarations that Defendants have submitted to the Court, facility records indicate that Defendants Dumas and Donovan were not assigned to Plaintiff's gallery on those days; rather, two other correction officers, whom Plaintiff has not named as Defendants herein, were on duty. *See* Dkt. No. 72, B. Dumas Decl., at ¶ 4; A. Donovan Decl., at ¶ 4. Furthermore, Defendants Dumas and Donovan avow that they "never confiscated, kept, improperly returned, or otherwise improperly interfered with Mr. Chavis's outgoing legal mail[ ]" and Defendant White affirms he

never ignored Plaintiff's request slips. *See* Dkt. No. 72, Dumas Decl., at ¶ 5; Donovan Decl., at ¶ 5; M. White Decl., at ¶ 4. Defendants Kienert and Girdich also aver that they "never ordered anyone to confiscate, keep, or interfere with Mr. Chavis's outgoing legal or internal mail" within the parameters of DOCS policy. *See* Dkt. No. 72, G. Kienert Decl., at ¶ 3; R. Girdich Decl., at ¶ 3. Similarly, with regard to Defendant Donaldson's alleged interference with Plaintiff's grievances, Defendant Donaldson avows that he never concealed nor failed to docket any grievance that Plaintiff filed. *See* Dkt. No. 72, Donaldson Decl., at ¶ 3.

Plaintiff further claims that, on July 12, 2002, Defendant Canning denied him access to his legal materials. Defendant Canning specifically controverts this allegation in a sworn Declaration, in which he further explains that he wrote a misbehavior report on July 12, 2002, due to Plaintiff's admission that he had written a harassing letter to an AAG. *See* Dkt. No. 72, G. Canning Decl., at ¶¶ 3-5; *see also* Nepveu Decl., Exhibit "C," at pp. 6-8 (AAG letter, dated July 9, 2002, & attached Chavis letter, dated July 3, 2002).

Plaintiff's final claim that Defendants denied him access to the courts is based upon his allegation that Defendant Roy ignored his letter. The Court dismisses this claim for the reasons stated above regarding personal involvement. *See supra* Part III.D.1. In light of the fact that many of Plaintiff's claims of denial of access to the courts are not only conclusory in nature but are also asserted against individuals who Plaintiff clearly had notice through the grievance process were not even present on the dates in question, the Court finds that such claims are frivolous. Therefore, the Court dismisses Plaintiff's access-to-the-courts claims against Defendants Kienert, Girdich, Dumas, White, Donovan, Canning, Donaldson and Roy pursuant to 28 U.S.C. § 1915(g).

F. First and Fourteenth Amendment-Retaliation

**\*16** Plaintiff asserts that the following Defendants took retaliatory actions against him:

(1) *A. Tousignant* issued a retaliatory misbehavior report after Chavis filed a grievance against staff on August 28, 2002 (Complaint at attached p. 10);

(2) *R. Girdich,* on October 30, 2002, fabricated a state charge against Chavis in retaliation for a grievance he had filed (Complaint at attached p. 4);

(3) *G. Canning,* on July 13, 2002, filed a retaliatory misbehavior report regarding threats to outside legal sources (Complaint at attached p. 9);

(4) *Ms. Buffman,* on December 25, 2002, filed a retaliatory misbehavior report after Chavis filed two grievances against her, dated December 15 and 16, 2002 (Complaint at attached p. 11); and

(5) *J. Cromp,* on December 24, 2002, filed a retaliatory misbehavior report for a grievance Chavis filed against Nurse Buffman on December 16, 2002 (Complaint at attached p. 13).

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or to be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *See Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995) (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). To state a First Amendment claim for retaliation, an inmate must demonstrate (1) that he was engaged in constitutionally protected activity, (2) that the defendant took adverse action against him, and (3) that there was a causal connection between the protected speech and the adverse action in that the alleged adverse action was substantially motivated by the protected activity. *See Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002) (quotation omitted); *see also Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (quotation omitted).

To satisfy the second prong, a prisoner must present evidence to support his claim that the defendants acted with an improper motive. Such evidence includes (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the plaintiff's prior good disciplinary record; (3) the plaintiff's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995). A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *See Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003) (holding that the plaintiff met his burden to show retaliatory motive by presenting circumstantial evidence relating to, among other things, the temporal

proximity of the allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded (citation omitted)). " 'Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." ' *Davis v. Goord,* 320 F.3d at 353 (quoting *Dawes v. Walker,* 239 F.3d at 493) (other citation omitted). " 'Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." ' Id. (quotation omitted). Furthermore, in satisfying the causal connection requirement, also referred to as temporal proximity, "the allegations must be " 'sufficient to support the inference "that the speech played a substantial part" in the adverse action." ' *Id.* at 492 (quotation omitted).

**\*17** The plaintiff bears the initial burden to show that the defendants' actions were improperly motivated. In situations in which the defendants' actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citation omitted); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (citations omitted); *see also Gayle,* 313 F.3d at 682 (holding that the defendant may successfully meet this burden of justification with regard to a particular punishment by demonstrating that the plaintiff " 'committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report" ' (quotation and other citation)). Moreover, the Second Circuit has noted that retaliation claims are prone to abuse and that, therefore, courts should examine such claims "with skepticism and particular care." *Colon,* 58 F.3d at 872 (citation omitted); *Dawes,* 239 F.3d at 491 (holding that "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quotation omitted).

Plaintiff claims that Defendants wrote four misbehavior reports against him, in which they charged him with harassment and/or threats, in retaliation for his exercising his constitutional rights. Defendants Canning, Tousignant, Cromp, and Buffman authored these four misbehavior reports on July 12, 2002, August 26, 2002,

December 23, 2002, and December 24, 2002, respectively. As explained more fully below, because Plaintiff has failed to meet his burden to show improper motives and because the record demonstrates that Defendants issued all of these reports for valid reasons, the Court concludes that Plaintiff's retaliation claims against these Defendants must fail.

Plaintiff asserts that on July 12, 2002, Defendant Canning wrote a retaliatory misbehavior report against him. The subject of this misbehavior report was the threatening letter, marked as "legal mail," that Plaintiff had written while he was confined in SHU to an AAG. In a subsequent interview, Plaintiff admitted to Defendant Canning that he wrote that letter, prompting Defendant Canning to charge him with violating prison rules 102.10 (threats in writing), 107.11 (inmates shall not harass any person), and 180.11 (correspondence procedures). *See* Nepveu Decl., Exhibit "C," at p. 16. Although it is dubious, given the nature of the letter, whether the activity in which Plaintiff engaged could be classified as protected activity, were this Court to liberally construe this issue in Plaintiff's favor, he would still fail to meet his burden with respect to his retaliation claim against Defendant Canning because he failed to present even a shred of evidence of improper motive on Defendant Canning's part. Moreover, Defendant Canning has, under oath, denied any improper motive. *See* Canning Decl. at ¶¶ 5-6. Finally, the Court's review of the letter leads to the inescapable conclusion that the tone and content of the letter is threatening and harassing; and, thus, the Court concludes that Defendant Canning clearly had a proper motive to write the misbehavior report.

**\*18** Next, Plaintiff complains about a misbehavior report, dated August 26, 2002, that Defendant Tousignant authored. The subject of this misbehavior report is the letter that Plaintiff wrote to Defendant Tousignant regarding Nurse Buffman, in which Plaintiff referred to Nurse Buffman as an "ill-minded lesbian dyke of a deeply rooted perverted mentality" and a "KKK staff member [who] hand masturbates SHU-inmates through the access door." *See* Nepveu Decl., Exhibit "E," at p. 6. Again, if the Court liberally construes this claim to find that, in submitting a grievance to a supervisor, Plaintiff may have been engaged in protected activity, he still fails to present any evidence of an improper motive. Under oath, Defendant Tousignant denied any acrimonious motive in writing the report. *See* Dkt. No.

72, Tousignant Decl., at ¶¶ 16-17. Moreover, even if Plaintiff had shown that Defendant Tousignant acted with an improper motive, his claim would still fail because, in light of the obvious harassing and threatening tone of Plaintiff's letter, Defendant Tousignant appropriately issued a misbehavior report against him.

Plaintiff also challenges the misbehavior reports, dated December 23 and 24, 2002, that Defendants Cromp and Buffman authored, respectively. Defendant Cromp's December 23, 2002 misbehavior report, much like those that the Court has already addressed, arose out of a threatening and harassing grievance that Plaintiff wrote regarding Nurse Buffman, in which he called Nurse Buffman a "despicable piece of trash" and an "unprofessional, ill-minded, and vindictive freak." *See* Nepveu Decl., Exhibit "G," at pp. 11-12. Although filing an institutional grievance is clearly protected activity, Plaintiff, yet again, fails to allege that Defendant Cromp possessed any improper motive in authoring the report. Moreover, Defendant Cromp, under oath, has denied any improper motive. *See* Dkt. No. 72, Cromp Decl., at ¶¶ 5-7. Furthermore, Plaintiff's grievance was docketed and addressed at all levels; thus, Plaintiff was not in any way constrained nor encumbered in having this and other grievances addressed. Lastly, with regard to Defendant Buffman's December 24, 2002 misbehavior report, on that date, Plaintiff told Defendant Buffman, during sick call, that he needed prescriptions refilled. When she asked him which refills he needed, Plaintiff refused to answer and became disrespectful and belligerent, called Defendant Buffman a "bitch," told her to "drop dead," and threatened to kill her. *See* Nepveu Decl., Exhibit "H," at p. 10; Buffman Decl. at ¶ 12. Under these circumstances, Defendant Buffman was clearly justified in filing this misbehavior report against Plaintiff. *See* Dkt. No. 72, Buffman Decl., at ¶¶ 12-13.

Plaintiff's final retaliation claim is against Defendant Girdich for allegedly fabricating a state charge on October 30, 2002. In his Declaration, Defendant Girdich denies bringing any state criminal charges against Plaintiff. *See* Dkt. No. 72, Girdich Decl., at ¶ 10. Since Plaintiff fails to expound on this claim, the Court finds that it is clearly without merit.

**\*19** In light of the fact that at least three of the misbehavior reports were in response to remarks that Plaintiff made in writing with his signature affixed to

such writings, the Court finds that these claims of retaliation are entirely without merit and bordering upon harassment. Furthermore, Plaintiff's retaliation claim against Defendant Girdich is completely unsubstantiated because Defendant Girdich never filed any state charges against Plaintiff. Accordingly, the Court concludes that Plaintiff has failed to state retaliation claims against Defendants Canning, Tousignant, Cromp, Buffman and Girdich, and, therefore, grants Defendants' motion for summary judgment with respect to these claims. Alternatively, the Court dismisses Plaintiff's retaliation claims against Defendants Canning, Tousignant, Cromp, and Girdich as frivolous pursuant to 28 U.S.C. § 1915(g).

### G. Eighth Amendment

Plaintiff alleges that Defendants committed numerous infractions that violated his Eighth Amendment right to be free from cruel and unusual punishment. The crux of his claims centers around the conditions of his confinement in SHU as well as the denial of medical care.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003) (citation omitted). In this respect, the Eighth Amendment requires that prison officials provide prisoners with humane conditions of confinement including " 'adequate ... medical care[.]" ' *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quotation and other citation omitted). To prove a violation of the Eighth Amendment, an inmate must show (1) that the deprivation alleged is 'objectively sufficiently serious' such that the plaintiff was denied 'the minimal civilized measure of life's necessities,' and (2) that the defendant official possessed a 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain.' " ' *Trammell,* 338 F.3d at 161 (citation omitted). Moreover, the Eighth Amendment prohibits punishments that are "grossly disproportionate to the severity of the crime," including unnecessary and wanton inflictions of pain which are " 'totally without penological justification." ' *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981) (quotation and other citations omitted); *see also Hope v. Pelzer,* 536 U.S. 730, 737 (2002) (citations omitted).

### *1. Prison Conditions*

With regard to his complaints about prison conditions, Plaintiff asserts that the following Defendants subjected him to inhumane conditions in violation of the Eighth Amendment:

(1) *G. Kienert,* on July 1, 2002, exhibited deliberate indifference when he subjected Chavis to illegal SHU confinement, and, purportedly on September 5, 6, and 30, 2002, as well as October 25, 2002, Kienert ordered SHU officers to deny Chavis access to hygenic items such as soap, shampoo, and nail clippers, and also directed the officers to tamper with his food trays, including spitting on the food (Complaint at attached pp. 1-2);

 **\*20** (2) *A. Boucaud,* on August 2, 2002, exhibited deliberate indifference when he fabricated and wrongfully extended Chavis's confinement in SHU (Complaint at attached pp. 2-3);

(3) *M. White,* on unspecified dates in August, September, and October 2002, exhibited deliberate indifference when he spat in Chavis's food and denied him access to various hygenic supplies resulting in Chavis's inability to shower for two months (Complaint at attached pp. 5-6);

(4) *Ms. Daggett,* on July 1, 2002, exhibited deliberate indifference by subjecting Chavis to illegal SHU confinement (Complaint at attached p. 7);

(5) *J. Rock,* on July 26, 2002, exhibited deliberate indifference when he commenced a Tier III Hearing in Chavis's absence and subjected Chavis to further illegal SHU confinement (Complaint at attached p. 8);

(6) *G. Canning,* on July 13, 2002, authored a false misbehavior report which led to further illegal SHU confinement (Complaint at attached p. 8);

(7) *L. Friot,* on July 1, 2002, exhibited deliberate indifference by continuing and subjecting Chavis to illegal SHU confinement (Complaint at attached p. 9); and

(8) *Lucien J. LeClaire,* on July 1, 2002, allowed Chavis to be subjected to illegal SHU confinement (Complaint at attached p. 16).

The Supreme Court has held that "[t]he Constitution 'does not mandate comfortable prisons,' ... but neither does it permit inhumane ones...." *Farmer,* 511 U.S. at 832

(internal quotation omitted). The prisoner "must show 'extreme deprivations', '[b]ecause routine discomfort is "part of the penalty that criminal offenders pay for their offenses against society...." *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000) (quotation and other citation omitted); *see also Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (holding that, [b]ecause society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a "conditions-of-confinement" claim.' ' (quotation omitted)).

To establish an Eighth Amendment claim based upon his conditions of confinement, an inmate must allege that the conditions of his confinement have violated " 'contemporary standards of decency." ' *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002)). "To satisfy the objective element, the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measure of life's necessities.' ' *Davidson,* 371 F.Supp.2d at 370 (quotation and other citation omitted). "[T]he objective element is satisfied 'only when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets." ' *Id.* (quotation omitted). Allegations of "overall conditions" will not rise to the level of cruel and unusual punishment without the existence of a "specific deprivation of a single human need...." *Wilson v. Seiter,* 501 U.S. 294, 305 (1991). As to the subjective element, the requisite scienter is that of deliberate indifference to the inmate's health or safety. See *Farmer,* 511 U.S. at 834.

 **\*21** Initially, the Court notes that Plaintiff's "deliberate indifference" claims against Defendants Kienert, Daggett, Friot, and LeClaire, stemming from his confinement in SHU on July 1, 2002, are without merit as the sole basis for these claims is the alleged illegality of his confinement to SHU on that date, an issue this Court has already resolved in Defendants' favor. Likewise, the Court has already addressed Plaintiff's claims against Defendants Boucaud (August 2, 2002 extension of SHU confinement), Rock (July 26, 2002 improper hearing subjecting Chavis to illegal SHU confinement), and Canning (July 12, 2002 misbehavior report leading to illegal SHU confinement) and concluded that they lack merit. Thus, Plaintiff's only

remaining conditions-of-confinement those based upon his allegations against Defendants Kienert for allegedly ordering SHU officers to deny him hygienic materials and tamper with his food and against Defendant White for carrying out those orders.

The Eighth Amendment does require that prison officials serve prisoners " 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.' " *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (quoting *Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir.1980)); *see also Wilson,* 501 U.S. at 303 (prisoners are guaranteed a nutritionally adequate diet). Moreover, although courts in this Circuit have found claims of unsanitary, spoiled, or contaminated foods to be sufficient to sustain an Eighth Amendment claim, *see Robles,* 725 F.2d at 15-16 (citing cases), Plaintiff's allegations that Defendants spit in his food and "violat[ed][his] bread by making holes in it" are wholly conclusory and unsubstantiated.

Plaintiff also claims the Defendants denied him various toiletry/hygienic items and that these denials "prohibited" him from showering "for a near 'two' month time period." *See* Complaint at attached p. 6. The Court does not understand how the deprivation of such items would lead to the deprivation of showers; what is more probable, however, is that Defendants provided Plaintiff with opportunities to shower, but without shampoo and soap. Defendant White's Declaration adequately supports this possibility; he explains that the SHU showers occur in the inmate's cell and a single switch turns on the water in an entire side for twenty-minutes and that it is not possible to control the shower in a single cell. *See* White Decl. at ¶ 9. Given these facts, which Plaintiff does not dispute, the Court concludes that it is incredulous for Plaintiff to assert that Defendant White, on Defendant Kienert's orders, denied him access to showers for a two-month period.

Further, Plaintiff has failed to show that the alleged denial of toiletries rose to the level of deliberate indifference to his health or safety. Courts, including the Second Circuit, have generally held that temporary deprivations of toiletries do not violate the Eighth Amendment. *See Trammell,* 338 F.3d at 165 (holding that "[d]eprivation of other toiletries for approximately two weeks-while perhaps uncomfortable-does not pose such an obvious

risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference." ' (quoting *Farmer,* 511 U.S. at 837, 114 S.Ct.1970)). Accordingly, the Court dismisses all of Plaintiff's Eighth Amendment claims regarding the conditions of his confinement as frivolous under 28 U.S.C. § 1915(g).

### 2. Medical-indifference Claims

**\*22** Plaintiff asserts that the following Defendants denied him access to medical care in violation of the Eighth Amendment:

(1) *A. Tousignant,* on July 28, 2002, denied proper medical care and further denied twenty-six (26) "medical food trays" to Chavis that were required due to his seafood allergies, resulting in loss of twenty (20) pounds over a three-month period (Complaint at attached pp. 10-11);

(2) *Ms. Buffman,* on July 10, 2002, denied Chavis emergency treatment and denied access to a doctor for treatment of serious allergic reaction and worked in concert with Tousignant in denying Chavis his medical food trays (Complaint at attached pp. 10-11);

(3) *P. Johnston,* PA, on December 17, 2002, denied Chavis access to medical care for severe to mild medical conditions and failed to refill prescriptions. Also, on December 24 and 27, 2002, Johnston failed to provide medical care to Chavis during allergic reactions (Complaint at attached p. 12);

(4) *J. Cromp,* on December 24, 2002, exhibited deliberate indifference when he concealed a valid grievance regarding Nurse Buffman's medical violations and thus sanctioned the medical violations (Complaint at attached p. 13);

(5) *L.N. Wright,* Chief Medical Officer, on unspecified dates in August and December 2002, repeatedly ignored Chavis's letters regarding medical complaints (Complaint at attached p. 13);

(6) *R. Donaldson,* from July 10, 2002, to the date of the Complaint, failed to file Chavis's grievances against medical staff regarding medical care thus allowing the violations to continue (Complaint at attached p. 14);

2005 WL 2452150

(7) *M. Yaddow*, CO SHU, on December 27, 2002, removed Chavis's request slip for medical care thus preventing access to adequate care (Complaint at attached p. 15); and

(8) *Richard D. Roy*, on March 26, 2002, ignored Chavis's letters regarding medical care (Complaint at attached pp. 16-17).

To state an Eighth Amendment claim based upon the denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) the defendants' deliberate indifference to that serious medical need. *See Farmer,* 511 U.S. at 834-35 (citations omitted); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citation omitted). With respect to the "deliberate indifference" prong of this claim, "the plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " " ' *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting [*Estelle v. Gamble,* 429 U.S. 97,] 102, 105-06, 97 S.Ct. at 290, 291-92).

The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " ' *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quotation omitted). Among the relevant factors that a court should consider in making this determination are " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " ' *Id.* (quotation and other citation omitted).

 **\*23** The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson,* 501 U.S. at 301-03; *Hathaway,* 37 F.3d at 66. A plaintiff also must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *See Farmer,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm

will result." *Id.; see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citation omitted). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (quotation omitted).

With respect to his claims against Defendants Wright and Roy, the Court finds that Plaintiff has failed to allege any personal involvement of these Defendants in any constitutional violation and therefore dismisses all Eighth Amendment claims, in addition to the other claims that the Court has dismissed, against these Defendants for the same reasons that the Court dismissed the due process claims against Defendant Roy. *See supra* Part III.D.1. In addition, with respect to Plaintiff's claim against Defendant Cromp, the Court finds that the record clearly belies Plaintiff's claim that Defendant Cromp concealed his grievance against Nurse Buffman because all three administrative levels addressed that particular grievance. The same is true of Plaintiff's allegations against Defendant Donaldson for concealing grievances that Plaintiff filed against medical staff, because, as the record indicates, Plaintiff did file such grievances, which were similarly addressed at all administrative levels. Lastly, with respect to his claim against Defendant Yaddow, Plaintiff asserts that Defendant Yaddow denied him access to medical care by removing his request slip on December 27, 2002. However, according to facility records, on that date, Defendant Yaddow worked from 3 p.m. to 11 p.m. in the C Gallery of Building 9, while Plaintiff was housed in the B Gallery of Building 9. *See* Dkt. No. 72, Yaddow Decl., at ¶¶ 3-4. Obviously, Defendant Yaddow would have had no occasion, nor arguably any opportunity, to conceal or remove any request slip if he was not even in the vicinity of Plaintiff on that date. Thus, the Court dismisses Plaintiff's Eighth Amendment medical-indifference claims against Defendants Cromp, Donaldson, and Yaddow as frivolous pursuant to 28 U.S.C. § 1915(g).

Plaintiff's remaining Eighth Amendment medical-indifference claims are against Defendants Tousignant, Buffman, and Johnston. With regard to these claims, Plaintiff alleges that he suffered from "mild" or "mild

to near serious" hive attacks and scalp bleeding. *See* Complaint at attached pp. 10-12. Such conditions are not sufficiently serious that they would produce death, degradation, or extreme pain. *See Chance,* 143 F.3d at 702. Therefore, with respect to these allegations, the Court finds that Plaintiff cannot satisfy the objective prong of his medical-indifference claim. Moreover, even if this Court were to find that Plaintiff's condition was sufficiently serious, because food allergies can in some cases become life-threatening, his claim would still fail because he has not come forward with any evidence that any of the above-named Defendants acted with deliberate indifference to these serious needs. In fact, Plaintiff's health record reveals that medical staff frequently saw him and that he often would request medical services and yet fail to appear because he was asleep at the designated time. *See* Nepveu Decl., Exhibit "K," at p. 19; Buffman Decl., at ¶ 10; *see also supra* Part II (noting that medical staff saw Plaintiff an average of fourteen times per month and further listing the multiple instances when Plaintiff was asleep during the requested/scheduled sick call times and/ or was belligerent and uncooperative with medical staff). The health record also contradicts Plaintiff's contention that Defendant Johnston failed to refill his prescriptions. *See* Nepveu Decl., Exhibit "K," at p. 20. In light of the fact that Plaintiff has failed to allege a sufficiently serious medical condition, coupled with the fact that the record clearly indicates that Defendants did not act with a sufficiently culpable state of mind, the Court grants Defendants' motion for summary judgment with regard to all of Plaintiff's Eighth Amendment medical-indifference claims.

**\*24** Plaintiff's remaining Eighth Amendment claims relate to his allegations that Defendants Tousignant and Buffman denied, or perhaps delayed, his medical food trays. Essentially, Plaintiff complains that he did not receive a Therapeutic Diet Request Form ordering a no-fish diet. In certain circumstances, the denial of a medically-prescribed diet may constitute an Eighth Amendment violation. *See Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (citations omitted). *But cf. Ramsey v. Coughlin,* 1 F.Supp.2d 198, 205 (W.D.N.Y.1998) (holding that, under the particular circumstances of that case, the inmate was not constitutionally entitled to vegetarian diet). Furthermore, a delay in medical treatment does not necessarily invoke the Eighth Amendment. "Although a delay in providing necessary medical care may in some cases constitute

deliberate indifference, ... such a classification [is reserved] for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Freeman v. Strack,* 2000 WL 1459782, \*6 (S.D.N.Y. Sep. 29, 2000) (citations omitted). Only when the official "knows of and disregards an excessive risk to inmate health or safety" will a court find that that official was deliberately indifferent. *Hathaway,* 99 F.3d at 553. In this case, the record indicates that neither Defendant Tousignant nor Defendant Buffman was responsible for filling out such a form or that either of them was even aware of the delay, if such occurred. *See* Tousignant Decl. at ¶¶ 9-10; Buffman Decl ., at ¶¶ 16-18; Nepveu Decl., Exhibit "K," at pp. 48-53; Exhibit "M," July 28, 2002 Memo from Tousignant. Even more telling is that fact that, from July 1, 2002, the date on which Plaintiff was transferred to Upstate Correctional Facility, through October 22, 2002, the date on which the Therapeutic Diet Form was executed, the medical staff saw Plaintiff twenty-five times and not once did he raise this issue with the staff. *See* Tousignant Decl. at ¶ 7; Nepveu Decl., Exhibit "K." Based upon this record, the Court finds that any temporary delay on the part of Defendants in providing Plaintiff with a no-fish diet was not a serious medical need, and in any case, Defendants did not know of and disregard this delay. Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's Eighth Amendment claims against Defendants Tousignant and Buffman.

H. Sanctions
In his opposition, Plaintiff asserts that, by serving a summary judgment motion in lieu of an answer for Defendant Kienert, AAG Nepveu has violated a court discovery order; and, therefore, the Court should sanction her. *See* Dkt. No. 75 at pp. 2-14. Magistrate Judge Treece issued the relevant discovery order on October 25, 2004. *See* Dkt. No. 65. In ruling on Plaintiff's motion to compel discovery, Magistrate Judge Treece concluded that, because at that time Plaintiff had not yet served Defendant Kienert with process, he could serve a set of interrogatories on Defendant Kienert thirty days after a response to the complaint was filed on behalf of Defendant Kienert. *See id.* at p. 4. Plaintiff served Defendant Kienert on November 8, 2004. *See* Dkt. No. 68. On November 2, 2004, in response to AAG Nepveu's request, Magistrate Judge Treece set Defendant Kienert's

response deadline for December 31, 2004, and extended the motion-filing deadline for all other Defendants to the same date. *See* Dkt. Nos. 66-70. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a defendant may move for summary judgment "at any time." Fed.R.Civ.P. 56. Thus, AAG Nepveu asserts that she acted in good faith and with the understanding that no outstanding discovery order was in place and that summary judgment was an appropriate response to the complaint on behalf of Defendant Kienert.

**\*25** Rule 37(d) of the Federal Rules of Civil Procedure authorizes a court to impose sanctions for a party's failure "to serve answers or objections to interrogatories ... after proper service of the interrogatories," and further authorizes a court to "make such orders in regard to the failure as are just." Fed.R.Civ.P. 37(d). Under the circumstances of this case, the Court finds that sanctions against AAG Nepveu are not warranted; therefore, the Court denies Plaintiff's request for sanctions.

### III. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Defendants' motion for summary judgment is GRANTED in its entirety; and the Court further

ORDERS that Plaintiff's due process claims against Defendants Kienert, Boucaud, Girdich, Donelli, Daggett, Friot, Selsky, Roy, and LeClaire, based upon Plaintiff's allegations regarding his admission to SHU on July 1, 2002, are DISMISSED AS FRIVOLOUS pursuant to 28 U.S.C. § 1915(g); and the Court further

ORDERS that Plaintiff's due process claims against Defendants Rock, Daggett, and Canning are DISMISSED WITHOUT PREJUDICE; and the Court further

ORDERS that Plaintiff's First and Fourteenth Amendment claims against Defendants Kienert, Girdich, Dumas, White, Donovan, Canning, Donaldson and Roy, based upon his allegations that Defendants denied him access to the courts, are DISMISSED AS FRIVOLOUS pursuant to 28 U.S.C. § 1915(g); and the Court further

ORDERS that Plaintiff's retaliation claims against Defendants Canning, Tousignant, Cromp, and Girdich are DISMISSED AS FRIVOLOUS pursuant to 28 U.S.C. § 1915(g); and the Court further

ORDERS that Plaintiff's Eighth Amendment claims regarding the conditions of his confinement are DISMISSED AS FRIVOLOUS pursuant to 28 U.S.C. § 1915(g); and the Court further

ORDERS that Plaintiff's Eighth Amendment medical-indifference claims against Defendants Cromp, Donaldson, and Yaddow are DISMISSED AS FRIVOLOUS pursuant to 28 U.S.C. § 1915(g); and the Court further

ORDERS that Plaintiff's request for sanctions is DENIED; and the Court further

ORDERS that the Clerk of the Court enter judgment in favor of Defendants and close this case.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2005 WL 2452150

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 733664
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

Luis FERNANDEZ

v.

John ARMSTRONG, et al. [1]

[1]    The defendants named in the amended complaint are: Commissioner John Armstrong, Warden Hector Rodriguez, Grievance Coordinator Ahmed, C.T.O. Wanda Booker, Counselor Gallick and Unit Manager Hannah. They were all employed by the Connecticut Department of Correction in various capacities at all times relevant to the Plaintiff's complaint.

No. 3:02CV2252CFD.
|
March 30, 2005.

**Attorneys and Law Firms**

Luis Fernandez, MacDougall-Walker Correctional Institution, Suffield, CT, pro se.

Robert F. Vacchelli, Attorney General's Office Public Safety & Special Revenue, Hartford, CT, for John J. Armstrong.

*RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

DRONEY, J.

**\*1**  Plaintiff, Luis Fernandez, is currently confined at the State of Connecticut MacDougall Correctional Institution, in Suffield, Connecticut. He commenced this civil rights action pursuant to 28 U.S.C. § 1915. He alleges that in August, 2002, while he was confined at the Cheshire Correctional Institution, the defendants failed to provide him with items necessary to enable him to brush his teeth and to shower and failed to provide him with postage-paid envelopes in which to mail documents to the court. Pending before the court is the defendants' motion for summary judgment. For the reasons set forth below, the motion is granted.

I. *Standard of Review*

"The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). The burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Not all factual disputes are material. The court considers the substantive law governing the case to identify those facts which are material. "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.

A court must grant summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact....' " *Miner v. Glen Falls,* 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). An asserted dispute over a material fact is considered "genuine," so as to defeat the motion for summary judgment, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *McCarthy v. American Int'l Group, Inc.,* 283 F.3d 121, 124 (2d Cir.2002).

Even though the burden is on the moving party to demonstrate the absence of any genuine factual dispute, the party opposing summary judgment "may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (internal quotation marks and citations omitted). It " 'must do more than simply show that there is some metaphysical doubt as to the material facts." *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The non-moving party "may not rely on conclusory allegations

2005 WL 733664

or unsubstantiated speculation." *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2002) (internal quotation marks and citation omitted). Instead, the non-moving party must produce admissible evidence that supports its pleadings. *See First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). A " 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (quoting *Anderson,* 477 U.S. at 252).

**\*2** In reviewing a motion for summary judgment the court resolves all ambiguities and draws all inferences in favor of the nonmoving party. *See Niagara Mohawk,* 315 F.3d at 175. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). *See also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992). Where one party is proceeding *pro se,* the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Despite this liberal interpretation, however, a "bald assertion," unsupported by evidence, cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). A motion for summary judgment cannot be defeated "merely ... on the basis of conjecture or surmise." *Trans Sport, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 188 (2d Cir.1992) (citation and internal quotation marks omitted).

II. *Facts* [2]

[2]   The facts are taken from the defendants' Local Rule 56(a) 1 Statement of Material Facts Not in Dispute [doc. # 40–2]; the plaintiff's Local Rule 56(a) 2 Statement [doc. # 42]; the plaintiff's Affidavit and exhibits attached to the affidavit [doc. # 45–2], the Affidavit of Jonathan Hall and the exhibits attached to the affidavit [doc. # 40–4] and the exhibits attached to the plaintiff's amended complaint [doc. # 9].

On August 7, 2002, the plaintiff Luis Fernandez filed a prison grievance claiming that on July 29, 2002, he had requested soap, a "care package" [3] and postage-paid envelopes from defendant Booker. Fernandez claimed that he did not have sufficient funds in his prisoner

account to purchase hygiene items from the commissary. Defendant Warden Rodriguez denied the grievance on September 12, 2002, because as of August 7, 2002, Fernandez did not meet the indigency standard necessary to receive free soap and a "care package". Under State of Connecticut Department of Correction Administrative Directive 6.10(3)(C), an indigent inmate is defined as "[a]n inmate who has less than five dollars on account at admission or whose account has not exceeded five dollars for the previous 90 days."

[3]   A "care package" apparently contains personal hygiene items.

On August 13, 2002, Fernandez submitted an inmate request to defendant Gallick for a "care package," special soap and postage-paid legal and "social" envelopes. [4] That same day, Gallick denied Fernandez's request because he did not meet the indigency standard. Fernandez wrote to Gallick again on August 14, 2002, with the same requests. That same day, defendant Ahmed provided the plaintiff with a "care package" including a comb, soap, shampoo, toothpaste and a toothbrush.

[4]   "Social" envelopes are for mailing non-legal correspondence.

On August 19, 2002, Fernandez filed an emergency grievance stating that Gallick had not provided him envelopes and bath soap in response to his August 14, 2002 request. Defendant Rodriguez rejected the grievance because it was not an emergency and noted that Fernandez had received a "care package" on August 14, 2002.

Under State of Connecticut Department of Correction Administrative Directive 10.7(4)(D), every inmate is responsible for paying "personal mailing expenses," unless an inmate is indigent. "An indigent inmate as defined in Administrative Directive 6.10 ... shall be permitted two (2) free social letters each week, and five (5) letters per month addressed to the court or attorneys...." On August 22, 2002, Fernandez received five legal envelopes with free postage. On August 29, 2002, Fernandez received two "social" envelopes with free postage and one bar of soap. On September 5, 2003, Fernandez received two "social" envelopes and two legal envelopes with free postage. On September 9, 2003, Fernandez received two "social" envelopes with free postage and a bar of soap.

### III. *Discussion*

**\*3** The defendants move for summary judgment on seven grounds. They argue that (1) the Eleventh Amendment bars any claims for damages against the defendants in their official capacities; (2) the State is not a "person" within the meaning of 42 U.S.C. § 1983; (3) the plaintiff fails to state a claim upon which relief may be granted; (4) the court should decline to exercise supplemental jurisdiction over any state law claims asserted against them; (5) the plaintiff has failed to allege the personal involvement of defendant Armstrong in the denial of his requests for hygiene products and envelopes; (6) the plaintiff's request for injunctive relief is moot; and (7) the defendants are protected by qualified immunity.

### A. *Eleventh Amendment*

The defendants first argue that any claims seeking damages against them in their official capacities are barred by the Eleventh Amendment. Generally, a suit for recovery of money may not be maintained against the state itself, or against any agency or department of the state, unless the state has waived its sovereign immunity under the Eleventh Amendment. See *Florida Dep't of State v. Treasure Salvors,* 458 U.S. 670, 684, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982). Section 1983 does not override a state's Eleventh Amendment immunity. See *Quern v. Jordan,* 440 U.S. 332, 342, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). The Eleventh Amendment immunity, which protects the state from suits for monetary relief, also protects state officials sued for damages in their official capacity. See *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). A suit against a defendant in his official capacity is ultimately a suit against the state if any recovery would be expended from the public treasury. See *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 n. 11, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

Fernandez sues the defendants in their official and individual capacities. To the extent that Fernandez sues the defendants in their official capacities for monetary damages, those claims are barred by the Eleventh Amendment. The motion for summary judgment is granted as to all claims for damages against the defendants in their official capacities.

### B. *Claims Against State of Connecticut*

The defendants next argue that the State of Connecticut is not a "person" within the meaning of 42 U.S.C. § 1983. The Supreme Court has held that the term "person" does not include a state or its agencies. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Also, states are protected from suit by the Eleventh Amendment unless they waive its protection. *See id.* Connecticut has not waived its Eleventh Amendment immunity from suit in this circumstance. *See Krozer v. New Haven,* 212 Conn. 415, 562 A.2d 1080 (1989), *cert denied,* 493 U.S. 1036, 110 S.Ct. 757, 107 L.Ed.2d 774 (1990). Accordingly, to the extent that any of the claims against the defendants may be construed as a claim against the State of Connecticut, those claims are dismissed.

### C. *Failure to State a Claim*

**\*4** The defendants argue that Fernandez's claims that in August 2002, they deprived him of basic hygiene items and postage-paid envelopes, failed to promulgate directives, and failed to comply with grievance directives do not state a claim upon which relief may be granted. The court will address each claim separately.

### 1. *Hygiene Items*

Fernandez alleges that in August 2002, the defendants failed to timely respond to his requests for a package containing hygiene items including a toothbrush, toothpaste, soap and shampoo. The defendants argue that Fernandez's claim does not allege a violation of his Eighth Amendment rights.

The Supreme Court has defined the contours of the Eighth Amendment protection against cruel and unusual punishment, made applicable to the states by the Fourteenth Amendment, as follows: "The Eighth Amendment's bar on inflicting cruel and unusual punishments ...'proscribe[s] more than physically barbarous punishments.' It prohibits penalties that are grossly disproportionate to the offense as well as those that transgress today's broad and idealistic concepts of dignity, civilized standards, humanity and decency." *Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (citations omitted). *See also Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). There is no static test for determining whether conditions of confinement are cruel and unusual. *See Rhodes,* 452 U.S. at 346. The Eighth Amendment must

Fernandez v. Armstrong, Not Reported in F.Supp.2d (2005)
2005 WL 733664

"draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id.*

The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled only to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir.1978), *rev'd on other grounds sub nom. Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Lareau v. Manson,* 651 F.2d 96, 106 (2d Cir.1981). "To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes,* 452 U.S. at 347. Not every governmental action affecting the interests or well-being of a prisoner is actionable under the Eighth Amendment. "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *see also Gaston v. Coughlin,* 249 F.3d 156, 163 (2d Cir.2001).

To prevail on a claim that conditions of confinement constitute cruel and unusual punishment, an inmate must establish objective and subjective components of the deliberate indifference standard. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). First, the inmate must show that he has suffered a "sufficiently serious" deprivation in objective terms, that is, that he has been deprived of the minimal necessities of life. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). An inmate also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

**\*5** On August 7, 2002, Fernandez submitted a grievance to a grievance coordinator requesting a package containing a tooth brush, toothpaste, soap and shampoo as well as postage-paid envelopes. Fernandez complained that defendant Booker had failed to respond to his

prior request for these items.[5] On August 14, 2002, defendant Ahmed provided Fernandez with the hygiene items. Fernandez claims that he was not able to shower or wash for five days due to the delay in receiving the hygiene items. Fernandez states that he suffered emotional distress as a result of the defendants' actions.

[5] Although Fernandez seems to suggest in his affidavit in opposition to the motion for summary judgment at ¶ 9 that he did not have the hygiene supplies for four months, his grievance states that it was only from July 29, 2002.

The Second Circuit has held that the deprivation of toiletries, particularly toilet paper, constitutes an unconstitutional condition of confinement in violation of the Eighth Amendment. *See Wright v. McMann,* 387 F.2d 519 (2d Cir.1967) (detention of an inmate in strip cell with no toilet paper unconstitutional). Courts, including the Second Circuit, have generally held, however, that temporary deprivations of toiletries does not violate the Eighth Amendment. *See Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003) ( "[d]eprivation of other toiletries for approximately two weeks—while perhaps uncomfortable —does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference.") (citing *Farmer,* 511 U.S. at 837; *Lunsford v. Bennett,* 17 F.3d 1574, 1579—80 (7th Cir.1994) (dismissing claims of inmates denied toilet paper, personal hygiene items and cleaning supplies for 24–hour period); *Harris v. Fleming,* 839 F.2d 1232, 1235 (7th Cir.1988) (holding denial of soap, toothpaste and toothbrush for ten days did not violate the Eighth Amendment); *Jackson v. DeTella,* 998 F.Supp. 901, 905 (N.D.Ill.1998) (eight-day deprivation of hygiene items and bedding did not violate prisoner's constitutional rights); *Martin v. Lane,* 766 F.Supp. 641, 648 (N.D.Ill.1991) (deprivation of laundry services and hygienic supplies for between three and eighteen days did not constitute a violation of inmate's Eighth Amendment rights); *Gilland v. Owens,* 718 F.Supp. 665, 685 (W.D.Tenn.1989) ("[s]hort term deprivations of toilet paper, towels, sheets, blankets, ... toothpaste, toothbrushes, and the like do not rise to the level of a constitutional violation.").

Here, Fernandez filed a grievance on August 7, 2002, complaining that defendant Booker had failed to respond

to his July 29, 2002, request for envelopes and personal hygiene supplies. On August 14, 2002, defendant Ahmed provided Fernandez with a package, including toothpaste, a toothbrush, shampoo and soap. Thus, even assuming the truth of Fernandez's allegations, he did not have hygiene items for sixteen days. Fernandez does not allege that he suffered any physical injury as a result. Based on the Second Circuit's holding in *Trammel,* the court concludes that Fernandez's allegations concerning the denial of hygiene supplies for a relatively short period of time in July and August 2002 do not constitute a serious deprivation of Fernandez's necessities. Thus, the plaintiff's claims fail to state a violation of the Eighth Amendment.

**\*6** Fernandez also claims that he was unable to shower for approximately five days. Courts have generally held that a temporary deprivation of the opportunity to shower does not violate the Eighth Amendment. *See McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) ("a two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs' ") (citation omitted); *Roberts v. Snyder,* No. CIV. A. 00–742–SLR, 2001 WL 655436, at \*5 (D.Del. March 27, 2001) (holding denial of opportunity to shower for five days "did not deprive plaintiff of 'minimal civilized measure of life's necessities.' ") (citation omitted); *Briggs v. Heidlebaugh,* 1997 WL 318081, \*3 (E.D.Pa. May 21, 1997) (denial of shower for two weeks not a constitutional violation); *Young v. Scully,* Nos. 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6768, 91 Civ. 6769, 1993 WL 88144, at \*4–\*5 (S.D.N.Y. Mar.22, 1993) (deprivation for a period of several days of exercise, shower, hot water, cell cleaning equipment, wardrobe, toiletries and hygiene items did not rise to level of extreme deprivation); *Lock v. Clark,* No. S90–327, 1992 WL 559660, at \*9 (N.D.Ind. March 17, 1992) (no constitutional violation where an inmate was held without soap and hygienic items for seven days, denied access to a shower, given only one and a half rolls of toilet paper, and left to wear only his undershorts); *Tinsley v. Vaughn,* Civ. A. No. 90–0113, 1991 WL 95323 at \*4 (E.D.Pa. May 29, 1991) (confining prisoner to cell and suspending shower privileges for twelve days not a constitutional deprivation).

Fernandez has submitted no evidence to show that he suffered any physical effects or injuries due to the fact that he did not shower for approximately five days in August 2002. Instead, Fernandez alleges that he suffered emotional distress as a result of the defendants' failure

to provide him with a shower for that five-day period. Under 42 U.S.C. § 1997e an inmate is prohibited from bringing an action in federal court which alleges mental or emotional injuries without a prior showing of a physical injury.[6] Because Fernandez has not alleged that he suffered any prior physical injury in conjunction with his claim of emotional distress, his allegations that he suffered emotional distress as a result of his inability to shower for five days fail to state a claim upon which relief may granted.

[6]  42 U.S.C. § 1997e(e) provides: "Limitation on recovery.—No federal civil action may be brought by a prisoner in a jail, prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury ."

The court concludes that Fernandez's inability to shower for a short period of time did not amount to a serious deprivation of plaintiff's "minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Accordingly, Fernandez has failed to meet his burden of demonstrating that the defendants violated his rights under the Eighth Amendment. The motion for summary judgment is granted as to this claim.

### 2. *Access to Envelopes*

Fernandez also alleges that the defendants failed to provide him with postage-paid envelopes in August 2002. He claims that without envelopes he could not access the courts. The defendants argue that Fernandez has failed to allege that he suffered an actual injury or was prejudiced in any way due to the temporary denial of access to postage-paid envelopes.

**\*7** "It is well established that inmates have a constitutionally protected right of access to the courts." *Smith v. Armstrong,* 986 F.Supp. 40, 46 (D.Conn.1996) (citing *Bounds v. Smith,* 430 U.S. 817, 822–25, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). In *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), the Supreme Court clarified what is encompassed in an inmate's right of access to the courts and what constitutes standing to bring a claim for the violation of that right. First, the Court held that to show a violation of his right of access to the courts, an inmate must allege an actual injury. *Id.* at 349. The fact that an inmate may not be able to

litigate effectively once his claim is brought before the court is insufficient to demonstrate actual injury. *Id.* at 355. Rather, the inmate must show that he was unable to file the initial complaint or petition, or that the complaint he filed was so technically deficient that it was dismissed without a consideration of the merits of the claim. *Id.* at 351. In addition, the Court observed that "the injury requirement is not satisfied by just any type of frustrated legal claim." *Id.* at 354.

The record reflects that Fernandez submitted a request to defendant Gallick for legal and "social" envelopes on August 14, 2002, but did not receive any envelopes in response to his request. He filed an emergency grievance on August 19, 2002, complaining that defendant Gallick had not provided him with the envelopes. Defendant Myers rejected the grievance because it did not constitute an emergency. Fernandez then filed an appeal of the grievance on August 23, 2002. The Free Postage Envelope Log for Fernandez's housing unit reflects that Fernandez received five postage-paid legal envelopes on August 22, 2002 and two postage-paid social envelopes on August 29, 2002.

Fernandez does not identify a specific case or claim that he was unable to file or allege that he missed any deadlines in any of his existing cases or that any cases were dismissed due to his lack of access to postage-paid envelopes for approximately a week in August 2002. Fernandez has failed to meet his burden of demonstrating that he suffered an injury as a result of the defendants' failure to provide him with postage-paid legal envelopes in August 2002. Accordingly, the motion for summary judgment is granted as to the claim of denial of access to the courts.

Fernandez also claims that defendant Gallick failed to provide him with postage-paid envelopes for social correspondence. The Supreme Court has held that prisoners have a First Amendment right to send non-legal mail to individuals outside of prison. *See Procunier v. Martinez,* 416 U.S. 396, 408–09, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Other Circuit and District Courts have held, however, that the First Amendment does not require prison officials to provide inmates with free postage. *See Lindell v. McCallum,* 352 F.3d 1107, 1111 (7th Cir.2003) (prisons and jails have no constitutional duty to subsidize prisoner litigation with unlimited amounts of free postage or legal supplies); *Van Poyck v. Singletary,* 106 F.3d 1558, 1559–60 (11th Cir.) (indigent inmates do not have right to

free postage for personal mail), *cert. denied* 552 U.S. 856 (1997); *Hershberger v. Scaletta,* 33 F.3d 955, 956–57 (8th Cir.1994) (same); *Walker v. Litscher,* No. 02–C–0430–C, 2003 WL 23200259, at *3 (W.D.Wis. March 14, 2003) (prison officials "refusal to provide [inmate] with free postage does not violate the First Amendment"); *Dawes v. Carpenter,* 899 F.Supp. 892, 899 (N.D.N.Y.1995) ("[T]he Constitution does not require the State to subsidize inmates to permit [personal] correspondence.")

**\*8** DOC records show that at the time of Fernandez's request for postage paid envelopes on August 14, 2002, he was not indigent as that term is defined in the Department of Correction Administrative Directives. Thus, he was not entitled to postage paid-envelopes. After Fernandez met the requirements for indigency on August 20, 2002, prison officials provided him with legal envelopes on August 22, and social envelopes on August 29, 2002. Although Fernandez disputes the issue of whether he was indigent before August 20, 2002, even if he were correct, no constitutional violation occurred for this short period of time.

Fernandez also does not provide information as to whom he intended to send mail using the envelopes for social correspondence or that he was unable to communicate to those individuals by other means during the two week period prior to receiving his postage-paid social envelopes. Thus, Fernandez has not specifically alleged that the defendants actually prevented him from communicating with outsiders during that two week period. *See Davidson v. Mann,* 129 F.3d 700, 701 (2d Cir.1997) (holding that "[a]bsent a specific allegation indicating that the directive ha[d] significantly impaired Davidson's ability to communicate with outsiders," Davidson had not stated a civil rights claim under Section 1983). Accordingly, Fernandez's claim of denial of postage-paid envelopes in August 2002 fails to state a claim upon which relief may be granted. The defendants' motion for summary judgment is granted on this ground.

### 3. *Failure to Respond to Grievances*

Fernandez alleges that defendants violated his constitutional right to petition the government for redress of grievances by failing to respond to the appeals of two grievances pertaining to the defendants' alleged failure to provide him with hygiene items and free envelopes. In response, defendants state that they are not arguing that Fernandez failed to exhaust his administrative remedies

as to the claims in amended complaint. They argue that interference with the right to petition for redress of grievances states a claim for relief only if the interference caused actual harm.

State of Connecticut Department of Correction Administrative Directive 9.6 governs the inmate grievance procedure. *See www.ct.gov/doc/LIB/doc/PDF/ AD/ad0906.pdf.* The directive governs inmate access to grievance forms and describes the procedure for timely resolution of grievances.

In *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996), the Second Circuit reiterated that the right to petition the government for redress of grievances is guaranteed by the First and Fourteenth Amendments. A claim of intentional interference with the right to petition the government is not actionable unless the interference caused actual harm, though. *See id.* The defendants do not argue that Fernandez has failed to exhaust his administrative remedies as to the claims in this action. The claims concerning the denial of hygiene items and denial of free envelopes were addressed by the court in the preceding section of this ruling. Thus, Fernandez has not demonstrated that he was harmed by the defendants' failure to respond to the appeal of two of his grievances.

**\*9** To the extent that Fernandez's claims may be construed as alleging that defendants filed to comply with the procedures set forth in Administrative Directive 9.6, the claim is not cognizable. This district has previously held that failure of a correctional official to comply with the institutional grievance procedures is not cognizable in an action filed pursuant to 42 U.S.C. § 1983, unless the action caused the denial of a constitutionally or federally protected right. *See Fernandez v. Armstrong,* Case No. 3:03CV583(JCH) (D.Conn. Dec. 7, 2004); *Ruocco v. Tung,* No. 3:02CV1443(DJS), 2004 WL 721716, at \*14 (D. Conn. Mar 30, 2004); *Hunnicutt v. Armstrong,* 305 F.Supp.2d 175, 188 (D.Conn.2004) (grievance procedure).

The court has determined that the defendants have not violated Fernandez's constitutional rights when they temporarily failed to provide him with free hygiene items and free envelopes. Thus, Fernandez has not identified any constitutionally or federally protected right that was violated by defendants' failure to comply with Department of Correction's grievance procedures. The court concludes that any claim that defendants

failed to comply with administrative directives does not demonstrate the denial of a constitutionally or federally protected right. Accordingly, such a claim is not cognizable in this civil rights action. The defendants' motion for summary judgment is granted as to any claim for failure to follow institutional grievance procedures.

### 4. *Failure to Promulgate Directives*

Fernandez contends that the defendants failed to promulgate directives containing mandatory language to create a liberty interest in humane prison conditions. The court can discern no constitutionally protected right to have correctional officials promulgate such directives.

In addition, defendants argue that even if such directives existed, inclusion of mandatory language in a prison directive does not, without more, give rise to a liberty interest protected by the due process clause. *See Sandin v. Connor,* 515 U.S. 472, 483, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). An inmate has a protected liberty interest "only if the deprivation ... is atypical and significant and the state has created the liberty interest by statute or regulation." *Id.* (citations and internal quotation marks omitted). Accordingly, the motion for summary judgment is granted as to Fernandez's claim that the defendants failed to promulgate directives.

### 5. *Other Claims*

Fernandez generally claims that the defendants retaliated against him for exercising his right of access to the courts and that mandatory language in the Department of Correction Administrative Directives created a liberty interest protected by the Due Process clause. The defendants argue that Fernandez has failed to allege facts to put them on notice of the nature and basis of these claims.

### a. *Retaliation Claim*

To state a claim for retaliation, the plaintiff must allege facts demonstrating "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). "[A]llegations which are nothing more than broad, simple, conclusory statements are insufficient to state a claim under § 1983 ." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d

2005 WL 733664

Cir.1987) (citing *Koch v. Yunich,* 533 F.2d 80, 85 (2d Cir.1976); *Fine v. City of New York,* 529 F.2d 70, 73 (2d Cir.1975)). Because of the "ease with which claims of retaliation may be fabricated," however, the court "examines prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). "A claim of retaliation that is 'wholly conclusory' can be dismissed on the pleadings alone." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

**\*10** Here, Fernandez simply states that the defendants retaliated against him for exercising his right of access to the courts. Fernandez fails to allege any facts or present any evidence to suggest that there was a retaliatory motive for any of the conduct of the defendants in response to his requests for hygiene products and envelopes. The court concludes that Fernandez has failed to allege facts stating a claim for retaliation. Accordingly, defendants' motion for summary judgment is granted as to this claim.

### b. *Due Process Claim*
Fernandez claims that Department of Correction Administrative Directives contained mandatory language that created liberty interests protected by the Due Process Clause of the Fourteenth Amendment. Fernandez states that the defendants violated his rights under the Due Process Clause because they failed to comply with the mandatory language in the Administrative Directives.

As discussed earlier in this ruling, the Supreme Court has held that mandatory language in a prison directive or regulation does not in and of itself create a liberty interest. *See Sandin,* 515 U.S. at 483 (inmate has a protected liberty interest "only if the deprivation ... is atypical and significant and the state has created the liberty interest by statute or regulation."). Furthermore, Fernandez fails to identify the Administrative Directives with which the defendants allegedly failed to comply. Without documentary support, his Due Process claim consists only of unsupported allegations that are conclusory at best.

Thus, Fernandez fails to state a claim of a violation of his Fourteenth Amendment Due Process rights. The defendants' motion for summary judgment is granted as to this claim.

### E. *State Law Claims*
Defendants contend that the court should decline to exercise supplemental jurisdiction over any state law claims contained in the amended complaint. The court agrees.

Supplemental or pendent jurisdiction is a matter of discretion, not of right. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 715–26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Where all federal claims have been dismissed before trial, pendent state claims should be dismissed without prejudice and left for resolution to the state courts. *See* 28 U.S.C. § 1367(c)(3); *Giordano v. City of New York,* 274 F.3d 740, 754 (2d Cir.2001) (collecting cases).

The court has dismissed all federal claims against the defendants. Thus, the court declines to exercise supplemental jurisdiction over any state law on the ground that it has dismissed all claims over which it has original jurisdiction. The motion for summary judgment is granted on this ground.

### IV. *Conclusion*
The defendants' Motion for Summary Judgment [doc. # 40] is GRANTED. The court declines to exercise supplemental jurisdiction over any state law claims raised by the plaintiff. *See* 28 U.S.C. § 1367(c)(3). The Clerk is directed to enter judgment in favor of defendants and close this case.

**\*11** SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2005 WL 733664

---

   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

51 F.3d 275
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. Use FI CTA7 Rule 53 for
rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Seventh Circuit.

William A. CHAVIS, Plaintiff/Appellant,

v.

J.W. FAIRMAN, Warden/Director, O. Sheahan,
Cook County Sheriff and Superintendent
Russell, of Division 5, Defendants/Appellees.

No. 94-1503.
|
Submitted April 6, 1995. [*]
|
Decided April 6, 1995.

[*] After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." *See* Fed.R.App.P. 34(a); Cir.R. 34(f). No such statement having been filed, the appeal is submitted on the briefs and the record.

Appeal from the United States District Court, for the Northern District of Illinois, Eastern Division, No. 92 C 7490; Marvin E. Aspen, Judge.

N.D.Ill., 1994 WL 55719.

AFFIRMED.

Before BAUER, COFFEY and FLAUM, Circuit Judges.

## ORDER

**\*1** William A. Chavis appeals the dismissal of his suit, brought under 42 U.S.C. § 1983, for failure to state a claim. Fed.R.Civ.P. 12(b)(6). Chavis, an inmate filing this suit pro se, asserts that the conditions at Cook County Jail while he was a pre-trial detainee violated

his constitutional rights under the First, Eighth and Fourteenth Amendments. For the reasons stated in the attached order, we AFFIRM the district court's judgment.

ATTACHMENT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

William A. Chavis, Plaintiff,

v.

J.W. Fairman, et al., Defendants.

Case No. 92 C 7490

Docketed Feb. 22, 1994

*MEMORANDUM OPINION AND ORDER*

MARVIN E. ASPEN, District Judge:

Plaintiff William A. Chavis ("Chavis") brings this *pro se* action under 42 U.S.C. § 1983 against defendants J.W. Fairman, Michael Sheahan, and Carl Russell (collectively "defendants"). Chavis alleges that defendants violated his First, Eighth, and Fourteenth Amendment rights as a result of their deliberate indifference to certain conditions of his confinement. Presently before us is defendants' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. [1] For the following reasons, we grant the motion.

## I. Motion to Dismiss Standard

A motion to dismiss should not be granted unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). As with all motions to dismiss,

we will take the "well-pleaded allegations of the complaint as true and view them, as well as reasonable inferences therefrom, in the light most favorable to the plaintiff." *Balabanos v. North Am. Inv. Group, Ltd.,* 708 F.Supp. 1488, 1491, n. 1 (N.D.Ill.1988). Moreover, because Chavis is proceeding *pro se,* we will construe his pleadings more liberally than those submitted by attorneys. *Haines v. Kerner,* 404 U.S. 509, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).

## II. Factual Background

For approximately four and a half months, Chavis was a pretrial detainee confined at the Cook County Jail. Chavis' litany of claims can best be summarized as follows:

(1) he received inadequate medical and dental care;

(2) the toilet facilities at the jail were filthy;

(3) he had inadequate lighting;

(4) he was forced to eat on the dining room floor where bugs flew around his head and mice could be seen at night;

(5) he did not receive adequate portions of food and sometimes the food was spoiled;

(6) he was forced to sleep on a mattress on the floor of his unit's dining room for over a year because the jail was overcrowded (there were 106 inmates in a unit that was built to house 40, and 109 inmates in another unit that was built to house 44);

(7) as a result of numerous gunshot wounds in his leg and hip, he suffered leg and hip pain from sleeping on a mattress on the floor;

 **\*2** (8) he slept close to drug addicts with infected track marks on their bodies and near inmates with communicable diseases;

(9) he only received a clean uniform once every three weeks and was threatened with abuse if he washed his uniform himself;

(10) he received inadequate showers (only one of the jail's four showers was functional);

(11) he was only allowed outdoor exercise once a month;

(12) due to the overcrowding, it was difficult to sit in the recreation room to read or watch television;

(13) he was denied religious services because the officers in charge never selected him to go;

(14) he was threatened for complaining to other inmates about the conditions at the jail;

(15) officers from the county sheriff's office kicked and stepped on his leg and hit him in the head several times causing him to go to the medical facility for pain pills;

(16) he was subjected to verbal abuse from members of the county sheriff's office.

After filing a grievance through the prisoner grievance system, only to be told that there was nothing the committee could do about the conditions of which he complained, Chavis filed this § 1983 action seeking declaratory and injunctive relief as well as monetary damages. [2] In his complaint, Chavis explicitly states that he is suing defendants in their official capacity and charges that defendants are responsible for the actions of county officers who kicked and beat him.

## III. Discussion

Defendants seek to dismiss plaintiff's complaint in its entirety on the grounds that Chavis has not stated any claims upon which relief can be granted. We address Chavis' allegations in turn.

### A. Equitable Relief

To begin with, defendants contend that Chavis' equitable claims are moot under the class action consent decree that was entered in *Duran v. Elrod,* No. 74 C 2949 (N.D.Ill. April 9, 1982), another case between pretrial detainees and the Cook County Jail. Indeed, Chavis' requests for declaratory and injunctive relief against defendants are governed by the terms of the *Duran* consent decree. The *Duran* class includes all Cook County pretrial detainees and the consent decree mandated renovation of the county

jail facilities, increased staff members, improved food services, provision of personal hygiene supplies, increased access to the law library, and more physical exercise periods and visitation hours. *Duran v. Elrod,* 713 F.2d 292, 293 (7th Cir.1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 143 (1984).

Normally, a judgment or decree resolves issues among parties to a lawsuit and does not affect parties outside the proceedings. However, class actions are an exception to this rule. *Martin v. Wilks,* 490 U.S. 755, 761-62, 109 S.Ct. 2180, 2184, 104 L.Ed.2d 835 (1989). Because the *Duran* class action involved rights of pretrial detainees and the consent decree is continuing in nature, Chavis is a member of that class even though he was not present in the jail when the decree was ordered. *See Martin v. Davies,* 917 F.2d 336, 339 (7th Cir.1990), *cert. denied,* 111 S.Ct. 2805, 115 L.Ed.2d 978 (1991).

**\*3** Equitable claims arising out of violations of a contempt decree must be addressed through contempt proceedings before the supervising court. *Martin,* 917 F.2d at 339. In this instance, Judge Milton I. Shadur oversees the *Duran* consent decree, not this Court. Accordingly, Chavis' equitable claims are not properly before us. [3]

### B. Damage Claims

Unlike equitable claims, the *Duran* consent decree does not bar § 1983 damages claims that derive from conditions of confinement for pretrial detainees in the Cook County Jail. *Martin,* 917 F.2d at 340. [4] We turn, then, to the various flaws defendants have identified in plaintiff's complaint.

### 1. Inadequate Medical and Dental Care, Lighting, and Toilet Facilities

Defendants seek to dismiss several of Chavis' claims on the grounds that he has failed to supply more than conclusory allegations. While courts will liberally construe pro se complaints, some facts must be intimated to support a claim in order to withstand dismissal. *Strauss v. City of Chicago,* 760 F.2d 756, 767. Here, Chavis offers no information to buttress his naked assertions that he has

received inadequate medical and dental care, and that the lighting and toilet facilities were likewise "inadequate." Complaint at ¶ ¶ 3 & 17. Without more, these claims simply cannot survive a motion to dismiss. Accordingly, we grant defendants' motion with respect to these claims.

### 2. Food and Dining Conditions

Chavis alleges that while incarcerated at the jail he had to eat on the floor where little bugs flew around his food, that he was routinely served "incorrect" portions of food, and that sometimes he was served spoiled food. Defendants correctly point out that these claims lack detail-leaving us to wonder, for instance, what constitutes an "incorrect" portion of food and how often Chavis received spoiled food-and contend that the claim should be dismissed.

It is clear that prisons have an obligation to "provid[e] nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *French v. Owens,* 777 F.2d 1250, 1255 (7th Cir.1985) (quotations omitted), *cert. denied,* 479 U.S. 817, 107 S.Ct. 77, 93 L.Ed.2d 32 (1986). The question, then, is whether the conditions of which Chavis complains fall below this standard.

Offered independently, each of Chavis' complaints fails to state a constitutional violation. Unlike the persistent provision of inedible meals, occasional service of spoiled food cannot be said to deprive inmates of basic nutritional needs. Similarly, while providing inmates with vermin infested food clearly rises to the level of a constitutional infraction, a mere allegation that bugs flew around the food, without more, [5] does not sufficiently allege that the jail served nutritionally inadequate food that threatened the health of those who consumed it. As for Chavis' charge that he was routinely served "incorrect" portions, this assertion is simply too vague to support a claim. Finally, while we acknowledge that eating on the floor is less comfortable than at a table, this side effect of overcrowding adds little to Chavis' efforts to state a constitutional claim.

**\*4** Even taken together these claims fail to survive dismissal. The Supreme Court recently stated that "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would

not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise...." *Wilson v. Seiter,* 111 S.Ct. 2321, 2327 (1991) (emphasis omitted). This is not such a case. While Chavis depicts less than optimal eating conditions and fare, all of his allegations combined still fail to suggest that he was being served food which posed "an immediate danger to his health and well being." Thus, we dismiss this claim.

### 3. Sleeping Conditions

Chavis complains that he was forced to sleep on a mattress on the floor in a room with numerous other inmates, rather than on a bed in a cell. His primary objection to this situation seems to be that sleeping on a mattress on the floor caused pain in his hip and leg. This claim must fail.

Courts in this district have previously recognized that, unless aggravating circumstances exist, "the Constitution is indifferent as to whether the mattress a detainee sleeps on is on the floor or on a bed." *Lynch v. Sheahan,* 92 C 1087, 1992 U.S.Dist. LEXIS 7749 (N.D.Ill. May 29, 1992). *See also Powell v. Cook County Jail,* 814 F.Supp. 757, 759 (N.D.Ill.1993) (same); *Bowden v. Fairman,* 92 C 7613, 1992 U.S.Dist. LEXIS 18399 (N.D.Ill.1992) (same). While Chavis alleges that mice could be seen in his unit at night, he notably does not allege that he came into contact with the mice, nor would such an allegations necessarily salvage his claim. Courts have routinely recognized that "[k]eeping vermin under control in jails, prisons and other large institutions is a monumental task," and that "failure to do so, without any suggestion that it reflects deliberate and reckless conduct in the criminal law sense, is not a constitutional violation." *Bowden v. Fairman,* No. 92 C 7613, 1992 WL 366905, 1992 U.S.Dist. LEXIS 18399 (N.D.Ill. December 2, 1992) (citing *Harris v. Fleming,* 839 F.2d 1232 (7th Cir.1988). *See also Lynch v. Sheahan,* No. 92. C 1087, 1992 WL 245599, 1992 U.S.Dist. LEXIS 13858 (N.D.Ill. Sept. 11, 1992) (absent showing that sleeping conditions were result of punitive intent, rather than overcrowding, fact that rats and roaches crawled over plaintiff while sleeping on a mattress on the floor of the Cook County Jail insufficient to survive summary judgment motion). More significantly, Chavis acknowledges that the sleeping conditions at the jail were the direct result of overcrowding, rather than the product of any punitive intent on defendants' part.

Accordingly, we dismiss this claim. *See Jones v. Sheahan,* 1993 WL 147480 at *2, 1993 U.S.Dist. LEXIS 6010 at *6 (N.D.Ill.1993) (where Sheriff of the Cook County Jail were "limited by the funds and facilities that had been made available to him by those controlling the purse strings," conditions caused by overcrowding would not support a § 1983 claim).

### 4. Proximity to Drug Addicts and Inmates with Communicable Diseases

**\*5** As for Chavis' claim that he was forced to sleep near inmates with communicable diseases and next to drug addicts with infected track marks, defendants properly highlight the absence of any allegations of injury. That is, Chavis nowhere claims that he contracted any communicable disease, or suffered any other injury, as a result of his proximity to these inmates. Accordingly, this claim, too, is dismissed. *See Bowden,* 1992 WL 366905 at *1-2, 1992 U.S.Dist. LEXIS at *4 (where plaintiff did not allege that he contracted tuberculosis, he could not maintain a § 1983 claim predicated on being housed with tubercular inmates) (citing *Niehus v. Liberio,* 973 F.2d 526, 531-32 (7th Cir.1992)).

### 5. Clothing Changes and Showering

Chavis alleges that he was only provided with a change of uniform once every three weeks, and that in the interim he was effectively prohibited from washing his clothes. Additionally, according to Chavis, 106 inmates were required to share a single functional shower.[6] The Constitution obliges penal institutions to provide inmates with basic hygienic necessities in keeping with "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399 (1981). However, when compared with conditions that have been held constitutional in this circuit, it rapidly becomes clear that Chavis' claims do not amount to constitutional deprivations.

In *Harris v. Fleming,* 839 F.2d 1232 (7th Cir.1988), a prisoner was allegedly deprived of toilet paper for five days, was not provided with soap, toothpaste or a toothbrush for 10 days, and was kept in a filthy, roach-infested cell. The Seventh Circuit concluded that these deprivations did not amount to unconstitutional

1995 WL 156599

punishment where the conditions were temporary and the plaintiff did not suffer any physical harm. Similarly, in *Lock v. Clark,* No. S90-327, 1992 WL 559660, 1992 U.S.Dist. LEXIS 21991 (N.D.Ind. March 17, 1992), the court found no constitutional violation where an inmate was held without soap and hygienic items for seven days, denied access to a shower, given only one and a half rolls of toilet paper, and left to wear only his undershorts.

By comparison, it is clear that wearing the same uniform for three weeks and sharing a shower with 106 inmates do not amount to the sort of serious deprivations that drag Chavis' conditions of confinement below "the minimal civilized measure of life's necessities." This is particularly true where, as here, Chavis fails to allege any injury stemming from either condition and neglects to detail how often he was permitted to shower. [7] We therefore dismiss these claims.

### 6. Recreation

During his stay at Cook County, Chavis was only permitted to exercise outside once a month. Furthermore, he alleges that it was difficult for him to find a seat in the television room, since inmates were wont to step on legs and other limbs that got in their way. [8] Lack of exercise may rise to a constitutional violation "[w]here movement is denied and muscles are allowed to atrophy, the health of the individual is threatened and the state's constitutional obligation is compromised." *French,* 777 F.2d at 1255. Generally, even dramatic restrictions on outdoor exercise do not violate the Eighth Amendment (or due process, where pretrial detainees are at issue) so long as prisoners have ample opportunity to enjoy indoor activity. *See Stewart v. McGinnis,* 800 F.Supp. 604 (N.D.Ill.1992), (although inmates were not permitted to exercise outdoors during an 85-day lockdown period, they were allowed to leave their cells, use the day room, and generally move about the prison, thus undercutting plaintiff's constitutional claim), *aff'd,* 5 F.3d 1031 (7th Cir.1993).

**\*6** Here, Chavis' allegations clearly demonstrate that he enjoyed significant freedom of movement around the prison. Although he laments the crowded condition of the television room, it is obvious that he has sufficient mobility to obviate his constitutional claims. Moreover, Chavis fails to allege that he suffered from any adverse

health effects, let alone that his muscles atrophied. For these reasons, we dismiss these claims.

### 7. Access to Religious Services

In *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), the Supreme Court stated that the First Amendment guarantees inmates a "reasonable opportunity" to practice religion. [9] This Court later expanded upon that general statement, holding that an inmate "is not denied a reasonable opportunity to practice his religion so long as he is granted regular access to religious services." *Houlihan v. Moynihan,* No. 87 C 3779 (N.D.Ill. June 26, 1989). Chavis alleges that

> county officers pick and choose who they want to go to religious services, [sic] as plaintiff [sic] beliefs are Islamic, and have been denied every time he tries to attend, as the officers working here only select who they want to go, meaning a certain number.

Complaint at ¶ 10. Although the mere necessity to limit the number of inmates who can attend religious services at any one time may well serve a legitimate penological function, Chavis' assertion that he was denied any access to religious services during his entire four and a half month stay is sufficient to allege that he was denied a reasonable opportunity to practice his religion.

However, Chavis is not home free, yet. In addition to stating a constitutional violation, Chavis must allege the requisite intent on the defendants' part in order to hold them liable. Here, Chavis makes clear that it was the guards who were responsible for selecting inmates to attend religious services, not defendants. Moreover, while we may reasonably infer a prison policy of restricting the number of prisoners who may go to services at any one time, we may not assume, without further allegations, that the jail had a policy either of preventing Muslims in general, or Chavis specifically, from worshipping.

Additionally, Chavis includes no allegations from which we can deduce that the named defendants were aware of the guards' conduct and consciously permitted it to continue. Although Chavis alleges that he filed a

grievance-only to be told that the committee "could do nothing about the situation here"-he neglects to apprise us of when the grievance was filed or, more importantly, whether it included this complaint. Without this information, we have no basis for supposing that any of the defendants were aware of Chavis' exclusion from worship services or that they had an opportunity to correct the situation. Without any basis from which to infer that defendants harbored any punitive intent toward Chavis, we must dismiss this claim.

### 8. Threats for Expressing His Beliefs

**\*7** Chavis alleges that he was threatened for complaining to other prisoners about jail conditions. However, it is plain that "[a]llegations of mere threats of violence are not punishment in the constitutional sense." *Murphy v. Cook County,* No. 92 C 3737, 1992 U.S.Dist. LEXIS 8959 (N.D.Ill. June 19, 1992) (citing *Emmons v. McLaughlin,* 874 F.2d 351, 353 (6th Cir.1989); *Collins v. Cundy,* 603 F.2d 825, 827 (10th Cir.1979) (*per curiam* ); *Simms v. Reiner,* 419 F.Supp. 468, 474 (N.D.Ill.1976)). This claim, then, is dismissed.

### 9. Physical and Verbal Abuse by Officers from the Sheriff's Department

Chavis alleges that during his stay at the jail, corrections officers sometimes kicked him in his injured right leg and hit him in the head. In addition, he complains that county officers regularly cursed him and called him foul names for no reason. Notably, however, Chavis does not identify the officers who engaged in this conduct, nor does he offer any indication that the named defendants were aware of the situation, let alone that they participated in or directed it.

In order to state a claim against any of the defendants under § 1983, Chavis must allege that the defendants were somehow involved in the constitutional violation at issue. While Chavis may have grounds for an action against the guards themselves, government officials cannot be held liable on a theory of respondeat superior. Because it is evident from his complaint, that the instant defendants had nothing to do with Chavis' alleged physical and verbal mistreatment, these claims are dismissed.

### IV. Conclusion

For the foregoing reasons, we grant defendants' motion to dismiss. It is so ordered.

Dated 2/15/94

[1]  We read Chavis' "Motion for Judgment against Defendants' [sic]" as a response to defendants' motion to dismiss, and view his additional motion for judgment as a surreply. To the extent that these filings represent independent motions, they are denied.

[2]  Chavis provides no details about the contents of the grievance or when it was filed.

[3]  In any event, the fact that Chavis has since been transferred from Cook County Jail first to the Illinois Department of Corrections facility in Joliet and then to the IDOC institution in Lincoln effectively moots his claims for equitable relief. *Martin,* 917 F.2d at 339.

[4]  While the due process clause of the Fourteenth Amendment, rather than the Eighth Amendment, applies to constitutional claims brought by pretrial detainees, the standard to be applied in both situations is essentially the same. In § 1983 punishment claims, a detainee, like a prisoner, must establish (1) that the alleged deprivation amounts to a constitutional denial, and (2) that the official intentionally inflicted harm, or that he had actual knowledge of impending harm and consciously refused to take reasonable steps to prevent it. *Wilson v. Seiter,* 111 S.Ct. 2321 (1991).

[5]  For example, Chavis does not allege that bugs could be found *in* or *on* his food, or, indeed, that he was not able to successfully swat them away. Although we acknowledge the discomfort such conditions undoubtedly cause, we cannot conclude that they amount to a constitutional violation.

[6]  Chavis' allegations have some notable gaps. For example, Chavis does not indicate whether he was afforded any clean underwear during the three weeks, nor does he explain how often he was actually allowed to shower. These, of course, are salient oversights.

[7]  In *Davenport v. De Robertis,* 844 F.2d 1310, 1316 (7th Cir.1988), *cert. denied, Lane v. Davenport,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988), for example, the Seventh Circuit held that one shower per week was constitutionally sufficient under the Eighth

Amendment. We have no reason to infer that Chavis was allowed less than one shower per week.

8    In Chavis' own words, "the majority of the inmates here are not that polite." Complaint at ¶ 17.

9    The First Amendment rights afforded pretrial detainees are the same as those afforded convicted inmates. *See Bell v. Wolfish,* 441 U.S. 520, 545-46, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

**All Citations**

51 F.3d 275 (Table), 1995 WL 156599

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3734086

2010 WL 3734086
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

Axel RENTAS, Plaintiff,
v.
Lisa NASON, et al., Defendants.

No. 09 Civ. 5528(JGK).
|
Sept. 22, 2010.

*MEMORANDUM OPINION AND ORDER*

JOHN G. KOELTL, District Judge.

**\*1** The plaintiff, Axel Rentas, brings this action pursuant to 42 U.S .C. § 1983 against Dr. Lisa Nason, an orthopedist who treated him at Rikers Island Correctional Facility. The plaintiff alleges that, in ordering his use of crutches discontinued, the defendant was deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment to the United States Constitution. The defendant moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted, on the ground that the plaintiff has failed to exhaust the mandatory inmate grievance procedure.[1]

[1]  The plaintiff has not filed any papers opposing the defendant's motion. The plaintiff was given notice on at least three occasions, beginning in February 2010, that failure to do so would result in the Court deciding the motion on the papers submitted by the defendant. The plaintiff did not respond, although he submitted a change of address form to the Court on August 17, 2010. The Court has carefully reviewed the papers to determine whether they support the relief sought.

**I.**

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the allegations in the Complaint are accepted as true. *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). In deciding a motion to dismiss, all reasonable inferences must be drawn in the plaintiff's favor. *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). The Court should not dismiss the Complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Twombly v. Bell Atl. Corp.,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

**II.**

The defendant moves to dismiss the Complaint on the ground that the plaintiff failed to exhaust the administrative remedies available to him on his claim before filing his case in federal court. The Prison Litigation Reform Act of 1995 (the "PLRA") provides that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Booth v. Churner,* 532 U.S. 731, 736, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). Exhaustion in cases covered by 1997e(a) is mandatory, and all available remedies must be exhausted at the time a Complaint is filed. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Neal v. Goord,* 267 F.3d 116, 121–23 (2d Cir.2001). The PLRA's exhaustion requirement applies to all inmate suits about prison life, as opposed to suits that challenge either the fact or duration of confinement, whether the suits involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. *Nussle,* 534 U.S. at 532.

In this case, the plaintiff alleges that the defendant violated his constitutional rights under the Eighth Amendment by "writ[ing] down a medical note stating in medical record to discontinue to utilize use of crutches for mobility within the housing area unit and facility areas." The plaintiff alleges that he suffered severe pain as a result of being deprived of access to crutches. However, nothing in the record or in the Complaint indicates that the plaintiff

2010 WL 3734086

filed a grievance against the defendant, as the PLRA requires prior to the commencement of an action. Indeed the plaintiff alleges that he filed a grievance based on the events underlying the injury that necessitated his use of crutches, but that does not suffice to exhaust his claim against Dr. Nason, because that claim is predicated on a separate and distinct injury. The plaintiff does not allege that he filed a grievance relating to the alleged removal of crutches. The plaintiff cannot pursue his claim in federal court without first having exhausted his administrative remedies. [2]

---

[2]    It is unnecessary to reach the defendant's alternative argument that the Complaint fails to state a claim because there is an insufficient allegation of a violation of the Eighth Amendment.

### III.

**\*2**  The defendant's motion to dismiss is therefore **granted without prejudice.** The Clerk is directed to enter judgment dismissing the Complaint and closing this case. The Clerk is also directed to close Docket No. 14.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3734086

---

End of Document                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00194-TJM-TWD    Document 233    Filed 09/05/17    Page 141 of 211
Cruz v. Church, Not Reported in F.Supp.2d (2008)
2008 WL 4891165

2008 WL 4891165
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Herman CRUZ, Plaintiff,
v.
M. CHURCH, Corr. Officer, et al., Defendants.

No. 9:05-CV-1067 (GTS/DEP).
|
Nov. 10, 2008.

**Attorneys and Law Firms**

Herman Cruz, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General State of New York, Stephen M. Kerwin, Esq., of Counsel, Albany, NY, for Defendants.

*MEMORANDUM-DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Plaintiff Herman Cruz, a New York State prison inmate, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, against six correctional officials employed by the New York State Department of Corrections. Generally, in his Complaint, Plaintiff alleges that Defendants violated his rights under the Constitution when, between approximately June and July of 2005, at Upstate Correctional Facility, they (1) used excessive force against him, (2) issued a retaliatory misbehavior report against him, and (3) denied him meals on isolated occasions. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].) Currently before the Court is Defendants' motion for summary judgment, and a Report-Recommendation that the motion be granted in part and denied in part. For the reasons set forth below, the Report-Recommendation is adopted in its entirety.

**I. BACKGROUND**

On April 23, 2007, Defendants moved for summary judgment with regard to Plaintiff's entire Complaint. (Dkt. No. 53.) The motion was referred to Magistrate Judge David E. Peebles for a Report-Recommendation. On June 17, 2008, Magistrate Judge Peebles issued a Report-Recommendation that the Court grant Defendants' motion with regard to Plaintiff's retaliation and food-deprivation claims, but that the Court otherwise deny the motion. (Dkt. No. 80.) On June 27, 2007, Plaintiff filed what he characterized as a "response," but "not [an] objection," to the Report-Recommendation. (Dkt. No. 83.) In that submission, Plaintiff takes issue with certain findings of fact made by Magistrate Judge Peebles with regard to Plaintiff's fooddeprivation and his excessive-force claims. (*Id.*) On July 7, 2008, Defendants filed an objection to the Report-Recommendation with regard to Plaintiff's excessive force claim. (Dkt. No. 85.)

**II. STANDARD OF REVIEW**

When specific objections to a Report-Recommendation are made, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). When only general objections are made, the Court reviews for clear error or manifest injustice. *Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd,* 175 F.3d 1007 (2d Cir.1999). Similarly, when no objection is made, the Court reviews for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

**III. ANALYSIS**

**A. Plaintiff's Retaliation Claim**

Since neither party filed an objection to Magistrate Judge Peebles' Report-Recommendation with regard to Plaintiff's retaliation claim, the Court reviews that portion of the Report-Recommendation for clear error or manifest injustice. After careful review, the Court concludes that the Magistrate Judge Peebles' Report-Recommendation with regard to Plaintiff's retaliation claim is well-reasoned and not clearly erroneous. Magistrate Judge Peebles employed the proper legal standard, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court adopts that portion of the Report-Recommendation.

## B. Plaintiff's Food-Deprivation Claim

**\*2** As stated above, in his "response" to Magistrate Judge Peebles' Report-Recommendation, Plaintiff takes issue with certain findings of fact made with regard to his food-deprivation claim. (Dkt. No. 83.) Regardless of whether the Court construes Plaintiff's response as a specific objection or a general objection, the Court finds no error (clear or otherwise) in Magistrate Judge Peebles' findings of fact and recommendation regarding Plaintiff's food-deprivation claim. Plaintiff simply has not adduced record evidence establishing that Defendants subjected him to food deprivations that were sufficiently serious to rise to the level of an Eighth Amendment violation. (*See* Dkt. No. 80, at 19-20 [Report-Recommendation, citing cases] .) *See also Cagle v. Perry,* 04-CV-1151, 2007 WL 3124806, at \*14 (N.D.N.Y. Oct.24, 2007) (McAvoy, J., adopting on *de novo* review Report-Recommendation) (two meal deprivations not sufficiently numerous, prolonged or severe to rise to level of Eighth Amendment violation). As a result, the Court adopts this portion of the Report-Recommendation.

## C. Plaintiff's Excessive Force Claim

Defendants make two objections to Magistrate Judge Peebles' recommendation with respect to Plaintiff's excessive force claim. First, Defendants argue that Magistrate Judge Peebles should not have disregarded Plaintiff's failure to comply with Local Rule 7.1(a)(3)'s requirement that a party opposing a motion for summary judgment file a response to the movant's Statement of Material Facts that admits or denies each of the movant's assertions in matching numbered paragraphs, supporting each denial with a specific citation to the record. (Dkt. No. 85, Part 1, at 1-5.) Second, Defendants argue that Magistrate Judge Peebles should have followed the established precedent in this Circuit holding that issues of credibility may be resolved by the Court on a motion for summary judgment when one of the parties has offered conflicting statements, some of which are consistent with the opposing party's version of events. (*Id.* at 5-6.)

### 1. Plaintiff's Failure to Comply with Local Rule 7.1(a) (3)

As an initial matter, it is questionable whether Defendants' purported "Notice Under Local Rule 56.2" satisfies the requirements of Local Rule 56.2. Local Rule 56.2 provides, in pertinent part: "When moving for summary judgment against a *pro se* litigant, the moving party shall inform the *pro se* litigant of the consequences of failing to respond to the summary judgment motion." N.D.N.Y. L.R. 56.2. While Local Rule 56.2 does not state in detail what the substance of the defendant's Rule 56.2 Notice shall be, it does state that "[a] sample notice can be obtained from the Court's webpage at 'www.nynd.uscourts.gov.' " *Id.* That sample notice provides, in pertinent part: "Pursuant to Local Rule 7.1 ..., you are required to submit the following papers in opposition to this motion: ... a short and concise statement of material facts as to which you claim there are genuine issues in dispute.... *If you do not submit a short and concise statement of material facts as to which you claim there are genuine issues in dispute,* all material facts set forth in the statement filed and served by the defendant(s) shall be deemed admitted." *See* N.D.N.Y. Rule 56.2 Notification, http:// www.nynd.uscourts.gov/ pdf/ftasumjd.pdf [last visited Oct. 20, 2008] [emphasis deleted and added].

**\*3** Here, Defendants' purported "Notice Under Local Rule 56.2" did not specifically notify Plaintiff that, *if he did not submit a response to Defendants' Statement of Material Facts,* all material facts set forth in Defendants' Statement of Material Facts would be deemed admitted. (Dkt. No. 53, Part 5.) Rather, Defendants' notice advised Plaintiff that "if you do not respond to the motion for summary judgment on time *with affidavits or documentary evidence* contradicting the facts asserted by the defendants, the court may accept the defendants' factual assertions as true." (*Id.* at 2 [emphasis added]. Defendants' warning is, of course, true. However, it is not complete in that it neglects to advise Plaintiff that he must also submit a written response to Defendants' Statement of Material Facts. Simply stated, such a notice potentially leaves a *pro se* plaintiff with the misimpression that it is permissible to not submit a written response to a defendant's statement of material facts so long as he submits affidavits or documentary evidence, because the Court will necessarily conduct a *sua sponte* review of those affidavits or documentary evidence for evidence contradicting the facts asserted by the defendants. This misimpression is only exacerbated by the fact that Defendants' notice also states that "[a]n affidavit is a sworn statement of fact ..." (Dkt. No. 53, Part 5, at 1.) This statement is true but (under the circumstances) potentially leaves a *pro se* plaintiff with the misimpression that an affidavit and a response to a Statement of Material Facts are the same

thing. *Compare* N.D.N.Y. L.R. 7.1(a)(2) (describing an "affidavit") *with* N.D.N.Y. L.R. 7.1(a)(3) (describing a "response to the Statement of Material Facts" as distinct from an "affidavit[ ]"). [1]

[1]   In addition to appearing to fall short of the requirements of Local Rule 56.2, it would appear that Defendants' notice falls short of the notice requirements contemplated by the Second Circuit in *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) (finding a notice provided by the New York State Attorney General's Office adequate because, in part, it "expressly warned [the *pro se* plaintiff] that ... if he did not provide the court with a short statement of any material facts as to which he contended there existed a genuine issue, the court would accept the assertions of the State's ... statement [of material facts] as true....").

In any event, the Court need not hold that Defendants' notice fails to comply with Local Rule 56.2. This is because, even assuming Defendants' notice were adequate (and Plaintiff's Rule 7.1 Response were not adequate), "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules [including the a local rule requiring a response to a statement of material facts]." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (affirming district court's exercise of discretion to overlook *pro se* civil rights plaintiff's failure to comply with local rule requiring response to statement of material facts on defendant's motion for summary judgment) [citations omitted]. While Defendants cite numerous cases in which this Court has exercised this discretion by refusing to overlook a violation of Local Rule 7.1(a)(3), [2] other cases exist in which this Court has exercised this discretion by overlooking such a violation. [3] The reason for these differing decisions is that it is within the Court's broad discretion (based on the circumstances) whether or not to shoulder the burden of performing an independent review of the record to find proof of a factual dispute. [4]

[2]   It is worth noting that, in none of the cases cited by Defendants did this Court hold that, by requiring that a non-movant file a response to the movant's Statement of Material Facts, Local Rule 7.1(a)(3) confers upon the movant some sort of absolute right to have its factual assertions deemed admitted. This is because the primary purpose of requiring a *response* to a Statement of Material Facts (which can be

followed by only a brief reply by the movant under the Local Rules) is to aid *the Court* in determining whether a question of material fact exists based on the record evidence before it. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001); *Kilmer v. Flocar, Inc.,* 212 F.R.D. 66, 69 (N.D.N.Y.2002) (Munson, J.); *Washington v. Niagara Mohawk Power Corp.,* 103 F.Supp.2d 517, 520 (N.D.N.Y.2000) (Kahn, J.).

[3]   *See, e.g., Johnson v. Tedford,* 04-CV-0632, 2007 WL 4118284, at *2 (N.D.N.Y. Nov.16, 2007) (Sharpe, J., adopting Report-Recommendation); *Bost v. Bockelmann,* 04-CV-0246, 2007 WL 527320, at *2 (N.D.N.Y. Feb.20, 2007) (Sharpe, J., adopting Report-Recommendation); *Colida v. Sony Corp.,* 93-CV-0573, 1994 WL 806088, at *2, n. 4 (N.D.N.Y. Dec.16, 1994) (Cholakis, J.), *vacated in part on other grounds,* No. 95-1375, 70 F.3d 130 (Fed.Cir. Nov. 16, 1995).

[4]   *See Monahan v. City of N.Y. Dept. of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) ("[T]he trial court has discretion to conduct an assiduous review of the record [despite the filing of a faulty statement of material facts required by a local rule] in an effort to weigh the propriety of granting a summary judgment motion ....") [citations omitted]; *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *9 (N.D.N.Y. June 22, 2006) (McAvoy, J., adopting, on *de novo* review, Report-Recommendation) ("[T]he Court certainly retains the discretion to conduct ... an independent review [of the record to find proof of a factual dispute .")*, accord, Dawkins v. Williams,* 511 F.Supp.2d 248, 255 (N.D.N.Y.2007) (Kahn, J., adopting, in pertinent part, Report-Recommendation) [citations omitted]; *Doe v. Nat'l Bd. of Podiatric Med. Exam'rs,* 03-CV-4034, 2004 WL 912599, at *4, n. 4 (S.D.N.Y. Aug.29, 2004) ("In deciding a motion for summary judgment, a district court is not constrained to rely on assertions made in a Local Rule 56.1 statement but may instead, at its discretion, perform an independent review of the record to determine how the motion for summary judgment should be decided.") [citations omitted].

**\*4** Here, the Court finds no error in Magistrate Judge Peebles' decision to conduct such a review. As Magistrate Judge Peebles alluded to in his thorough Report-Recommendation, Plaintiff filed what he intended to be a response to Defendants' Statement of Material Facts. (Dkt. No. 80, at 9, n. 6.) The problem with that response was that it did not comply with Local Rule 7.1(a)(3) in that it did not (1) mirror each of the thirteen

paragraphs of Defendants' Statement of Material Facts, (2) expressly admit or deny each of Defendants' factual assertions, and (3) support each denial with a specific citation to the record. (Dkt. No. 55, Part 1, at 3-6 [Plf.'s "Statement of Facts," containing twelve paragraphs, only seven of which were supported by citations to the record].) However, the record evidence adduced by Plaintiff was not particularly copious, consisting of some thirty-eight (38) pages of exhibits and affidavit testimony. (Dkt. No. 55, Part 1, at 7-21; Dkt. No. 55, Part 3, at 1-5; Dkt. No. 55, Part 3, at 6-24.) Moreover, before he filed his papers in opposition to Defendants' motion in this action on May 4, 2007, Plaintiff was not so experienced at federal court litigation that the special leniency normally afforded to *pro se* litigants because of their experience should have been diminished. [5]

[5]    In particular, before May 4, 2007, Plaintiff had filed five other federal court actions. *See Cruz v. Senkowski,* 90-CV-0289 (W.D.N.Y.) (habeas corpus proceeding); *Cruz v. Wead,* 97-CV-0846 (W.D.N.Y.) (prisoner civil rights action); *Cruz v. Hillman,* 01-CV-4169 (S.D.N.Y.) (prisoner civil rights action); *Cruz v. Thompson,* 04-CV-1497 (N.D.N.Y.) (prisoner civil rights action); *Cruz v. Lashway,* 06-CV-0867 (N.D.N.Y.) (prisoner civil rights action). It appears that, as of May 4, 2007, he had filed only one response to a motion for summary judgment in federal court, and it is unclear whether that response included response to a Statement of Material Facts. *See Cruz v. Wead,* 97-CV-0846 (W.D.N.Y.) (Plaintiff filed a "response" to defendants' motion for summary judgment on June 20, 2001).

For these reasons, the Court is not persuaded by Defendants' argument that Magistrate Judge Peebles erred by excusing Plaintiff's failure to comply with Local Rule 7.1(a)(3).

## 2. Plaintiff's Inconsistent Statements as to the Source of His Injury

In support of their argument that it is the established precedent in this Circuit that issues of credibility may be resolved by the Court on a motion for summary judgment when one of the parties has offered conflicting statements and some of those statements are consistent with the opposing party's version of events, Defendants cite *Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir.2005). (Dkt. No. 85, Part 1, at 5-6.) Defendants need to appreciate the narrowness of the exception discussed in *Jeffreys,* and the circumstances necessary to trigger that narrow exception.

It is well established that issues of credibility are *almost never* to be resolved by a court on a motion for summary judgment. [6] Granted, there is a *narrow exception* to this well-established rule. *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y. March 29, 2007). In *Jeffreys,* the Second Circuit explained that this narrow exception is for testimony by a non-movant that possesses the following two characteristics: (1) it constitutes almost the exclusive basis for a disputed issue of fact in the case (or, expressed differently, it is largely unsubstantiated by any other direct evidence); and (2) it is so lacking in credibility (because the testimony is incomplete and/or replete with inconsistencies and improbabilities) that, even after drawing all inferences in the light most favorable to the non-movant, no reasonable jury could find for the non-movant. [7] Again, it must be remembered that the circumstances giving rise to this exception are "rare." [8]

[6]    *See Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 174 (2d Cir.2006) ("[C]redibility, in the ordinary course of things, is for a fact-finder to evaluate."); *Stichting v. Schreiber,* 407 F.3d 34, 55 (2d Cir.2005) ("[T]o resolve at the summary judgment stage, and before Mead testifies, the question of whether a reasonable jury might believe Mead would, we think, amount to a credibility determination that we are not entitled to make."); *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996) (at the summary judgment stage, the court "is ... to eschew credibility assessments"); *accord, Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."); *accord, Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *see also Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) ("In applying [the summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."); *accord, U.S. v. Rem,* 38 F.3d 634, 644 (2d Cir.1994).

[7]    *See Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) ("[I]n the rare circumstances where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district

court to determine whether ... there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account.... In the circumstances presented in the instant case-where (1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe Jeffreys' testimony, ... we hold that the District Court did not err by awarding summary judgment. Because no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in the complaint, ... conclude that summary judgment was appropriate.") [internal quotation marks and citations omitted]; *cf. Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 42-46 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line [1] was "unsupported by documentary or other concrete evidence," and indeed was contradicted by the other record evidence, and [2] was "conclusory" and "inconsistent" with plaintiffs' present representations); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612-15 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony [1] recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign," and [2] were inconsistent with plaintiff's other statements and claims), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

8    *Jeffreys,* 426 F.3d at 554; *Caraballo v. City of New York,* 05-CV-8011, 2007 WL 1584202, at *6 (S.D.N.Y. May 31, 2007); *Blake,* 487 F.Supp.2d at 202; *Dove v. City of New York,* 03-CV-5052, 2007 U.S. Dist. LEXIS 18341, at *16, 2007 WL 805786 (E.D.N.Y. March 15, 2007); *Chapel Park Villa, Ltd. v. The Travelers Ins. Co., Inc.,* 02-CV-0407, 2006 WL 2827867, at *7 (W.D.N.Y. Sept.29, 2006); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *2 (S.D.N.Y. Feb.15, 2006).

**\*5** Here, Defendants argue that Magistrate Judge Peebles should have discredited Plaintiff's statement (made on June 16, 2005) that his physical injuries had been caused by an assault by Defendants (on June 5, 2005),

because that statement was inconsistent with his earlier statement to a health care provider (made on June 5, 2005) that his physically injuries had been caused by a fall in a shower. (Dkt. No. 85, Part 1, at 5.) Defendants are correct that the two statements are inconsistent. However, it is not true that the statement of June 16, 2005, constitutes the exclusive, or almost the exclusive, basis for a disputed issue of fact in the case. Magistrate Judge Peebles correctly observed that the statement of June 16, 2005, was corroborated by (1) Plaintiff's later sworn statements to the same effect (*see* Dkt. No. 1, ¶¶ 6 [6]-6[8] [Plf.'s Verified Compl.]; Dkt. No. 1, at 15, ¶¶ 12-13 [Plf.'s Decl. in Support of his Compl.]; Dkt. No. 55, Part 3, ¶¶ 13, 15, 26 [Plf.'s Decl.] ), and (2) a modicum of medical evidence substantiating that, at or about the time of the alleged assault, Plaintiff suffered physical injuries that are plausibly consistent with his claim (*see* Dkt. No. 53, Part 11 [Ex. E to Viglucci Affid., attaching Plf.'s medical records]; Dkt. No. 55, Part 3, at 12-19 [Exs. 6-13 to Plf.'s Decl., attaching Plf.'s medical records].) *See Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *20 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting, on *de novo* review, Report-Recommendation) (finding that the plaintiff's affidavit testimony was not so unsubstantiated as to be incredible under exception created by *Jeffreys v. City of New York,* 426 F.3d 549 [2d Cir.2005] ).

It should be noted that, contrary to Defendants' argument, Magistrate Judge Peebles did not "discount[ ]" Plaintiff's statement of June 5, 2005, "in favor of" his statement of June 16, 2006. (Dkt. No. 85, Part 1, at 6.) Magistrate Judge Peebles merely recognized that Plaintiff's statement of June 16, 2006, was not so unsubstantiated by other evidence as to trigger the narrow exception discussed in *Jeffreys.* Defendants remain free to use Plaintiff's statement of June 5, 2005, to try to persuade a jury that no assault occurred. It should also be noted that conspicuously missing from Defendants' motion papers are affidavits from Defendants Church and Vann denying their involvement in the alleged assault on Plaintiff. (*See generally* Dkt. No. 53.)

Because the Court finds that the first prong of the two-part test set forth by *Jeffreys* has not been satisfied, there is no need to proceed to the second prong of that test (e.g., examining the statements' inconsistencies and improbabilities). The Court notes that, even if it were to proceed to that prong, it would be have difficulty concluding that Plaintiff's statement of June 5, 2005, and

2008 WL 4891165

his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by Defendants. (Dkt. No. 1, ¶ 6[8] [Plf.'s Verified Compl.]; Dkt. No. 55, Part 1, ¶ 5 [Plf.'s "Statement of Facts"].) *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112 (2d Cir.1998) ("If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete.") [emphasis added]. As a result, the Court adopts this portion of the Report-recommendation.

**\*6  ACCORDINGLY,** it is

**ORDERED** that the Report-Recommendation (Dkt. No. 80) is hereby **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED** that Defendants' First Motion for Summary Judgment (Dkt. No. 53) is **GRANTED IN PART** in that the Second and Third Causes of Action of Plaintiff's Complaint (Dkt. No. 1), asserting claims of retaliation and food deprivation, are **DISMISSED with prejudice;** and it is further

**ORDERED** that First Motion for Summary Judgment (Dkt. No. 53) is otherwise **DENIED,** and that the First Cause of Action of Plaintiff's Complaint (Dkt. No. 1), asserting a claim of excessive force, shall be **SET DOWN FOR TRIAL.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Herman Cruz, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 against various corrections officials employed by the New York State Department of Correctional Services ("DOCS"), complaining of the alleged deprivation of his civil rights occurring during the period of his incarceration. In his complaint, plaintiff claims that he was assaulted by the six named defendants, was denied meals on isolated occasions, and was issued a misbehavior report in retaliation for having filed a

grievance complaining of actions on the part of certain corrections officials. As relief, plaintiff seeks recovery of compensatory and punitive damages.

Currently pending before the court is a motion by defendants seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety. In their motion, defendants urge the court to reject the plaintiff's version of the relevant events as facially incredible and determine that no reasonable factfinder could find in his favor on the three claims asserted.

Having carefully reviewed the record now before the court, informed by the arguments raised by the defendants, I conclude that dismissal of plaintiff's excessive force claims is precluded by the existence of genuine, triable issues of material fact, but that defendants are entitled to dismissal of plaintiff's retaliation and food deprivation claims, and therefore recommend that defendants' motion be granted, in part, but otherwise denied.

I. *BACKGROUND* [1]

[1]     In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at \*2 (E.D.N.Y. Mar. 30, 2007) (citations omitted). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

Plaintiff is a prison inmate entrusted to the custody of the DOCS. Complaint (Dkt. No. 1) at p. 1. At the times relevant to his claims plaintiff was designated to the Upstate Correctional Facility, located Malone, New York. [2] *Id.*

[2]     Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at \*4 n. 11 (S.D.N.Y. Sept. 12, 2002).

On June 5, 2005, while confined within the special housing unit ("SHU") at Upstate, plaintiff intentionally started a fire in his cell. Complaint (Dkt. No. 1) at p. 6. The

avowed purpose for setting the fire was plaintiff's desire to either commit suicide or be transferred out of the Upstate SHU. *Id.; see also* Cruz Decl. (Dkt. No. 55-3) ¶ 16. Once the fire was extinguished by prison officials, Cruz was transferred into the facility's mental health unit and placed on special watch. Complaint (Dkt. No. 1) at p. 6; *see also* Cruz Decl. (Dkt. No. 55-3) Exh. 4-A. At approximately 6:30 pm on that date plaintiff was examined for physical injuries; during that inspection no injuries were discerned, and plaintiff denied having suffered any. Viglucci Aff. (Dkt. No. 53-6) Exh. E; *see also* Cruz Aff. (Dkt. No. 553) Exh. 4-A.

**\*7** It is at this point that the parties' versions of the relevant events diverge. Plaintiff maintains that after his admission into the mental health unit and ensuing medical examination, defendants Baker, Russell, Patterson, Gill, Church and Vann came into his room and assaulted him, punching and kicking him and causing him to suffer a broken rib. Complaint (Dkt. No. 1) at p. 6; *see also* Cruz Decl. (Dkt. No. 55-3) ¶ 13. Defendants Baker, Gill, Patterson and Russell, by contrast, have submitted affidavits in which they deny having assaulted the plaintiff. [3] *See* Baker Aff. (Dkt. No. 53-12) ¶¶ 8-9; Gill Aff. (Dkt. No. 53-13) ¶ 6; Patterson Aff. (Dkt. No. 53-14) at ¶¶ 6-7; Russell Aff. (Dkt. No. 53-15) ¶¶ 3-5.

[3]   Conspicuously absent from among defendants' motion submission are affidavits from the remaining two defendants, including Corrections Officer Church and Corrections Officer Vann, denying their involvement in any alleged assault of the plaintiff.

Plaintiff's ambulatory health record entries for the relevant period reflect complaints of back and rib pain registered by the plaintiff at 7:30 pm on June 5, 2005, one hour after having been initially examined for injuries resulting from the fire; during the course of that examination, plaintiff attributed his injuries to having slipped and fallen in the shower. Viglucci Aff. (Dkt. No. 53-6) Exh. E., repeated at (Dkt. No. 55-3) Exhs. 6A12A. X-rays taken on June 6, 2005 confirmed that at some point plaintiff suffered a rib fracture. Viglucci Aff. (Dkt. No. 53-6) Exh. E. Plaintiff's health records reveal that plaintiff's injuries were treated during the ensuing days with analgesics. *See id.*

On June 16, 2005, for the first time, plaintiff reported that he was attacked by prison officials on June 5, 2005, at that point blaming his injuries, including the rib fracture, upon

the assault rather than a fall in the shower, as previously reported. Viglucci Aff. (Dkt. No. 53-6) Exh. E; Cruz Decl. (Dkt. No. 55-3) Exh. 12-A. An examination conducted on that date disclosed the existence of a "baseball size" bruise on plaintiff's right lower back, though no marks were found on his face. [4] *Id.* Plaintiff maintains that he initially made a false report regarding the cause of his injuries out of fear of retribution. *See, e.g.,* Plaintiff's Response to Defendants' Summary Judgment Motion (Dkt. No. 55) ¶ 5.

[4]   As will be seen, defendants claim that plaintiff's broken rib and subsequent inquiries were self-inflicted, based upon reports that upon his entry into the mental health unit on June 5, 2006 plaintiff was seen standing on his bunk and jumping onto the floor, throwing himself on his back and flailing. *See* Plaintiff's Response to Defendants' Summary Judgment Motion (Dkt. No. 55) Exh. D.

Plaintiff was issued a misbehavior report on June 5, 2005 by defendant Megan Church, a corrections officer, accusing Cruz of arson, in violation of disciplinary rule 118.10, based upon the fire which occurred on that date in his cell. Viglucci Aff. (Dkt. No. 53-6) Exh. D. A second misbehavior report was issued as a result of the incident, also on that same date, by Corrections Officer J. Kissane, charging plaintiff with destruction or loss of property, in violation of disciplinary rule 116.10. A Tier III disciplinary hearing was conducted on June 16, 2005 in connection with those charges, resulting in a finding of guilt on both counts, and the imposition of a penalty which included one hundred eighty days of disciplinary confinement in the facility's SHU, with a corresponding loss of package, commissary and telephone privileges and an order that plaintiff pay restitution in the amount of $241.00, with an additional recommended loss of good time credits. [5] *Id.*

[5]   The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998).

2008 WL 4891165

**\*8** Plaintiff was issued yet another misbehavior report on June 5, 2005, charging him with harassment (Rule 107.11), making threats to staff (Rule 102.10), and violating facility correspondence regulations (Rule 180.11). Viglucci Aff. (Dkt. No. 53-6) Exh. C. Those charges stemmed from a letter allegedly sent by the plaintiff to Corrections Officer Church, containing derogatory statements concerning her. *See id.* Following a Tier III hearing in connection with that misbehavior report, plaintiff was found guilty of two of the three charges, but acquitted of making threats. *Id.* As a consequence, disciplinary confinement, with corresponding lack of package, commissary and telephone privileges, was imposed for a period of ninety days, with an additional recommended loss of good time credits. *Id.*

In addition to complaining of the June 5, 2005 alleged staff assault, plaintiff's complaint also makes allegations, although bereft of specifics, to the effect that in response to his filing of a grievance on July 11, 2005, regarding the assault and actions taken by defendant Church toward him, Cruz was issued another misbehavior report. Complaint (Dkt. No. 1) at p. 10. Neither plaintiff's complaint, the accompanying supporting affidavit, nor his papers in opposition to the defendants' summary judgment motion provide elaboration regarding this claim, including to identify the issuing officer, recite the infraction charged, or provide information regarding its disposition.

Similarly, in his complaint plaintiff alleges having been denied "chow" on numerous occasions. Complaint (Dkt. No. 1) Third Cause of Action at p. 12; Cruz Decl. (Dkt. No. 55-3) ¶ 10. Plaintiff does not indicate the dates, or on how many occasions, his meals were not served, nor once again does he identify the individuals to whom that deprivation is attributable.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on August 25, 2005. Dkt. No. 1. As defendants, plaintiff's complaint names six DOCS employees, including Corrections Officers M. Church, A. Baker, Patterson, and R. Russell, as well as Corrections Sergeant R. Gill and Corrections Lieutenant Vann, all of whom are employed at Upstate. *Id.* Plaintiff's complaint contains three causes of action, asserting the use of excessive force, unlawful retaliation, and cruel and unusual punishment based upon the alleged deprivation of meals. Issue has since been joined by the defendants' filing

of an answer in which they deny the bulk of the material allegations of plaintiff's complaint and set forth various affirmative defenses. *See* Dkt. Nos. 23, 73.

On April 23, 2007, following the close of discovery, defendants filed a motion for summary judgment. Dkt. No. 53. In their motion, defendants argue that no reasonable factfinder could credit plaintiff's version of the relevant events and find liability on the part of any of the defendants with respect to plaintiff's three separate claims. *Id.* Plaintiff has since responded in opposition to defendants' motion by the filing on May 4, 2007 of several documents, including an affidavit. [6] *See* Dkt. No. 55. Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c); *see also* Fed.R.Civ.P. 72(b).

[6]      Plaintiff's submission does not include a statement formally responding to defendants' Local Rule 7.1(a)(3) statement of material facts not in issue. While the plaintiff's failure to include such a responsive statement among his opposition papers has significant potential adverse consequences, *see* N.D.N.Y.L.R. 7.1(a)(3); *see also Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at \*1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000), and the importance of this requirement should not be trivialized, I have chosen to overlook this procedural deficiency in light of the plaintiff's other submissions in opposition to the motion and in deference to his *pro se* status. *See The Travelers Indemnity Co. of Ill. V. Hunter Fan Co.,* No. 99 CIV 4863, 2002 WL 109567, at \*7 (S.D.N.Y. Jan.28, 2002) (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (indicating that a court has broad discretion whether to overlook a party's failure to comply with its local rules).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*
**\*9** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see* *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Excessive Force*

**\*10** The centerpiece of plaintiff's complaint in this action is his contention that he was assaulted by the defendants following his transfer into the Upstate mental health unit on June 5, 2005, causing him to suffer injuries which included a broken rib. Despite plaintiff's sworn statements to the effect that the assault occurred, with some modicum of potential corroboration provided by medical records substantiating that at or about that time plaintiff did in fact suffer injuries which are plausibly consistent with his claim, defendants nonetheless request that the court find plaintiff's version of the events to be incredible as a matter of law, and thus conclude that no reasonable factfinder could find in his favor with regard to that cause of action.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

This is not the typical excessive force case, in which defendants argue that while force may have been exerted by corrections officials against an inmate, it was proportionate to the need to further legitimate penological interests and protect the safety and integrity of the facility, or that when utilizing force they did not act with a sufficiently culpable state of mind. In this instance, defendants assert that the assault, as claimed by the plaintiff, simply did not occur. Ordinarily, such a disparity between the parties' versions of the relevant events would present a classic example of an issue of material fact of the type which would preclude the entry of summary judgment. Despite this defendants nonetheless argue that plaintiff's version of the events is simply not supportable, inviting the court to make the required credibility assessment and find, as a matter of law, that no

Case 9:17-cv-00194-TJM-TWD    Document 233    Filed 09/05/17    Page 150 of 211
Cruz v. Church, Not Reported in F.Supp.2d (2008)
2008 WL 4891165

reasonable factfinder could conclude he was subjected to excessive force at the hands of the defendants.

While resolution of genuine issues of material fact are ordinarily best left for resolution by a jury, in certain rare circumstances where conflicting versions of the relevant events are presented in the record a court may nonetheless resolve the inconsistencies and grant summary judgment, particularly where a plaintiff relies exclusively on his or her version of the relevant events, without corroboration, and in circumstances where there are inconsistencies, contradictions or incompleteness in the plaintiff's version. *See Jeffreys,* 426 F.3d at 554-55; *see also Shabazz v. Pico,* 994 F.Supp. 460, 468-71 (S.D.N.Y.1998); *see also Dove v. City of New York,* No. 03-CV-5052, 2007 WL 805786, at *5 (E.D.N.Y. Mar. 15, 2007). This, however, is not one of those cases.

**\*11** Despite defendants' protestations to the contrary, plaintiff's version of the relevant events is not necessarily inconsistent with the evidence in the record, including that concerning his medical injuries. Plaintiff's health records reveal that at 6:30 pm on June 5, 2005, following a fire in his cell, he was examined, with no signs of injury. Cruz Decl. (Dkt. No. 55-3) at Exh. 6A. One hour later, Cruz was again examined, after reportedly having slipped and fallen in the shower, with complaints of rib and back pain. *Id.* While at that time there did not appear to be any visible signs of injury, x-rays ordered on June 6, 2005 revealed the existence of a broken rib. *Id.; see also* Viglucci Aff. (Dkt. No. 53-6) Exh. E. While defendants theorize that the broken rib was self-inflicted as a result of plaintiff's antics, observed by prison officials on June 5, 2005-and there is considerable potential plausibility to that theory-only a jury, having heard all of the evidence, can make that pivotal credibility determination and resolve the issues of fact surrounding whether the assault incident occurred, as claimed by the plaintiff.

In sum, while at different points in time the plaintiff has undeniably offered conflicting versions of the relevant events of June 5, 2005, he has also provided an explanation for having done so, and his claim of having sustained injury on that date as a result of an assault is potentially somewhat corroborated by the existence of a visible bruise and x-rays revealing a broken rib. Under these circumstances I recommend against invoking the *Jeffreys* exception, and in favor of denying the

portion of defendants' motion challenging the sufficiency of plaintiff's excessive force claims.

### C. *Retaliation*

In his complaint plaintiff also asserts a claim of retaliation, based principally upon his filing of a grievance on July 11, 2005, allegedly resulting in the subsequent issuance of a misbehavior report. Complaint (Dkt. No. 1) at p. 10. Observing that such claims are "prone to abuse," see *Flaherty v. Cohen,* 713 F.2d 10, 13 (2d Cir.1983), and that the record is lacking in specifics regarding the grievance and ensuing misbehavior report, defendants seek dismissal of this claim as well. [7]

[7]    Plaintiff's complaint, generously construed, could be interpreted as also alleging that defendants Gill and Church retaliated against him for filing grievances and complaints against him by their issuance of false misbehavior reports on June 5, 2005. While the mere filing of false misbehavior reports, without more, is not actionable, *see Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988)), such conduct, if committed in retaliation for an inmate having engaged in protected activity, is potentially actionable under the First Amendment. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). In this case, however, plaintiff is not well-positioned to argue that the misbehavior reports contained false allegations since Tier III hearings conducted in connection with both misbehavior reports issued on June 5, 2005 resulted in at least partial findings of guilt.

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002). If the plaintiff carries this burden, the defendants must show by a preponderance of the evidence that they would have

taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, then, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*12** As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims generally revolve around both the engaging in protected conduct, and establishment of a nexus between that conduct and adverse action later taken. In this instance plaintiff's retaliation claims have been alleged in only conclusory form, and are not supported by evidence in the record establishing a nexus between protected activity and the adverse actions complained of. The specific instance cited, for example, fails to disclose the temporal relationship between the July 11, 2005 grievance and the ensuing misbehavior report, nor does it identify the corrections official who issued the report.[8] Since, in response to defendants' motion, plaintiff has not come forward with evidence to support his retaliation claim, I recommend that it be dismissed as a matter of law.

[8]   Since personal involvement in conduct resulting in a constitutional violation is a pre-requisite to a finding of liability, plaintiff's failure to allege their participation in the issuance of a misbehavior report could provide a separate, independent basis for dismissal of plaintiff's retaliation claims against the six named defendants. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)).

### D. *Food Deprivation*
In his third and final cause of action plaintiff alleges, once again in wholly conclusory form, that he was denied food by the defendants while at Upstate. Defendants seek dismissal of this claim based upon plaintiff's failure to demonstrate the facts from which a reasonable jury could conclude that his Eighth Amendment rights were violated.

Undeniably, the Eighth Amendment requires that prisoners receive food that is adequate to maintain health; it need not, however, be either tasty or aesthetically

pleasing. *LeMaire v. Maass,* 12 F.3d 1444, 1456 (9th Cir.1993) (citing *Cunningham v. Jones,* 567 F.2d 653, 659-60 (6th Cir.1977)). When corrections officials deny a prison inmate the measure of food necessary to maintain health, the Eighth Amendment's prohibition against cruel and unusual punishment is implicated. *Robles v. Coughlin,* 725 F.2d 12, 15-16 (2d Cir.1983). If, on the other hand, meals, are withheld from a prisoner on an isolated basis, such conduct, though not necessarily to be condoned, does not typically rise to a level of constitutional significance. *See Cunningham,* 567 F.2d at 659-60 (remanding case for a determination of nutritional adequacy where complaint alleging that prisoners were served only one meal per day had been dismissed); *Moss v. Ward,* 450 F.Supp. 591, 596-97 (W.D.N.Y.1978) (indicating that "being deprived of one or two meals might not be cruel and unusual punishment", but finding in this case that deprivation of food for four consecutive days was an unconstitutionally disproportionate punishment for violation of a disciplinary rule).

In the face of defendants' pending motion for summary judgment, plaintiff has failed to come forward with anything of evidentiary value establishing that he was in fact deprived of food, not by his own actions but rather those of prison officials, nor has he identified the prison officials involved and the frequency with which the deprivation occurred. Indeed, as defendants assert, the only specifics alleged in plaintiff's complaint in connection with his third cause of action is that Cruz filed a grievance asserting that he was told by another corrections officer that defendant Church would not feed him. *See* Complaint (Dkt. No. 1) at p. 6. Plaintiff does not follow that allegation with any claim that defendant Church actually denied him any meals, nor does he identify the persons responsible for withholding the other meals to which he makes reference in connection with that claim.[9]

[9]   The parties' versions regarding the denial of food are to a degree in conflict. Plaintiff asserts, as one of the reasons why he opted to light a fire in his cell, that he was not being fed. *See, e.g.,* Complaint (Dkt. No. 1) at p. 15. Defendants counter that the fact that plaintiff may not have received certain meals stems from plaintiff's refusal to obey an order to retreat to the back of his cell in order to be served his food. *See, e.g.,* Viglucci Aff. (Dkt. No. 53-6) Exh. C, 6/5/05 recommendation from Lt. Martin to Sgt. Gill. This fact dispute is not material, however, since in response to defendants' motion the plaintiff

Case 9:17-cv-00194-TJM-TWD    Document 233    Filed 09/05/17    Page 152 of 211
Cruz v. Church, Not Reported in F.Supp.2d (2008)
2008 WL 4891165

has failed to allege food deprivation of sufficient proportions to support an Eighth Amendment claim. *See, e.g., Robles* ("While no court has explicitly said that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension.") (citations omitted); *Moss,* 450 F.Supp. at 596-97.

**\*13** Under these circumstances I conclude that no reasonable factfinder could determine that defendants have violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by denying him meals.

## IV. *SUMMARY AND RECOMMENDATION*

Having carefully reviewed the record in light of defendants' arguments, I find that there are genuine issues of material fact which must be resolved by a jury before plaintiff's excessive force claim against the six named defendants can be adjudicated, and therefore recommend against dismissal of that claim at this procedural juncture. I further recommend, however, that the remaining portions of defendants' summary judgment motion be granted and that plaintiff's second and third causes of action, alleging retaliation and food deprivation, respectively, be dismissed as a matter of law.[10] Based upon the foregoing, it is hereby

[10]    Large segments of plaintiff's complaint and submissions to the court in opposition to defendants' summary judgment focus upon allegations of verbal

harassment of the plaintiff by the six named defendants and other corrections employees at Upstate. Such allegations, without more, do not rise to the level of constitutional significance required to support a claim under 42 U.S .C. § 1983. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Beckles v. Bennett,* No. 05 Civ.2000, 2008 WL 821827, at *23 (S.D.N.Y. Mar. 26, 2008).

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 53) be GRANTED, in part, and that plaintiff's second and third causes of action be DISMISSED, but that defendants' motion otherwise be DENIED, and that plaintiff's excessive force claim be set down for trial.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

The clerk is directed to promptly forward a copy of this order to the plaintiff by regular mail and defendant via electronic means.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 4891165

2013 WL 3776167
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Frederick DILLON, Plaintiff,
v.
CITY OF NEW YORK and
Officer Walker, Defendants.

No. 12 Civ. 7112(LAP).
|
July 18, 2013.

*Memorandum AND Order*

LORETTA A. PRESKA, Chief Judge.

**\*1** On September 19, 2012, Plaintiff Frederick Dillon ("Plaintiff"), proceeding *pro se,* brought this action against the City of New York and Officer Walker[1] (collectively, "Defendants") under 42 U.S.C. § 1983 ("Section 1983") relating to his incarceration in the George R. Vierno Center (the "GRVC") at Rikers Island. Plaintiff alleges that Defendants subjected him to cruel and unusual punishment by denying him an opportunity to shower on August 27, 2012. Defendants move to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)"). For the reasons set forth below, the Court GRANTS Defendants' motion to dismiss [dkt. no. 17].

[1]     Plaintiff describes Officer Walker as having "brown skin with black minimum close cut," with "eyeglasses" and standing "about 5#9 foot" in the Complaint ("Complaint" or "Compl.") [dkt. no. 3]. However, counsel for Defendants has failed to identify Officer Walker for representation purposes. (*See* Memorandum of Law at 1 n. 1.) The Complaint is subject to dismissal regardless of the identity of that individual defendant.

I. BACKGROUND
Plaintiff alleges that while he was incarcerated at the GRVC, Defendants subjected him to cruel and unusual punishment by denying him an opportunity to shower. (*See* Compl. § II.D.) Specifically, Plaintiff alleges that,

on August 27, 2012, he asked Officer Walker if he could shower and Officer Walker responded by saying, "[Y]our lawyer is here to see you." (*Id.*) Plaintiff alleges that when he returned from meeting with his lawyer and asked to shower, Officer Walker told Plaintiff that "shower time is over." (*Id.*)

II. Discussion

A. *Legal Standard*
In assessing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations in a complaint as true and construe all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki,* 516 F.3d 50, 56 (2d Cir.2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. A plaintiff is obliged to provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action" as grounds for his entitlement to relief. *Twombly,* 550 U.S. at 555.

Courts must read *pro se* complaints liberally and construe them to raise the strongest arguments that they suggest. *See, e.g.,Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007). This is particularly applicable when plaintiffs allege civil rights violations. *See McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). *Pro se* plaintiffs must still provide enough facts to "nudg[e] their claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570. Thus, a *pro se* plaintiff's factual allegations must be sufficient to "raise a right to relief above the speculative level." *Id.* at 555. Even under this liberal standard for *pro se* complaints, dismissal is appropriate where the plaintiff fails to state a claim upon which relief can be granted. *See Harris v. Mills,* 572 F.3d 66, 73 (2d Cir.2009) (dismissing a claim for injunctive relief "even under the liberal standard of review for *pro se* proceedings.").

B. *Plaintiff's Eighth Amendment Claims*
**\*2** Plaintiff brings his claims pursuant to Section 1983. However, "Section 1983 itself creates no substantive rights

2013 WL 3776167

[as] it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citing *Okla. City v. Tuttle,* 471 U.S. 808, 816 (1985)). Under Section 1983, a plaintiff must show that he was deprived rights, privileges, or immunities secured by the Constitution or federal laws. *Sykes,* 13 F.3d at 519. The Court construes Plaintiff's allegations as Eighth Amendment claims.

Conditions of confinement claims implicate the Eighth Amendment's prohibition of cruel and unusual punishment.[2] *See Wilson v. Seiter,* 501 U.S. 294, 296–97 (1991). Although the Constitution "does not mandate comfortable prisons," it also does not permit inhumane ones. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). A condition of confinement rises to the level of cruel and unusual punishment where the condition deprives inmates of "the minimal civilized nature of life's necessities." *Rhodes,* 452 U.S. at 347. Under this standard, the Eighth Amendment requires that prison officials provide inmates with adequate food, clothing, shelter, and medical care. *See Farmer,* 511 U.S. at 832.

[2]   The Eighth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment. *See Robinson v. Cal.,* 370 U.S. 660, 666 (1962).

To succeed on a cruel and unusual punishment claim pursuant to the Eighth Amendment regarding conditions of confinement, the plaintiff must allege facts that satisfy both an objective and subjective test. *See Wilson,* 501 U.S. at 297–98. For the reasons set forth below, Plaintiff's allegations fail to meet either the objective or subjective test.

### 1. Objective Test

For a plaintiff to satisfy the objective test, the alleged deprivation must be "sufficiently serious." *See Farmer,* 511 U .S. at 834 (quoting *Wilson,* 501 U.S. at 298). Under the objective test, a prison official's act or omission must deny the inmate "basic human needs" or expose the inmate to conditions that "pose an unreasonable risk of serious damage to [his] future health ." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (*per curiam* ) (citing *Helling v. McKinney,* 509 U.S. 25, 32 (1993)).

A conditions of confinement claim concerning the denial of showers rises to the level of an Eighth Amendment violation when such a denial deprives the prisoner of basic human needs. *See McCoy,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003). Courts are reluctant to consider the temporary deprivation of showers a constitutional violation. *Cf. Myers v. City of N.Y.,* No. 11 Civ. 8525(PAE), 2012 WL 3776707, at *8 (S.D.N.Y. Aug. 29, 2012) (temporary deprivations of personal hygiene do not deny plaintiff basic human needs and thus are not constitutional violations) (citing *Benjamin v. Fraser,* 161 F.Supp.2d 151, 175–76 (S.D.N.Y.2001)), *aff'd,* No. 12–4032 (2d Cir. July 16, 2013) (summary order). Specifically, the denial of showers for as long as two weeks is not sufficiently serious to state a constitutional claim. *See McCoy v. Goord,* 255 F.Supp.2d at 260 (a two-week suspension of shower privileges does not rise to the level of an Eighth Amendment violation); *Cruz v. Jackson,* No. 94 Civ. 2600(RWS), 1997 WL 45348, at *6 (S.D.N.Y. Feb. 5, 1997) (defendant's Eighth Amendment violation allegation was objectively insufficient to state an Eighth Amendment claim where complaint alleged that defendant was deprived the opportunity to shower for two weeks).

**\*3** Plaintiff alleges that he was deprived the opportunity to shower only on the morning of August 27, 2012. (*See* Compl. § II.D.) Thus, Plaintiff has failed to allege a plausible deprivation of "the minimal civilized nature of life's necessities." *Rhodes,* 452 U.S. at 347. The allegations in the Complaint are insufficient to raise an objective Eighth Amendment violation. Accordingly, Plaintiff's allegations are dismissed. *See McCoy,* 255 F.Supp.2d at 260; *Cruz,* 1997 WL 45348, at *6.

### 2. Subjective Test

Even if Plaintiff demonstrated that his claim was sufficiently serious under the objective test, which he has not, the Complaint would still be dismissed because Plaintiff fails to satisfy the subjective test for the reasons below.

The subjective test for conditions of confinement requires that the plaintiff demonstrate that the defendants acted with "a 'deliberate indifference' to inmate health or safety." *See Farmer,* 511 U.S. at 834 (quoting *Wilson,* 501 U.S. at 302–03). To satisfy the subjective test, the plaintiff must show that the defendants knew of and disregarded an excessive risk to the plaintiff's health or safety; the

defendants must both be aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists; and the defendants must also draw that inference. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

Here, Plaintiff does not plausibly allege that Defendants acted with a culpable state of mind when Plaintiff was denied shower privileges on August 27, 2012. Plaintiff alleges that when Officer Walker walked past his cell door, Plaintiff asked for shower access. (Compl.§ II.D.) Plaintiff alleges that Officer Walker responded by telling Plaintiff that Plaintiff's lawyer was there to see Plaintiff. (*Id.*) When Plaintiff returned, Officer Walker informed him that "shower time [was] over." (*Id.*) In his Complaint, Plaintiff merely describes an officer's reasoned response to a request to shower on a single day which lacks any subjective intent to deprive Plaintiff. (*Id.*) Thus, Plaintiff does not plausibly allege that Officer Walker knew of and disregarded an excessive risk to Plaintiff's health and safety by not allowing him to shower on a single occasion. Accordingly, the Complaint is dismissed because Plaintiff fails to satisfy the subjective test. *Hathaway,* 37 F.3d at 68–69.

### C. Prejudice

As explained above, a court must construe *pro se* complaints liberally. *See Abbas,* 480 F.3d at 639. District Courts are not required to grant leave to amend a complaint where a plaintiff has not requested such leave. *See Anatian v. Coutts Bank (Switz.) Ltd.,* 193 F.3d 85, 89 (2d Cir.1999) ("[T]he district court was not obliged to grant plaintiffs leave to amend their complaint" where "plaintiffs made no attempt to seek leave to amend their ... complaint."). Still, district courts should not dismiss *pro se* complaints without granting the plaintiff an opportunity to amend his complaint when a liberal reading of the complaint indicates that a valid claim might be stated. *See Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991); *see*

*also DeBoe v. Du Bois,* 503 F. App'x 85, 87 (2d Cir.2012) (summary order) ("[D]istrict courts generally should not dismiss a *pro se* complaint without granting the plaintiff at least one opportunity to amend."). However, a district court is not required to grant leave to amend where an amendment would be futile. *See Cuoco v. Moritsugu,* 222 F.3d 88, 112 (2d Cir.2000).

**\*4** Plaintiff has not asked for leave to amend his complaint if the Defendants' motion to dismiss is granted. Even construing Plaintiff's complaint liberally, Plaintiff's claims are so substantively deficient that better pleading will not cure them, and thus dismissal with prejudice is appropriate. *See Cuoco,* 222 F.3d at 112 ("The problem with [plaintiff's] causes of action is substantive; better pleading will not cure [the complaint]. Repleading would thus be futile.") For this reason, the Complaint is dismissed with prejudice.

## III. CONCLUSION [3]

[3]   Because Plaintiff's claims fail on the merits, the Court does not address all grounds set forth in Defendants' motion to dismiss.

For the foregoing reasons, Defendants' motion to dismiss pursuant to Rule 12(b)(6) [dkt. no. 17] is GRANTED. The Complaint is dismissed with prejudice. The Clerk of Court is directed to close this case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3776167

---

**End of Document**          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3776707
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Anthony E, MYERS, Plaintiff,
v.
The CITY OF NEW YORK, Warden Evelyn
Maribal, and Michael Bloomberg, Defendants.

No. 11 Civ. 8525(PAE).
|
Aug. 29, 2012.

*OPINION & ORDER*

PAUL A. ENGELMAYER, District Judge.

**\*1** Plaintiff Anthony E. Myers, proceeding *pro se,* brings various claims, pursuant to 42 U.S.C. § 1983, stemming from his detention at a New York City Department of Correction ("DOC") correctional facility. Defendants The City of New York (the "City"), Warden Evelyn Maribal, and Mayor Michael Bloomberg move to dismiss Myers's Complaint. For the reasons discussed below, defendants' motion is granted. Myers's Complaint is dismissed without prejudice to re-filing upon exhaustion of his administrative remedies.

**I. Background**

**A. Facts** [1]

[1]  The Court's account of the underlying facts in this case is drawn from the Complaint ("Compl.") (Dkt.2). On a motion to dismiss, the Court takes all facts pleaded in the Complaint as true.

Myers is currently a pretrial detainee at the Otis Bantum Correctional Center ("OBCC"), a DOC facility. Myers's bail is set at $200,000; because he has been unable to make bail, he remains in custody. When Myers arrived at OBCC on August 1, 2011, he was held in "an over-crowded, non-air[-]conditioned holding pen for over 16" hours. The holding cell had a "urine and filth laden floor" on which Myers had to sit, along with 40 other men. Instead of being given a cup from which to drink, while in the holding cell, Myers was given a "plastic

glove," and instructed to poke holes in the fingers and drink water from the glove. The officers guarding the cell used derogatory language while talking to and about the inmates, including, "nigger, faggot, and any other derogatory profanity you could imagine." Before being moved from the holding cell into his own cell, Myers was strip searched, and was subsequently strip searched on four other occasions.

Myers is currently being held in what he describes as an overcrowded "dorm environment" with 60 inmates. The inmates share five toilets and five sinks, which Myers alleges is inadequate. In addition to the alleged overcrowding itself, Myers also complains of problems stemming from it: Visitors face long wait times, and sometimes leave; supplies such as "clothes, shoes, soap, razors and other items" are depleted or unavailable; and laundry services are non-existent, such that the sheets on which he sleeps are "rust-laden." On at least one occasion, the tier in which Myers is housed was denied access to the law library "as a result of 2 consecutive searches." [2]

[2]  Although Myers does not allege exclusion from the law library in the text of his Complaint, he does attach a grievance including these allegations, dated November 9, 2011, which is incorporated into the Complaint.

Myers filed grievances at OBCC about issues relating to overcrowding, laundry, excessive bail, strip searches, and access to the law library. He did not appeal or otherwise follow up on these grievances, explaining that he "was told that filing a grievance was futile and a waste of time" by prison officials, and because "[i]t is obvious that the issues in this complaint are much larger than the grievance protocol."

Myers alleges that the overcrowding is a direct result of "aggressive policing in minority neighborhoods," "ag[g]ressive Stop and Frisk programs," and corruption, including the planting of drugs on arrestees, on the part of the City and the New York City Police Department, at the direction of Mayor Bloomberg and Police Commissioner Raymond Kelly. In support of his arguments, Myers attaches multiple newspaper articles to his Complaint.

**B. Procedural History**
**\*2**  On November 18, 2011, Myers filed his Complaint in this action (Dkt.2). He alleges (1) excessive bail;

(2) violation of consent decrees; (3) overcrowding, and various allegedly unconstitutional and inhumane prison conditions stemming from overcrowding, including a period spent in an unsanitary holding cell, depleted hygienic supplies, lack of access to laundry, and long wait times for visitors; (4) violation of the City's minimum standards for confinement conditions; (5) verbal abuse; (6) unconstitutional strip searches; and (7) denial of access to the law library. He seeks $5 million in damages, as well as injunctive relief.

On February 6, 2012, defendants filed a motion to dismiss (Dkt.12). [3] On March 16, 2012, Myers filed his opposition to the motion (Dkt.22); defendants replied on March 29, 2012 (Dkt.23).

[3]    At the time defendants filed their motion, counsel for defendants did not know whether service had been executed on defendant Mayor Bloomberg, and so the motion was filed on behalf of the City and Maribal only. Upon learning that Mayor Bloomberg had been served, defendants sought to include him among the defendants moving to dismiss, a request which this Court granted (Dkt.27).

## II. Legal Standard on a Motion to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Despite the well-established rule in this circuit that *pro se* submissions are to be liberally construed and interpreted to raise "the strongest arguments they suggest," *see Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006), the plausibility standard applies equally to *pro se* complaints. *See Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011).

To state a claim for relief that is facially plausible, an allegation must be "more than an unadorned, the-defendant-unlawfully-harmed me accusation"; a claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Accordingly, where a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570.

In making that determination, the Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus,* 433 F.3d 248, 249–50 (2d Cir.2006) (internal quotation marks and citation omitted). On the other hand, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678; *see also Twombly,* 550 U.S. at 555 (a court is " 'not bound to accept as true a legal conclusion couched as a factual allegation' ") (quoting *Papasan v. Allain,* 478 U.S. 265, 286 (1986)).

## III. Discussion

### A. Excessive Bail

Myers argues that his bail, currently set at $200,000, is excessive, in violation of the Eighth Amendment, which states that "excessive bail shall not be required." U.S. CONST. AMEND. VIII. To the extent Myers purports to bring a habeas petition challenging his confinement, under either 28 U.S.C. § 2241 or 28 U.S .C. § 2254, [4] his petition is denied. Under both §§ 2241 and 2254, "a petitioner seeking relief from state court detention is required to exhaust state remedies before his federal habeas corpus petition will be considered." *King,* 2011 WL 3471548, at *1 (citing 28 U.S.C. § 2254(b)(1)(A); *U.S. ex rel. Scranton v. N.Y.* 532 F.2d 292, 294 (2d Cir.1976)). " 'State remedies are deemed exhausted when a petitioner has; (i) presented the federal constitutional claim asserted in the petition to the highest state court (after preserving it as required by state law in lower courts) and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim.' " *Smith v. McGinnis,* No. 01–cv–1363, 2008 WL 5203726, at *4 (S.D.N.Y. Dec. 11, 2008) (quoting *Ramirez v. Attorney Gen. of State of N.Y.* 280 F.3d 87, 94 (2d Cir.2001)). Myers has not challenged his bail through the New York State courts before bringing his claim here. Accordingly, his claim for excessive bail is dismissed, without prejudice to re-filing if and when Myers can demonstrate that he has exhausted state remedies.

[4]    It is an open question in this Circuit whether a petition seeking habeas corpus relief from pretrial state detention is more properly brought under § 2241 or § 2254. *See King v. Demarco,* No. 11–cv–2000,

2011 WL 3471548, at *1 (E.D.N.Y. Aug. 3, 2011) (collecting authorities).

### B. Section 1983 Claims Against Defendant Maribal

**\*3** As to the remainder of Myers's claims, his submissions reflect an intent to bring claims pursuant to 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citing *City of Okla. City v. Tuttle,* 471 U.S. 808, 816 (1985)). "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone,* 634 F.3d 642, 644 (2d Cir.2011) (citing *Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir.2002) (per curiam)); *see also Ross v. Westchester Cnty. Jail,* No. 10–cv–3937, 2012 WL 86467, at *9 (S.D.N.Y. Jan. 11, 2012). "A defendant's conduct must therefore be a proximate cause of the claimed violation in order to find that the individual defendant deprived the plaintiff of his rights." *Ross,* 2012 WL 86467, at *9 (citing *Martinez v. California,* 444 U.S. 277, 285 (1980)). Additionally, where, as here, a plaintiff is seeking money damages against the defendants, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite" to recovery under § 1983. *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (citing *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006)).

Myers does not allege anywhere in the Complaint that defendant Maribal, the warden at OBCC, was personally involved in any of the incidents which give rise to this suit. Other than in the caption and in section I.B (in which plaintiff is instructed to list the defendants to his action), her name appears nowhere in the Complaint. *See Barnes v. Pozzi,* No. 10–cv–2554, 2012 WL 3155073, at *8 (S .D.N.Y. Aug. 3, 2012) (dismissing, for lack of personal involvement, two § 1983 defendants who were not mentioned anywhere in the allegations of the complaint). In his affirmation opposing the motion to dismiss (Dkt.22), Myers argues that, because Maribal is the warden, and therefore "responsible for overall policy adherence/compliance" in OBCC, "disregard of minimum standards and detainees['] constitutional rights would have been [her] direct responsibility." However, a "prison official cannot be personally liable under § 1983 on the basis of respondeat superior or simply because he is atop the prison hierarchy." *Lozada v. Warden Downstate*

*Corr. Facility,* No. 10–cv–8425, 2012 WL 2402069, at *3 (S.D.N.Y. June 26, 2012) (citing *Colon v. Coughlin,* 58 F.3d 865, 873–74 (2d Cir.1995)). Accordingly, Myers's § 1983 claims against Maribal are dismissed, with prejudice, in their entirety.

### C. Failure to Exhaust Administrative Remedies [5]

[5]    Because the Court dismisses Myers's Complaint for failure to exhaust, the Court does not reach defendants' argument that Myers committed perjury on his application to proceed *in forma pauperis.* However, if Myers can, in the future, demonstrate exhaustion, and does re-file those claims in his Complaint which are not herein dismissed with prejudice, he is admonished that failure to report *any* income, including monetary gifts, on his *in forma pauperis* application will result in the dismissal of all claims with prejudice.

The Prison Litigation Reform Act ("PLRA") requires an inmate to exhaust all available administrative remedies before bringing a § 1983 action. *See* 42 U.S.C. § 1997e(a). "This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim." *Simmons v. Bezio,* No. 11–cv–753, 2012 WL 3054127, at *2 (N.D.N.Y. June 21, 2012) (citing *Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004)) (additional citations omitted). Inmates must exhaust their administrative remedies even if they are seeking only money damages not available in prison administrative proceedings. *Giano,* 380 F.3d at 675. Under the PLRA, " '[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.' " *Dennis v. Westchester Cnty. Jail Corr. Dep't,* No. 11–cv–1452, 2012 WL 2125837, at *1 (2d Cir. June 13, 2012) (summ.order) (quoting 42 U.S.C. § 1997e(a)). This language from the PLRA is, in fact, recited verbatim in the seven-page form on which Myers filed his Complaint. "If nonexhaustion is clear from the face of the complaint (and incorporated documents), a motion to dismiss pursuant to Rule 12(b) (6) for failure to exhaust should be granted." *McCoy v. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003).

**\*4** Failure to exhaust is an affirmative defense. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004), *overruled on other grounds*

by *Woodford v. Ngo,* 548 U.S. 81 (2006). It must be raised by a defendant, and it is the defendant's burden to prove that the plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted). The Second Circuit has identified a number of circumstances under which administrative exhaustion is not mandatory, *i.e.,* when

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The correctional facility's requirements, and not the PLRA, "define the boundaries of proper exhaustion." *Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir.2009). Because OBCC, where Myers is confined, is a DOC facility, his administrative remedies are covered by the DOC's five-step Inmate Grievance Resolution Program (the "IGRP").[6] *See* DOC Directive 3375R–A. The IGRP requires an inmate to: (1) file an informal complaint with the Inmate Grievance Resolution Committee ("IGRC"); (2) in the event that informal resolution is not reached within five days, request a formal hearing before the IGRC; (3) appeal any unfavorable decision by the IGRC to the Commanding Officer; (4) appeal any unfavorable decision by the Commanding Officer to the Central Office Review Committee; and (5) appeal any unfavorable decision from the Central Office Review Committee to the New York City Board of Correction. *See Martin,* 2012 WL 1392648, at *5; *Mamon,* 2012 WL 260287, at *3; *see also, e.g., Reuben v. N.Y. City Dep't of Corr.,* No. 11–cv–378, 2011 WL 5022928, at *2 (S.D.N.Y. Oct. 18, 2011); *Chisholm v. N.Y. City Dep't of Corr.,* No. 08–cv–8795, 2009 WL 2033085, at *1 (S.D.N.Y. July 13, 2009). "An inmate's administrative remedies are not exhausted until he proceeds through all five levels of the IGRP." *Houston v. Horn,* No. 09–cv–801, 2010 WL 1948612, at *6 (S.D.N.Y. May 13, 2010); *see also Martin,* 2012 WL

1392648, at *5; *Williams v. Dep't of Corr.,* No. 11–cv–1515, 2011 WL 3962596, at *10 (S.D.N.Y. Sept. 7, 2011) (internal quotations omitted).

[6]  The Court takes judicial notice of the IGRP, as courts in this Circuit regularly do. *See Martin v. City of N.Y.,* No. 11–cv–600, 2012 WL 1392648, at *5 n. 2 (S.D.N.Y. Apr. 20, 2012); *see also Mamon v. N.Y. City Dep't of Corr.,* Nos. 10–cv–8055 et al., 2012 WL 260287, at *3 n. 4 (S.D.N.Y. Jan. 27, 2012); *Swanston v. Dep't of Corr.,* No. 11–cv–1219, 2011 WL 5105489, at *2 (S.D.N.Y. Oct. 27, 2011). The DOC's website also contains a link describing the IGRP. *See* City of New York Dep't of Corr., Inmate Grievance Resolution Program Directive, http:// www.nyc.gov/ html/doc/downloads/pdf/3375R-A.pdf.

Myers claims that he took the initial step of filing an informal complaint with the IGRC regarding access to the law library, strip searches, excessive bail, overcrowding, and laundry. As to his other claims, he does not even allege to have initiated the grievance procedure. As to no claims does Myers allege to have exhausted his administrative remedies. In fact, he admits the opposite; In his Complaint, Myers argues that the IGRP is an inappropriate venue for his claims, because "[i]t is obvious that the issues in this complaint are much larger than the grievance protocol." However, Myers's belief that his claims are too important to be handled by the IGRP does not excuse his failure to exhaust the administrative remedies that he acknowledges were available.

***5** Myers also states that he "was told that filing a grievance was futile and a waste of time by general officers and officers of rank." "It is well established that the PLRA's exhaustion requirement cannot be waived based upon the plaintiff's belief that pursuing administrative remedies would be ineffective or futile." *Berry v. City of N.Y.,* No. 00–cv–2834, 2002 WL 31045943, at *7 (S.D.N.Y. June 11, 2002) (collecting cases). It is true that a "defendant can be estopped from asserting an affirmative defense of failure to exhaust where ... the defendant takes some action to inhibit an inmate from exhausting his administrative remedies[.]" *Williams,* 2011 WL 3962596, at *5; *see also Veloz v. N.Y.,* 339 F.Supp.2d 505, 515 (S.D.N.Y.2004) (collecting cases). But vague allegations that unnamed "officers" told Myers that filing a grievance was a waste of his time are insufficient to excuse him from having to file a grievance. *See Dixon v. Laboriel,* No. 01–cv–3632, 2010 WL 2365860, at *4 (S.D.N.Y. June 10,

2010) ("the alleged ineffectiveness of the administrative remedies that are available does not absolve a prisoner of his obligation to exhaust such remedies"); *Johnson v. Killian,* No. 07–cv–6641, 2009 WL 1066248, at *5 (S.D.N.Y. Apr. 21, 2009) ("a prediction of denial, even if wholly reasonable, does not warrant depriving the prison administration of the opportunity to address the claim in the first instance, a paramount goal of the PLRA"); *see also Woodford v. Ngo,* 548 U.S. 81, 89–90 (2006) (statutes requiring exhaustion serve an important purpose in situations where "[a]ggrieved parties may prefer not to exhaust administrative remedies for a variety of reasons").

Because Myers does not plausibly allege that his failure to exhaust falls within any of the three exceptions recognized in this Circuit, his claims against defendants the City and Mayor Bloomberg are dismissed.

The Court now considers whether these dismissed claims are properly dismissed with or without prejudice to re-filing if Myers does, in the future, exhaust his administrative remedies.

**D. Consent Decrees**

Myers first alleges that the conditions of his confinement violate consent decrees put into place by the Hon. Morris E. Lasker. The Court surmises that these are references to consent decrees regarding Rikers Island facilities entered by Judge Lasker, and later administered by the Hon. Harold Baer, Jr., in *Benjamin v. Horn,* No. 75–cv–3073, and related cases. In *Benjamin v. Fraser,* 161 F.Supp.2d 151 (S.D.N.Y.2001), Judge Baer terminated those provisions of the consent decrees relevant to Myers's allegations. *Id., aff'd in relevant part and rev'd in part,* 343 F.3d 35 (2d Cir.2003) (continuing only those portions of the consent decrees pertaining to ventilation, bed-spacing, lighting, and food service areas); *see also Patterson v. City of N.Y.,* No. 11–cv–7976, 2012 WL 3264354, at *5 (S.D.N.Y. Aug. 9, 2012) (discussing termination of Lasker consent decrees). Myers's claims that the conditions at OBCC violate consent decrees in this district are, therefore, dismissed with prejudice.

**E. Fourteenth Amendment**

 **\*6** Myers, as a pretrial detainee in a municipal jail, makes claims relating to the conditions of his confinement at OBCC which are deemed to arise under the Due Process Clause of the Fourteenth Amendment. *Patterson,* 2012

WL 3264354, at *5. "Due process requires that a pretrial detainee not be punished." *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16 (1979). Therefore, in assessing whether a pretrial detainee's challenges to the conditions of his confinement violate due process, "the proper inquiry is whether those conditions amount to punishment." *Id. at 535.* Courts make this determination by examining "whether the restrictions or conditions 'are rationally related to a legitimate nonpunitive governmental purpose and whether they appear excessive in relation to that purpose.' " *Patterson,* 2012 WL 3264354, at *5 (quoting *Bell,* 441 U.S. at 561). In doing so, courts must be mindful that " 'prison administrators [are to be] accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' " *Patterson,* 2012 WL 3264354, at *5 (quoting *Bell,* 441 U.S. at 547).

*1. Overcrowding*

Myers alleges that the holding cell where he was placed upon entry to OBCC and the dormitory in which he is currently housed are overcrowded. He claims that the conditions in which he is housed violate the City's minimum standards, in that: (1) there are 60 detainees housed in an area designed to hold 50; (2) there are 5 sinks, but there should be 6; and (3) there are 5 toilets, but there should be 7. *See* 40 R.C.N.Y. § 1–04(c)(5)(i) ("A multiple occupancy area shall house no more than ... 50 detainees."; *id.* § 1–04(c)(3) ("A multiple-occupancy area shall provide a minimum of one operable toilet and shower for every 8 prisoners and one operable sink for every 10 prisoners.").

The violation of minimum City standards as to occupancy does not, on its own, violate Myers's constitutional due process rights. *See Brown v. Plata,* 131 S.Ct. 1910, 194445 (2011); *Bell,* 441 U.S. at 542; *Patterson,* 2012 WL 3264354, at *6. "[C]ourts must not confuse professional standards with constitutional requirements," *Brown,* 131 S.Ct. at 1944, [7] and overcrowding amounts to punishment only when a detainee is subjected "over an extended period to genuine privations and hardship not reasonably related to a legitimate governmental objective." *Lareau v. Manson,* 651 F.2d 96, 103 (2d Cir.1981).

[7]    Absent explicit "substantive limitations on official discretion," state regulations do not create liberty

2012 WL 3776707

interests enforceable under the Due Process Clause. *Patterson,* 2012 WL 3264354, at *4 (quoting *Ky. Dep't of Corr. v. Thompson,* 490 U.S. 454, 461 (1989) (citing *Edwards v. Johnson,* 209 F.3d 772, 779 (5th Cir.2000); *Hovatar v. Robinson,* 1 F.3d 1063, 1068 n. 4 (10th Cir.1993)). The New York City minimum standards to which Myers cites contain no such substantive limitations on official discretion, and therefore create no liberty interest cognizable under the federal constitution. *See Patterson,* 2012 WL 3264345, at *4. Accordingly, Myers's myriad claims as to defendants' failure to meet various City minimum standards are dismissed, with prejudice.

Because Myers's complaints of overcrowding and an insufficient number of sinks and toilets do not reach the level of a constitutional violation of his due process rights, these claims are dismissed, with prejudice.

### 2. Holding cell conditions

Myers alleges that, prior to being placed in the dormitory where he is currently housed, he was in a holding cell for over 16 hours. The only place to sit in the cell was on "a urine and filth laden floor," and the cell was not air-conditioned. Detainees were not given cups to drink water from, but rather had to drink from latex gloves.

**\*7** While it may have been uncomfortable for Myers to be held in a warm room without air-conditioning for 16 hours, it does not rise to the level of a constitutional violation. *See, e.g., Hall v. Perilli,* No. 03–cv–4635, 2004 WL 1068045, at *8 (S.D.N.Y. May 13, 2004) (Report & Recommendation) (collecting cases in which temporary intemperate conditions, unaccompanied by serious medical needs, are insufficient to state a constitutional violation). "[T]he Constitution does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981), and to recover on a claim of unsanitary prison housing conditions, a plaintiff must allege that he was denied " 'the minimal civilized measure of life's necessities.' " *Carr v. Canty,* No. 10–cv–3892, 2012 WL 3578742, at *3 (S.D.N.Y. Aug. 16, 2012) (quoting *Rhodes,* 452 U.S. at 347). A detainee who is regularly forced to sleep on the floor or on a filthy surface, or who is housed for a sustained period of time in filthy conditions, may state a claim for unconstitutionally unsanitary conditions; however, courts have only found such claims in situations that lasted at least for multiple days. *See Gaston v. Coughlin,* 249 F.3d 156, 166 (2d Cir, 2001) (possible constitutional violation where prison

left uncleaned for days a corridor littered with human excrement, despite multiple inmate complaints); *McCord v. Maggio,* 927 F.2d 844, 847 (5th Cir.1991) (constitutional violation where detainee regularly had to spend nights either standing up or lying on a mattress placed on a floor covered in sewage water); *LaReau v. MacDougall,* 473 F.2d 974, 977–79 (2d Cir.1972) (five days in small cell with no toilet facilities constitutes a constitutional violation). Here, Myers alleges that his confinement in the holding cell lasted approximately 16 hours, and he makes no claim that the unsanitary conditions continue in the cell in which he is now placed. Discomfort of this short duration does not rise to the level of a constitutional violation. *See Wang v. Vahldieck,* No. 09–cv–3783, 2012 WL 119591, at *9 (E.D.N.Y. Jan. 9, 2012) ("temporary or limited exposure to unsanitary conditions fails to state an injury of constitutional magnitude") (citing *Ortiz v. Dep't of Corr.,* No. 08–cv–2195, 2011 WL 2638137, at *7 (S.D.N.Y. Apr. 29, 2011) (Report & Recommendation) (collecting cases)). Nor does Myers's claim that, while in the holding cell, he was given a medical glove to drink out of, instead of a cup. Depriving detainees of "basic human needs," such as "food, clothing, shelter, medical care and reasonable safety," may violate the constitution. *Helling v. McKinney,* 509 U.S. 25, 32 (1993). Because Myers does not claim that he went without water, but only that it was offered in a less-than-ideal vessel for the 16 hours he was in the holding cell, there is no possible constitutional violation.

Because the conditions alleged by Myers while he was in the holding cell for 16 hours do not rise to the level of a constitutional violation of his due process rights, these claims are dismissed with prejudice.

### 3. Depleted hygienic supplies

**\*8** Myers claims that, due to overcrowding, toiletries, including "soap, razors and other items are quickly depleted or not available ." "The failure to regularly provide prisoners with ... toilet articles including soap, razors, combs, toothpaste, toilet paper, access to a mirror and sanitary napkins for female prisoners constitutes a denial of personal hygiene and sanitary living conditions." *Atkins v. Cnty. of Orange,* 372 F.Supp.2d 377, 406 (S.D.N.Y.2005) (internal quotations marks and citations omitted). However, "[c]ourts are extremely reluctant ... to find constitutional violations based on temporary deprivations of personal hygiene and grooming items." *Benjamin,* 161 F, Supp.2d at 175–76 (internal quotation

2012 WL 3776707

marks & citations omitted) (collecting cases); *see also, e.g., Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003) (deprivation of toiletries for two weeks does not rise to the level of a constitutional violation). The vague allegations in Myers's Complaint are insufficient, as written, to allege a constitutional violation. On the face of the Complaint it is not even clear that Myers himself has gone without toiletries items, let alone for a significant period of time. Accordingly, this claim is dismissed, without prejudice to re-filing if (1) Myers can demonstrate that he has exhausted his administrative remedies, and (2) Myers can plead, with sufficient specificity, that he has been deprived of hygienic items repeatedly, and/or for an extended period of time.

#### 4. Lack of access to laundry

Myers alleges that clean clothes are in short supply and that, due to lack of access to laundry facilities, he has had to sleep on "rust laden sheets for over a month." Prisoners are entitled, under the constitution, to clothing and linens that are clean, or to the opportunity to clean such items themselves. *Benjamin,* 161 F.Supp.2d at 178 (collecting cases); *Patterson,* 2012 WL 3264354, at *8. While Myers does claim that laundry service at OBCC has ceased, and that clean clothes are in short supply, he does not allege that he has been denied to opportunity or the means to clean his linens or clothes himself, and thus does not allege a due process violation. *Patterson,* 2012 WL 3264354, at *8. This claim is dismissed, without prejudice to re-filing if (1) Myers can demonstrate that he has exhausted his administrative remedies and (2) Myers can plead, with sufficient specificity, that he has been deprived of any means by which to obtain clean clothes and/or linens.

#### 5. Long wait times for visitors

Myers's Complaint claims that, because OBCC is above-capacity, "[v]isits take longer to facilitate, [which] frustrates my and other visitors [until] they leave out of frustration" from having waited so long. "[L]imitations on visits that are reasonably related to a legitimate penological interest do not violate" a detainee's constitutional rights. *Patterson,* 2012 WL 3264354, at *7 (citing *Block v. Rutherford,* 468 U.S. 576, 585–89 (1984)). Facilities, such as OBCC, have a legitimate penological interest in establishing a rigorous registration process in order to safely coordinate and accurately track visits between those inside and those beyond their walls. While it is true that the withdrawal of visitation privileges

for extended periods of time, or for arbitrary reasons, may implicate a detainee's due process rights, *Overton v. Bazzetta,* 539 U.S. 126, 137 (2003), the fact that some visitors leave before clearing OBCC's registration process does not convert Myers's claim into a constitutional one. As Myers does not allege that OBCC's process is arbitrary, or that his visitation privileges have been revoked, this claim is dismissed, with prejudice.

#### F. Verbal Abuse

**\*9** Myers alleges that, while placed in the holding cell, the correction officers used profane language. "[V]erbal harassment or profanity alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and is therefore not actionable," *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *see also Vogelfang v. Capra,* No. 10–cv–3827, 2012 WL 832440, at *11 (S.D.N.Y. Mar. 13, 2012) (collecting cases). Accordingly, Myers' verbal abuse claim is dismissed, with prejudice.

#### G. Strip Searches

Myers claims he was strip searched five times—once before being placed in his cell, and four times upon leaving OBCC to appear in court. He argues that such suspicionless strip searches are unconstitutional when performed upon a non-felony detainee, such as himself.

"The Fourth Amendment prohibits only unreasonable searches." *Bell,* 441 U.S. at 558. In determining the reasonableness of a search, courts must "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id,* at 559. In the setting of a jail or prison, "correctional officers must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities," and deference must be given to such officers' judgment "unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington,* 132 S.Ct. 1510, 1517 (2012) (citing *Bell,* 441 U.S. at 546); *Id,* at 1518 (quoting *Block v. Rutherford,* 468 U.S. 576, 584– 85 (1984)). In *Florence,* the Supreme Court found that a suspicionless strip search of a detainee arrested on a non-serious crime conducted prior to his introduction into the general jail population was reasonable. Myers's

argument, therefore, that officers' strip searching him upon his original entry into OBCC, and upon leaving OBCC to appear in court, is unconstitutional because he is a non-felony detainee, fails. The Fourth Amendment does not require correctional officials to exempt some detainees —*e.g.,* those arrested on a non-felony charge—who will be admitted to a jail's general population from strip searches, and, under the standard outlined in *Florence,* the searches to which Myers was subjected were "reasonably related to legitimate security interests," including preventing the smuggling of contraband into or out of OBCC. *Florence,* 132 S.Ct. at 1516–17. Myers's unconstitutional strip search claims are dismissed, with prejudice.

**H. Law Library Access**

Myers alleges that the tier in which he is housed, "5upper," was denied access to the law library on one occasion "as a result of 2 consecutive searches." As an initial matter, it is unclear from Myers's allegation whether Myers himself sought and was denied access to the library, or whether he only heard, through another detainee in his tier, that 5upper was not allowed to use the law library; if it is the latter, Myers lacks standing to bring this claim. However, even assuming, *arguendo,* that Myers himself was denied access to the law library on this one occasion, he still does not have standing to bring a claim of denial of access to courts.

**\*10** The Constitution guarantees confined individuals meaningful access to courts, which, in the case of *pro se* litigants, includes access to a facility's law library, or to an alternative source of legal information. *See Bounds v. Smith,* 430 U.S. 817, 828 (1977); *Pollack v. Holanchock,* No. 10–cv–2402, 2012 WL 1646893, at \*2 (S.D.N.Y. May 10, 2012). "Because law libraries and legal assistance programs do not represent constitutional rights in and of themselves, but only the means to ensure 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts,' prisoners must demonstrate 'actual injury' in order to have standing." *Benjamin v. Fraser,* 264 F.3d

175, 185 (2d Cir.2001) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 (1996)). Here, Myers alleges only that his tier was denied access to the law library on one occasion; he does not assert that it had any cognizable effect on his ability to pursue litigation. Furthermore, access to legal assistance need not be unfettered, and facilities "may place reasonable restrictions on inmates' use of facility law libraries as long as those restrictions do not interfere with inmates' access to the courts." *Melendez v.. Haase,* No. 04– cv–73, 2010 WL 5248627, at \*7 (S.D.N.Y. Dec. 15, 2010) (internal quotation marks and citation omitted). A one-time restriction on access to the law library does not rise to the level of unconstitutional obstruction of access to courts. This claim is dismissed, with prejudice.

**CONCLUSION**

Defendants' motion to dismiss is GRANTED in its entirety. The following claims are dismissed with prejudice: (1) all § 1983 claims against defendant Maribal; (2) failure to comply with consent decrees; (3) failure to follow minimum standards; (4) overcrowding; (5) insufficient number of sinks and toilets; (6) unconstitutional conditions in the holding cell; (7) long wait times for visitors; (8) verbal abuse; (9) unconstitutional strip search; and (10) access to law library. The following claims are dismissed without prejudice to re-filing, if Myers can demonstrate exhaustion of the appropriate underlying procedures and plead his allegations with sufficient particularity: (1) excessive bail; (2) depleted hygienic supplies; and (3) lack of access to laundry. The Clerk of Court is directed to terminate the motion at docket number 12, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3776707

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Cruz v. Jackson, Not Reported in F.Supp. (1997)

1997 WL 45348

1997 WL 45348
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Raymond CRUZ, Plaintiff,
v.
Norwood JACKSON, Commissioner
Department of Correctional Services
County of Westchester; R.L. Davis, Warden,
Westchester County Jail, Defendants.

No. 94 Civ. 2600 (RWS).
|
Feb. 5, 1997.

**Attorneys and Law Firms**

Raymond Cruz, Dannemora, NY, Pro Se.

Marilyn J. Slatten, Westchester County Attorney, White Plain, NY, for Defendants; Kyle C. McGovern, Assistant County Attorney, of counsel.

*OPINION*

SWEET, District Judge.

**\*1** In this prisoner's civil rights action brought pursuant to 42 U.S.C. § 1983, defendants Westchester County Department of Corrections ("the County"), Norwood Jackson ("Jackson") and R.L. Davis ("Davis") (collectively, the "Defendants") move, pursuant to Rules 12(b)(6) and 41(b), Fed.R.Civ.P., to dismiss the complaint of *pro se* plaintiff Raymond Cruz ("Cruz") for failure to prosecute and failure to state a claim. Cruz has also requested appointment of counsel. For the reasons set forth below, the Defendants' motion to dismiss will be granted in part and denied in part. This case will also be referred to the Pro Se Office for assignment of *pro bono* counsel in accordance with the procedures of the Pro Se Office.

*Parties*

*Pro se* Plaintiff Cruz was, at all times relevant to the complaint, an inmate at the Westchester County Jail.

Defendant Westchester County Department of Correction operates the Westchester County Jail. The Department of Correction is an entity of Westchester County.

Defendant Jackson is Commissioner of the Westchester County Department of Correction. Defendant Davis is Warden of the Westchester County Jail.

*Facts and Prior Proceedings*

On April 12, 1994, Cruz commenced this action based on alleged violations of 42 U.S.C. § 1983. The complaint alleges that following an "incident" in the Westchester County Jail on August 15, 1993: (1) Cruz was placed in "keep-lock" (i.e., confinement to his cell) for an unspecified period of time without being charged with "anything to deserve this keep lock"; (2) the Defendants took and did not return Cruz's clothing and other personal items; (3) Cruz was beaten "badly"; (4) Defendants denied Cruz medical treatment; (5) Cruz was denied safe and healthful living conditions (including ventilation, hot food, showers, and clean drinking and bathing water); (6) Defendants denied Cruz access to religious services from August 15 to August 30, 1993; (7) Cruz's mail was tampered with or not delivered; (8) Cruz was denied legal phone calls for two weeks; and (9) Cruz was denied visitation for one week and had his visitation privileges restricted thereafter. Cruz also alleged that the two individual defendants threatened to keep him in keep-lock "forever." Davis allegedly called Cruz a dog.

On September 7, 1994, Defendants served discovery demands on Cruz, including interrogatories, document demands, a demand for medical records and authorization to release medical records, and a request for "discovery and inspection of expert." Several requests for extensions of the discovery deadline were made by the parties and granted by this Court. On May 20, 1996, this Court granted Cruz an extension of time to respond to discovery demands and file a pretrial order no later than July 31, 1996. The May 20 Order indicated that if the pretrial order was not filed by July 31, the case would be "subject to dismissal for failure to prosecute."

**\*2** On June 5, 1996, Cruz responded to Defendants' interrogatories and executed an authorization to release medical records. On August 1, 1996, this Court received Cruz's pretrial order.[1] An executed affidavit of service

**Cruz v. Jackson, Not Reported in F.Supp. (1997)**
Case 9:17-cv-00194-TJM-TWD    Document 233    Filed 09/05/17    Page 165 of 211

1997 WL 45348

dated July 23, 1996 indicates that the pretrial order was served by mail upon Defendants. Cruz failed to respond to the remaining discovery demands prior to July 31. Defendants filed the instant motion on July 31, 1996. Cruz failed to respond to the motion by the original return date of August 28, 1996. By order dated September 16, 1996, this Court adjourned the return date to October 23, 1996, warning Cruz that failure to respond could result in dismissal. On October 21, 1996, Cruz served opposition papers, along with responses to Defendants' interrogatories, request for documents and for medical records and authorization. Defendants' reply brief was received by this Court on October 24, 1996, at which time the motion was deemed fully submitted.

1    In a cover letter accompanying the pretrial order, Cruz requested assignment of counsel.

*Discussion*

I. *The Action Will Not Be Dismissed Pursuant to* Rule 41(b)

Rule 41(b) provides in part: "[f ]or failure of the plaintiff to prosecute or to comply with ... any order of court, a defendant may move for dismissal of an action or of any claim against the defendant."

While a determination to dismiss an action for lack of prosecution is within the discretion of the district court, such a dismissal is a harsh remedy to be used only in extreme situations. *Minnette v. Time Warner,* 997 F.2d 1023, 1027 (2d Cir.1993). A court should be especially reluctant to dismiss an action brought by a *pro se* plaintiff, particularly where there is indication of a good faith effort to pursue the litigation. *See id.* (district court abused discretion in dismissing *pro se* action where plaintiff had diligently prosecuted case prior to three month delay, and defendants failed to show prejudice); *see also Stewart v. United States Postal Service,* 649 F.Supp. 1531, 1535 (S.D.N.Y.1986) (*pro se* plaintiffs must be allowed particular grace before their claims are dismissed for failure to prosecute) (citing *Romandette v. Weebatix Co.,* 807 F.2d 309 (2d Cir.1986)). Dismissal for discovery failures, such as those in this case, is also only to be used in extreme situations. *Simmons v. Abruzzo,* 49 F.3d 83, 88 (2d Cir.1995).

While Cruz has failed to meet discovery deadlines set by this Court, his conduct has not been sufficiently extreme to warrant dismissal at this juncture. Cruz has submitted a pretrial order and has now complied with all of the Defendants' discovery demands, with the exception of the request for expert discovery. It appears from Cruz's pretrial order that he does not propose to introduce expert testimony. The fact that Cruz has been in lock-down and transferred to another facility during the pendency of this action also counsels leniency toward Cruz's delays. While Defendants may be somewhat prejudiced by the delays in discovery in this case, courts have declined to dismiss cases where even more egregious dilatory tactics and frustration of court orders took place. *See e.g., Jones v. Smith,* 99 F.R.D. 4, 14–15 (M.D.Pa.1983) (granting *pro se* plaintiff final opportunity to comply with orders of court, despite repeated wilful, dilatory and contumacious tactics), *aff'd* 734 F.2d 6 (3d Cir.1984).

**\*3** Accordingly, the action will not be dismissed for failure to prosecute or failure to comply with court orders.

II. *The Motion to Dismiss for Failure to State a Claim Will Be Granted In Part and Denied In Part*

Rule 12(b)(6) imposes a substantial burden upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957). The factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the defendants. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). *Pro se* complaints are to be construed particularly liberally on a motion to dismiss, *Haines v. Kerner,* 404 U.S. 519, 520 (1972), especially when civil rights violations are alleged. *See Morgan v. LaValle,* 526 F.2d 221, 224 (2d Cir.1975). A *pro se* litigant's submissions are to be interpreted "to raise the strongest arguments they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

Section 1983 imposes liability for acts under color of state law that deprive a plaintiff of "rights, privileges or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must allege that the conduct complained of was committed by a person acting under color of state law and

Cruz v. Jackson, Not Reported in F.Supp. (1997)

Case 9:17-cv-00194-TJM-TWD   Document 233   Filed 09/05/17   Page 166 of 211

1997 WL 45348

that the conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States. *See Parratt v. Taylor,* 451 U.S. 527, 535 (1981); *Eagleston v. Guido,* 41 F.3d 865, 875–76 (2d Cir.1994).

There is no heightened pleading burden under Section 1983. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993). The function of pleadings under the Federal Rules is to give fair notice of the claims asserted to enable a defendant to answer and prepare for trial, allow the application of *res judicata,* and identify the nature of the case so it may be assigned the proper form of trial. *Simmons,* 49 F.3d at 86.

Defendants contend that Cruz has failed to state a claim because he has failed to identify the particular federal constitutional or statutory provision Defendants' acts have violated and failed to plead facts that constitute such a violation. However, given the obligation to construe *pro se* pleadings liberally, Cruz has alleged government actions that could arguably raise constitutional claims. *See Wallace v. Conroy,* 945 F.Supp. 628, 632 (S.D.N.Y.1996) (construing factual allegations to raise procedural due process claim, although *pro se* plaintiff did not expressly assert such claim); *Savage v. Snow,* 575 F.Supp. 828, 833 (S.D.N.Y.1983) (same).

A. *Procedural Due Process*
**\*4** Cruz complains of being placed in "keep-lock" (i.e., confined to his cell) for an unspecified period of time and deprived of a variety of privileges (including legal phone calls, visitation and religious services) for periods of up to two weeks, without being charged with misconduct warranting such punishment. These allegations could be fairly read as contending that prison officials deprived Cruz of a liberty interest or interests without providing the process due to him under the Constitution. *See Wolff v. McDonnell,* 418 U.S. 539, 555–57, 563 (1974) (prisoners facing serious misconduct charges entitled to minimal procedural safeguards, including notice of charges, opportunity to be heard and a written decision to impose punishment).

To state a procedural due process claim challenging a disciplinary action, a prisoner must allege both that he was deprived of a liberty interest cognizable under the Due Process Clause, and that he was deprived of that interest without the requisite process. *See Wallace v. Conroy,* 945 F.Supp. 628, 632 (S.D.N.Y.1996). A cognizable interest

may arise in two ways. First, the Due Process Clause may, of its own force, protect a prisoner from a restraint on his freedom that exceeds the sentence in a manner that is entirely and unexpectedly divergent from the sentence of imprisonment. *See, e.g., Vitek v. Jones,* 445 U.S. 480, 493 (1980) (transfer to a mental hospital); *Washington v. Harper,* 494 U.S. 210, 221–222 (1990) (involuntary administration of psychotropic drugs). Second, state law may create a liberty interest in freedom from restraint, but only if such restraint amounts to an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 115 S.Ct. 2293, 2300 (1995); *see also Wallace v. Conroy,* 945 F.Supp. 628, 633 (S.D.N.Y.1996).

The court's role in procedural due process claims challenging prison disciplinary actions is to balance the penal system's legitimate institutional goals against the inmate's constitutional protections. *Wolff,* 418 U.S. at 556. A federal court should be reluctant to interfere in matters of prison administration and confinement. *Sandin,* 115 S.Ct. at 2299.

Assuming that the deprivations Cruz alleges were imposed as a punishment for his purported role in the unspecified incident on his cell block, the deprivations do not constitute atypical or significant hardships in relation to the ordinary incidents of prison life. Temporary confinement to a cell is a routine part of prison existence. Brief deprivations of religious services and visitation privileges, when imposed in response to misconduct, also fail to rise to the level at which due process concerns come into play.

Moreover, even if the deprivations alleged were "atypical and significant," Cruz does not indicate how the procedures prison officials followed in deciding to impose or continue Cruz's punishment were inadequate. Cruz has not alleged any facts that would support an inference that the procedures used in imposing his punishment were insufficient. Although Cruz complains of not being charged with misconduct warranting his punishment, he does not say he never received notice of the charges against him or that he was denied procedures to determine whether punishment was appropriate.

**\*5** Accordingly, Cruz's procedural due process claim will be dismissed, with leave to replead.

**Cruz v. Jackson, Not Reported in F.Supp. (1997)**
Case 9:17-cv-00194-TJM-TWD   Document 233   Filed 09/05/17   Page 167 of 211
1997 WL 45348

B. *Cruel and Unusual Punishment*

1. *Excessive Force*

Cruz alleges that he was "badly" beaten. Under the Eighth Amendment, the use of excessive force against prisoners may constitute "cruel and unusual punishment." *Hudson v. McMillian,* 503 U.S. 1, 5 (1992). A plaintiff need not allege "serious" injury to state an excessive force claim. *Id.* at 7. However, the Eighth Amendment does not protect against *de minimis* or reasonable uses of force. *Id.* at 9–10; *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973).

The test of whether the use of force violates the Eighth Amendment is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 6–7. Application of this test involves examining both the "subjective" and "objective" components of the claim. *Id.* at 8–9; *Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). The objective components of a claim may include allegations of the type and extent of the force used, the nature and seriousness of any injury that may have occurred, and other objective indicia of the "excessiveness" of the force. *Branham,* 77 F.3d at 630. The nature of the disturbance to which prison officials are responding will also be relevant to the question of whether the force used was "excessive." *See Hudson,* 503 U.S. at 7 (proper to evaluate need for force and relationship between need and amount of force used). The subjective component relates to whether the defendant possessed a "wanton" state of mind when engaging in the conduct. *Branham,* 77 F.3d at 630. The objective allegations of a claim may give rise to an inference of subjective wantonness. *See Hudson,* 503 U.S. at 7 (extent of injury is factor that may suggest whether force could plausibly be thought necessary or instead evinces wantonness).

Here, Cruz alleges that he and other inmates were badly beaten after an "incident" on the cell block. While there is no heightened pleading burden in Section 1983 cases, such conclusory allegations are insufficient to give rise to an inference that the force used to respond to the incident was excessive. *See Branham,* 77 F.3d at 630–31 (upholding dismissal where wantonness could not be inferred from allegations). Cruz alleges no facts from which the force used may be subjectively or objectively assessed. He does not state what the officers did or what injuries, if any, he suffered. While the term "beaten" may suggest that the officers delivered blows of some sort, it may also

encompass *de minimis* applications of force. He does not indicate the nature of the incident that prompted the use of force. Such skeletal factual allegations do not permit an inference of wantonness on the part of the officers, who were admittedly responding to some sort of incident on Cruz's cell block. [2]

[2]   In this Circuit, a plaintiff must allege the "personal involvement" of the defendant in the constitutional deprivation. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). A plaintiff may satisfy pleading requirement by alleging that the defendant: (1) directly participated in the infraction; (2) was a supervisory official who learned of the violation, but failed to remedy the wrong; (3) was a supervisory official who created (or perpetuated) a policy or custom which permitted the violation; or (4) was a supervisory official who was grossly negligent in supervising the subordinates who caused the unlawful condition. *Id.* at 323–24. While the individual defendants do not argue on this motion that Cruz failed to allege personal involvement in the deprivations alleged, it does not appear that Cruz has adequately alleged personal involvement of the named defendants in the beating. Arguably, the defendants were on notice of the subsequent punishment and the conditions of confinement, but there is no reason to infer that the defendants were aware of the beating at the time it took place.

**\*6** Therefore, Cruz's excessive force claim will be dismissed, with leave to replead.

2. *Denial of Medical Treatment*

Cruz also alleges that he was denied medical treatment. A plaintiff may state an Eighth Amendment claim when he alleges that prison officials denied, delayed or interfered with necessary medical treatment with deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 103 (1976). The medical condition for which the plaintiff alleges he was denied treatment must be "sufficiently serious" to raise Eighth Amendment concerns. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Ordinarily, a health condition is sufficiently serious when it involves some urgency, risk of degeneration or death, or extreme pain. *Id.* (*quoting Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990)) (Pratt, J. dissenting)).

Cruz v. Jackson, Not Reported in F.Supp. (1997)

1997 WL 45348

Cruz has not described at all the condition for which he was denied medical treatment. Thus, he has not alleged a condition that was "sufficiently serious" to invoke Eighth Amendment scrutiny of the alleged failure to provide treatment. Accordingly, Cruz's Eighth Amendment claim for denial of medical treatment will be dismissed, with leave to replead.

3. *Conditions of Confinement*

Cruz alleges that there were no smoke detectors and no ventilation where he was confined, and that he was served cold food for four months, given rusty water to drink, denied showers for up to two weeks, and permitted only cold showers for "weeks" thereafter. Such allegations may be read as an Eighth Amendment challenge to the conditions of his confinement. *See Helling v. McKinney,* 509 U.S. 25, 31 (1993) (conditions of confinement subject to scrutiny under Eighth Amendment).

To prevail on a claim under the Eighth Amendment based on prison conditions, a plaintiff must plead and prove both a subjective element (i.e., a culpable state of mind on the part of the defendants) and that the objective conditions were "sufficiently serious" to invoke the Eighth Amendment's protections. *Wilson v. Seiter,* 501 U.S. 294, 298–99 (1991). With respect to the subjective component, the plaintiff must prove that prison officials acted with "deliberate indifference." *Id.* at 297. As for the objective component, "the deprivation alleged must be in objective terms 'sufficiently serious' such that the deprivation 'den[ied] the minimal civilized measure of life's necessities.' " *Branham,* 77 F.3d at 630–31 (*quoting Wilson,* 501 U.S. at 298).

Cruz's allegation that he was served cold food for four months is insufficient to give rise to a claim under the Eighth Amendment. While warm meals may be preferable to cold, the denial of warm food did not deprive him of "the minimal civilized measure" of nutrition.

Cruz's allegations of lack of ventilation and smoke detectors do not state a claim for relief. Allegations of exposure to ambient air-borne toxins can state a claim under the Eighth Amendment. *Helling,* 509 U.S. at 35 (second-hand tobacco smoke). Thus, failure to ventilate an environment in which such toxins were present might state a claim for relief, since denying minimally clean air would deprive an inmate of the "minimal civilized measure of" one of "life's necessities." Here, however, Cruz has

not alleged any particular hazards in the air as a result of the lack of ventilation. As to the lack of smoke detectors, although inmates are certainly entitled to protection from fires, this Court declines to hold that the absence of a smoke detector denies a prisoner a "minimal civilized measure" of fire protection.

**\*7** Cruz's allegation that he was given rusty water to drink does not give rise to an Eighth Amendment claim. Because contaminated water may pose serious health problems, an allegation that prison officials persistently provided only rusty drinking water would satisfy the objective component of an Eighth Amendment claim. *See Helling,* 509 U.S. at 33 (stating, in dicta, that prison inmate could successfully complain about demonstrably unsafe drinking water). However, Cruz has not stated how long he was given rusty water. An isolated serving of rusty water would not give rise to an Eighth Amendment claim. Moreover, Cruz has not alleged facts to support an inference that the Defendants acted with deliberate indifference to his need for clean drinking water. He does not state that the Defendants knew about the rust in the water or that he informed them of it. Although a general hostility toward Cruz may be inferred from the statements allegedly made by Davis and Jackson, such general hostility is not equivalent to deliberate indifference to the deprivation of a particular necessity of a prisoner's life.

Finally, Cruz's allegation that he was deprived of a shower for two weeks does not satisfy the objective component of an Eighth Amendment claim. The caselaw does not support an Eighth Amendment claim based on temporary deprivation of shower privileges, so long as minimal hygienic needs are met. *See Williams v. Greifinger,* 918 F.Supp. 91, 95 n. 3 (S.D.N.Y.1996); *Shakka v. Smith,* 71 F.3d 162, 168 (4th Cir.1995) (denial of shower for three days after having excrement thrown on plaintiff not cruel and unusual, where plaintiff had other means of cleaning self); *Hamilton v. Peters,* 919 F.Supp. 1168, 1173 (N.D.Ill.1996) (denial of regular showers for finite period of 28 days does not state Eighth Amendment claim). Here, Cruz was denied showers for a finite time. From his complaint, it appears that he had running water in his room. Thus, at no time was he deprived of basic hygienic needs.

Case 9:17-cv-00194-TJM-TWD   Document 233   Filed 09/05/17   Page 169 of 211

Cruz v. Jackson, Not Reported in F.Supp. (1997)

1997 WL 45348

Accordingly, Cruz's claim that the conditions of his confinement violated his Eighth Amendment rights will be dismissed, with leave to replead.

### C. *Denial of Religious Services*

Cruz's allegation that he was denied access to religious services will be read liberally to make a claim under the free exercise clause of the First Amendment. *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989) (prisoners should be afforded every reasonable opportunity to attend religious services). An inmate's First Amendment rights are not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990); *see also Pell v. Procunier,* 417 U.S. 817, 822 (1974) (inmate retains only those constitutional rights not incompatible with his status as a prisoner). In evaluating an inmate's First Amendment claim, a federal court must balance the inmate's rights against legitimate prison security needs. *Benjamin,* 905 F.2d at 574.

Although Defendants' legitimate security needs may ultimately provide a rational justification for depriving Cruz of religious services during the first two weeks of his keep lock, it cannot be said that Cruz can prove no set of facts that would entitle him to relief under the First Amendment. The mere fact that Cruz was in disciplinary confinement does not justify limiting his free exercise rights. *Young,* 866 F.2d at 570 (error to assume that prison officials were justified in limiting free exercise rights merely because plaintiff in disciplinary confinement). The balancing required by the First Amendment cannot be done without further development of the factual record.

**\*8** Accordingly, Cruz's free exercise of religion claim will not be dismissed.

### D. *Municipal Liability*

Defendants also contend that the complaint against the county should be dismissed. A municipality may not be held liable under 42 U.S.C. § 1983 for actions of its employees based on the theory of *respondeat superior. Monell v. Dep't of Social Services,* 436 U.S. 658, 694 (1978). In order to establish municipal liability for unconstitutional acts by municipal employees, a plaintiff must show that the violation of his constitutional rights resulted from a municipal policy, custom or practice. *Id.; Oklahoma City v. Tuttle,* 471 U.S. 808, 818 (1985). Defendants contend that Cruz has failed to allege a

"custom or policy" sufficient to hold the county liable for the alleged violations.

Cruz may satisfy the "policy, custom or practice" requirement in one of four ways. *See Moray v. City of Yonkers,* 924 F.Supp. 8, 12 (S.D.N.Y.1996). He may allege the existence of: (1) a formal policy officially endorsed by the municipality, *see Monell,* 436 U.S. at 690; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question, *see Pembauer v. City of Cincinnati,* 475 U.S. 469, 483–84 (1986); *Walker v. City of New York,* 974 F.2d 293, 296 (2d Cir.1992); (3) a practice so consistent and widespread that it constitutes a "custom or usage" sufficient to impute constructive knowledge of the practice to policy-making officials, *see Monell,* 436 U.S. at 690–91; or (4) a failure by policy-makers to train or supervise subordinates to such an extent that it amounts to "deliberate indifference" to the rights of those who come in contact with the municipal employees. *See City of Canton v. Harris,* 489 U.S. 378, 388 (1989). A complaint asserting municipal liability claims need only meet the liberal federal notice-pleading requirements. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993). Thus, it is generally more appropriate to rely on summary judgment, rather than a motion to dismiss, to weed out unmeritorious claims of municipal liability. *Id.* at 168–69.

Here, construing his complaint liberally, Cruz has alleged that the Commissioner and the Warden of the Westchester County Jail were aware of and participated in the deprivation of his rights. Whether these municipal officers had policy-making authority over the actions at issue in this case is a question of state law. *See Jett v. Dallas Independent Sch. Dist.,* 491 U.S. 701, 737 (1989). Absent specific state or local legal authority to the contrary, it is reasonable to infer from the complaint that Jackson and Davis, as administrators of the jail, had policy-making authority over disciplinary, medical and religious practices in their facilities. *See Reed v. Town of Branford,* No. 395 CV 1244, 949 F.Supp. 87, 1996 WL 734653, \*5 (D.Conn. Dec. 13, 1996) (upholding municipal liability claim where defendants were superintendent of local wastewater treatment plant and chief executive officer of town). Thus, if these officers participated in the alleged constitutional violations, their involvement would be sufficient to impose municipal liability.

1997 WL 45348

**\*9** Accordingly, Defendants' motion to dismiss for failure to allege a municipal policy, practice or custom will be denied. [3]

[3]     Cruz's remaining allegations do not appear to provide independent constitutional or statutory bases for relief. To the extent that Cruz was deprived of property (including clothing, mail and personal items), there is an adequate state cause of action precluding a federal claim. *See Hudson v. Palmer,* 468 U.S. 517, 533 (1984); *Butler v. Castro,* 896 F.2d 698, 700–04 (2d Cir.1990)* (New York provides remedy for deprivation of property in section 9 of New York Court of Claims Act). To the extent he claims defendants invaded violated his constitutional rights by tampering with his mail, legitimate security and penological interests have been held to outweigh a prisoner's interest in mail. *See Bach v. Illinois,* 504 F.2d 1100 (7th Cir.1974)* (prison has legitimate security interest in opening incoming mail); *Woods v. Yeager,* 463 F.2d 223 (3d Cir.1972)* (examination of prisoners' correspondence not addressed to attorneys or courts is reasonable exercise of discretion of prison management); *Turner v. Safley,* 482 U.S. 78, 91–

93 (1978) (upholding restriction on inmate-to-inmate correspondence against First Amendment challenge, where restriction was logically related to penological interest in security).

*Conclusion*

For the reasons set forth above, Defendants' motion to dismiss is granted in part and denied in part. Specifically, Cruz's Due Process and Eighth Amendment claims are hereby dismissed, with leave to replead within thirty (30) days. Cruz's First Amendment free exercise of religion claim will not be dismissed.

The Court also directs that *pro bono* counsel be assigned to Cruz in accordance with the selection procedures of the Pro Se Office.

It is so ordered.

**All Citations**

Not Reported in F.Supp., 1997 WL 45348

---

2008 WL 3884369
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Wayne BARNES, Plaintiff,
v.
Lt. CRAFT; Sgt. J. O'Keefe; C.O. C. Hodges; and
G. Goord, Commissioner of the New York State
Department of Correctional Services, Defendants.

No. 9:04-CV-1269.
|
Aug. 18, 2008.

**Attorneys and Law Firms**

Wayne Barnes, Hackensack, NJ, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Michael G. McCartin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*ORDER*

NORMAN A. MORDUE, Chief Judge.

*1 The above matter comes to me following a Report-Recommendation by Magistrate Judge George H. Lowe, duly filed on the 24th day of July, 2008. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. The Defendants' motion for summary judgment (Dkt. No. 43) is granted.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

IT IS SO ORDERED.

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Wayne Barnes ("Plaintiff"), while an inmate, commenced this *pro se* civil rights action on November 1, 2004, against four employees of the New York State Department of Correctional Services ("Defendants"), pursuant to 42 U.S.C. § 1983. (Dkt. No. 9 [Plf.'s Am. Compl.].) Generally, Plaintiff's Amended Complaint alleges that Defendants violated his rights under the First, Eighth and Fourteenth Amendments by confining him to the Special Housing Unit ("S.H.U.") at Ulster Correctional Facility ("Ulster C.F.") between March 12, 2004, and March 17, 2004, without providing him a hearing, in response to his refusal to shave his full beard, for which he claims he possessed, at the time, a valid exemption issued by the New York State Department of Correctional Services ("DOCS") due to his need to maintain the beard in order to engage in Rastafarian spiritual practices. (*Id.*) Currently pending before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 43.) For the reasons that follow, I recommend that Defendants' motion be granted.

**I. BACKGROUND**

**A. Plaintiff's Amended Complaint**

Liberally construed, Plaintiff's Amended Complaint asserts the following factual allegations, in pertinent part.

In late 2003, while Plaintiff was incarcerated in the New York State Department of Correctional Services ("DOCS"), he was "passing through" Ulster Correctional Facility ("Ulster C.F."), wearing a full beard.[1] C.O. Hodes[2] stopped Plaintiff and ordered him to shave

2008 WL 3884369

his beard. [3] Plaintiff informed C.O. Hodes that he had received a written permit from DOCS exempting him from DOCS' rule that beards may be no more than one inch in length (hereinafter "DOCS' one-inch beard rule"). [4] C.O. Hodes called Wyoming C.F. (the correctional facility at which Plaintiff was regularly housed, and which was responsible for maintaining Plaintiff's records at the time), and was informed that Plaintiff indeed had such a written exemption on file. [5] As a result, C.O. Hodes permitted Plaintiff to pass through Ulster C.F. without having to shave his beard. [6]

[1]    (Dkt. No. 9, ¶ 7(a) [Plf.'s Am. Compl.].)

[2]    I note that, although Plaintiff's Amended Complaint refers to this individual as "C.O. C. Hodges" (Dkt. No. 9), Defendants have previously identified this individual as "C.O. Hodes" (Dkt. No. 19, Part 2 at 1 [Defs.' Mem. of Law in Support of Motion to Dismiss] ), and Plaintiff has previously requested that the Court amend his Amended Complaint accordingly (Dkt. No. 22, at 10 [Plf.'s Mem. of Law in Opp. to Motion to Dismiss] ).

[3]    (Dkt. No. 9, ¶ 7(a) [Plf.'s Am. Compl.].)

[4]    (*Id.* at ¶ 7(a).)

[5]    (*Id.*)

[6]    (*Id.*)

*2 Then, during the afternoon of March 12, 2004, while again passing through Ulster C.F., Plaintiff was again stopped by C.O. Hodes and ordered to shave his beard. [7] Plaintiff asked C.O. Hodes whether he did not remember Plaintiff from the previous time he had passed through Ulster C.F. [8] Plaintiff explained that he was the inmate who had received a written exemption from DOCS' one-inch beard rule. [9] C.O. Hodes responded that, at Ulster C.F., a permit does not matter and that if Plaintiff did not cut his beard he would have to go to the "box" until he cut it. [10] Despite having been given a copy of the written exemption (by an unidentified person at an unidentified point in time), and knowing that Plaintiff was exempt from DOCS' one-inch beard rule regarding beards, C.O. Hodes sought to incarcerate Plaintiff in the "box" at Ulster C.F. [11]

[7]    (*Id.* at ¶ 7(a) & Exs. 1, 2 [attaching "Administrative Segregation Recommendation" dated 3/12/04, and complaint letter from Plaintiff dated 4/13/04].)

[8]    (*Id.* at ¶ 7(a).)

[9]    (*Id.*)

[10]    (*Id.*)

[11]    (*Id.*)

Toward this end, C.O. Hodes called Sgt. O'Keefe and informed him that Plaintiff was refusing to cut his beard and claiming that he had an exemption on file due to the fact that he was a "practicing and registered Rastafarian." [12] Plaintiff informed Sgt. O'Keefe that previously, when Plaintiff had been passing through Ulster. C.F., C.O. Hodes had learned that Plaintiff did indeed have an exemption on file. [13] Plaintiff also informed Sgt. O'Keefe that the Ulster C.F. "Intake Draft" has a copy of the permit from DOCS in Albany, New York. [14] Sgt. O'Keefe responded that, at Ulster C.F., a permit from Albany holds no weight and that if Plaintiff continued to refuse to cut his beard he would be sent to Ulster C.F.'s Special Housing Unit ("S.H.U.") until he cut his beard, regardless of any such permit. [15]

[12]    (*Id.* at ¶ 7(b) & Ex. 2 [attaching complaint letter from Plaintiff dated 4/13/04].)

[13]    (*Id.* at ¶ 7(b).)

[14]    (*Id.* at ¶ 7(a), (b).)

[15]    (*Id.* at ¶ 7(b).)

As a result, at approximately 3:40 p.m. on March 12, 2004, Sgt. O'Keefe signed an "Administrative Segregation Recommendation," stating that the reason for his recommendation was that "[Plaintiff] refused to shave his beard to one inch during the incoming draft process. [Plaintiff] claims he has an exemption on file." [16] At some point thereafter, Lt. Craft signed the "Administrative Segregation Recommendation," authorizing Plaintiff's confinement in S.H.U. pending a hearing on the recommendation. [17] The bottom of the "Administrative Segregation Recommendation" form stated as follows:

[16]    (*Id.* at Ex. 1 [attaching "Administrative Segregation Recommendation" dated 3/12/04].)

**17**     (*Id.*)

**Notice to Inmate:** A hearing will be conducted within 14 days of this recommendation in accordance with the provisions of Part 254 of Chapter V. You will be entitled to call witnesses on your own behalf, provided that doing so does not jeopardize institutional safety or correctional goals.

> If restricted pending a hearing on this recommendation, you may write to the Deputy Superintendent for Security or his/her designee prior to the hearing to make a statement on the need for continued confinement. [18]

**18**     (*Id.*)

Between March 12, 2004, and March 17, 2004, Plaintiff remained in the Ulster C.F. S.H.U., during which time he was subjected to the following restrictive conditions, among others: the continuous confinement in his cell, the continuous isolation from the general prison population, the continuous denial of use of prison facilities (such as the libraries, gym, etc.), and sleep deprivation due to the 24-hour lighting in his cell and the loud noise of the air-conditioning system above his cell. [19]

**19**     (*Id.* at ¶¶ 5, 7 & Exs. 2, 4 [attaching complaint letter from Plaintiff dated 4/13/04, and a letter from Plaintiff dated 5/23/04].)

**\*3** On March 17, 2004, Plaintiff sent a letter of complaint to an unidentified person at Ulster C.F., complaining about the harsh conditions to which he was being subjected in S.H.U. [20] Plaintiff alleges that he sent this letter to "the hearing officer" (and/or perhaps to an unspecified lieutenant), [21] although he acknowledges that no hearing had yet been held. [22] Plaintiff never received a response to his letter. [23] However, on or about March 17, 2004, Plaintiff was released from S.H.U. and returned to Wyoming C.F. [24] No hearing was ever held. [25]

**20**     (*Id.* at Ex. 4 [attaching letter from Plaintiff dated 5/23/04].) I note that Plaintiff does not attach to his Amended Complaint a copy of this March 17, 2004, letter.

**21**     (*Id.* at Exs. 4, 6 [attaching letter from Plaintiff dated 5/23/04 alleging that he sent the 4/17/04 letter to "the hearing officer (Lt./etc.)" and letter from Plaintiff

dated 6/16/04 alleging that he sent the 4/17/04 letter to "the 'hearing officer' "].)

**22**     (*Id.* at Ex. 4 [attaching letter from Plaintiff dated 5/23/04 alleging that he sent the 4/17/04 letter "prior to a hearing"].)

**23**     (*Id.* at Exs. 4, 6 [attaching letter from Plaintiff dated 5/23/04 stating *inter alia* "I have yet to have ... a response from the hearing officer regarding this issue," and letter from Plaintiff dated 6/16/04 stating *inter alia* "I have never gotten a response from the hearing officer"].)

**24**     (*Id.* at Exs. 2, 4, 6 [attaching complaint letter from Plaintiff dated 4/13/04, letter from Plaintiff dated 5/23/04, and letter from Plaintiff dated 6/16/04].)

**25**     (*Id.* at ¶¶ 5, 7(c) & Ex. 4 [attaching letter from Plaintiff dated 5/23/04].)

Although Plaintiff's Amended Complaint references only the First Amendment (in asserting a retaliation claim), I liberally construe that pleading as attempting to raise an inadequate prison-conditions claim under the Eighth Amendment, and a procedural due process claim under the Fourteenth Amendment, given his special status as a *pro se* civil rights litigant, and given various of the statements made in his Amended Complaint and documents attached to that pleading. [26]

**26**     (*See, e.g., id.* at ¶ 5 & Ex. 4 [attaching his letter dated 5/23/04, complaining that there was "no hearing" with regard to his confinement in the Ulster C.F. S.H.U.]; *id.* at Exs. 2 & 4 [attaching his letters dated 4/13/04 and 5/23/04, complaining about the allegedly "harsh," "degrading" and "inhumane" conditions in the Ulster C.F. S.H.U.].)

**B. Defendants' Motion for Summary Judgment**
Defendants argue that the Court should grant their motion for summary judgment for six reasons: (1) Plaintiff's Fourteenth Amendment procedural due process claim should be dismissed because he has failed to establish that his six-day stay in administrative segregation created a sufficient liberty interest to give rise to such a claim; (2) Plaintiff's Eighth Amendment claim of inadequate prison conditions should be dismissed because he has failed to establish either that he experienced a sufficiently serious deprivation or that Defendants acted with a sufficiently culpable state of mind; (3) Plaintiff's First Amendment retaliation claim should be dismissed

because he failed to establish that the adverse action allegedly taken against him was anything more than *de minimis* in nature; (4) in the alternative, Plaintiff's claims against Defendants Goord and Craft should be dismissed because Plaintiff has failed to establish that they were personally involved in the constitutional violations alleged; (5) in the alternative, Plaintiff's claims against all Defendants should be dismissed because, based on the current record, they are protected from liability by the doctrine of qualified immunity, as a matter of law; and (6) in the alternative, Plaintiff's action should be dismissed under Local Rule 41.2(b) of the Local Rules of Practice for this Court because of Plaintiff's failure to keep the Court apprised of his current address. (Dkt. No. 43, Part 12 [Defs.' Mem. of Law].)

Plaintiff has opposed Defendants' motion. (Dkt. No. 48.)

## II. RELEVANT LEGAL STANDARD

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [27] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [28]

[27]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[28]    *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

**\*4** However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [29] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [30] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." [31]

[29]    Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[30]    Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[31]    *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

It should be noted that, where a non-movant fails to adequately oppose a properly supported factual assertion made in motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. [32] Moreover, to be sufficient to create a factual issue for purposes of a summary judgment motion, statements made in an affidavit or deposition testimony must (among other things) not be conclusory. [33] Such statements are conclusory if, for example, their assertions lack any supporting evidence or are too general. [34]

[32]    *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13, 2004 WL 5477530 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for

summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

33    *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

34    *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

### III. ANALYSIS

**A. Whether Plaintiff's Fourteenth Amendment Procedural Due Process Claim Should Be Dismissed Because He Has Failed to Establish that His Six-Day Stay in Administrative Segregation Created a Sufficient Liberty Interest to Give Rise to Such a Claim**

In 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Defendants argue that the short duration of Plaintiff's stay in Administrative Segregation at Ulster C.F., coupled with the rather ordinary conditions of that segregated confinement, do not create a sufficient liberty interest to give rise to a Fourteenth Amendment procedural due process claim. (Dkt. No. 43, Part 12, at 2-6 [Defs.' Mem. of Law].)

Plaintiff responds with a three-part argument: (1) he possessed a protected liberty interest because he possessed a valid DOCS-issued beard exemption when he was placed in administrative segregation; (2) he need not show *Sandin v. Connor*'s "atypical and significant hardship" requirement because the injury that he experienced consisted of the retaliatory conduct itself; and (3) in any event, his stay in Administrative Segregation imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" because (a) the conditions of his stay in Administrative Segregation were sufficiently harsh, and (b) those conditions were not "ordinary" to him since he was otherwise incarcerated in the general population of a medium-security correctional facility. (Dkt. No. 48, at 15-16 [Pages 14 and 15 of Plf.'s Response Mem. of Law].)

**\*5** With respect to Plaintiff's first argument, the fact that he possessed a DOCS-issued beard exemption does not create a protected liberty interest for purposes of a procedural due process claim. *Lee v. Quillar,* 04-CV-1203, 2007 U.S. Dist. LEXIS 50894, at *5-7, 2007 WL 2069942 (E.D.Cal. July 13, 2007) (recommending dismissal of prisoner's procedural due process claim arising from disciplinary charge that he failed to cut his beard, even though charge contravened medical authorization permitting prisoner to wear beard), *adopted by,* 2007 U.S. Dist. LEXIS 61480, 2007 WL 2340235 (E.D.Cal. Aug. 16, 2007). 35 This is because, in 1995, the United States Supreme Court shifted a court's focus, when conducting a procedural due process analysis, from the language of the particular authority allegedly giving rise to the protected liberty interest alleged (e.g., a state law or regulation) to the nature of the deprivation alleged. *Sandin*

*v. Connor,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). [36] Specifically, as stated earlier, in 1995, the Supreme Court held that a liberty interest protected by the Fourteenth Amendment's Due Process Clause will generally be limited to freedom from a restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-84.

[35]    *See also Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 52797, at *2, 14-21, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.) (recommending dismissal of prisoner's procedural due process claim arising from disciplinary charge and conviction-even assuming disciplinary charge had been issued in contravention of medical permit-since deprivation following conviction did not result in an atypical and significant hardship).

[36]    *See also Blouin v. Spitzer,* 356 F.3d 348, 362-363 (2d Cir.2004) (recognizing abrogation or modification of prior rule which focused on language of state regulation), *accord, Anderson v. Recore,* 317 F.3d 194, 198-200 (2d Cir.2003), *accord, Watson v. City of N. Y.,* 92 F.3d 31, 37-38 (2d Cir.1996), *accord, Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Before continuing to Plaintiff's second argument, a few words are appropriate about any *substantive* due process claim he may be trying to assert in his Amended Complaint. [37] As an initial matter, I do not liberally construe Plaintiff's Amended Complaint (which essentially challenges the way DOCS' beard policy was implemented) as alleging a violation of his right to *substantive* due process. [38] Even if I were to so construe Plaintiff's Amended Complaint, I would have difficulty finding that the issuance of a DOCS' beard exemption (without the issuance of a court order) created such a right of substantive due process. *See Johnson v. Coughlin,* 90-CV-1731, 1997 WL 431065, at *6, 1997 U.S. Dist. LEXIS 11025, at *19-20 (S.D.N.Y. July 30, 1997) ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment."). [39]

[37]    The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinermon v. Burch,*

494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinermon,* 494 U.S. at 125 [internal quotations marks and citation omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125-26 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

[38]    Setting aside the lack of factual allegations in Plaintiff's Amended Complaint plausibly suggesting a substantive due process claim, I note that, as the Supreme Court has repeatedly held, "if a constitutional claim is covered by a specific constitutional provision, such as the ... Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the [more generalized notion] of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272, n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citing *Graham v. Connor,* 490 U.S. 386, 392-94 [1989] ). Here, Plaintiff's failure-to-honor-his-beard-exemption claim is more appropriately analyzed as a First Amendment retaliation claim, an Eighth Amendment inadequate-prison-conditions claim, and/or a Fourteenth Amendment procedural due process claim. Thus, there is no need to analyze that claim as a Fourteenth Amendment substantive due process claim.

[39]    *Cf. Young v. Goord,* 192 F. App'x 31, 33 (2d Cir.2006) ("[I]t is at least reasonable to read Rule 110.32 [the DOCS regulation governing inmates' beard length, which permits DOCS-issued exemptions] *not* to create a substantive right to a religious exemption from the beard-length policy ....") [emphasis in original].

Furthermore, even if I were able to find that the issuance of a DOCS' beard exemption alone created such a right of substantive due process, I would have difficulty finding evidence in the record that Defendants' actions were not simply "incorrect or ill-advised" but were "arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks

2008 WL 3884369

and citations omitted], *aff'g,* 91-CV-1196, *Memorandum-Decision and Order* (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action). I note that prison beard-length policies generally appear to have a legitimate penological objective-whether it be to facilitate inmate identification, prevent hygiene problems, or minimize the need for contact between guards and the inmate during searches. [40] Here, the record indicates that accurate identification was one of the penological objectives of the beard-length policy in question. [41]

[40]  *Cf. Singh v. Goord,* 520 F.Supp.2d 487, 507 (S.D.N.Y.2007) ( "[N]umerous courts have held that Directive 4914's initial shave requirement serves a legitimate penological interest in maintaining prison security and a record of prisoners' appearances in case of escape.") [collecting cases].

[41]  (Dkt. No. 43, Part 5, at 2 [Ex. C to McCartin Decl., attaching Directive 4914, stating, "It is the purpose of this directive to ensure that inmate appearance will be regulated sufficiently to maintain accurate identification of each individual"].)

**\*6**  With respect to Plaintiff's second argument, I have found no cases suggesting that *Sandin*' s atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of due process violations. [42]

[42]  *See, e.g., Wells v. Wade,* 36 F.Supp.2d 154, 158-59 (S.D.N.Y.1996) (finding that evidence did *not* exist that plaintiff experienced atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris,* 07-CV-0102, 2007 WL 4287840, at \*3-5 (E.D.Ark. Dec.7, 2007) (finding that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process claim, but that his allegations-arising from same placement in segregated housing-*did* plausibly suggest that defendants took adverse

action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff,* 05-CV-0198, 2007 WL 2479467, at \*4-5 (W.D.Mich. Aug.28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of retaliation claim).

With regard to Plaintiff's third argument, the fact that the conditions of his Administrative Segregation were restrictive, and the fact that he "ordinarily" was incarcerated in the general population of a medium-security correctional facility, do not, in and of themselves, create a question of fact regarding whether his stay in Administrative Segregation, coupled with the conditions of that segregated confinement, gave rise to a Fourteenth Amendment claim. Rather, in determining whether Plaintiff's six-day stay in Administrative Segregation imposed an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life," the Court must determine what the conditions of that six-day Administrative Segregation were, as established by the record evidence, and then compare the imposition of those conditions for six days to "the ordinary incidents of prison life."

Here, Plaintiff has adduced at least *some* record evidence that, during the time in question, he experienced the following conditions of confinement. First, prior to entering his cell in S.H.U. on March 12, 2004, Plaintiff was strip searched and "handled very rigorously...." (Dkt. No. 43, Part 3, at 33-34 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) Plaintiff was told that, if he took his hands off the wall, he would "be beaten up[,] but not [in] those words." (*Id.* at 34.)

Second, during his confinement in Administrative Segregation, from March 12, 2004, to March 17, 2004, Plaintiff was alone in his cell, and he never left his cell. (Dkt. No. 43, Part 3, at 33, 36 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) He was locked in his cell twenty-four (24) hours a day for all six days he spent in Administrative Segregation. (*Id.* at 39.) In addition, Plaintiff did not participate in recreation period, nor was he afforded the opportunity to shower. (*Id.* at 38-39; *see also* Plf.'s Decl. in Opp., ¶ 25.)

Third, Plaintiff's cell in Administrative Segregation was approximately five feet by ten feet in size. (Dkt. No. 43, Part 3, at 35 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) It contained one bed, one toilet, and no shower. (*Id.*) The lights were on in the cell twenty-four (24) hours a day. (*Id.* at 37.) What Plaintiff thinks was an "air-conditioning system" made a loud noise almost constantly that vibrated the cell. (*Id.*) While in the cell, Plaintiff was "deprived of sleep" and he felt "claustrophobic." (Plf.'s Decl. in Opp., ¶ 25.)

Fourth, although it was wintertime, the cell was "very hot" and "too hot." (Dkt. No. 43, Part 3, at 37 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 25.) If the window was open, the cell would feel too cold to Plaintiff. (Dkt. No. 43, Part 3, at 38 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 25.) Plaintiff felt comfortable only when wearing just a t-shirt, although "it still would be too humid." (Dkt. No. 43, Part 3, at 38 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)

**\*7** Fifth, during his six-day stay in Administrative Segregation, Plaintiff "never received any medical attention." (Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 25.)

Sixth, and finally, during his confinement in Administrative Segregation, Plaintiff possessed his "State[-issued] green[ ] clothing]," received three meals a day, and was permitted to mail at least one letter. (Dkt. No. 43, Part 3, at 36, 38 [Exhibit A to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 21.)

No record evidence exists that, during the six-day period at issue, Plaintiff was subjected to any substandard cell conditions (e .g., regarding bedding, cleanliness, etc.), or poor treatment (e.g., unwarranted searches, beatings, denial of meals, etc.), other than the previously described conditions and poor treatment. (*See* Plf.'s Decl. in Opp., ¶ 25; Dkt. No. 43, Part 3, at 39-40 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)

Under these circumstances, I find that no record evidence exists that the duration and conditions of Plaintiff's stay in Administrative Segregation at Ulster C.F. created a protected liberty interest to give rise to a Fourteenth Amendment due process claim. Generally, the conditions experienced by Plaintiff in Administrative Segregation were the same as, or perhaps slightly more harsh than,

the conditions ordinarily experienced in disciplinary confinement in a correctional facility within the New York State DOCS. [43] *See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of SHU confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing 7 N.Y. Comp.Codes R. & Regs. §§ 304.1-304.14).

[43]   I note that, in his deposition, Plaintiff testified that he had "spoken to several prisoners of the treatment you get [in S.H.U. confinement]" and that he "was subject to ... that type of treatment." (Dkt. No. 43, Part 3, at 34 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)

Finally, numerous courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in a Special Housing Unit ("S.H.U.") of *far* more than six (6) days, even where the conditions of confinement in the Special Housing Unit were, to varying degrees, more restrictive than those in the prison's general population. *See, e.g., Sealey v. Giltner,* 197 F.3d 578, 589-590 (2d Cir.1999) (101 days of disciplinary confinement in SHU under conditions that were "doubtless unpleasant and *somewhat more severe than those of general population"* did not rise to the level of atypicality) [emphasis added]. [44] Several of those cases have also recognized (1) the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the number of showers allowed per week) are placed even on inmates in the general population [45] and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in the general population of a New York State correctional facility. [46]

[44]   *See also Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement

that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

45      *See, e.g., Husbands,* 990 F.Supp. 218-19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population. For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily. [7 NYCRR] § 304.3. This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements.... SHU inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general population inmates are allowed three showers per week, *id.* § 320.3(d)(1). SHU inmates are confined to their cells approximately twenty-three hours a day. General population inmates are confined to their cells approximately twelve hours a day during the week and even more on the weekends.... Thus, conditions at New York correctional facilities involve a significant amount of lockdown time even for inmates in the general population."); *accord, Warren,* 985 F.Supp. at 354-55; *see also Ruiz,* 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown time' even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing

him there for 30 days did not work a major disruption in his environment.").

46      *See, e.g., Husbands,* 990 F.Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence of six years to life at the time of the events in question. With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there. Lengthy disciplinary confinement is prevalent in New York State prisons. In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions. 7 NYCRR § 254.7(a)(1)(iii). As of March 17, 1997, there were 1,626 inmates in SHU for disciplinary reasons.... Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days. These statistics suggest that lengthy confinement in SHU-for periods as long as or longer than [the plaintiff's 180-day] stay-is a normal element of the New York prison regime."); *accord, Warren,* 985 F.Supp. at 354.

 **\*8**  For all of these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment due process claim.

### B. Whether Plaintiff's Eighth Amendment Claim of Inadequate Prison Conditions Should Be Dismissed Because He Has Failed to Establish Either that He Experienced a Sufficiently Serious Deprivation or that Defendants Acted with a Sufficiently Culpable State of Mind

Generally, to prevail on a claim of inadequate prison conditions, a plaintiff must demonstrate two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005).

To satisfy the seriousness requirement, a plaintiff must demonstrate that the conditions of his confinement deprived him of "the minimal civilized measure of life's necessities" or an "unquestioned and serious deprivation of basic human needs." *Farmer,* 511 U.S. at 834; *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). As the Supreme Court has rather famously observed, "[T]he Constitution does not

2008 WL 3884369

mandate comfortable prisons," and "conditions [that] are restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes,* 452 U.S. at 347, 349.

To satisfy the deliberate-indifference requirement, a plaintiff must demonstrate that the defendants acted with a state of mind of "deliberate indifference to inmate health or safety...."[47] This means a state of mind "more blameworthy than negligence."[48] Rather, it means that the defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[49] In other words, "this standard requires that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, leads to liability."[50]

[47]    *Farmer,* 511 U.S. at 834.

[48]    *Id.* at 835.

[49]    *Id.* at 837.

[50]    *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (citing *Farmer,* 511 U.S. at 841.)

### 1. Sufficient Seriousness

Here, I find no record evidence that the conditions of Plaintiff's six-day stay in Administrative Segregation were *sufficiently serious* for purposes of the Eighth Amendment in that they deprived him of *the minimal civilized measure of life's necessities,* such as food, water, or a toilet. To the contrary, Plaintiff testified in his deposition that his cell contained "the bare necessities." (Dkt. No. 43, Part 3, at 35 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) For example, he testified that his cell was equipped with a toilet, a bed, lights, heat, an "air-conditioning system," and a window. (*Id.* at 35, 37-38.) In addition, he testified that he possessed a t-shirt and his "State[-issued] greens"; he received three meals a day; and he was able to mail a letter. (*Id.* at 36, 38; *see also* Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 21.)

**\*9** Granted, Plaintiff has adduced some evidence that, during the six-day time period, he was denied the opportunity to exercise outside, the ability to shower, and (when his window was open) a certain degree of

warmth. (Dkt. No. 43, Part 3, at 35, 38-39 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 25.) However, these deprivations for six days were simply not sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation. *See Trammel v. Keane,* 338 F.3d 155, 158-159, 164 (2d Cir.2003) (affirming grant of defendants' motion for summary judgment dismissing Eighth Amendment claim based on [1] deprivation of all property except one pair of undershorts and [2] exposure to "bitter cold," because the temperatures to which inmate was exposed were not cold enough, and the period of time in which he was deprived of clothing-seventeen days-was not long enough); *Scot v. Merola,* 555 F.Supp. 230, 231-234 (S.D.N.Y.1983) (granting defendants' Rule 12[b] [6] motion to dismiss inmate's Eighth Amendment claim based on his incarceration for three-and-a-half months on Rikers Island in housing area without heat where windows were broken, and temperature dropped below fifty degrees).[51]

[51]    *See also Lock v. Clark,* 90-CV-0327, 1992 U.S. Dist. LEXIS 21991, at \*1, 11-12, 1992 WL 559660 (N.D.Ind. March 17, 1992) ("The deprivations alleged by Mr. Lock in this case [which consisted of being confined for seven days in a "strip cell" in a segregation unit] fail to satisfy the objective component of his Eighth Amendment conditions claim, and they do not rise to the level of a constitutional violation."). (*See also* Dkt. No. 43, Part 12, at 8 [Defs.' Mem. of Law, citing cases].)

Furthermore, Plaintiff has adduced evidence that he "never received any medical attention." (Dkt. No. 48, Plf.'s Decl. in Opp ., ¶ 25.) However, he has not adduced evidence that (1) he needed such attention or (2) he requested such attention. (*Id.*) As a result, he has adduced no evidence that, during the time in question, either (1) medical attention was, to him, one of "life's necessities," or (2) he was *denied* such attention after requesting it. *Trammell,* 338 F.3d at 164 ("Although Trammell's requests to be taken from his cell for medical evaluation were not granted, the record shows that the defendants were mindful of, not indifferent to, his health and ensured that his basic 'health or safety' was not at risk.").

For these reasons, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim of inadequate prison conditions for failure to establish a deprivation that was sufficiently serious.

2008 WL 3884369

### 2. Deliberate Indifference

Because I have already found that an adequate ground exists upon which to recommend the dismissal of Plaintiff's Eighth Amendment claim of inadequate prison conditions, the Court need not analyze Defendants' alternative Eighth Amendment argument that Plaintiff has failed to establish that Defendants acted with a sufficiently culpable state of mind with regard to the conditions of Plaintiff's confinement during his six-day stay in Administrative Segregation at Ulster C.F. However, in the interest of thoroughness, I will briefly analyze that claim.

Defendants focus their argument on the fact that none of them had any control over, or even knew about, the allegedly inadequate conditions of Plaintiff's confinement during his six-day stay in Administrative Segregation. (Dkt. No. 43, Part 12, at 7-9 [Defs.' Mem. of Law].)

**\*10** Plaintiff responds with a three-part argument: (1) Defendant Hodes acted with the requisite mental state because he knew on March 12, 2004, that Plaintiff had a DOCS-issued beard exemption (due to his previous encounter with Plaintiff in late 2003); (2) Defendants Craft and O'Keefe acted with the requisite mental state because they recklessly failed to take the easy step of checking if he had a beard exemption; and (3) each Defendant, after causing Plaintiff to be confined to Administrative Segregation, failed to "[ ]check [ ]" up on him there. (Dkt. No. 48, at 16-17 [Pages 15 and 16 of Plf.'s Response Mem. of Law].)

I can find no record evidence that any Defendant knew of the allegedly inadequate prison conditions that Plaintiff would experience in Administrative Segregation at Ulster C.F. before they caused Plaintiff to be confined there. Furthermore, I know of no case law that imposes on a correctional official who charges an inmate with a disciplinary offense a duty to "check up" on that inmate once he is confined to administrative segregation, or that deems that official to be *reckless* if he fails to check up on that inmate.

Plaintiff may have adduced some evidence that Defendants Hodes and O'Keefe turned a blind eye to the written exemption inside the top of his "draft bag" upon his arrival at Ulster C.F. on March 12, 2004. (Dkt. No. 43, Part 3, at 17-28 [Ex. A to McCartin Decl.,

attaching Plf.'s depo. trans.].) However, that evidence does not constitute evidence that Defendants Hodes and O'Keefe possessed a reckless mental state with regard to the prison conditions that Plaintiff would experience in Administrative Segregation at Ulster C.F.

For these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's Eighth Amendment claim of inadequate prison conditions for failure to establish that Defendants acted with a sufficiently culpable state of mind with regard to the conditions of Plaintiff's confinement during his six-day stay in Administrative Segregation at Ulster C.F.

### C. Whether Plaintiff's First Amendment Retaliation Claim Should Be Dismissed Because He Failed to Establish that the Adverse Action Allegedly Taken Against Him Was Anything More than *De Minimis* in Nature

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

Barnes v. Craft, Not Reported in F.Supp.2d (2008)

2008 WL 3884369

**\*11** *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) [citations omitted].

Defendants focus their First Amendment argument on the assertedly *de minimis* nature of the adverse action, the fact that it was not accompanied by any threat of future such adverse action, and the fact that Plaintiff subjectively expected that the adverse action would be brief (at the time it was taken). (Dkt. No. 43, Part 12, at 12-15 [Defs.' Mem. of Law].) In response, Plaintiff focuses on, among other things, the nature of the deprivations he unjustifiably experienced during his confinement in Administrative Segregation. (Dkt. No. 48, at 18-19 [Pages 17 and 18 of Plf.'s Response Mem. of Law].)

In making their argument, Defendants attempt to distinguish the facts of the current case from the facts of a Second Circuit case finding that a question of fact existed as to the *de minimis* nature of a nine-day keeplock confinement, *which was accompanied by threat of future misbehavior reports. See Gill v. Tuttle,* 93 F. App'x 301, 303 (2d Cir.2004). I agree that this sort of additional adverse action by a defendant is an adequate ground upon which to distinguish *Gill v. Tuttle* and similar cases. [52] Granted, I have found some district court cases (from within the Second Circuit) ruling that a question of fact existed as to

the *de minimis* nature of keeplock confinements that do not appear to have been accompanied by such additional adverse action. [53] However, the keeplock confinements in those cases were somewhat longer than was the keeplock confinement in this action.

52   *See, e.g., Keesh v. Goord,* 04-CV-0271, 2007 WL 2903682, at \*10 (W.D.N.Y. Oct.1, 2007) (question of fact existed as to *de minimis* nature of Correction Officer Ekpe's keeplock confinement of plaintiff for one day, during which, according to the record evidence [specifically, Plf.'s Ex. 9], Correction Officer Ekpe "may have ... deprived [plaintiff] of meals") [citations omitted]; *see also Keesh v. Goord,* 04-CV-0271, Verified Complaint, ¶ "IV.W." (W.D.N.Y. filed Apr. 7, 2004) (swearing that Def. Ekpe and officials "refused to provide me with my meal").

53   *See, e.g., Auleta v. LaFrance,* 233 F.Supp.2d 396, 402 (N.D.N.Y.2002) (Kahn, J.) ("At this stage of the action [i.e., the pleading stage], Plaintiff's claim that he was placed in keeplock for 7½ days is properly construed as alleging adverse action") [citations omitted]; *Bartley v. Collins,* 95-CV-10161, 2006 U.S. Dist. LEXIS 28285, at \*22, 2006 WL 1289256 (S.D.N.Y. May 12, 2006) ("Collins's second misbehavior report against plaintiff did constitute adverse action because it caused plaintiff to be placed in keeplock confinement for ten days.") [citations omitted]; *Wells v. Wade,* 96-CV-1627, 2000 WL 1239085, at \*4 (S.D.N.Y. Aug.31, 2000) ("[A] rational trier of fact could find that the filing of a frivolous misbehavior report that resulted in thirteen days of pre-hearing 'keeplock' confinement would be likely to chill a person of ordinary firmness from continuing to engage in activity protected by the First Amendment: namely, pursuing a prison grievance.") [internal quotations omitted].

I have also found some cases in which a plaintiff was taken to a Special Housing Unit ("S.H.U."), as was Plaintiff in the current action. [54] These cases suggest that, generally, a *transfer* to a housing unit may be a type of adverse action that is more than *de minimis.* [55] However, these cases do appear to be somewhat distinguishable because they invariably involve a formal *transfer* (i.e., change in residence) to a Special Housing Unit for a long period of time. [56]

54   (*See* Dkt. No. 43, Part 11, ¶ 12 [Defs.' Rule 7.1 Statement, asserting that Plaintiff was "place[d]

in administrative segregation status in the Special
Housing Unit ... at Ulster Correctional Facility...."];
Dkt. No. 43, Part 9, ¶¶ 8, 10 [O'Keefe Decl., stating
that "I was directed to have the plaintiff taken to SHU
on administrative segregation status ..." and "plaintiff
was placed in the SHU on March 12, 2004 ..."].)

55    *See Allah v. Poole,* 506 F.Supp.2d 174, 187
(W.D.N.Y.2007) ( "[C]ourts have held that transfers
to other facilities or housing units can satisfy
the adverse-action requirement ...."} [collecting
cases]; *Chavis v. Struebel,* 317 F.Supp.2d 232,
238-39 (W.D.N.Y.2004) ("[T]ransferring an inmate to
another housing unit or to a psychiatric facility ...
satisfies the adverse action requirement.") [citations
omitted].

56    *See, e.g., Walker v. Pataro,* 99-CV-4607, 2002
WL 664040, at *8-9 (S.D.N.Y. Apr.23, 2002)
(question of fact exists as to *de minimis* nature
of permanent transfer to different housing unit in
general population, which resulted in loss of higher-
paying prison job).

**\*12** Here, there was no long-term transfer to the Ulster
C.F. S.H.U. Rather, Plaintiff was taken to the Ulster
C.F. S.H.U. (during his transportation through Ulster
C.F.) for what was intended to be, and what Plaintiff
*understood* would be, a brief period of time. [57] There is
no admissible record evidence that Defendants *knew* the
duration of, or (allegedly) substandard conditions of, the
confinement that Plaintiff would ultimately experience in
the Ulster C.F. S.H.U. [58] Moreover, there is no admissible
record evidence that Plaintiff ended up staying in S.H.U.
for six days *because of* the acts of Defendants O'Keefe
or Craft (or any Defendant). [59] Rather, the admissible
record evidence suggests that the delay in Plaintiff's
release from S.H.U. was caused by (1) the delay of
the Inmate Records Coordinator in reviewing Plaintiff's
file (presumably in DOCS' Central Files) to determine
whether he was correctly stating that he had an exemption
for his beard, and/or perhaps (2) Plaintiff's own delay in
sending a letter to his Administrative Segregation hearing
officer regarding his release. [60]

57    (Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing that
"After I contacted the facility Watch Commander
on March 12, 2004 and informed him of the
circumstances, I was directed to have the plaintiff
taken to SHU on administrative segregation status
until plaintiff's file could be reviewed and it could

be determined whether plaintiff was correctly stating
that he had an exemption for his beard. The Inmate
Records Coordinator was going to be the individual
to check the records."]; Dkt. No. 43, Part 3, at 18,
22-23 [Ex. A to McCarin Decl., attaching Plf.'s depo.
trans., stating that, during the time in question, he was
being "transported through Ulster [C.F.]" on his way
back from "court appearances in New York City"];
Dkt. No. 43, Part 3, at 45 [Ex. A to McCarin Decl.,
attaching Plf.'s depo. trans., stating that he did not
write a letter before March 17, 2004, "because I figure
I would have been out of the box before this because
they would have verified that I had a permit but
apparently that didn't happen."].)

58    (Dkt. No. 43, Part 8, ¶¶ 7-11 [Craft Decl.]; Dkt.
No. 43, Part 9, ¶¶ 8, 10-11 [O'Keefe Decl.]; Dkt.
No. 43, Part 10, ¶¶ 10, 12-13 [Hodes Decl.]; Dkt.
No. 43, Part 3, at 40 [Ex. A to McCarin Decl.,
attaching Plf.'s depo. trans.]; *see also* Dkt. No. 48,
Plf.'s Rule 7.1 Response, ¶ 15 [stating, "Plaintiff
posses[es] no information or knowledge" in response
to Defendants' Rule 7.1 factual assertion that "[f]rom
March 12, 2004 until March 17, 2004, none of
[D]efendants w[as] responsible for the conditions
of the Ulster Correctional Facility SHU while
[P]laintiff was in that SHU"].) I note that the
only role that Defendants O'Keefe and Craft played
in Plaintiff's confinement to S.H.U. was in the
initial decision to take Plaintiff to S.H.U.-Defendant
O'Keefe recommending that Plaintiff be subject to
Administrative Segregation, and Defendant Craft
authorizing Plaintiff's pre-hearing confinement to
Administrative Segregation. (Dkt. No. 43, Part 9,
¶ 8 [O'Keefe Decl., swearing, "After I contacted
the facility Watch Commander on March 12, 2004
and informed him of the circumstances, I was
directed to have the plaintiff taken to SHU on
administrative segregation status...."]; Dkt. No. 9, at
18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy
of Administrative Segregation Recommendation of
March 12, 2004, authored by Defendant O'Keefe, and
authorized by Defendant Craft]; Dkt. No. 9, ¶ 7[c]
[Plf.'s Verified Am. Compl., alleging that Def. Craft
"failed to ... see why I should not be sent to the Special
Housing Unit [and] he never verified that I had or
had not an exemption from cutting my beard...."];
Dkt. No. 43, Part 10, ¶ 10 [Hodes Decl., swearing,
"I played no role in a decision to place plaintiff into
administrative segregation in the Ulster SHU. That
decision was made by others...."].)

59    (*See* Dkt. No. 43, Part 10, ¶ 12 [Hodes Decl.,
swearing, "Once plaintiff was placed in the SHU on

March 12, 2004, I had no further contact with him."];
Dkt. No. 43, Part 9, ¶ 10 [O'Keefe Decl., swearing,
"Once plaintiff was placed in the SHU on March
12, 2004, I had no further contact with him."]; Dkt.
No. 43, Part 8, ¶ 11 [Craft Decl., swearing that,
during Plaintiff's confinement to S.H.U., he had no
involvement in the conditions of that confinement].)

60    (Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing,
"I was directed to have the plaintiff taken to SHU
on administrative segregation status until plaintiff's
file could be reviewed and it could be determined
whether plaintiff was correctly stating that he had
an exemption for his beard. The Inmate Records
Coordinator was going to be the individual to check
the records. ... ]; Dkt. No. 9, at 18 [Plf.'s Verified
Am. Compl., attaching copy of Administrative
Segregation Recommendation of March 12, 2004,
authored by Defendant O'Keefe, and authorized
by Defendant Craft, indicating that Plaintiff would
be "confined pending a determination on [the]
recommendation," a hearing would "be conducted
within 14 days of [the] recommendation," and that
Plaintiff could "write to the Deputy Superintendent
for Security or his/her designee prior to the hearing
to make a statement on the need for continued
confinement"]; Dkt. No. 43, Part 3, at 45-47 [Ex. A to
McCarin Decl., attaching Plf.'s depo. trans., stating
that he did not write a letter before March 17, 2004,
"because I figure I would have been out of the box
before this because they would have verified that I
had a permit but apparently that didn't happen. And,
so, ... I wrote that letter to [the Lieutenant or Hearing
Officer who would be conducting his Administrative
Segregation Hearing] and I gave it to the Officer for
mailing."].)

As a result, I find some guidance in a case from the
U.S. District Court for the Western District of New York
that recently recognized the rather common-sense point
of law that, when considering whether or not adverse
action is *de minimis* for purposes of a First Amendment
retaliation claim, it is appropriate for a court to focus on
the adverse action *caused by the defendant or defendants
in question* (rather than whatever bad things happened to
the plaintiff following the taking of adverse action by the
defendant or defendants). In *Coleman v. Sutton,* a prison
doctor transferred a prisoner to the prison's infirmary,
where-because of the prisoner's own refusal to stay in the
infirmary-he was then transferred to the prison's Special
Housing Unit. *Coleman v. Sutton,* 530 F.Supp.2d 451,
452-53 (W.D.N.Y.2008). The Western District held that
the prisoner's transfer to S.H.U. was not sufficiently

adverse to constitute adverse action (for purposes of the
prisoner's First Amendment retaliation claim against the
correctional officer) since that transfer was caused not by
the correctional officer but by the plaintiff's own refusal
to stay in the prison's infirmary. *Coleman,* 530 F.Supp.2d
at 453.

Here, as in *Coleman,* while Plaintiff's *initial placement* in
S.H.U. was caused by Defendants O'Keefe and Craft,
Plaintiff's stay there *for six days* was caused not by those
Defendants but by other events. Under the circumstances,
I can find no record evidence that Plaintiff's being taken
to S.H.U. pending the Ulster C .F. Inmate Records
Coordinator's review of Plaintiff's file (to determine
whether he was correctly stating that he had an exemption
for his beard) was an action that was sufficiently adverse
to deter a similarly situated individual of ordinary
firmness from exercising his constitutional rights (i.e., by
continuing to wear a beard of more than an inch in length
as a tenet of his Rastafarian religion).

*13    For these reasons, I recommend that, in the
alternative, the Court dismiss Plaintiff's First Amendment
retaliation claim because he has failed to establish that the
adverse action allegedly taken against him was anything
more than *de minimis* in nature.

### D. Whether, in the Alternative, Plaintiff's Claims Against Defendants Goord and Craft Should Be Dismissed Because Plaintiff Has Failed to Establish that They Were Personally Involved in the Constitutional Violations Alleged

Because I have already concluded that no constitutional
violations occurred in which any Defendant (including
Defendants Goord and Craft) could have been personally
involved, the Court need not analyze Defendants'
alternative argument that Plaintiff's claims against
Defendants Goord and Craft be dismissed because
Plaintiff has failed to establish that they were personally
involved in the constitutional violations alleged. However,
in the interest of thoroughness, I will analyze that
argument (and assume, for the sake of argument, that
constitutional violations did occur in which they could
have been personally involved).

" '[P]ersonal involvement of defendants in alleged
constitutional deprivations is a prerequisite to an award
of damages under § 1983.' " *Wright v. Smith,* 21 F.3d
496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of*

*Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ). [61] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. [62] If the defendant is a supervisory official, such as a DOCS Commissioner or Deputy Commissioner, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. [63] In other words, supervisory officials may not be held liable merely because they held a position of authority. [64] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation, (2) failed to remedy the violation after being informed of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing or supervising subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring. [65]

[61]  *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

[62]  *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

[63]  *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

[64]  *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

[65]  *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007) (setting forth five prongs); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (setting forth four prongs).

**1. Defendant Goord**

In their Rule 7.1 Statement, Defendants have asserted that "Defendant Goord was not personally involved in any of the actions that lead to the plaintiff's confinement in the Ulster Correctional Facility SHU from March 12, 2004

until March 17, 2004," supporting that assertion with a record citation. (Dkt. No. 43, Part 11, ¶ 23 [Defs.' Rule 7.1 Statement, citing pages 28-29 of Plaintiff's depo. trans.].) Setting aside the fact that Defendants' assertion is too much like a conclusion of law, I find that the deposition transcript to which they cite does not go so far as to say that Defendant Goord "was not personally involved" in the constitutional violations alleged. (Dkt. No. 43, Part 3, at 28-31 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].)

**\*14**  Rather, fairly and reasonably read, Plaintiff's deposition transcript says that Defendant Goord's involvement was limited to the fact that (1) he had (presumably) created two conflicting rules and/or policies (i.e., a rule or policy requiring a prisoner to physically possess on his person his written beard-exemption during a prison transfer and a rule or policy prohibiting the prisoner from physically possessing property on their person during a prison transfer), and (2) he had (presumably) failed to property instruct or train his subordinates as to how to resolve that conflict without violating the prisoner's rights. (*Id.*) Clearly, this is meant to assert that Defendant Goord was personally involved through the third and fourth means of personal involvement described above-(1) the creation, or allowed continuance, of a policy or custom under which the violation occurred, and/or (2) gross negligence in the managing or supervising of subordinates who caused the violation.

However, Defendants are correct that Plaintiff's deposition testimony contains no evidence of any other of the five sorts of personal involvement described above-(1) direct participation in the alleged constitutional violation, (2) a failure to remedy the violation after being informed of it through a report or appeal, or (3) the exhibition of deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring. Therefore, having established this specific fact for purposes of their summary judgment motion, Defendants were entitled to have the fact either admitted by Plaintiff or denied by him with an accurate record citation. N.D.N.Y. L.R. 7.1(a)(3). Plaintiff denies the assertion. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 23.) However, the only "evidence" he cites in support of that denial are those portions of his Amended Complaint, Opposition to Defendants' Motion to Dismiss for Failure to State a Claim, and Objections to my previous Report-

2008 WL 3884369

Recommendation, wherein he "charge[d]" Defendant Goord with "actions" and "inactions" causing Plaintiff's injuries. (*Id.*)

Such a general citation is not the "specific citation to the record where the factual issue arises" that is required by Local Rule 7.1(a)(3). As a result, the Court need not, and I recommend that it decline to, *sua sponte* sift through the 52 pages of Plaintiff's verified Objections to my previous Report-Recommendation in a quest for a specific factual assertion by Plaintiff that Defendant Goord was personally involved in one of the three ways described in the previous paragraph of this Report-Recommendation. (Among other things, the chance of Plaintiff having personal knowledge of such facts is extremely unlikely, in light of his other allegations.) Furthermore, Plaintiff's Opposition to Defendants' Motion to Dismiss does not constitute evidence because it was not verified. (Dkt.Nos.22.) Finally, his Amended Complaint generally may constitute evidence since it is verified. (Dkt. No. 9.) However, the portion of his Amended Complaint in which he refers to Defendant Goord (in a footnote in Paragraph "7.D.") is not sufficiently specific as to Defendant Goord's "actions and inactions" to constitute admissible evidence based on personal knowledge to successfully oppose a motion for summary judgment. *See* Fed.R.Civ.P. 56(e)(1) ("A supporting or opposing affidavit must be made on personal knowledge ...."); *see also, supra,* notes 33-34 of this Report-Recommendation.

**\*15** As a result, Plaintiff has effectively admitted the narrowed fact described above-that there contains no record evidence that Defendant Goord (1) directly participated in the alleged constitutional violation, (2) failed to remedy the violation after being informed of it through a report or appeal, or (3) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring. It will turn, then, to Plaintiff's theory that Defendant Goord was personally involved because he (1) created, or allowed to continue, a policy or custom under which the violation occurred, and/or (2) was grossly negligent in the managing or supervising of subordinates who caused the violation.

Plaintiff points to no admissible record evidence of a *DOCS-wide* rule or policy, created or promulgated by Defendant Goord, prohibiting the prisoner from physically possessing property on their person during a

prison transfer. (Dkt. No. 48, at 17-18 [Pages 16 and 17 of Plf.'s Response Mem. of Law].) Nor does Plaintiff point to any admissible record evidence of a DOCS-wide rule or policy, created or promulgated by Defendant Goord, requiring a prisoner to physically possess *on his person* his written beard-exemption during a prison transfer. (*Id.*) [66] Nor does Plaintiff point to any record evidence that Defendant Goord failed to properly instruct or train his subordinates as to how to ascertain or confirm a prisoner's possession of a written beard-exemption during a prison transfer without violating the prisoner's rights. (*Id.*) [67] The only "evidence" that Plaintiff has is (1) the fact of Defendant Goord's position as the "boss of Corrections," [68] and the (2) occurrence of the (presumed) violation in question. (*Id.*) This sort of liability (premised on the theory that a supervisor must have been liable because his subordinate did something wrong) is precisely the sort of *respondeat superior* liability that is not allowed under 42 U.S.C. § 1983.

[66]   I note that the written beard-exemption in question, issued by Deputy Commissioner Lucien J. Leclaire, Jr., on December 8, 2003, merely states, "This letter should be retained by you and will serve as your statewide beard and mustache exemption permit." (Dkt. No. 43, Part 6.)

[67]   For example, Plaintiff points to no admissible record evidence that incidents such as the one at issue in this action had previously occurred and been brought to Defendant Goord's attention, or that he had otherwise known of a need to instruct correctional officers on how to ascertain or confirm a prisoner's possession of a written beard-exemption during a prison transfer without violating the prisoner's rights. In addition, I note that defense counsel asked Plaintiff in his deposition, "Do you have any evidence or reason to believe that Commissioner Goord instructs Officers not to walk ten feet away to check a draft bag to determine if the permit is available in that draft bag [as Plaintiff asserts it was in this circumstance]" (Dkt. No. 43, Part 3, at 30 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].) In pertinent part, Plaintiff responded, "I don't know exactly what he instructs them...." (*Id.*)

[68]   (Dkt. No. 43, Part 3, at 28 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].)

### 2. Defendant Craft

In their Rule 7.1 Statement, Defendants have asserted the following facts, in pertinent part: (1) "[f]rom March 12, 2004 until March 17, 2004, [Defendant Craft was not] responsible for the conditions of the Ulster Correctional Facility SHU while [P]laintiff was in that SHU"; (2) "[f]rom March 12, 2004 until March 17, 2004, [Defendant Craft had no] interaction with [Plaintiff] while he was in the Ulster Correctional Facility SHU"; (3) "Plaintiff never spoke to [D]efendant Craft from March 12, 2004 until March 17, 2004"; (4) "Plaintiff did not write to [D]efendant Craft requesting to be released from the Ulster Correctional Facility SHU until March 17, 2004"; (5) "Defendant Craft never received [P]laintiff's March 17, 2004 letter"; and (6) "[o]n the same morning that [P]laintiff wrote to [D]efendant Craft, [P]laintiff was in fact released from the Ulster Correctional Facility SHU and was transported back to Wyoming Correctional Facility." (Dkt. No. 43, Part 11, ¶¶ 14-15, 19-22 [Defs.' Rule 7.1 Statement].) Moreover, Defendants have supported each factual assertion with one or more accurate record citations. (*Id.*) [69]

[69]   In an apparent typographical error, I note that Defendants mistakenly cited Paragraphs 8 through 10, rather than Paragraph 11, of Defendant Craft's declaration in support of the first factual assertion listed above. (*See* Dkt. No. 43, Part 11, ¶ 15 [Defs.' Rule 7.1 Statement]; Dkt. No. 43, Part 8, ¶ 11 [Craft Decl .].)

**\*16** In his Rule 7.1 Response, Plaintiff states "[d]eny" with regard to each of the six factual assertions listed above. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶¶ 14-15, 19-22.) However, Plaintiff's assertions following each of these "denials" render the denials ineffective for purposes of Local Rule 7.1(a)(3), which requires that, in order to successfully controvert a fact asserted in a Statement of Material Facts, the non-movant must, among other things, (1) "specifically controvert[ ]" the facts in question, and/or (2) "set forth a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 7.1(a)(3).

In particular, with regard to the first factual assertion, Plaintiff acknowledges that he "possesses no information or knowledge to respond [to that assertion]." (*Id.* at ¶ 15.) With regard to the second factual assertion, Plaintiff states only that Defendant *O'Keefe* spoke to an unidentified correction officer in the Ulster C.F. S.H.U. on March 12, 2004, and in any event Plaintiff provides no record citation in support of this assertion. (*Id.* at ¶ 14.) With regard to the

third factual assertion, he effectively *admits* that assertion, stating, "Plaintiff never spoke to Defendant Craft." (*Id.* at ¶ 19.) [70] He also effectively admits the fourth factual assertion, stating that he did not write the letter in question until March 17, 2004. (*Id.* at ¶ 20.) [71] With regard to the fifth factual assertion, he again acknowledges that he "possesses no information or knowledge to respond [to that assertion]." (*Id.* at ¶ 21.)

[70]   Apparently, Plaintiff takes issue with only the word "until" in the factual assertion contained in Paragraph 19 of Defendants' Rule 7.1 Statement, which he interprets as implying that Plaintiff did in fact speak to Defendant Craft on March 17, 2004. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 19.) If so, I find that this controversy can be eliminated by simply construing Defendants' factual assertion as reading "Plaintiff never spoke to [D]efendant Craft from March 12, 2004 *through* March 17, 2004," which is clearly the fact that Defendants are intending to assert. (*See* Dkt. No. 43, Part 3, at 28 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.]; Dkt. No. 43, Part 8, ¶¶ 8-10 [Craft Decl.] .)

[71]   Again, apparently, Plaintiff takes issue with only part of the factual assertion in question, asserting that he addressed the letter to the "Lt./Hearing Officer," and not to Defendant Craft. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 20.) If so, I find that he cites no record evidence controverting his deposition testimony that he *intended* the letter to go to Defendant Craft. (Dkt. No. 43, Part 3, at 45-47 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans., stating, "I ... did write the Lieutenant Craft. I don't ... think at the time I remembered his name. But Sergeant O'Keefe did mention ... Lieutenant Craft.... I don't think I wrote Lieutenant Craft specifically. But, I did write [the letter to the] Lieutenant because I knew it was a Lieutenant."].) In any event, I find that any factual dispute about this narrow issue is immaterial, since the crux of Defendants' factual assertion is clearly that Plaintiff did not write a letter to Defendant Craft requesting to be released from the S.H.U. until March 17, 2004, *if ever.*

Finally, with respect to the sixth factual assertion, Plaintiff appears to take issue with only part of the factual assertion in question, asserting that he was not transported back to *Wyoming Correctional Facility* but was "placed on a DOCS bus toward *Auburn Correctional Facility.*" (*Id.* at ¶ 22 [emphasis added].) For the sake of brevity, I will set aside the evidentiary insufficiency of the documents on the

docket to which Plaintiff cites in support of partial denial. (*Id.*) Rather, I find that the limited fact that Plaintiff is denying is immaterial to Defendants' motion and thus can be disregarded by the Court.

As a result, pursuant to Local Rule 7.1(a)(3), the following five facts are undisputed for purposes of Defendants' motion: (1) from March 12, 2004, until March 17, 2004, Defendant Craft was not responsible for the conditions of the Ulster C.F. S.H.U. while Plaintiff was in that S.H.U.; (2) from March 12, 2004, until March 17, 2004, Defendant Craft had no interaction with Plaintiff while he was in the Ulster C.F. S.H.U.; (3) Plaintiff never spoke to Defendant Craft from March 12, 2004, through March 17, 2004; (4) Plaintiff did not write to Defendant Craft requesting to be released from the Ulster C.F. S.H.U. until March 17, 2004, if ever; (5) Defendant Craft never received Plaintiff's March 17, 2004, letter; and (6) on the same morning that Plaintiff wrote his March 17, 2004, letter, Plaintiff was in fact released from the Ulster C.F. S.H.U.

**\*17** Based on these undisputed facts, and based on the lack of record evidence establishing any involvement of Defendant Craft in the conditions of confinement that Plaintiff experienced in the Ulster C .F. S.H.U., I find that no rational fact-finder could conclude that Defendant Craft was personally involved in the Eighth Amendment violation alleged by Plaintiff. [72] I make the same finding with regard to Plaintiff's Fourteenth Amendment due process claim because (even assuming Plaintiff possessed a right of procedural due process arising from his six-day confinement in S.H.U.) he was afforded all the process that was due from Defendant Craft under the circumstances in that (1) no record evidence exists that Plaintiff did not properly receive notice of the Administrative Segregation Recommendation, [73] and (2) Plaintiff was entitled to a hearing only within *14 days* of Defendant O'Keefe's signing of the Administrative Segregation Recommendation on March 12, 2004. [74] However, I have trouble making the same finding with regard to Plaintiff's First Amendment retaliation claim, because record evidence exists that Defendant Craft was the individual who signed the Administrative Segregation Recommendation (submitted by Defendant O'Keefe on March 12, 2004) authorizing Plaintiff's confinement in S.H.U. pending a hearing to be conducted within 14 days of the recommendation. [75]

[72] I note that, as I stated in Part III.B.2. of this Report-Recommendation, I know of no case law that imposes on a correctional official who charges an inmate with a disciplinary offense a duty to "check up" on that inmate once he is confined to administrative segregation, or that deems that official to be *reckless* if he fails to check up on that inmate.

[73] (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, containing paragraph at bottom labeled, **"Notice to Inmate"**] [emphasis in original]; *cf.* Dkt. No. 43, Part 3, at 27-28, 45 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans., stating that, before Plf. was brought to the Ulster C.F. S.H.U., Def. Craft orally informed Plf. to write to Def. Craft if he "wanted to get out of the box or not go in the box"].)

[74] (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, stating, in pertinent part, "A hearing will be conducted within 14 days of this recommendation in accordance with the provisions of Part 254 of Chapter V."]; Dkt. No. 43, Part 8, ¶ 3 [Craft Decl.] *See also* 7 N.Y. Comp.Codes R. & Regs. § 301.4(a) ("This hearing [conducted pursuant to Part 254] shall be conducted with 14 days of an inmate's admission to administrative segregation, after issuance of an administrative segregation recommendation made by the employee who ascertained the facts or circumstances.").

[75] (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, authored by Defendant O'Keefe, and authorized by Defendant Craft]; *cf.* Dkt. No. 9, ¶ 7[c] [Plf.'s Verified Am. Compl., asserting that Def. Craft "failed to ... see why I should not be sent to the Special Housing Unit [and] he never verified that I had or had not an exemption from cutting my beard...."]; Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing, "After I contacted the facility Watch Commander on March 12, 2004 and informed him of the circumstances, I was directed to have the plaintiff taken to SHU on administrative segregation status...."].)

For these reasons, I recommend, in the alternative, as follows: (1) that all of Plaintiff's claims against Defendant Goord be dismissed because Plaintiff has failed to establish that he was personally involved in the constitutional violations alleged; and (2) that only

Plaintiff's Eighth and Fourteenth Amendment claims be dismissed against Defendant Craft because Plaintiff has failed to establish that he was personally involved in the constitutional violations alleged.

### E. Whether, in the Alternative, Plaintiff's Claims Against all Defendants Should Be Dismissed Because, Based on the Current Record, They Are Protected from Liability by the Doctrine of Qualified Immunity, as a Matter of Law

Because I have already found that adequate grounds exist upon which to recommend the dismissal of Plaintiff's claims, the Court need not analyze Defendants' alternative argument that Plaintiff's claims against all Defendants should be dismissed because, based on the current record, Defendants are protected from liability by the doctrine of qualified immunity, as a matter of law. (Dkt. No. 43, Part 12, at 15-17 [Defs.' Mem. of Law].) As a result, I do not analyze Defendants' argument other than to make one point.

In my Report-Recommendation of January 30, 2007, addressing Defendants' motion to dismiss for failure to state a claim, I stated, "I believe that a credible argument might be made by Defendants that the law [as to whether a DOCS-issued exemption from the one-inch beard rule was effective, or whether a court order was required] was not clearly established [on March 12, 2004], giving rise to a qualified immunity defense." (Dkt. No. 24, at 31-32 & nn. 84-84.) As explained in that Report-Recommendation, I made that statement based on the case of *Young v. Goord*, in which the U.S. District Court for the Eastern District of New York traced the "alternat[ing]" law between November 16, 1993, and February 5, 2001, with regard to whether a DOCS "exemption" or a "court order" was necessary to excuse an inmate from the effects of DOCS' one-inch beard rule. *Young v. Goord*, 01-CV-0626, *2005 WL 562756, at *2-6 (E.D.N.Y. March 10, 2005)*, *aff'd, 192 F. App'x 31 (2d Cir. Aug 2, 2006)* (unpublished decision cited only to show case's subsequent history). In their argument regarding qualified immunity, Defendants have cited no case after *Young*, suggesting that the law continued to alternate after February 5, 2001. (Dkt. No. 43, Part 12, at 15-17 [Defs.' Mem. of Law].)[76] As a result, I have no reason to believe that that point of law was not clearly established by March 12, 2004.

[76]    Indeed, *Young* stated that the DOCS Directive issued on February 5, 2001, "remain[s] in force" as of the date of the decision, which was March 10, 2005. *Young,* 2005 WL 562756, at *6.

### F. Whether, in the Alternative, Plaintiff's Action Should Be Dismissed Under Local Rule 41.2(b) Because of His Failure to Keep the Court Apprised of His Current Address

*18    Defendants argue that, in the alternative, Plaintiff's action should be dismissed under Local Rule 41.2(b) because (1) he was released from DOCS' custody on November 13, 2007, (2) since November 13, 2007, and the date of Defendants' motion, January 23, 2008, Plaintiff had failed to notify the Court of his current address, and (3) this failure has caused the Court's mail to Plaintiff (specifically, the Court's receipt of Plaintiff's partial payment of the Court filing fee) to be returned as undeliverable on November 20, 2007. (Dkt. No. 43, Part 12, at 17-18 [Defs.' Mem. of Law; Dkt. No. 43, Part 11, ¶ 26 [Defs.' Rule 7.1 Statement].) Defendants are correct in the above recitation of events. Indeed, an additional mailing from the Court to Plaintiff was returned as undeliverable on January 7, 2008, due to Plaintiff's failure to promptly notify the Court of his change in address upon release from DOCS. (Dkt.Nos.42.)

However, on January 17, 2008, Plaintiff resurfaced in the Bergan County Jail in Hackensack, New Jersey, and by letter notified the Court of his change in address. (Dkt. No. 45.) In his letter, Plaintiff explained that, immediately upon his release from DOCS, he was taken into custody by the Department of Homeland Security and "placed in [i]mmigration proceedings," wherein he was (allegedly) denied access to his legal work and materials necessary to write to the Court. (*Id.*) Plaintiff repeats these assertions in his sworn declaration in opposition to Defendants' motion. (Dkt. No. 48, Plf.'s Decl. in Opp., ¶¶ 2-4.) Defendants have submitted no reply to Plaintiff's response. In addition, I can find only minimal prejudice to the Court and Defendants due to Plaintiff's two-month delay, under the circumstances.

For these reasons, I find that Plaintiff's two-month failure to keep the Court notified of his current address is not an appropriate ground upon which to dismiss his Amended Complaint. Rather, Plaintiff's Amended Complaint should be dismissed for the reasons (and

alternative reasons) discussed above in Parts III.A. through III.D. of this Report-Recommendation.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 43) be *GRANTED.*

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but were not, presented to the Magistrate Judge in the first instance.** [77]

[77]     *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n.

8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 3884369

---

**End of Document**          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00194-TJM-TWD    Document 233    Filed 09/05/17    Page 191 of 211

Gibson v. City of New York, Not Reported in F.Supp. (1998)

1998 WL 146688

🚩 KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by Curry v. Kerik, S.D.N.Y., April 10, 2001

1998 WL 146688

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Rufus GIBSON, Plaintiff,

v.

The City of New York; Warden Ortiz; Deputy
Warden Edwin Knight; Deputy Warden
Clyton Eastmond; John Doe Area Captains
(of assigned posts at times of violations of
Block 5 South in Otis Bantum Correctional
Center CPSU); John Doe Captain (Badge #
878); and John Doe Official, Defendants.

No. 96 CIV. 3409(DLC).

|

March 25, 1998.

**Attorneys and Law Firms**

Rufus Gibson, Pro Se, Fishkill Correctional Facility,
Beacon.

Jeffrey Friedlander, Esq., Acting Corporation Counsel for
the City of New York, New York, By Renee Nebens, Esq.,
Assistant Corporation Counsel.

OPINION AND ORDER

COTE, District J.

**\*1** On May 9, 1996, Rufus Gibson ("Gibson") filed
this action pursuant to Section 1983 claiming that the
defendants had violated his Fourteenth Amendment
rights while he was a pretrial detainee, by subjecting
him to unconstitutional conditions of confinement and
by depriving him of due process prior to a disciplinary
confinement. [1] On May 9, 1996, Chief Judge Griesa, to
whom this case was then assigned, ordered Gibson to
file an amended complaint within sixty days with more
specific information to show why he is entitled to relief. On
May 23, 1996, the plaintiff filed a slightly more detailed
complaint (the "First Amended Complaint"), which was
accepted by the Court as meeting the requirements of the
May 9, 1996 Order. On March 4, 1997, the defendants

filed a motion to dismiss the First Amended Complaint
for failure to state a claim. [2] At a March 7, 1997, pretrial
conference held on the record, the Court allowed the
plaintiff to either oppose that motion or further amend his
complaint. On April 7, 1997, the plaintiff filed a Second
Amended Complaint which contained more detail and
which changed the named defendants to those listed in
the caption of this Opinion and Order. The defendants
now move to dismiss the Second Amended Complaint
for failure to state a claim and the plaintiff moves for
the entry of a default judgment against defendant Robert
Ortiz ("Ortiz"). [3] For the reasons stated below, the motion
to dismiss is granted in part and denied in part and the
motion for entry of a default judgment is denied.

[1]     Gibson has since been convicted and transferred to
the custody of the New York State Department of
Corrections.

[2]     The motion to dismiss the First Amended Complaint
was made on behalf of defendants named in
that pleading: the New York City Department
of Correction Otis Bantum Correctional Facility,
Warden Ortiz, and Deputy Warden Edwin Knight.

[3]     The instant motion was originally made solely on
behalf of the City of New York. After having
been served with the Second Amended Complaint in
July 1997, defendants Clyton Eastmond and Edwin
Knight joined in the motion. On September 23,
1997, the plaintiff moved to have a default judgment
entered against Robert Ortiz, who had also been
served in July 1997, but who had not filed an answer.
On October 7, 1997, Assistant Corporation Counsel
Renee Nebens filed a declaration seeking to have
Robert Ortiz join in the instant motion. For the
reasons described elsewhere in this Opinion, the
October 7 request is granted.

Background

The Court takes as true the facts as alleged in the Second
Amended Complaint. Beginning on or about February
10, 1996, Gibson was confined in the Central Punitive
Segregation Unit ("CPSU") [4] at Rikers Island for a period
of ninety days after a disciplinary hearing. [5] For the
first thirty days of Gibson's CPSU confinement, he was
housed at the James A. Thomas Center ("JATC") even
though JATC "was ordered closed due to high levels of
asbestos, insect infestation and possibly lead paint" and

1998 WL 146688

"the general population inmates were moved to other buildings." On March 10, 1996, the CPSU was moved to the Otis Bantum Correctional Center ("OBCC"). While Gibson was housed in OBCC CPSU between March 10 and May 16, 1996, he was denied access to recreation on eight occasions (March 10, 11, and 14, April 3, 13, 20, and 22, and May 4), denied access to the law library on four occasions (March 27, 28, and 29, and April 10), denied access to a religious service on March 15, and required to choose between access to recreation and the law library on April 18 and between access to recreation and the barber shop on April 19. Gibson states that he reported each deprivation to defendants Deputy Warden Edwin Knight ("Knight") and Deputy Warden Clyton Eastmond ("Eastmond"), both of whom failed to intervene or prevent the recurrence of these deprivations. In addition, the plaintiff alleges that Ortiz was aware of the problems because Knight and Eastmond reported to him.

4   The defendants explain that the CPSU is the housing area at Rikers Island where inmates who have been disciplined for rules' infractions are housed.

5   The plaintiff does not say when his confinement in CPSU began or for what offense he was confined. The Court has inferred the date on which Gibson's confinement began from the other events for which the plaintiff provides dates.

**\*2** Gibson also states that the defendants were deliberately indifferent to his condition as an asthmatic. During a slashing incident in the law library, a John Doe Captain and a corrections officer used a chemical agent (mace) in an attempt to subdue another inmate. While Gibson was not involved in the fight, he was present in the law library at the time and the exposure to the chemical agent triggered an asthma attack. Gibson returned to his cell and used his inhaler to stop the attack. Gibson complains that he was not asked by prison officials if he wanted to see a doctor and was not taken to the prison infirmary.

Finally, Gibson claims that his due process rights were violated during the procedure which had led to his confinement in CPSU. On May 1, 1996, after an Article 78 proceeding, the infraction for which Gibson was confined in CPSU was dismissed due to "a late warden signature." Gibson, however, was not released from CPSU for another fifteen days, that is, until May 16, 1996, his regularly scheduled release date. Gibson daily asked

John Doe Area Captains and Knight why he was being held beyond his confinement date. These individuals told Gibson that they had checked and had not received an order for his release.

## Standard for Motion to Dismiss

A court may dismiss an action pursuant to Rule 12(b)(6), Fed.R.Civ.P., only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which will entitle him to relief.' " *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Koenig,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In considering the motion, the court must take "as true the facts alleged in the complaint and draw[] all reasonable inferences in the plaintiff's favor." *Jackson Nat. Life Ins. v. Merrill Lynch & Co.* 32 F.3d 697, 699–700 (2d Cir.1994). The Court can dismiss the claim only if, assuming all facts alleged to be true, plaintiff still fails to plead the basic elements of a cause of action.

When a plaintiff is proceeding *pro se,* the court must liberally construe the complaint. *See, e.g., Boddie v. Schneider,* 105 F.3d 857, 860 (2d Cir.1997). "A complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits." *Baker v. Cuomo,* 58 F.3d 814, 818 (2d Cir.1995).

## Discussion

The plaintiff's allegations form the basis for claims (1) that the defendants subjected him to conditions of confinement which violated his constitutional rights, (2) that the defendants interfered with his constitutional right for access to the courts, and (3) that the defendants violated his due process rights in connection with the procedures leading to his confinement in CPSU. The Court considers each of these claims in turn.

## I. *Conditions of Confinement*

Since the plaintiff was a pretrial detainee at the time of the alleged deprivations, his claims regarding the conditions of his confinement are governed by the Due Process Clause of the Fourteenth Amendment. *See Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.1991) (citing *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60

L.Ed.2d 447 (1979)). Under the Due Process Clause, the state may subject a pretrial detainee to restrictions that are inherent to confinement in a detention facility so long as those conditions do not amount to punishment. *See Bell,* 441 U.S. at 536–7. "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense ...." *Id.* at 537. The Supreme Court has stated that the issue is whether " 'the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.' " *Block v. Rutherford,* 468 U.S. 576, 584, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (quoting *Bell,* 441 U.S. at 538).

**\*3** While the Supreme Court has not provided specific guidance for determining when a pretrial detainee's rights have been violated, it has held that a person's Due Process rights regarding the conditions of confinement under the Fourteenth Amendment are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (citations omitted). *See Bryant,* 923 F.2d at 983; *Hayes v. New York City Dept. of Corrections,* 91 Civ. 4333, 1995 WL 495633 at \*5 (S.D.N.Y. Aug.21, 1995). The Supreme Court has articulated a two part test for determining whether an inmate has suffered an injury of a violation of his Eighth Amendment rights. *See Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). First, there is an objective component, which,

> [f]or a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a *substantial risk of serious harm.*

*Id.* (emphasis supplied). Second, there is a subjective component requiring that the prison official have a "sufficiently culpable state of mind," to wit, be deliberately indifferent to the harmful conditions. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). In *Farmer,* the Court rejected an objective test for a defendant's deliberate indifference, and held instead

> that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement

> unless the official *knows of and disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837 (emphasis supplied).

### 1. Denial of Access to Recreation

Gibson states that he was denied access to recreation on eight occasions and forced to choose between recreation and the law library or the barber shop on two other occasions. When the dates are compared, it appears that he was deprived on only one occasion of the opportunity for recreation on consecutive days—March 10 and 11. [6] While it is well-established that inmates have a right to exercise, *see Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996), the deprivation of the opportunity to participate in recreation for eight days in a sixty day period, even when coupled with the deprivation of an opportunity to exercise on two consecutive days, is not sufficiently serious to constitute punishment under the Fourteenth Amendment. *See, e.g., Anderson v. Coughlin,* 757 F.2d 35, 36 (2d Cir.1985) (an occasional day without exercise during inclement weather is not cruel and unusual punishment); *Davidson v. Coughlin,* 968 F.Supp. 121, 129 (S.D.N.Y.1997) (collecting cases under Eighth Amendment).

[6]   Gibson does not specify which option he chose when he was forced to choose between recreation and the law library or the barber shop. If he chose to forgo recreation on both of these occasions, it is possible that there were also three consecutive days when he did not have recreation—April 18, 19 and 20. This three day deprivation, however, would have been partially the result of a choice made by the plaintiff rather than solely the result of the defendants' actions.

### 2. Denial of Religious Service

Gibson alleges that he was denied access to a religious service on one occasion. This single deprivation is insufficient to state a deprivation that amounts to punishment. *See, e.g., Giglieri v. New York City Dep't of Corrections,* 95 Civ. 6853, 1997 WL 419250 at \*3 (S.D.N.Y. July 25, 1997) (duration is one factor

Case 9:17-cv-00194-TJM-TWD   Document 233   Filed 09/05/17   Page 194 of 211

Gibson v. City of New York, Not Reported in F.Supp. (1998)

1998 WL 146688

to consider in determining whether a deprivation or condition violates a pretrial detainee's Fourteenth Amendment rights). *But see Cruz v. Jackson,* 94 Civ. 2400, 1997 WL 45348 at *7 (S.D.N.Y. Feb.5, 1997) (denial of access to religious services for fifteen day period sufficient to state a claim).

### 3. *Medical Claim*

**\*4** Gibson further claims that he was denied adequate medical care when a corrections officer used mace to subdue another inmate while Gibson was in the vicinity. Specifically, Gibson complains that no officer asked him if he wanted to go to the infirmary after Gibson suffered an asthma attack. Gibson's allegations fail to meet either component of the test for a violation of his constitutional rights. While asthma may in some circumstances constitute a serious condition, Gibson promptly controlled his asthma attack with his inhaler and does not state that he suffered any further harm. Moreover, since the asthma was promptly controlled, corrections officers were not deliberately indifferent to his medical needs by failing to ask him if he wanted to go to the infirmary.

### 4. *Conditions at JATC*

Gibson alleges that during the thirty days he was confined at JATC before the CPSU was transferred to OBCC he was exposed to asbestos, insect infestation and perhaps lead paint. Further, he alleges that the CPSU remained at JATC for thirty days after a court order had closed the facility and after general population inmates had been transferred to different facilities. Gibson's allegations are sufficient to state a claim. First, Gibson's allegations regarding the conditions at JATC, coupled with the duration of his confinement there and the alleged existence of a court order closing the facility, are sufficient to describe a substantial risk of serious harm. Second, liberally construing the complaint, Gibson implies that the defendants were deliberately indifferent to that substantial risk because it took thirty days for the defendants to move the CPSU after a court order had closed JATC and after the general population inmates had been transferred.

### II. *Denial of Access to the Law Library*

The plaintiff alleges that on four occasions he was denied access to the law library and on another occasion he was forced to choose between the law library and recreation. [7]

The Court understands the plaintiff to be complaining of interference with his constitutionally protected right of access to the courts. In order to state a claim for denial of access to the courts, "a plaintiff must demonstrate that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (quoting *Lewis v. Casey,* 518 U.S. 343, ——, 116 S.Ct. 2174, 2179, 2180, 135 L.Ed.2d 606 (1996)). The actual injury requirement derives from the doctrine of standing. *Id.* Here, Gibson has not alleged that he was hindered in his efforts to pursue a legal claim. Given that the plaintiff has amended his complaint twice—once after the defendants' first motion to dismiss specifically raised this issue—and that the denial of access occurred at most five times in a sixty day period, the Court finds that granting the plaintiff further leave to amend regarding this allegation would be futile.

[7]     The plaintiff does not state which option he chose on this occasion.

### III. *Due Process Violation*

**\*5** Gibson claims that his due process rights were violated in two ways. First, there were procedural irregularities in the process by which he was first confined in the CPSU. [8] Second, he was held in the CPSU for fifteen days after his disciplinary sentence had been vacated in an Article 78 proceeding. The Second Circuit has stated that

[8]     Gibson identifies the procedural irregularity as a "late warden signature," but indicates that he requires discovery to determine the exact irregularity which caused the disciplinary decision to be revoked through the Article 78 proceeding.

[d]etermining whether an inmate has received due process involves "a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined ... and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (quoting *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996) (ellipses in original)). To show a protected liberty interest arising from state law, an inmate must show that the restraint imposes an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The relevant factors

Case 9:17-cv-00194-TJM-TWD   Document 233   Filed 09/05/17   Page 195 of 211

Gibson v. City of New York, Not Reported in F.Supp. (1998)

1998 WL 146688

which a court must consider to determine if a hardship is "atypical and significant" include:

> (1) the effect of disciplinary action on the length of prison confinement; (2) the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions; and (3) the duration of the disciplinary segregation imposed compared to discretionary confinement.

*Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). *See also Sealey,* 116 F.3d at 52; *Brooks v. Di Fasi,* 112 F.3d 46, 49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997).

The Court will address the third factor—the duration of Gibson's confinement—first. The defendants, citing *Young v. Hoffman,* 970 F.2d 1154, 1156 (2d Cir.1992), argue that Gibson's first due process claim fails since his state challenge cured any procedural defect. Thus, they argue, Gibson was improperly confined for at most fifteen days. The Second Circuit has held, however, that

> [t]he rule is that once prison officials deprive an inmate of his constitutional procedural rights at a disciplinary hearing and the prisoner commences to serve a punitive sentence imposed at the conclusion of the hearing, the prison officials responsible for the due process deprivation must respond in damages, absent the successful interposition of a qualified immunity defense.

*Walker v. Bates,* 23 F.3d 652, 658–59 (2d Cir.1994).[9] Thus, the Court properly considers the full ninety days in determining whether Gibson was deprived of a liberty interest.

[9]   While the Second Circuit has not discussed the issue resolved in *Walker* since the Supreme Court's decision in *Sandin,* the Circuit has been faced with fact patterns which indicate that it adheres to the analysis in *Walker. See, e.g., Wright,* 132 F.3d at 135 (plaintiff's 288 day sentence overturned by Article 78

proceeding and then followed by Section 1983 action for damages); *Brooks,* 112 F.3d at 48 (plaintiff's 180 day sentence overturned by Article 78 proceeding and then followed by Section 1983 action).

While ninety days may not always be a significant deprivation, the Court is unable to determine based on the record now presented whether the duration of Gibson's disciplinary segregation—for either the full ninety day or the shorter fifteen day period—is similar to discretionary confinement of pretrial detainees. Similarly, the Court has no basis to make a determination of whether the conditions of disciplinary confinement differ from routine prison conditions—the second factor for consideration. At present, the record is clear as to only one factor, that is, the first factor. Gibson has not claimed that his confinement in CPSU in any way altered the term of his prison confinement.

**\*6** Assuming that Gibson's confinement in the CPSU implicated a protected liberty interest, he has stated a claim for a violation of his due process rights on only one of his two theories. As articulated in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Due Process Clause requires that prisoners be provided with written notice at least 24 hours prior to the hearing of the alleged violation of the disciplinary rules, a written statement indicating what evidence the fact-finder at the hearing relied upon and the reason for the disciplinary action taken, and, if institutional safety requires the omission of certain evidence, a statement indicating the fact of such omission. *Id.* at 564–65. Gibson has not alleged that he was deprived of any of the procedures required under *Wolff* at the proceeding for which he was initially confined in the CPSU. Moreover, if the defendants had failed to follow any of these procedures, Gibson would be aware of the deficiency and would not require discovery to state a claim. Thus, Gibson has failed to state a claim on his first theory. As to Gibson's second theory—that he was confined to the CPSU for fifteen days after the Article 78 proceeding vacated his disciplinary sentence—further factual development of the factors described above is required to determine whether fifteen days of disciplinary confinement for a pretrial detainee imposes an "atypical and significant hardship."

## IV. *Motion for a Default Judgment*

Default judgments are governed by Rule 55, Fed.R.Civ.P. Rule 55(a) provides for entry of a default "[w]hen a party

Gibson v. City of New York, Not Reported in F.Supp. (1998)

1998 WL 146688

against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules." Rule 55(a), Fed.R.Civ.P. A court "[f]or good cause shown may set aside an entry of default." Rule 55(c), Fed.R.Civ.P. Although Rule 55(c) applies on its face to setting aside defaults already entered, the same analysis should be employed in evaluating opposition to entry of a default. *See Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 243 (2d Cir.1994).* The Second Circuit has stated that

> [g]ood cause depends upon such factors as the willfulness of the default, the prejudice the adversary would incur were the default set aside [or should the Court decline to enter it], and the merits of the defense proffered.

*In re Chalasani,* 92 F.3d 1300, 1307 (2d Cir.1996). In addition, the Court must keep in mind the "oft-stated preference for resolving disputes on the merits." *Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 95 (2d Cir.1993).

Here, Gibson asks the Court to enter a default judgment against Ortiz. Gibson has not shown that the default by Ortiz was willful. Ortiz joined the other defendants in moving to dismiss the *First* Amended Complaint. Only after the plaintiff filed and served a Second Amended Complaint did Ortiz neglect initially to join the motion to dismiss the Second Amended Complaint. Additionally,

Gibson has not shown that he would suffer any prejudice from the Court declining to enter the default judgment against Ortiz. Finally, Ortiz may be able to interpose a successful defense; Gibson has not alleged that Ortiz was personally involved in the claims that survive the motion to dismiss. *See Sealey,* 116 F.3d at 51.[10]

[10] While the defendants included in their motion to dismiss the First Amended Complaint an argument based on the plaintiff's failure to allege personal involvement, they have not included such an argument in the instant motion.

### Conclusion

**\*7** The defendants' motion to dismiss is granted on all claims, except the plaintiff's claims that he was subjected to unconstitutional conditions of confinement while housed in the JATC CPSU for thirty days and that he was held in the CPSU for fifteen days after his disciplinary sentence had been vacated in an Article 78 proceeding. The plaintiff's motion for the entry of a default judgment against defendant Ortiz is denied.

SO ORDERED:

### All Citations

Not Reported in F.Supp., 1998 WL 146688

---

  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00194-TJM-TWD    Document 233    Filed 09/05/17    Page 197 of 211
McNatt v. Unit Manager Parker, Not Reported in F.Supp.2d (2000)
2000 WL 307000

2000 WL 307000
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Michael McNATT et al.,
v.
UNIT MANAGER PARKER et al.

No. 3:99CV1397 AHN.
|
Jan. 18, 2000.

RULING AND ORDER

NEVAS.

**\*1**  The plaintiffs, Michael McNatt, Carlton Jolley and John Roy have filed this civil rights action *pro se* and *in forma pauperis* pursuant to 28 U.S.C. § 1915. The first amended complaint named as defendants Unit Manager Parker, Captain Rubo, Lieutenant Sullivan, Head Kitchen Supervisor Potz, John Armstrong, Correctional Officer Willis, Counselor Montesi and John Hall. In November 1998, the court granted the defendants' motion to dismiss as to the official capacity claims for monetary damages and the claim for preliminary injunctive relief. In March 1999, the plaintiffs filed a second amended complaint including all defendants named in the first amended complaint and adding Deputy Warden Miele, Counselor Jean Gladding, Lieutenant Debbie Vaughn, Lieutenant Eddie Desk, Correctional Officer Franck, Correctional Officer Riggott, Major Wayne Sparks and Nurse Roberta Leddy. Pending are a motion for summary judgment filed by defendants Parker, Rubo, Sullivan, Potz, Armstrong, Montessi, Hall and Willis, a motion to dismiss filed by defendants Miele, Gladding, Vaughn, Desk, Franck, Riggott, Sparks and Leddy and several miscellaneous motions filed by the plaintiffs. The Court considers these motions in turn.

I. *Plaintiffs' Motions*
The plaintiffs have filed three motions. First, plaintiffs seek an extension of time to respond to the defendants' motion for summary judgment. The plaintiffs' response having been received, the motion for extension of time [doc. # 99] is DENIED as moot.

In response to a statement in the defendants' motion for summary judgment, the plaintiffs seek to amend and add a statement of the specific constitutional violations claimed in this action. The plaintiffs' motion [doc. # 98] is GRANTED. The court will consider the plaintiffs' statement in reviewing the motion for summary judgment and motion to dismiss.

Finally, the plaintiffs ask the court to enter a revised scheduling order and permit them to reserve the right to file a motion to compel. The purpose of the revised scheduling order is to enable plaintiffs to respond to the motion for summary judgment. As noted above, the response has been filed. In addition, the defendants have accepted the plaintiff's allegations as true for the purposes of the motion for summary judgment. Thus, it appears unlikely that the plaintiffs will be required to file a motion to compel to obtain evidence to substantiate any of their allegations in order to file their opposition to the motion for summary judgment. Accordingly, the request for a revised scheduling order and to reserve the right to file a motion to compel [doc.94–1, 94–2] is DENIED as moot.

II. *Defendants' Motion for Summary Judgment*
The allegations in the first and second amended complaints concerning defendants Parker, Rubo, Sullivan, Potz, Armstrong, Montesi, Hall and Willis are essentially the same. To the extent that the plaintiffs are attempting to reassert their claims for damages against the defendants in their official capacities and for preliminary injunctive relief, these claims are dismissed for the reasons stated in the court's previous ruling. The second amended complaint proceeds only as to the damages claims against the defendants in their individual capacities and the request for declaratory relief.

**\*2**  Defendants Parker, Rubo, Sullivan, Potz, Armstrong, Montesi, Hall and Willis argue in support of their motion that the plaintiffs' allegations, even if true, fail to state a claim for the denial of constitutionally protected rights.

A. *Standard of Review*
In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). A court must grant summary judgment "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact ..." *Miner v. Glen Falls,* 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.) (quoting *Anderson,* 477 U.S. at 248), *cert. denied,* 506 U.S. 965 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849 (1991). See also *Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992). A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements. *See Securities & Exchange Comm'n v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978).

**B.** *Facts* [1]

[1]    The defendants have assumed the truth of the plaintiffs' allegations for purposes of this motion. Thus, the facts are taken from the second amended complaint supplemented by discovery responses provided to the plaintiffs and included in the defendants' statement of material facts not in dispute.

During the time period relevant to this complaint, the plaintiffs were confined at the Garner Correctional Institution in Newtown, Connecticut. On June 19, 1996, the plaintiffs were brought to the segregation unit and held in Administrative Detention pending the investigation of a food strike. The following day they each received disciplinary reports after defendant Parker completed his investigation. A disciplinary hearing was held on June 21, 1996, and all charges were dismissed. Despite the dismissal of the charges, the plaintiffs were told that they would not be released from segregation without defendant Rubo's

approval. McNatt and Roy were released on June 28, 1996, Jolley on July 3, 1996.

During the time they were confined in segregation the plaintiffs were subjected to the following conditions. They did not receive mattresses until approximately 11:00 p.m. the first night of their confinement. The mattresses had holes and urine stains and smelled of mildew and "foul matter." The plaintiffs did not receive sheets to cover the mattresses for six days. Plaintiffs McNatt and Jolley developed a rash from the mattresses. Medical personnel provided plaintiffs McNatt and Jolley with hydrocortisone cream for the rash.

**\*3**  The cell in which plaintiffs McNatt and Jolley were confined contained human feces and urine behind the bunk beds. They were not given toilet paper to remove this material for one day. They were not provided materials with which to clean the cell for six days. The cold water in the cell did not function properly. The plaintiffs were subjected to random urine tests performed on all segregation inmates by an unidentified correctional officer. The tests were negative. The plaintiffs were denied clean clothes and toiletries for six days. The plaintiffs experienced dry skin and scalp because they were not immediately provided access to lotion from their inmate property. They were required to shower without shower shoes in unsanitary shower facilities. Plaintiff Jolley was not wearing a shirt when he was brought to the restrictive housing unit and caught the "flu" from being exposed to cold air from the ventilation system. The medical staff treated plaintiff Jolley with penicillin. Defendant Montesi permitted plaintiffs Jolley and McNatt to make legal calls but refused to provide the plaintiffs grievance or complaint forms while they were confined in segregation.

When plaintiffs McNatt and Roy were released from segregation, they were not returned to their institutional jobs or to their previous cells. After one week, plaintiff McNatt did return to his job in the dining hall, but lost the job after two or three weeks because of a new policy.

**C.** *Discussion*

In support of their motion, the defendants argue that the plaintiffs' placement in administrative detention did not violate their right to due process, the conditions of confinement claims are without merit, the John Doe claims regarding urine testing must fail, the plaintiffs were not denied access to the courts, the plaintiffs have

no constitutional right to return to their former cells or institutional jobs, the plaintiffs have no constitutional right to earn good time credit, the plaintiffs failed to allege the personal involvement of defendants Armstrong, Hall, Potz or Sullivan and the defendants are entitled to qualified immunity. The court considers these arguments in turn.

### 1. Conditions of Confinement

The plaintiffs first challenge the conditions of confinement in administrative detention as cruel and unusual punishment in violation of their rights under the Eighth Amendment.

The Supreme Court has defined the contours of the Eighth Amendment protection against cruel and unusual punishment, made applicable to the states by the Fourteenth Amendment, as follows: "The Eighth Amendment's bar on inflicting cruel and unusual punishments ... 'proscribe[s] more than physically barbarous punishments.' It prohibits penalties that are grossly disproportionate to the offense as well as those that transgress today's broad and idealistic concepts of dignity, civilized standards, humanity and decency." *Hutto v. Finney,* 437 U.S. 678, 685 (1978) (citations omitted). *See also Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). There is no static test for determining whether conditions of confinement are cruel and unusual. See *Rhodes,* 452 U.S. at 346. The Eighth Amendment must " "draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id.* The Second Circuit, in addressing the needs protected by the Eighth Amendment, stated that sentenced prisoners are entitled only to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir.1978), rev'd on other grounds, *Bell v. Wolfish,* 441 U.S. 520 (1979); *Lareau v. Manson,* 651 F.2d 96, 106 (2d Cir.1981). "To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes,* 452 U.S. at 347. Not every governmental action affecting the interests or well-being of a prisoner is actionable under the Eighth Amendment. "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers,* 475 U.S. 312, 319 (1986).

**\*4** The plaintiffs contend that the following conditions constitute cruel and unusual punishment: stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions.

The Eighth Amendment requires correctional officials to provide sanitary conditions that meet the "minimal civilized measures of life's necessities." *Wilson,* 501 U.S. at 298. The court considers together the plaintiffs' claims concerning sanitary conditions. Generally, the Eighth Amendment is not violated where the unsanitary conditions are temporary. *See, e.g., Harris v. Fleming,* 839 F.2d 1232, 1235 (7th Cir.1988) (holding insufficient to state claim for cruel and unusual punishment allegations that inmates denied toilet paper for five days and soap, toothpaste and toothbrush for ten days); *Martin v. Lane,* 766 F.Supp. 641, 648 (N .D.Ill.1991) (holding deprivation of laundry services and sanitary and hygienic living conditions for between three and eighteen days not actionable); *Gilland v. Owens,* 718 F.Supp. 665, 685 (W.D.Tenn .1989) ("[s]hort term deprivations of toilet paper, towels, sheets, blankets, ... toothpaste, toothbrushes, and the like do not rise to the level of a constitutional violation").

In addition, the court considers the totality of the conditions of confinement to determine whether a prisoner has been deprived of basic human needs. *Compare Johnson v. Pelker,* 891 F.2d 136, 138–39 (holding that denial of dry clothing and bedding was temporary inconvenience not compounded by deprivation of other necessities and not cognizable under § 1983) *with LaReau v. MacDougall,* 473 F.2d 974, 976–78 (2d Cir.1972) (placing prisoner in strip cell where he is subject to near total sensory deprivation violates Eighth Amendment), *cert. denied,* 414 U.S. 878 (1973) *and Wright v. McMann,* 387 F.2d 519, 526 (2d Cir.1967) (depriving prisoner for substantial periods of hygienic items and clothing in dead of winter in strip cell violates Eighth Amendment).

In this case, the plaintiffs indicate that they were denied toilet paper for one day and denied clean clothing, toiletries, bedding and cleaning supplies for six days. The incident occurred in June, not in the middle of winter. The plaintiffs had toilet facilities in their cells and intermittent running water. They were afforded

an opportunity to shower, although not in facilities meeting their preferences. Although the conditions in the restrictive housing unit were not pleasant, the brief duration of the deprivation causes the court to conclude that the conditions did not constitute an Eighth Amendment violation. See *Mabery v. Keane,* No. 95 Civ. 1093(JFK), 1998 WL 148386, at *8 (S.D.N.Y. Mar. 30, 1998) (holding that conclusory allegations of unconstitutional sanitary and health conditions from lack of cleaning supplies, infrequent extermination of housing units, poor ventilation in shower and bathroom areas resulting in seepage of "stink" and moisture into housing areas and the nearby burning of raw sewage resulting in inmates having to breathe fumes failed to state claim for Eighth Amendment violation).

**\*5** Further, the court notes that to prevail on their Eighth Amendment claim the plaintiffs must show both that the conditions violate common notions of decency and that prison officials acted with deliberate indifference. Here, the plaintiffs state that they were not immediately provided clothing, cleaning supplies, toiletries and items from their personal property because the correctional officers who normally performed these tasks were on vacation. The plaintiffs state that they learned through discovery that defendants Franck and Riggott should have provided them the required materials. These defendants, however, are not included in the motion for summary judgment. The plaintiffs do not claim that defendants Parker, Rubo, Sullivan, Potz, Armstrong, Willis, Montessi and Hall, were aware that the plaintiffs had not been provided the above-listed items.

The only allegation concerning defendant Sullivan is that the plaintiffs asked him why they could not get sheets or their property and he responded that "trouble-makers get nothing." The plaintiffs do not indicate when they spoke to defendant Sullivan. Although this statement is unprofessional and exhibits a lack of care for the plaintiffs' needs, it does not suggest that defendant Sullivan intended to cause the plaintiffs harm. Although the court does not condone the seeming indifference to the plaintiffs' needs, the defendants' purported actions do not approach unconstitutional proportions. *See Johnson v. Fairman,* No. 95 C 5416, 1997 WL 137179, at *3 (N.D.Ill. Mar. 24, 1997) (although inmate's allegations that he "developed flu symptoms" and became "extremely ill and required medical attention" due to the cold, dirty showers, nonworking sink, and general "unsanitary" condition

of the jail might state a constitutional claim, they do not establish the requisite deliberate indifference required under the Due Process Clause). The court concludes that the plaintiffs fail to demonstrate that the defendants "[knew] of and disregard [ed] an excessive risk to inmate health or safety" as is required to state a claim for deliberate indifference. *Branham v. Meachum,* 77 F.3d 626, 631 (2d Cir.1996) (internal quotation marks and citation omitted).

The plaintiffs challenge the size of the food servings in the restrictive housing unit. The Eighth Amendment prohibition against cruel and unusual punishment requires that prisoners be served nutritionally adequate food. *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983). Although the denial of food has not been explicitly held to violate the Eighth Amendment prohibition, there are circumstances under which substantial deprivations of food may rise to constitutional dimension. *Id.* See *Cunningham v. Jones,* 567 F.2d 653, 659–60 (6th Cir.1977) (one meal per day may be unconstitutional if not nutritionally adequate); *Moss v. Ward,* 450 F.Supp. 591, 596–97 (W.D.N.Y.1978) (determining that deprivation of food for four days was disproportionate punishment).

**\*6** Here, although the plaintiffs allege that the serving portions are smaller, they do not demonstrate that the food received during the ten- or fifteen-day period was not nutritionally adequate for their needs. The plaintiffs have attached to their opposition papers a statement from another inmate describing the meals served for a two-day period as containing insufficient calories and describing the caloric requirements for men of various weights. The statement does not indicate the size of the portions or include a menu indicating that the listed items comprised all food served to the restrictive housing inmates on certain dates. There is no evidence of the specific nutritional requirements of any of the plaintiffs. Further, although the inmate providing the statement purports to have a degree in chemistry, the court questions his qualification as an expert in nutrition. Thus, the statement is only the opinion of another inmate. Finally, the plaintiffs fail to allege that they suffered any ill effects from the reduced portions. *See Bean v. Washington,* No. 99 C 3003, 1999 WL 795481, at *6 (N .D.Ill. Sept. 9, 1999) (holding insufficient to state an Eighth Amendment claim dissatisfaction with institutional food unaccompanied by showing that food does not meet his nutritional needs or

has caused him ill health). Thus, the plaintiffs fail to state an Eighth Amendment claim concerning food portions.

The plaintiffs also argue that when they were released from the restrictive housing unit, they were not returned to the cells they previously occupied and were not returned to their prison jobs. Inmates have no due process interest in being confined in a certain location within a prison. *See Russell v. Scully,* 15 F.3d 219 (2d Cir.1993). Thus, the plaintiffs' assignment to different cells is not actionable.

Furthermore, a prisoner does not have a liberty interest in a prison job. *See, e.g., Newman v. Alabama,* 559 F.2d 283, 292 (5th Cir.1977), *cert. denied,* 438 U.S. 915 (1978) (holding no federal constitutional right to a particular job in prison). *Banks v. Norton,* 346 F.Sup. 917, 921 (D.Conn.1972) (holding no liberty interest in a job in prison). Here, the plaintiffs do not challenge their removal from the jobs when they were placed in administrative detention. The defendants argue, and the plaintiffs do not dispute, that they would have to be reclassified upon their release before they could return to any job. Because the plaintiffs have no constitutional right to a prison job, the fact that they were not all returned to their jobs is not actionable.

Accordingly, the defendants' motion for summary judgment is granted as to the conditions of confinements claims.

2. *Due Process*

The plaintiffs next contend that they were denied procedural due process in that they were not afforded a classification hearing within 72 hours of their placement in the restrictive housing unit as required by the Department of Correction Administrative Directives.

**\*7** To state a due process claim, the plaintiffs must demonstrate that they possessed a protected liberty or property interest, and that they were denied that interest without being afforded due process of law. *See Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). The plaintiffs bear the burden of demonstrating the existence and infringement of a protected liberty or property interest. *See Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). If the plaintiffs are unable to show the existence of a protected interest, the claim must be dismissed regardless of whether the defendants acted in accordance with the requisite procedures. *See Id.* at 317–18.

In *Sandin v. Connor,* 515 U.S. 472 (1995), the Supreme Court established the appropriate standard for determining the existence of a protected liberty interest in due process claims involving prison disciplinary proceedings. The Court held that a protected liberty interest generally will arise only where, as punishment for alleged misconduct, a prisoner is involuntarily placed in confinement which is " 'qualitatively different' from the punishment characteristically suffered by a person convicted of a crime and results in 'stigmatizing consequences.' " *Id.* at 479 n. 4 (quoting *Vitek v. Jones,* 445 U.S. 480, 493–94 (1980)). Thus, to show that a liberty interest is sufficient to invoke the protections of the Due Process Clause, a prisoner must establish both that his resulting confinement or restraint creates an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" and that the state has enacted a regulation or statute which grants inmates a protected liberty interest in remaining free from that confinement or restraint. *Sandin,* 515 U.S. at 484; *see Frazier,* 81 F.3d at 317. Where an inmate fails to demonstrate that he suffered conditions that were atypical and significant, the court may grant summary judgment against him. *See Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997).

In this case, the plaintiffs were sent to administrative detention on June 19, 1996, pending an investigation into their involvement in a food strike. On June 20, 1996, they received disciplinary reports. Disciplinary hearings were held on June 21, 1996 and the charges were dismissed. Pending further investigation, the plaintiffs continued to be housed in administrative detention. McNatt and Roy were returned to general population on June 28, 1996, Jolley on July 3, 1996.

Confinement in administrative segregation or in administrative detention pending investigation of disciplinary charges is confinement that an inmate should reasonably anticipate. *See Russell v. Scully,* 15 F.3d 219, 221 (2d Cir.1993). When reviewing confinement in segregation to determine whether the confinement constitutes an atypical and significant hardship, the court does not distinguish between confinement for disciplinary or administrative purposes. *See Arce v. Walker,* 139 F.3d 329, 335 (2d Cir.1998).

**\*8** The Second Circuit generally requires the district court to identify with specificity the factual predicates underlying its conclusion that sanctions do not implicate a protected liberty interest. *See, e.g., Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997).* Where the inmate does not allege any unusual conditions, however, the district court need not provide a detailed articulation of the factual predicates underlying its decision. *See Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.), *cert. denied,* 119 U.S. 246 (1998).

Although there is no bright line determining when confinement constitutes an atypical and significant hardship, "the decisions in the Second Circuit are unanimous that keeplock or SHU confinement of 30 days or less in New York prisons" is not 'atypical or significant hardship' under *Sandin.*" *Williams v. Keane,* No. 95 CIV. 0379 AJP JGK, 1997 WL 527677, at \*6 (S.D.N.Y. Aug. 25, 1997) (citing cases). *See also McNellis v. Meachum,* Civ. No. 2:92cv936 (PCD) (D.Conn. Oct. 4, 1995) (holding that thirty day period of disciplinary segregation does not give rise to liberty interest under *Sandin* ).

The plaintiffs allege that as a result of their placement in administrative detention, they were unable to continue working at their institutional jobs or purchase items from the commissary and were required to eat in their cells. They also contest the cleanliness of the cells and the lack of access to inmate property and toiletries. The plaintiffs state, however, that the lack of access to property and toiletries was the result of the absence on vacation of the responsible staff members, not a usual condition of confinement in administrative detention. The court has concluded that the conditions of confinement in administrative detention, either individually or in combination, do not constitute a constitutional violation. In light of the previous determination in this district that confinement in disciplinary segregation for thirty days does not, in and of itself, constitute the deprivation of a protected liberty interest and the determination above that the plaintiffs have not demonstrated any unconstitutional conditions of confinement which would constitute additional unusual circumstances of confinement, the defendants' motion for summary judgment is granted on the due process claim.

3. *Medical Treatment*

The plaintiffs also claim that they were denied adequate medical treatment while they were confined in administrative detention. Specifically, they allege that inmates Jolley and McNatt developed rashes from sleeping on the mattresses and inmate Jolley became sick with the "flu" from exposure to cold air from the ventilation system.

Deliberate indifference to a serious medical need is a violation of the Eighth Amendment prohibition against cruel and unusual punishment. In this case, however, the plaintiffs fail to allege any facts suggesting that any medical staff members were indifferent to their needs. The plaintiffs allege that when they reported these conditions to medical staff, McNatt and Jolley were provided hydrocortisone cream for their rashes and that Jolley received penicillin for his "flu" symptoms. Because the plaintiffs allege that they received prompt treatment for their medical needs, they fail to state a claim for deliberate indifference to serious medical needs. *See Wells v. Franzen,* 777 F.2d 1258, 1264 (7th Cir.1985) (holding that provision of medical treatment defeats claim for deliberate indifference to serious medical need). Accordingly, the defendants' motion to dismiss is granted as to the claims for denial of medical treatment.

4. *Access to the Courts*

**\*9** The plaintiffs also contend that their right of access to the courts was violated because defendant Montessi failed to provide them grievance forms while they were in the restrictive housing unit. Thus, they were required to wait until their release to file complaints regarding the conditions in the unit. They also claim that there was no procedure to enable them to obtain books from the institutional law library.

In *Lewis v. Casey,* 518 U.S. 343 (1996), the Supreme Court clarified what is encompassed in an inmate's right of access to the courts and what constitutes standing to bring a claim for the violation of that right. The Court held that to show a violation of his right of access to the courts, an inmate must allege an actual injury. *See id.* at 349. For example, an inmate cannot simply allege that the prison law library or legal assistance program is inadequate. He must "demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.* at 351. The fact that an inmate may not be able to litigate effectively once his claim is brought before the court, is insufficient to demonstrate

actual injury. *See id.* at 354. Rather, the inmate must show that he was unable to file the initial complaint or petition, or that the complaint he filed was so technically deficient that it was dismissed without a consideration of the merits of the claim. *See id.* at 351.

In this case, the plaintiffs allege that they could not pursue their claims regarding the conditions in the restrictive housing unit until they were released, a delay of at most ten days for McNatt and Roy, fifteen days for Jolley. They neither provide evidence nor allege that they were unable to file a complaint or petition addressing their claims or that a complaint or petition was dismissed as technically deficient without a consideration of the merits. Thus, the plaintiffs fail to demonstrate that they suffered an actual injury as required to state a claim for the denial of access to the courts. The defendants' motion to dismiss is granted as to the access to the court's claim.

### 5. *Urine Testing*

The plaintiffs contend that they were specifically selected for urine testing in violation of their Fourth Amendment rights. The defendants state that the urine test was conducted on all inmates in the restrictive housing unit and the unit was randomly selected for testing.

The court notes that the plaintiffs allege only that they were selected by John Doe to undergo testing and that the tests were conducted by John Doe. They have not identified this individual in the more than three years that this case has been pending. In addition, the plaintiffs do not allege that any of the named defendants were involved in the testing. Because the plaintiffs have failed to demonstrate personal involvement in the drug testing or supervisory liability for any defendant, the defendants' motion for summary judgment is granted on this claim. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

### 6. *Retaliation*

**\*10** Finally, the plaintiffs claim that the actions of the defendants were taken in retaliation. They assume that because their stays in the restrictive housing unit were the same as they would have been had they been found guilty of the disciplinary charge, the actions of the defendants were in retaliation for the dismissal of the charges. The court notes, however, that the plaintiffs were not released from administrative detention on the

same date. In addition, notations on the papers provided by both parties, indicates that after the charges were dismissed, the plaintiffs continued to be held because the investigation into the plaintiffs' involvement in the food strike continued. The plaintiffs note that no report of the results of the continued investigation was located during discovery. This fact, however, does not prove, as the plaintiffs contend, that no further investigation was performed.

The First Amendment protects an inmate from retaliation for exercising his right to seek redress through the prison grievance process or the courts. *See Hernandez v. Coughlin,* 18 F.3d 133, 138 (2d Cir.1994) (acknowledging that inmate could file § 1983 retaliation claim for actions taken after he informed public officials of his grievance); *Merriwether v. Coughlin,* 879 F.2d 1037, 1045 (2d Cir.1989) (routine administrative decisions taken in retaliation for exercising constitutional rights constitutes § 1983 claim).

Here, the plaintiffs do not allege that the defendants retaliated against them for exercising any First Amendment right. The court concludes that the plaintiffs' retaliation claim is not cognizable in this action.

### 7. *State Law Claims*

The court has determined above that the plaintiffs' federal constitutional rights have not been violated by defendants Parker, Rubo, Sullivan, Potz, Armstrong, Willis, Montessi and Hall. Thus, the remaining claims against these defendants are state law claims.

Supplemental or pendent jurisdiction is a matter of discretion, not of right. Thus, the court need not exercise supplemental jurisdiction in every case. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 715–26 (1966). The federal court should exercise supplemental jurisdiction and hear a state claim when doing so would promote judicial economy, convenience and fairness to the litigants. The court should decline to exercise supplemental jurisdiction, however, when state law issues would predominate the litigation or the federal court would be required to interpret state law in the absence of state precedent. See *Id.* at 726.

Although this court has the discretion to hear the plaintiff's state law claims, it declines to exercise that jurisdiction in this case. *See Spear v. Town of*

Case 9:17-cv-00194-TJM-TWD    Document 233    Filed 09/05/17    Page 204 of 211
McNatt v. Unit Manager Parker, Not Reported in F.Supp.2d (2000)
2000 WL 307000

*West Hartford,* 771 F.Sup. 521, 530 (D.Conn.1991) ("absent unusual circumstances, the court would abuse its discretion were it to retain jurisdiction of the pendant state law claims on the basis of a federal question claim already disposed of"), *aff'd,* 954 F.2d 63 (2d Cir.), *cert. denied,* 506 U.S. 819 (1992); 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction when it has dismissed all claims over which it has original jurisdiction).

### III. *Defendants' Motion to Dismiss*

**\*11**  Defendants Miele, Gladding, Vaughn, Desk, Franck, Riggott, Sparks and Leddy have filed a motion to dismiss the second amended complaint on the same grounds raised in the motion for summary judgment. In light of the determination above that the plaintiffs fail to state a claim for the violation of a constitutionally protected right and the previous dismissal of claims for damages in the official capacity and preliminary injunctive relief, the defendants' motion to dismiss [doc. # 82] is GRANTED as to all federal claims presented in the second amended complaint. The court declines to exercise supplemental jurisdiction over any state law claims against defendants Miele, Gladding, Vaughn, Desk, Franck, Riggott, Sparks and Leddy.

The court also notes that even if the plaintiff could state a claim against defendants Franck and Riggott, as the correctional officers who should have provided clothes, bedding, cleaning supplies and toiletries to the plaintiffs, the claims still should be dismissed. The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), requires an inmate to exhaust his administrative remedies before bringing a § 1983 action with respect to prison conditions. The term "action ... with respect to prison conditions" is not defined in § 1997e. The term is defined, however, in another portion of the Prison Litigation Reform Act of 1995, Pub.L. 104–140, 110 Stat. 1327, which is codified at 18 U.S.C. § 3626(g)(2). There the term is defined

to be "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings ..." Other courts have determined that this definition "is the best indication of what Congress intended when it used the term 'action ... with respect to prison conditions' in § 1997e(a)." *Moore v. Smith,* 18 F.Supp.2d 1360, 1363 (N.D.Ga.1998). *See Beeson v. Fishkill Correctional Facility,* 28 F.Supp.2d 884, 888 (S.D.N.Y.1998) (citing cases).

In this case, the plaintiffs do not allege, as they are required to do under the Prison Litigation Reform Act, that they made any attempt to resolve their conditions of confinement claims through the prison grievance procedure. Absent exhaustion of administrative remedies, the claims are not cognizable.

### *Conclusion*

The plaintiffs' motion for extension of time [doc. # 99] and motion for a revised scheduling order and to reserve the right to file a motion to compel [doc.94–1, 94–2] are DENIED as moot. The plaintiffs' motion to amend and add constitutional citations [doc. # 98] is GRANTED.

The defendants' motion for summary judgment [doc. # 80] and motion to dismiss [doc. # 82] are GRANTED. The court declines to exercise supplemental jurisdiction over any state law claims. The Clerk is directed to enter judgment in favor of the defendants and close this case.

SO ORDERED this 18th day of January, 2000, at Bridgeport, Connecticut.

### **All Citations**

Not Reported in F.Supp.2d, 2000 WL 307000

---

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4735364
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ramesh Khudan, Plaintiff,
v.
Superintendent William Lee, et al., Defendants.

No. 12-cv-8147 (RJS)
|
Signed 09/08/2016

**Attorneys and Law Firms**

Amy L. Bellantoni, The Bellantoni Law Firm, LLP, Scarsdale, NY, for Plaintiff.

Jeb Harben, Office of the Attorney General, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

Plaintiff brings this action against various officers of the New York State Department of Corrections and Community Supervision ("DOCCS") under 42 U.S.C. § 1983 alleging violations of his Eighth and Fourteenth Amendment rights while he was an inmate at Green Haven Correctional Facility ("Green Haven"). Now before the Court is Defendants' motion for summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies. For the reasons set forth below, Defendants' motion is granted.

I. BACKGROUND [1]

[1]    The following facts are taken from Defendants' Local Civil Rule 56.1 Statement (Doc. No. 61 ("Rule 56.1 Statement" or "56.1 Stmt.")), and Plaintiff's Counter Rule 56.1 Statement (Doc. No. 67 ("Counter Statement" or "Counter Stmt.")). In deciding Defendants' motion for summary judgment, the Court also has considered Defendants' memorandum of law in support of their motion (Doc. No. 60 ("Mem.")), Plaintiff's memorandum of law in

opposition (Doc. No. 66 ("Opp'n")), and Defendants' reply (Doc. No. 70 ("Reply")), as well as the declarations and exhibits submitted in connection with the instant motion.

A. Facts

Plaintiff, a New York State prisoner currently housed at the Franklin Correctional Facility, was formerly incarcerated at Green Haven, a prison administered by the DOCCS. Plaintiff alleges that on October 31, 2009, while he was an inmate at Green Haven, he was "violently attacked and stabbed in the eye" by a fellow inmate in the facility's recreational yard (the "October 31 Incident"). (Counter Stmt. ¶¶ 3, 18, 20-22; *see also* 56.1 Stmt. ¶¶ 1-3.) Plaintiff attributes his injuries to the fact that Defendants Duane Malark and Jeffrey Erns, Corrections Officers at Green Haven, falsely informed members of a gang that he was a sex offender and rapist, and that Defendants Superintendent William Lee, Lieutenant Neal Greene, and Corrections Officers Rory Hamilton, David Deming, Arthur Andrews, Robert Sherman, and P. Allen failed to provide security in the recreational yard and take other security measures that would have prevented the attack. (Counter Stmt. ¶¶ 3-4.) For several days after the attack, Plaintiff was hospitalized at Putnam County Hospital, where he was treated for his injuries. (Counter Stmt. ¶ 12.)

For purposes of this motion, the parties' dispute centers entirely on whether Plaintiff properly exhausted the administrative remedies available to him with respect to the October 31 Incident. Specifically, DOCCS administers the Inmate Grievance Program ("IGP"), which ordinarily requires prisoners to complete a three-step process in order to exhaust administrative remedies. *See N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5; see also Espinal v. Goord,* 558 F.3d 119, 125 (2d Cir. 2009) (describing IGP regulations in effect in 2009). [2] At step one, the prisoner is obligated to file a grievance, consisting of, among other things, "a concise, specific description of the problem and the action requested," with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one calendar days of the incident. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(a). The IGRC then has sixteen calendar days from receipt of the grievance to informally resolve the issue, and if there is no informal resolution, the IGRC must conduct a hearing within sixteen calendar days of receiving the grievance and issue a written decision within two working days after the

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    1

hearing concludes. *Id.* § 701.5(b). At step two, a prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility within seven calendar days by completing and signing the appeal section on his IGRC response form and submitting it to the grievance clerk. *Id.* § 701.5(c). The superintendent then has twenty calendar days to respond to the prisoner's appeal. *Id.* Finally, at step three, the prisoner may appeal an adverse decision from the superintendent by submitting a "notice of decision to appeal" form to the Central Officer Review Committee ("CORC") within seven days. [3] *Id.* § 701.5(d). If at any level of review the decisionmaker fails to timely respond to the grievance, the inmate may appeal to the next level. *Id.* § 701.6(g); *see also Heyliger v. Gebler,* 624 Fed.Appx. 780, 782 (2d Cir. 2015). While an inmate may also ask the DOCCS Inspector General to investigate a complaint, "such an investigation is not a formal part of the IGP." *Dabney v. Pegano,* 604 Fed.Appx. 1, 3 (2d Cir. 2015).

[2]    By contrast, grievances that allege "harassment" by prison staff – in other words, "employee misconduct meant to annoy, intimidate or harm an inmate" – may be subject to expedited review and immediately referred to the superintendent, who must make a decision within twenty-five calendar days of receipt of a harassment grievance. N.Y. Comp. Codes R. & Regs., tit. 7, §§ 701.2(e), 701.8(f)-(h); *see also Leer v. Fisher,* No. 13-cv-8529 (JPO), 2015 WL 413253, at *4-5 (S.D.N.Y. Feb. 2, 2015) (describing the procedure for harassment allegations). However, Plaintiff avers, and Defendants do not dispute, that the ordinary three-step review process applied in this case. (Opp'n 3, 5; *see also* Doc. No. 31 at 2.) Accordingly, the Court assumes that Plaintiff's grievance was not eligible for expedited review.

[3]    Although the superintendent must forward grievances regarding DOCCS-wide policies directly to the CORC, *id.* at § 701.5(c)(3)(i), Plaintiff does not allege that he complained of DOCCS-wide policies.

**\*2**  Here, Defendants contend that Plaintiff failed to complete any step of the three-step grievance process, and point to the absence of any records at Green Haven reflecting that Plaintiff ever filed a grievance related to the October 31 Incident. Specifically, Defendants rely on an affidavit from the inmate records coordinator at the facility, Jennifer Hotaling, who attests that a diligent search of Green Haven's records reveals no grievance being filed by Plaintiff in relation to the October 31 Incident, notwithstanding the fact that it is Green

Haven's policy to maintain records of all grievances filed within the facility. (Doc. No. 64 ("Hotaling Decl.") ¶ 2.) Significantly, Ms. Hotaling's search did uncover a grievance from Plaintiff in Green Haven's records, filed March 2, 2010, in which Plaintiff made "general complaints about [his] medical care" at the facility and alleged violations of, among other things, the Health Insurance Portability and Accountability Act, but that grievance made no reference to the October 31 Incident. (*Id.* ¶ 2; *see also id.* at 7-12 (enclosing a copy of Plaintiff's grievance regarding medical care at Green Haven)). Defendants also point to the lack of evidence that Plaintiff ever appealed an adverse disposition of his purported grievance at step two or step three. (56.1 Stmt. ¶ 4.) Specifically, Jeffrey Hale, the assistant director of the IGP, attests that, having conducted a diligent search of the CORC's database for records of appeals, he could not locate any grievances relating to the claims presented in this case, even though the CORC maintains computer records of all appeals received from facilities participating in the IGP since 1990. (Doc. No. 63 ("Hale Decl.") ¶¶ 2-3, 9.)

For his part, Plaintiff claims that he completed all three steps of the IGP, although he provides no evidence other than his own declaration and deposition, which, as discussed further below, are insufficient to create a genuine dispute of material fact. Plaintiff also attests that the staff of Green Haven repeatedly interfered with his efforts to have his grievance adjudicated by ransacking his cell, threatening to kill him if he complained to the superintendent, and threatening him whenever he attempted to learn the status of his grievance. (Counter Stmt. ¶¶ 6, 23-24, 26-28; *see also* Doc. No. 65-2 ("Khudan Dep") 13:12-16, 14:22-15:4, 16:6-9.) However, Plaintiff fails to point to any specific dates when these incidents occurred, does not identify any names of officers who purportedly threatened him, fails to identify the specific locations in Green Haven where these alleged threats took place, and does not provide any other details of the improper conduct.

## B. Procedural History

On October 29, 2012, Plaintiff, then proceeding *pro se* and *in forma pauperis,* submitted his first complaint in this action, which was originally assigned to the Honorable Loretta A. Preska. (Doc. Nos. 2, 6.) In April

2016 WL 4735364

2013, then-Chief Judge Preska ordered Plaintiff to file an amended complaint. (Doc. No. 7.) After retaining counsel, Plaintiff filed the first amended complaint on October 7, 2013. (Doc. No. 13.) That same date, this action was reassigned to my docket. On April 23, 2014, Plaintiff filed the operative pleading in this action, the second amended complaint, asserting two distinct violations of his Eighth and Fourteenth Amendment rights pursuant to Section 1983. (Doc. No. 32.) On October 7, 2014, Defendants moved to dismiss the second amended complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and failure to state a claim pursuant to 12(b)(6). (Doc. Nos. 40, 43.) Specifically, Defendants argued for dismissal based on Plaintiff's failure to exhaust administrative remedies under the PLRA, among other grounds. (Doc. No. 43.) On September 17, 2015, the Court denied the motion to dismiss without prejudice to renewal as a motion for summary judgment on the issue of administrative exhaustion. (Doc. No. 55 at 11.) Nevertheless, because "the question of exhaustion of administrative remedies *must* be addressed before the Court can consider the merits of [P]laintiff's claims" (*id.* at 5) (quoting *Foreman v. Comm. Goord,* No. 02-cv-7089 (SAS), 2004 WL 385114, at *6 (S.D.N.Y. Mar. 2, 2004)), the Court authorized the parties to conduct limited, expedited discovery on the issue of administrative exhaustion and directed Defendants to promptly file the instant motion for summary judgment solely on the issue of administrative exhaustion (*id.* at 10-11). Accordingly, Defendants submitted their motion for summary judgment on November 13, 2015 (Doc. Nos. 59, 60), Plaintiff submitted his opposition on December 3, 2015 (Doc. No. 66), and the motion was fully briefed when Defendants submitted their reply on December 29, 2015 (Doc. No. 70).

## II. LEGAL STANDARD

 **\*3** Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely

disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson,* 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

## III. DISCUSSION

Defendants argue that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the PLRA. The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake,* 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo,* 548

U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (internal quotation marks and alterations omitted)). As the Supreme Court and Second Circuit have instructed, "proper exhaustion ... means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Hernandez v. Coffey,* 582 F.3d 303, 305 (2d Cir. 2009) (quoting *Woodford,* 548 U.S. at 90). "The exhaustion inquiry thus requires that we look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal,* 558 F.3d at 124. Furthermore, factual disputes related to administrative exhaustion are properly resolved by the Court, not by the jury. *See Messa v. Goord,* 652 F.3d 305, 309 (2d Cir. 2011).

**\*4** Under the IGP, an inmate must exhaust all available administrative remedies by completing all three steps before filing suit in federal court, and "only after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted." *Laguna v. Kwan,* No. 13-cv-7079 (VB), 2015 WL 872366, at \*3 (S.D.N.Y. Jan. 28, 2015) (quoting *Gardner v. Daddezio,* No. 07-cv-7201 (SAS), 2008 WL 4826025, at \*2 (S.D.N.Y. Nov. 5, 2008)). Here, under the IGP's three-step procedure, Plaintiff was initially required to file a grievance with the IGRC within twenty-one calendar days of the October 31 Incident, that is, no later than November 21, 2009. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(a)-(b). Even assuming Plaintiff filed such a grievance, and even assuming he received no response, as he alleges (Counter Stmt. ¶ 8), Plaintiff was required to complete steps two and three as well – appealing both to the superintendent and to the CORC if the superintendent had adversely disposed of his grievance or failed to timely respond. N.Y. Comp. Codes R. & Regs., tit. 7, §§ 701.5(c)-(d), 701.6(g); *see also Heyliger,* 624 Fed.Appx. at 782 (noting that if a decisionmaker fails to timely respond to a grievance under the IGP, the inmate must appeal to the next step in order to properly exhaust).

As noted above, Defendants contend that no grievance was ever filed by Plaintiff regarding the October 31 Incident, and, as proof of that fact, point to the Hotaling Declaration, which indicates that a diligent search found no records of such grievance in Green Haven's records, and the Hale Declaration, which also attests that a diligent search of the CORC's database of appeals turned

up no grievances relating to the claims in this case. (Hotaling Decl. ¶ 2; Hale Decl. ¶ 9.)[4] And while Defendants acknowledge that Plaintiff sent a complaint to the Inspector General, Defendants note, correctly, that the submission to the Inspector General did not constitute a proper appeal. *See Dabney,* 604 Fed.Appx. at 3. Accordingly, Defendants have "adequately supported the affirmative defense of failure to exhaust." *See, e.g., Bennett v. Onua,* No. 09-cv-7227 (SAS), 2010 WL 2159199, at \*3 (S.D.N.Y. May 26, 2010) (finding that defendants discharged their initial burden on summary judgment by producing affidavits that a search of prison records indicated that no grievances were ever filed).

[4]     Although Plaintiff urges the Court to disregard Ms. Hotaling's declaration because it is not based on her personal knowledge and contains hearsay (Opp'n 4-5), the Court is unpersuaded by this argument. Here, Defendants may offer Ms. Hotaling's declaration pursuant to Rule 803(10), which exempts from the hearsay bar statements offered to prove the absence of a public record after a diligent search in order to prove that a matter did not occur, where "a public office regularly kept a record or statement for a matter of that kind." Fed. R. Evid. 803(10)(A)(ii). Ms. Hotaling attests to being familiar with Green Haven's grievance record retention system in her capacity as inmate records coordinator. (Hotaling Decl. ¶¶ 1, 3.) She also attests that grievance records were "maintained and kept as records in the ordinary course of operations at Green Haven" pursuant to the facility's "policy and procedure." (*Id.* at ¶ 3) Accordingly, Defendants may offer Ms. Hotaling's declaration for the purpose of proving that Plaintiff never filed a grievance with the IGRC. The fact that Ms. Hotaling did not herself conduct the search, but merely directed that it be conducted, is also not a basis for striking the declaration. *See Davis v. U.S. Dep't of Homeland Sec.,* No. 11-cv-203 (ARR) (VMS), 2013 WL 3288418, at \*7 (E.D.N.Y. June 27, 2013) ("[D]istrict courts within this circuit ... have found an official with broader supervisory authority who is not necessarily involved in the specific search for the records at issue to be capable of submitting a sufficient declaration."(collecting cases)). Furthermore, the fact that Ms. Hotaling did not attest to having been a "custodian" of Green Haven's records is also no reason to exclude her affidavit. *See United States v. Parker,* 761 F.3d 986, 992 (9th Cir. 2014); *United States v. McDonald,* 905 F.2d 871, 875 (5th Cir. 1990).

**\*5** For his part, Plaintiff has failed to produce a copy of his grievance and has introduced no other evidence, beyond his own testimony, that his grievance was actually filed pursuant to the IGP. Moreover, even if Plaintiff's testimony were enough to create a disputed issue of fact with respect to whether he filed a grievance form with the IGRC at Green Haven (Counter Stmt. ¶¶ 5, 12; Doc. No. 65-1 ("Khudan Decl.") ¶ 5; Khudan Dep. 7:21-23, 8:9-10), he fails to point to evidence that he properly appealed his grievance to the superintendent at step two. As noted above, Plaintiff was required to complete the appeal section on his IGRC response form and submit it to the grievance clerk. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(c). In his deposition, Plaintiff claimed that he "tried to speak with the [s]uperintendent about the grievance," but that unnamed officers in his unit deterred him from doing so through threats. (Counter Stmt. ¶ 27 (citing Khudan Dep. 15:5-17).) But the law is clear that prisoners "cannot satisfy the PLRA's exhaustion requirement solely by ... making informal complaints" to prison staff. *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir. 2007); *see also Bolton v. City of New York,* No. 13-cv-5749 (RJS), 2015 WL 1822008, at \*2 (S.D.N.Y. Apr. 20, 2015) ("The law is well settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient" to satisfy the "PLRA exhaustion requirement." (collecting cases)). Furthermore, although Plaintiff asserts that he never received a response to his grievance (Counter Stmt. ¶ 25), he was still required to appeal to the superintendent. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.6(g); *see also Heyliger,* 624 Fed.Appx. at 782. Accordingly, the Court concludes, as a matter of law, that Plaintiff failed to complete step two of the three-step IGP.

Plaintiff similarly fails to create a genuine dispute of fact as to whether he completed step three of the IGP – the filing of an appeal to the CORC. In his affidavit, Plaintiff makes no mention of submitting an appeal to the CORC, but curiously characterizes his complaint to the Inspector General's Office as his "effort to appeal to the highest level of the grievance process" (Doc. No. 65-1 ¶ 9), even though appeals to the Inspector General's Office are "not a formal part of the IGP," *Dabney,* 604 Fed.Appx. at 3. At his deposition, Plaintiff asserted that he sent an appeal of his grievance to "Albany" (Khudan Dep: 16:10-14), but Plaintiff fails to specify where in Albany he sent his grievance and fails to provide any other details, including the approximate date he submitted his appeal and whether

he properly used a "notice of decision to appeal" form. Relying entirely on this vague and confusing deposition testimony, Plaintiff argues that he submitted his grievance to the CORC, which Plaintiff asserts is located in Albany. (Opp'n 5-6.)

While the Court recognizes that it "cannot resolve issues of credibility on summary judgment," it nonetheless finds that Plaintiff's "self-serving" and "incomplete" testimony that he sent an appeal to "Albany" is insufficient to create a *genuine* dispute of fact, particularly in light of Defendants' evidence that no grievance was ever sent to the CORC and Plaintiff's testimony that his complaint to the Inspector General was his "effort to appeal" his grievance. *See Lozada v. Delta Airlines, Inc.,* No. 13-cv-7388 (JPO), 2014 WL 2738529, at \*5 (S.D.N.Y. June 17, 2014) (concluding that plaintiff's "self-serving, incomplete, and inconsistent" deposition testimony was "not sufficient to create a genuine dispute of fact in light of [defendant's] documented evidence"); *see also Deebs v. Alstom Transp., Inc.,* 346 Fed.Appx. 654, 656-57 (2d Cir. 2009) (affirming grant of summary judgment where "plaintiffs rel[ied] almost exclusively upon" their "speculative" and "vague" testimony in the face of defendants' documentary evidence); *Toro v. City of New York,* No. 12-cv-4093 (RRM) (RLM), 2015 WL 1014044, at \*5 (E.D.N.Y. Mar. 6, 2015) (granting summary judgment where "there is no evidence – beyond the allegations in his complaint and his own unsupported deposition testimony – that [plaintiff] actually reported such misconduct to the authorities"). Accordingly, the Court concludes as a matter of law that Plaintiff failed to complete step three of the IGP. Because Plaintiff failed to complete steps two and three of the IGP process, the Court thus finds that Plaintiff failed to properly exhaust administrative remedies under the IGP.

Plaintiff fares no better with his argument that the IGP's grievance process was not "available" to him at Green Haven. In June, the Supreme Court forcefully rejected judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *Ross,* 136 S. Ct. at 1858-59. As the Supreme Court clarified, an inmate's failure to exhaust may only be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Id.* The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief" and

therefore constructively unavailable. *Id.* at 1859. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross,* 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.; see also Booth v. Churner,* 532 U.S. 731, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Ross,* 136 S. Ct. at 1859. To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, a grievance process is unavailable "when prison administrators thwart inmates from taking advantage of [it] through machination, misrepresentation, or intimidation." *Id.* at 1860. While the Second Circuit has suggested that these scenarios are merely illustrative and "not ... exhaustive," these illustrations nonetheless guide the Court's inquiry. *See Williams v. Correction Officer Priatno,* ___ F.3d ____, No. 14-4777, 2016 WL 3729383, at *4 n.2 (2d Cir. July 12, 2016).

**\*6** Here, Plaintiff essentially asserts the third scenario, alleging that prison officials routinely interfered with his attempts to file grievances. However, much of Plaintiff's Rule 56.1 Counterstatement relies on inadmissible hearsay. For example, Plaintiff attests that he "was informed by other [unnamed] inmates that grievances routinely go 'missing' and are not responded to" at Green Haven. (Counter Stmt. ¶ 7 (citing Khudan Decl. ¶ 7).) Plaintiff also maintains that he was warned on November 23, 2009 by an unidentified officer from the Inspector General's Office not to file a grievance because "in this facility, the officers ... will set you up" and "hurt you." (*Id.* ¶ 33 (citing Khudan Dep. 16:14-22).) Because Plaintiff offers these out-of-court statements in order "to prove the truth of the matter asserted" in them, Fed. R. Evid. 801(c)(2), and because these statements do not qualify for any exceptions to the hearsay rules, such testimony is not cognizable on summary judgment and will not be considered by the Court, *see, e.g. ABB Indus. Sys., Inc. v. Prime Tech., Inc.,* 120 F.3d 351, 357 (2d Cir. 1997) (noting that hearsay that is inadmissible at trial is not cognizable on summary judgment motion); *Baity v. Kralik,* 51 F. Supp. 3d 414, 419-20 (S.D.N.Y.

2014) (disregarding plaintiff's affidavit that "contain[ed] a surfeit of improper averments, including statements not based on Plaintiff's personal knowledge and conclusory statements that are nothing more than speculation," including an averment that corrections officer "developed a reputation for missing time during his probationary period").

Plaintiff also claims that certain unnamed officers in Green Haven "ransacked" his room, tampered with his grievances and his mail, and threatened to kill him when he attempted to learn the status of his grievance from the superintendent and other officers. (Counter Stmt. ¶¶ 6, 15-16, 23-24, 26-28, 32; *see also* Khudan Dep. 6:24-7:5, 11:11-12, 11:14-21, 13:12-16.) However, Plaintiff fails to specify the dates of any threats, the names of any officers who threatened him, and the locations in Green Haven where these alleged threats took place. Courts generally review claims of "retaliation by prisoners 'with skepticism' because of the ease with which a retaliation claim may be fabricated." *Bolton,* 2015 WL 1822008, at *2 (quoting *Nunez v. Goord,* 172 F. Supp. 2d 417, 431 (S.D.N.Y. 2001)). Thus, it is well settled that "[c]onclusory allegations of intimidation are not sufficient" to create a genuine disputed issue of fact regarding the availability of administrative remedies. *See, e.g., Hooks v. Howard,* No. 907-cv-0724 (TJM) (RFT), 2010 WL 1235236, at *5 n.3 (N.D.N.Y. Mar. 30, 2010) (collecting cases). Accordingly, Plaintiff's accusations, which "stand alone" and are "unsupported," are insufficient to withstand summary judgment. *See Bolton,* 2015 WL 1822008, at *2; *accord Heyliger v. Gebler,* No. 06-cv-6220 (FPG), 2014 WL 4923140, at *3 (W.D.N.Y. Sept. 30, 2014) (granting summary judgment, notwithstanding plaintiff's testimony that his "original grievance was discarded by prison officials," where plaintiff "never described or named the individual who allegedly took this action"), *aff'd,* 624 Fed.Appx. 780 (2d Cir. 2015); *Litchmore v. Williams,* No. 11-cv-7546 (DAB) (JCF), 2013 WL 3975956, at *6 (S.D.N.Y. Aug. 5, 2013) (granting summary judgment where there was "no evidence" that "plaintiff's appeal was actually mailed, intercepted, or ignored" and no "evidence of any particular officer's misconduct"); *Bennett v. James,* 737 F. Supp. 2d 219, 226 (S.D.N.Y. 2010) (granting summary judgment where plaintiff provided only "conclusory allegations" regarding unavailability of administrative remedies in his affidavit), *aff'd,* 441 Fed.Appx. 816 (2d Cir. 2011); *Rosado v. Fessetto,* No. 9:09-cv-67 (DNH) (ATB), 2010 WL 3808813, at *7

(N.D.N.Y. Aug. 4, 2010) ("Courts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *report and recommendation adopted,* 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010); *Winston v. Woodward,* No. 05-cv-3385 (RJS), 2008 WL 2263191, at *9 (S.D.N.Y. May 30, 2008) (granting summary judgment where plaintiff failed to "specify the dates of [officers'] alleged misconduct, the details of the particular incidents of threats and harassment, the officers who allegedly made threatening or harassing statements, or a copy of the alleged appeal that Plaintiff claims he sent through the mail that was, as he claims, fraudulently tampered with"); *Veloz v. New York,* 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (granting summary judgment where, "[e]ven assuming [plaintiff] did submit the grievances," plaintiff "offer[ed] no evidence that any particular officer thwarted his attempts to file," and instead, "simply contend[ed] that the practice of destroying or misplacing grievances must have been the cause of his grievances being lost"), *aff'd,* 178 Fed.Appx. 39 (2d Cir. 2006).

**\*7** With respect to the other two "scenarios" identified in *Ross,* Plaintiff has not argued, nor pointed to any admissible evidence, that the IGP operated as a simple dead end – "with officers unable or consistently unwilling to provide any relief to aggrieved inmates" – or that it was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially 'unknowable.' " *Ross,* 136 S. Ct. at 1859. Although the Second Circuit recently found that certain grievance procedures under the IGP met this latter standard, the court's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams,* 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams,* who was housed in a special housing unit and segregated from the regular prison population, gave his grievance complaint to a correction officer to file on his behalf. *Williams,* 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.,* and because the Second Circuit concluded that the applicable grievance

regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the district court's dismissal for failure to exhaust. Here, by contrast, Plaintiff asserts that he filed his grievance with Green Haven's IGRC. (Opp'n 4.) And while Plaintiff claims that his grievance received no response, the IGP clearly required him to properly appeal the IGRC's failure to respond to the superintendent and ultimately to the CORC. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.6(g); *Heyliger,* 624 Fed.Appx. at 782. Given this unambiguous directive, Plaintiff has clearly failed to show that the IGP was "essentially unknowable." *See Ross,* 136 S. Ct. at 1859.

In light of the fact that none of the exceptional scenarios outlined by the Supreme Court in *Ross* apply, the Court concludes that Plaintiff has failed to establish a genuine dispute of material fact regarding the availability of administrative remedies at Green Haven. Therefore, the Court grants Defendants' motion for summary judgment.

## IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that Defendants' motion for summary judgment is granted. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis,* any appeal would not be taken in good faith. *See Tavarez v. Reno,* 54 F.3d 109, 110 (2d Cir. 1995) (instructing that *in forma pauperis* status should be denied for the purpose of an appeal where the appeal would "lack ... an arguable basis in law or fact"). The Clerk is respectfully directed to terminate the motion pending at docket number 59 and to close this case.

SO ORDERED.

Dated: September 8, 2016.

**All Citations**

Slip Copy, 2016 WL 4735364

---